KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
David M. Friedman (DF-4278)
Daniel B. Goldman (DG-4503)
Andrew K. Glenn (AG-9934)
Jonathan E. Minsker (JM-8535)
1633 Broadway
New York, New York 10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

Counsel for the Official Committee
of Unsecured Creditors as to all claims
except for claims against Defendants
Citibank, N.A.; Citicorp USA, Inc.;
Citigroup Financial Products, Inc.;
Citigroup Global Markets Holdings, Inc.;
CIBC, Inc.; CIBC World Markets Corp.;
Rabobank Nederland, New York; and
Key Bank of New York

KLEE, TUCHIN, BOGDANOFF
  & STERN LLP
David M. Stern (DS-3689)
Martin R. Barash (MB-2251)
Edward T. Attanasio (EA-1488)
2121 Avenue of the Stars
33rd Floor
Los Angeles, California 90067
Tel:  (310) 407-4000
Fax:  (310) 407-9090

Counsel for the Official Committee
of Unsecured Creditors as to all claims against
Defendants Citibank, N.A.; Citicorp USA, Inc.;
Citigroup Financial Products, Inc.;
Citigroup Global Markets Holdings, Inc.;
CIBC, Inc.; CIBC World Markets Corp.;
Rabobank Nederland, New York; and
Key Bank of New York

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| In re ) | Chapter 11 Cases |
| ) | |
| ADELPHIA COMMUNICATIONS CORP., et al., ) | Case No. 02-41729 (REG) |
| a Delaware corporation, ) | |
| ) | |
| Debtors. ) | (Jointly Administered) |
| _____ ) | |
| ADELPHIA COMMUNICATIONS CORP. AND ) | Adversary Proceeding |
| ITS AFFILIATED DEBTORS AND DEBTORS IN ) | No. _____ |
| POSSESSION and OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF ADELPHIA ) | |
| COMMUNICATIONS CORP., ) | |
| ) | **COMPLAINT** |
| Plaintiffs, ) | |
| ) | **Jury Trial Demanded** |
| vs. ) | |
| ) | |
| BANK OF AMERICA, N.A. *et al.* ) | |
| ) | |
| _____ ) | |

# TABLE OF CONTENTS

SUMMARY OF ACTION .................................................................................................. 9

JURISDICTION AND VENUE ..................................................................................... 15

THE PARTIES AND OTHER KEY PARTICIPANTS ............................................ 16

    The Agent Banks And The Investment Banks ................................................ 20

    The Non-Agent Banks ...................................................................................... 31

    The Non-Co-Borrowing Banks ....................................................................... 37

    The Assignees ................................................................................................... 42

    The Rigas Family Entities ............................................................................... 79

FACTS ............................................................................................................................ 81

    A. The Rigas Family's Ownership And Control Of The Debtors. .................... 81

    B. The Debtors' Credit Facilities. .................................................................... 83

        1. The Non-Co-Borrowing Facilities. .................................................... 83

a.  The Frontiervision Credit Facility. .................................................... 83

b.  The Parnassos Credit Facility. .......................................................... 85

c.  The Century-TCI Credit Facility. ...................................................... 86

2. The Co-Borrowing Facilities. ............................................................. 87

a.  The UCA/HHC Co-Borrowing Facility. ............................................ 87

b.  The CCH Co-Borrowing Facility. ..................................................... 89

c.  The Olympus Co-Borrowing Facility. ............................................... 93

C. The Rigas Family Used The Co-Borrowing Facilities To Loot The Debtors. ........... 97

1.  The Unprecedented Structure Of The Co-Borrowing Facilities. ................... 97

2.  The Debtors And The Rigas Family Intended That The Co-Borrowing
Facilities Would Be Used For Fraudulent Purposes. ............................... 98

a.  UCA/HHC. ..................................................................................... 98

b.  CCH. ............................................................................................. 100

c.  Olympus. ....................................................................................... 101

3. The Fraudulent Uses Of The Co-Borrowing Facilities By The Rigas
Family. ................................................................................................ 102

a.  The Rigas Family's Purchase Of $1.9 Billion Of Adelphia
Securities. ..................................................................................... 102

b.  The Debtors' Payment Of $252 Million Of Margin Loans On
Behalf Of The Rigas Family. ......................................................... 103

c.  The Rigas Family's Purchase Of $710 Million Of Cable
Systems. ........................................................................................ 103

d.  Other Uses By The Rigas Family Of Funds From The Co-
Borrowing Facilities. .................................................................... 104

4.  The Rigas Family's Fraudulent Use Of Non-Co-Borrowing Facilities. ....... 105

D. The Rigas Family Concealed From Creditors Other Than Defendants The True
Amount Outstanding Under The Co-Borrowing Facilities. ............................... 106

1. The Debtors Simply Omitted The RFE Uses Of The Co-Borrowing
Facilities And Other Amounts From Their Balance Sheets. ................... 106

2. The Fraudulent Use Of The CMS. ............................................................. 107

3. The Rigas Family Falsely Created The Appearance Of A
"Deleveraging". ................................................................................... 108

E. Defendants Knew Of Or Recklessly Disregarded The Fraud. ................................ 110

1. The Rigas Family Specifically Informed Defendants Of Their Fraudulent Activities. .............................................................. 110

2. Defendants Knew That The Rigas Family Concealed The Debtors' Co-Borrowing Debt. ..................................................................... 111

3. Defendants Knew That The Rigas Family Was Using The CMS To Facilitate The Fraud. .......................................................... 113

4. Defendants Knew That The Proceeds Of The Non-Co-Borrowing Facilities Were Used For Fraudulent Purposes. ..................................... 114

F. Many Defendants Assisted In, Or Recklessly Ignored, The Rigas Family's Fraud To Garner Enormous Fees. ...................................... 115

1. The Unity Of Interest Between Each Agent Bank And Its Affiliated Investment Bank. ..................................................... 115

2. The Agent Banks And Investment Banks' Close Relationship With The Debtors And The Rigas Family. ......................................... 119

G. Defendants Rewarded The Rigas Family With Extensive Margin Loans. ............... 127

H. The Investment Banks' Fraudulent Solicitation Of The Debtors' Notes. ................. 127

I. The Fraud Is Disclosed. ................................................................. 130

J. The Inevitable Result Of The Fraud: The Debtors File Chapter 11. ......................... 131

K. Indictment Of The Rigas Family. ........................................................ 131

FIRST CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders) ...................................................................... 132

SECOND CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders) ................................................................. 135

THIRD CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders) ................................................................. 137

FOURTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders) ......................................................... 140

FIFTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders) ........................................................................ 143

SIXTH CLAIM FOR RELIEF  (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders) ................................................................................................... 145

SEVENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders) ................................................................................................... 148

EIGHTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders) ................................................................................................... 151

NINTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders) ................................................................................................... 154

TENTH CLAIM FOR RELIEF  (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders) ................................................................................................... 156

ELEVENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders) ................................................................................................... 159

TWELFTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders) ................................................................................................... 162

THIRTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against Century-TCI Lenders) ................................................................................................... 165

FOURTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against Century-TCI Lenders) ................................................................................................... 166

FIFTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders) ................................................................................................... 168

SIXTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders) ................................................................................................... 170

SEVENTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet) ................... 172

EIGHTEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet) ................... 175

# TABLE OF CONTENTS
(continued)

NINETEENTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against Fleet) ....................... 176

TWENTIETH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548 And 550 Against Fleet)....................... 177

TWENTY-FIRST CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC).................. 178

TWENTY-SECOND CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC).................. 180

TWENTY-THIRD CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Key Bank) ........... 181

TWENTY-FOURTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Key Bank) ........... 183

TWENTY-FIFTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against BNS) ................... 184

TWENTY-SIXTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against BNS) ................... 186

TWENTY-SEVENTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS) ....................... 187

TWENTY-EIGHTH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS) ....................... 188

TWENTY-NINTH CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC).................. 189

THIRTIETH CLAIM FOR RELIEF (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC).................. 191

THIRTY-FIRST CLAIM FOR RELIEF (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against the Margin Lenders) ......................................................................................... 192

THIRTY-SECOND CLAIM FOR RELIEF (Violation of the Bank Holding Company Act Against the Agent Banks and the Investment Banks)............................. 195

THIRTY-THIRD CLAIM FOR RELIEF (Equitable Disallowance of Defendants' Claims or, Alternatively, Equitable Subordination Under 11 U.S.C. § 510(c) Against all Defendants) ................................................................................. 196

THIRTY-FOURTH CLAIM FOR RELIEF (Recharacterization of Debt as Equity Against the Co-Borrowing Lenders)............................................................. 202

THIRTY-FIFTH CLAIM FOR RELIEF (Recharacterization of Debt as Equity Against the Century-TCI Lenders) ............................................................. 203

THIRTY-SIXTH CLAIM FOR RELIEF  (Breach of Fiduciary Duty Against the Agent Banks and the Investment Banks) ................................................................. 205

THIRTY-SEVENTH CLAIM FOR RELIEF  (Aiding and Abetting Breach of Fiduciary Duty Against the Agent Banks and the Investment Banks).......................................... 207

THIRTY-EIGHTH CLAIM FOR RELIEF  (Aiding and Abetting Fraud Against the Agent Banks and the Investment Banks) .................................................... 210

THIRTY-NINTH CLAIM FOR RELIEF (Gross Negligence Against the Agent Banks)......... 212

FORTIETH CLAIM FOR RELIEF (Gross Negligence Against the Investment Banks).......... 214

FORTY-FIRST CLAIM FOR RELIEF (Declaratory Judgment Against the CCH Co-Borrowing Lenders) .............................................................. 216

FORTY-SECOND CLAIM FOR RELIEF (Declaratory Judgment Against the Olympus Co-Borrowing Lenders) .............................................................. 218

FORTY-THIRD CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547 and 550 Against the Century-TCI Lenders) ....... 219

FORTY-FOURTH CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547 and 550 Against the Parnassos Lenders) ............ 220

FORTY-FIFTH CLAIM FOR RELIEF (Unjust Enrichment Against the UCA/HHC Lenders) .................................................................................. 220

FORTY-SIXTH CLAIM FOR RELIEF (Unjust Enrichment Against the CCH Co-Borrowing Lenders) .............................................................. 222

FORTY-SEVENTH CLAIM FOR RELIEF (Unjust Enrichment Against the Olympus Lenders) .................................................................................. 223

FORTY-EIGHTH CLAIM FOR RELIEF (Equitable Estoppel Against the Co-Borrowing Lenders) .................................................................................. 224

FORTY-NINTH CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547, 550 and 551 Against the Frontiervision Lenders) .................................................................................. 227

FIFTIETH CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547 and 550 Against the CCH Lenders) ....................................... 229

FIFTY-FIRST CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547, 550 and 551 Against the Olympus Lenders) ........................ 229

FIFTY-SECOND CLAIM FOR RELIEF  (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547, 550 and 551 Against the UCA/HHC Lenders) .................................................................................. 231

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| In re ) | |
| ) | Chapter 11 Cases |
| ADELPHIA COMMUNICATIONS CORP., et al., ) | |
| a Delaware corporation, ) | Case No. 02-41729 (REG) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| _____ ) | |
| ADELPHIA COMMUNICATIONS CORP. AND ) | |
| ITS AFFILIATED DEBTORS AND DEBTORS IN ) | |
| POSSESSION and OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF ADELPHIA ) | |
| COMMUNICATIONS CORP., ) | |
| ) | |
| Plaintiffs, ) | Adversary Proceeding |
| ) | No. _____ |
| vs. ) | |
| ) | |
| BANK OF AMERICA, N.A., individually and as ) | |
| Agent for various banks party to credit agreements ) | |
| described herein; BANC OF AMERICA SECURITIES ) | **COMPLAINT** |
| LLC; BANK OF MONTREAL, individually and as ) | |
| Agent for various banks party to credit agreements ) | |
| described herein; BMO NESBITT BURNS CORP.; ) | |
| WACHOVIA BANK, NATIONAL ASSOCIATION ) | |
| (F/K/A FIRST UNION NATIONAL BANK), ) | **Jury Trial Demanded** |
| individually and as agent for various banks party to ) | |
| credit agreements described herein; WACHOVIA ) | |
| SECURITIES, INC. (F/K/A FIRST UNION ) | |
| SECURITIES, INC.); CITIBANK, N.A., individually ) | |
| and as Agent for various banks party to credit ) | |
| agreements described herein; CITICORP USA, INC., ) | |
| individually and as Agent for various banks party to ) | |
| credit agreements described herein; CITIGROUP ) | |
| GLOBAL MARKETS HOLDINGS, INC. (F/K/A ) | |
| SALOMON SMITH BARNEY HOLDINGS, INC.), ) | |
| D/B/A SALOMON SMITH BARNEY, INC; ) | |
| CITIGROUP FINANCIAL PRODUCTS, INC. (F/K/A ) | |
| SALOMON BROTHERS HOLDING CO., INC.); ) | |
| ABN AMRO BANK N.V., individually and as Agent ) | |
| for various banks party to credit agreements described ) | |
| herein; ABN AMRO SECURITIES LLC, BANK OF ) | |
| NEW YORK CO., INC., individually and as Agent for ) | |
| various banks party to credit agreements described ) | |

herein; BNY CAPITAL CORP.; THE BANK OF )
NOVA SCOTIA, individually and as Agent for various )
banks party to credit agreements described herein; )
SCOTIA CAPITAL (USA), INC.; BARCLAYS )
BANK PLC, individually and as Agent for various )
banks party to credit agreements described herein; )
BARCLAYS CAPITAL INC.; CIBC, INC., )
individually and as Agent for various banks party to )
credit agreements described herein; CIBC WORLD )
MARKETS CORP.; JP MORGAN CHASE & CO. )
(F/K/A CHASE MANHATTAN CORP.), individually )
and as Agent for various banks party to credit )
agreements described herein; CHASE SECURITIES, )
INC.; CREDIT LYONNAIS, NEW YORK BRANCH, )
individually and as Agent for various banks party to )
credit agreements described herein; CREDIT )
LYONNAIS SECURITIES (USA), INC.; CREDIT )
SUISSE FIRST BOSTON, NEW YORK BRANCH, )
individually and as Agent for various banks party to )
credit agreements described herein; CREDIT SUISSE )
FIRST BOSTON (USA) INC.; DEUTSCHE BANK )
AG (F/K/A BANKERS TRUST COMPANY), )
individually and as Agent for various banks party to )
credit agreements described herein; DEUTSCHE )
BANC ALEX BROWN, INC. (F/K/A BT ALEX )
BROWN, INC.); DLJ CAPITAL FUNDING, INC., )
individually and as Agent for various banks party to )
credit agreements described herein; DONALDSON, )
LUFKIN & JENRETTE, INC.; FLEET NATIONAL )
BANK, individually and as Agent for various banks )
party to credit agreements described herein; FLEET )
SECURITIES, INC.; MERRILL LYNCH CAPITAL )
CORP., individually and as Agent for various banks )
party to credit agreements described herein; MERRILL )
LYNCH & CO., INC.; MORGAN STANLEY )
SENIOR FUNDING, INC., individually and as Agent )
for various banks party to credit agreements described )
herein; MORGAN STANLEY & CO., INC.; PNC )
BANK CORP., individually and as Agent for various )
banks party to credit agreements described herein; )
PNC CAPITAL MARKETS, INC.; THE ROYAL )
BANK OF SCOTLAND, PLC, individually and as )
Agent for various banks party to credit agreements )
described herein; SOCIETE GENERALE, S.A., )
individually and as Agent for various banks party to )
credit agreements described herein; SG COWEN )

SECURITIES CORPORATION; SUNTRUST )
BANKS, INC., individually and As Agent for various )
banks party to credit Agreements described herein; )
SUNTRUST SECURITIES, INC.; TORONTO )
DOMINION (TEXAS), INC., individually and as )
Agent for various banks party to credit agreements )
described herein; TD SECURITIES (USA) INC.; THE )
FUJI BANK, LIMITED, individually and as Agent for )
various banks party to credit agreements described )
herein; THE MITSUBISHI TRUST AND BANKING )
CORPORATION, individually and as Agent for )
various banks party to credit agreements described )
herein; COOPERATIEVE CENTRALE )
RAIFFEISEN-BOERENLEEN BANK B.A. )
"RABOBANK NEDERLAND," NEW YORK )
BRANCH, individually and as Agent for various banks )
party to credit agreements described herein; )
BAYERISCHE LANDESBANK GIROZENTRALE; )
CREDIT INDUSTRIEL ET COMMERCIAL; )
CYPRESSTREE INVESTMENT FUND LLC; DEBT )
STRATEGIES FUND, INC.; DG BANK DEUTSCHE )
GENOSSENSCHAFTSBANK AG; FARMERS & )
MERCHANTS BANCORP INC.; FIFTH THIRD )
BANCORP; FIRST ALLMERICA FINANCIAL LIFE )
INSURANCE COMPANY; FIRSTAR BANK, N.A.; )
FOOTHILL INCOME TRUST II, L.P.; FRANKLIN )
FLOATING RATE TRUST; JACKSON NATIONAL )
LIFE INSURANCE COMPANY; KEMPER )
FLOATING RATE FUND; KZH CYPRESSTREE-1 )
LLC; KZH III LLC; KZH ING-2 LLC; KZH )
LANGDALE LLC; KZH PONDVIEW LLC; KZH )
SHOSHONE LLC; KZH WATERSIDE LLC; )
LIBERTY FLOATING RATE ADVANTAGE FUND )
(F/K/A LIBERTY-STEIN ROE ADVISOR )
FLOATING RATE ADVANTAGE FUND); )
MASTER SENIOR FLOATING RATE TRUST; )
MEESPIERSON CAPITAL CORP.; MELLON )
BANK, N.A.; MERRILL LYNCH SENIOR )
FLOATING RATE FUND, INC.; NATEXIS )
BANQUES POPULAIRES GROUP; NATIONAL )
CITY BANK OF PENNSYLVANIA; NORTH )
AMERICAN SENIOR FLOATING RATE FUND, )
INC.; OLYMPIC FUNDING TRUST, SERIES 1999; )
OPPENHEIMER SENIOR FLOATING RATE )
FUND.; PINEHURST TRADING INC.; PRINCIPAL )
LIFE INSURANCE COMPANY; RIVIERA )

FUNDING LLC; ROYAL BANK OF CANADA;　　）
SENIOR HIGH INCOME PORTFOLIO, INC.;　　）
STANWICH LOAN FUNDING LLC; STEIN ROE　）
FLOATING RATE LIMITED LIABILITY　　）
COMPANY; SUMITOMO MITSUI BANKING　　）
CORPORATION; THE DAI-ICHI KANGYO BANK, )
LTD.; THE INDUSTRIAL BANK OF JAPAN,　　）
LIMITED; THE TORONTO-DOMINION BANK;　）
U.S. BANK NATIONAL ASSOCIATION; UBS AG, )
STAMFORD BRANCH; UNITED OF OMAHA LIFE )
INSURANCE COMPANY; BANK BOSTON, N.A.;　）
BANK ONE, N.A.; BANQUE NATIONALE DE　　）
PARIS; BAYERISCHE HYPOUND VEREINSBANK )
AG; BNP PARIBAS; CITIZENS BANK OF RHODE )
ISLAND; CREDIT AGRICOLE INDOSUEZ;　　）
CREDIT LOCALE FRANCE -- NEW YORK　　）
AGENCY; DRESDNER BANK AG; FIRST　　）
HAWAIIAN BANK; FIRST NATIONAL BANK OF )
CHICAGO; FIRST NATIONAL BANK OF　　）
MARYLAND; GENERAL ELECTRIC CAPITAL　）
CORPORATION; GOLDMAN SACHS CREDIT　）
PARTNERS, L.P.; ING PRIME RATE TRUST　）
(F/K/A PILGRIM AMERICA PRIME RATE　　）
TRUST); KZH HOLDING CORPORATION III;　）
MANUFACTURERS AND TRADERS TRUST　）
COMPANY; MORGAN GUARANTY TRUST　　）
COMPANY; OCTAGON CREDIT INVESTORS　）
LOAN PORTFOLIO; PFL LIFE INSURANCE　　）
COMPANY; ROYALTON COMPANY; THE LONG- )
TERM CREDIT BANK OF JAPAN, LTD.; THE　）
TRAVELERS INSURANCE COMPANY; UNION　）
BANK OF CALIFORNIA, N.A.; VAN KAMPEN　）
AMERICAN CAPITAL PRIME RATE INCOME　）
TRUST; WEBSTER BANK; THE GOLDMAN　　）
SACHS & CO.; HSBC BANK USA; KEY BANK OF )
NEW YORK; ABBEY NATIONAL TREASURY　）
SERVICES; ADDISON CDO, LIMITED; AG　　）
CAPITAL FUNDING; AIM FLOATING RATE　　）
FUND; AIMCO CLO SERIES, 2000-A; AIMCO CLO )
SERIES, 2001-A; ALLSTATE INVESTMENTS,　）
LLC; ALLSTATE LIFE INSURANCE　CO.; ALPHA )
US FUND II, LLC; AMARANTH FUND, L.P.;　）
AMMC CDO I, LIMITED; AMMC CDO II, LTD.; )
APEX (IDM) CDO LTD.; APEX (TRIMARAN) CDO )
I, LTD.; ARCHIMEDES FUNDING II, LTD.;　）
ARCHIMIDES FUNDING III LTD.; ARES　　）

FINANCE-II LTD.; ARES CLO MANAGEMENT )
LLC; ARES LEVERAGED INVESTMENT FUND II, )
L.P.; ARES III CLO LTD.; ARES IV CLO LTD.; )
ARES V CLO LTD.; ARES VI CLO LTD.; ATHENA )
CDO LIMITED; AURUM CLO 2002 – LTD.; )
AVALON CAPITAL LTD.; AVALON CAPITAL )
LTD. 2; B & W MASTER TOBACCO FUND; )
BALANCED HIGH YIELD FUND II LTD.; )
BALLYROCK CDO I LIMITED; BEAR STEARNS )
INVESTMENT PRODUCTS; BEAR, STEARNS & )
CO.; BLUE SQUARE FUNDING SERIES 3; )
BOSTON INCOME PORTFOLIO; BROAD )
FOUNDATION; CALIFORNIA PUBLIC )
EMPLOYEES RETIREMENT SYSTEM; CAPTIVA )
IV FINANCE LTD.; CARAVELLE INVESTMENT )
FUND II, L.L.C.; CARLYLE HIGH YIELD )
PARTNERS II, LTD.; CENTURION CDO II LTD.; )
CENTURION CDO III, LIMITED; CENTURY )
INTEREST; CENTURY POST PETITION )
INTEREST; CERES II FINANCE LTD.; CHARTER )
VIEW PORTFOLIO; CIGNA INVESTMENTS, INC.; )
CITADEL HILL 2000 LTD.; CLYDESDALE CLO )
2001-1 LTD.; COLUMBUS LOAN FUNDING LTD.; )
CONSTANTINUS EATON VANCE CDO V LTD.; )
CONTINENTAL CASUALTY COMPANY; CSAM )
FUNDING I; CSAM FUNDING II; D.E. SHAW & )
CO., LLC; D.E. SHAW LAMINAR PORTFOLIOS, )
LLC; DB STRUCTURED PRODUCTS, INC.; DEBT )
STRATEGIES FUND II; DEBT STRATEGIES )
FUND III; DELANO COMPANY #274; DZ BANK )
AG DEUTSCHE ZENTRAL-GENOSSENSCHAFTS- )
BANK; EATON VANCE CDO II LTD.; EATON )
VANCE INSTITUTIONAL SENIOR LOAN FUND; )
EATON VANCE MANAGEMENT; EATON VANCE )
SENIOR INCOME TRUST; ELC CAYMAN LTD.; )
ELC (CAYMAN) LTD. CDO SERIES 1999-I; ELC )
(CAYMAN) LTD. SERIES 1999-I; ELC CAYMAN )
LTD. 1999-III; ELC (CAYMAN) LTD. 2001-I; ELF )
FUNDING TRUST I; ELF FUNDING TRUST III; )
ELI BROAD; EMERALD ORCHARD LIMITED; )
ENDURANCE CLO I, LTD.; ERSTE BANK NEW )
YORK; EVERGREEN FUNDING LTD., CO.; FC )
CBO IV LTD.; FIDELITY ADVISOR FLOATING )
RATE HIGH INCOME FUND (161); FIDELITY )
ADVISORS SERIES II; FIDELITY CHARLES )
STREET TRUST; FIDELITY HIGH YIELD )

COLLECTIVE; FIDELITY SCHOOL STREET )
TRUST; FIRST DOMINION FUNDING I; FIRST )
DOMINION FUNDING II; FIRST DOMINION )
FUNDING III; FLAGSHIP CLO 2001-1; FLAGSHIP )
CLO II; FORTIS CAPITAL CORP.; FRANKLIN )
ADVISOR, INC.; FRANKLIN CLO I; FRANKLIN )
CLO II; FRANKLIN CLO III; FRANKLIN )
FLOATING RATE DAILY ACCESS FUND; )
FRANKLIN FLOATING RATE MASTER SERIES ; )
FRANKLIN FLOATING RATE TRUST; GALAXY )
CLO 1999-1 LTD.; GLENEAGLES TRADING LLC; )
GOLDENTREE LOAN OPPORTUNITIES I, LTD.; )
GOLDENTREE LOAN OPPORTUNITIES II, LTD.; )
GOLDENTREE HIGH YIELD MASTER FUND, )
LTD.; GOLDENTREE HIGH YIELD )
OPPORTUNITIES II, LTD.; GRAYSON & CO.; )
GREAT POINT CLO 1999-1; GREYSTONE CLO )
LTD.; GSC RECOVERY IIA, L.P.; GT HIGH YIELD )
VALUE MASTER FUND; HALCYON FUND, L.P.; )
HAMILTON CDO LTD.; HARBOUR TOWN )
FUNDING, LLC; HARBOURVIEW CDO II LTD.; )
HARBOURVIEW CLO IV, LTD.; HARCH CLO I, )
LTD.; HIGH INCOME PORTFOLIO; HIGHLAND )
LEGACY LIMITED; HIGHLAND LOAN FUNDING )
V, LTD.; HIGHLAND OFFSHORE PARTNERS; )
IBM WHITEHALL FUNDING 2001 TRUST; IDS )
LIFE INSURANCE COMPANY; INDOSUEZ )
CAPITAL FUNDING IIA, LTD.; INDOSUEZ )
CAPITAL FUNDING IV, L.P.; ING PILGRIM )
SENIOR INCOME FUND; ING SENIOR INCOME )
FUND; INVESTMENT FUND II LLC; )
INVESTMENT PARTNERS I; J.H. WHITNEY )
MARKET VALUE FUND, L.P.; JISSELKIKUN )
FUNDING, INC.; JUPITER LOAN FUNDING LLC; )
KATONAH I, LTD.; KATONAH II LTD.; )
KATONAH III LTD.; KING STREET CAPITAL, )
L.P.; KZH CNC LLC; KZH HIGHLAND-2 LLC; )
KZH ING-1 LLC; KZH ING-3 LLC; KZH PAMCO )
LLC; KZH SOLEIL LLC; KZH SOLEIL-2 LLC; KZH )
STERLING LLC; LANDMARK CDO LIMITED; )
LCM I LIMITED PARTNERSHIP; LEHMAN )
COMMERCIAL PAPER, INC.; LONGHORN CDO )
(CAYMAN) LTD.; LONGHORN II CDO )
(CAYMAN) LTD.; MAGNETITE ASSET )
INVESTORS L.L.C.; MERRILL LYNCH DEBT )
STRATEGIES FUND II, INC.; MERRILL LYNCH )

GLOBAL INVESTMENT SERIES: INCOME )
STRATEGIES PORTFOLIO; MIZUHO )
CORPORATE BANK, LTD.; ML CLO XV PILGRIM )
AMERICA (CAYMAN) LTD.; ML CLO XX )
PILGRIM AMERICA (CAYMAN) LTD.; )
MONUMENT CAPITAL LTD.; MORGAN )
STANLEY EMERGING MARKETS, INC.; )
MORGAN STANLEY PRIME INCOME TRUST; )
MOUNTAIN CAPITAL CLO I; MOUNTAIN )
CAPITAL CLO II; MUIRFIELD TRADING, LLC; )
MUZINICH CASHFLOW CBO II LTD.; MW POST )
OPPORTUNITY OFFSHORE FUND; MW POST )
PORTFOLIO FUND; NATIONWIDE LIFE AND )
ANNUITY INSURANCE COMPANY; )
NATIONWIDE MUTUAL INSURANCE )
COMPANY; NEMEAN CLO LTD.; NEW )
ALLIANCE GLOBAL CDO, LIMITED; NEW YORK )
LIFE INSURANCE AND ANNUITY CO.; NOMURA )
BOND & LOAN FUND; NORTHWOODS )
CAPITAL, LTD.; NORTHWOODS CAPITAL II, )
LTD.; NORTHWOODS CAPITAL III, LTD.; )
NUVEEN FLOATING RATE FUND; NUVEEN )
SENIOR INCOME FUND; OAK HILL CLO )
MANAGEMENT I LLC; OAK HILL CREDIT )
PARTNERS I LIMITED; OAK HILL FUND II, LTD.; )
OAK HILL SECURITIES FUND, L.P.; )
OPPORTUNITY FUND, LLC; ORYX CLO, LTD.; )
OWL CREEK ASSET MANAGEMENT, L.P.; )
OXFORD STRATEGIC INCOME FUND; PACIFICA )
PARTNERS I, L.P.; PAM CAPITAL FUNDING L.P.; )
PAMCO CAYMAN LTD.; PERRY PRINCIPLES )
LLC; PHOENIX-GOODWIN HIGH YIELD FUND; )
PILGRIM CLO 1999-1 LTD.; PILGRIM SENIOR )
INCOME FUND; PIMCO CORPORATE INCOME )
FUND; POST BALANCED FUND, L.P.; POST )
HIGH YIELD L.P.; POST OPPORTUNITY FUND, )
L.P.; POST OPPORTUNITY OFFSHORE FUND; )
PPM SHADOW CREEK FUNDING LLC; PPM- )
SPYGLASS FUNDING TRUST; PROVIDENCE )
CAPITAL LLC; PRUDENTIAL INSURANCE )
COMPANY OF AMERICA; PUTNAM )
DIVERSIFIED INCOME TRUST; PUTNAM HIGH )
YIELD ADVANTAGE FUND; PUTNAM HIGH )
YIELD TRUST; PUTNAM MASTER INCOME )
TRUST; PUTNAM MASTER INTERMEDIATE )
INCOME TRUST; PUTNAM PREMIER INCOME )

TRUST; PUTNAM VARIABLE TRUST – PVT )
DIVERSIFIED INCOME FUND; PUTNAM )
VARIABLE TRUST – PVT HIGH YIELD FUND; )
QDRF MASTER LTD.; QUANTUM PARTNERS )
LLC; RACE POINT CLO, LIMITED; REDWOOD )
MASTER FUND, LTD.; RELIANCE STANDARD )
LIFE INSURANCE COMPANY; RESTORATION )
FUNDING CLO LTD.; ROSEMONT CLO, LTD.; )
SAFETY NATIONAL CASUALTY CORP.; )
SANKATY HIGH YIELD PARTNER II, L.P.; )
SATELLITE SENIOR INCOME FUND, LLC; )
SAWGRASS TRADING LLC; SCUDDER )
FLOATING RATE FUND; SEABOARD CLO 2000 )
LTD.; SENECA CAPITAL, L.P.; SENIOR DEBT )
PORTFOLIO; SEQUILLS – CENTURION V LTD.; )
SEQUILS-ING (HBDGM) LTD.; SEQUILS- )
LIBERTY, LTD.; SEQUILS-MAGNUM LTD.; )
SEQUILS-PILGRIM I, LTD.; SIERRA CLO I LTD.; )
SIGNATURE 1A (CAYMAN), LTD.; )
SKANDINAVISKA ENSKILDA BANKEN (AB); SL )
LOANS I LIMITED; SOF INVESTMENTS, L.P.; )
SPRUGOS INVESTMENTS IV, LLC; SRF 2000 )
LLC; SRS STRATEGIES (CAYMAN), L.P.; SRV- )
HIGHLAND, INC.; STANFIELD ARBITRAGE CDO )
LTD.; STANFIELD CLO, LTD.; STANFIELD )
QUATTRO CLO, LTD.; STANFIELD RMF )
TRANSATLANTIC CDO LTD.; STATE OF SOUTH )
DAKOTA RETIREMENT SYSTEM; STEIN ROE & )
FARNHAM CLO I LTD.; STEPHEN ADAMS )
LIVING TRUST; SUNAMERICA SENIOR )
FLOATING RATE, INC.; SYNDICATED LOAN )
FUNDING TRUST; THE ING CAPITAL SENIOR )
SECURED HIGH INCOME HOLDINGS FUND, )
LTD.; THE PRESIDENT & FELLOWS OF )
HARVARD COLLEGE; THIRD AVENUE TRUST; )
THRACIA LLC; TRAVELERS CORPORATE LOAN )
FUND, INC.; TRYON CLO LTD. 2000-1; TUSCANY )
CDO LTD.; TYLER TRADING, INC.; UNIVERSITY )
OF CHICAGO; VAN KAMPEN PRIME RATE )
INCOME TRUST; VAM KAMPEN SENIOR )
FLOATING RATE FUND; VAM KAMPEN SENIOR )
INCOME TRUST; VENTURE CDO 2002, LIMITED; )
WESTMINSTER BANK PLC; WHITNEY PRIVATE )
DEBT FUND, L.P.; WINDSOR LOAN FUNDING, )

LIMITED; WINGED FOOT FUND TRUST; JOHN  )
DOE NOS. 1-100; and JOHN DOE, INC. NOS. 1-100,)
                                          )
                    Defendants.           )
_____  )

Plaintiffs, Adelphia Communications Corporation ("Adelphia") and its affiliated debtors and debtors in possession in case numbers 02-12834 (REG) through 02-41957 (REG) (the "Debtors") and the Official Committee of Unsecured Creditors of Adelphia Communications Corporation and its affiliated debtors (the "Committee"), for their complaint against Defendants, allege, upon information and belief, as follows:

## SUMMARY OF ACTION

1.     This action seeks to redress Defendants' knowing participation, substantial assistance and complicity in one of the most serious cases of systematic corporate looting and breach of fiduciary duty in American history.

2.     The fraud at Adelphia and its affiliated Debtors did not involve any sophisticated accounting gimmicks.  To the contrary, it involved simple larceny, but on a massive scale.  The Rigas Family[1] used the Debtors as its piggy bank to fund personal expenses at will and to maintain voting control over Adelphia.  The Rigas Family siphoned away over $3.4 billion from the Debtors -- <u>funds knowingly and eagerly loaned by Defendants</u> -- rendering the Debtors bankrupt and insolvent.

---

[1]     Capitalized terms not defined in the Summary of Action are defined infra.

3.        The Rigas Family's scheme could not have succeeded without Defendants' assistance. Certain of the Defendants -- the Co-Borrowing Lenders -- funded the fraud by extending undisclosed senior loans to the Rigas Family secured by the Debtors' assets. Other Defendants -- the Investment Banks, each of which was affiliated with a Co-Borrowing Lender -- solicited the purchase of debt and equity securities junior in right of payment to their senior loans without disclosing the pervasive fraud suffusing the Debtors' business.

4.        The Rigas Family's principal tools in their fraudulent scheme, and their primary source of ill-gotten gains from that scheme, were the syndicated loans known as "Co-Borrowing Facilities." The structure of those facilities was unprecedented for a major public company such as Adelphia: each "co-borrower" -- whether an indirect Adelphia subsidiary or an unaffiliated entity owned by the Rigas Family -- could borrow the entire amount of the facilities (up to approximately $5.6 billion) without regard to its ability to repay and with all other co-borrowers being jointly and severally liable to repay the loans.

5.        Neither the Rigas Family nor the Co-Borrowing Lenders created a borrowing structure that held the respective co-borrowers accountable based on appropriate borrowing capacity, actual borrowings and their balance sheets. No attempt was made to recognize -- much less respect -- the corporate separateness and disparate financial resources of the Debtors and entities owned by the Rigas Family. Instead, the Rigas Family and certain of the Co-Borrowing Lenders structured the Co-Borrowing Facilities knowing that entities controlled by the Rigas Family were entitled to draw -- and in fact did draw -- billions of dollars under the Co-Borrowing Facilities; that such entities owned a disproportionately small amount of the assets from which the Co-Borrowing Lenders could realistically expect repayment; and that such

entities in fact would not be able to repay their borrowings, but instead would saddle the Debtors with a massive bill for loans that the Debtors did not utilize.

6.        The primary purpose and the plain effect of each of the Co-Borrowing Facilities at issue in this action was to use the Debtors' assets to give the Rigas Family access to billions of dollars that only the Debtors would have the wherewithal to repay, and to enable the Rigas Family to maintain control over the Debtors by using a substantial portion of those dollars to acquire Adelphia stock and other securities.  The very structure of the Co-Borrowing Facilities -- a structure that the Co-Borrowing Lenders created and approved -- provided the principal means by which the Rigas Family's looting could and did occur.  Moreover, the Co-Borrowing Lenders actually knew or recklessly disregarded the fact that the looting occurred as soon as the Co-Borrowing Facilities closed and that it continued thereafter.

7.        Defendants knew that the Rigas Family used the proceeds of the Co-Borrowing Facilities and other loans made available to them to enrich themselves at the Debtors' expense and to maintain voting control of Adelphia.  The Rigas Family used the Co-Borrowing Lenders' funds to, among other things:

- acquire nearly $2 billion of securities issued by Adelphia and underwritten by certain of the Defendant Investment Banks;

- repay approximately $252 million of margin loans owed by Highland Communications, an entity owned by the Rigas Family, to certain of the Defendants' private banking or brokerage affiliates;

- acquire for its own account more than $700 million in cable television systems;

- fund expenses related to its privately-held Buffalo Sabres professional hockey team;

- construct a golf course on land owned by the Rigas Family; and

- cause the Debtors to enter into fraudulent transactions with certain Rigas Family-owned businesses.

These transactions did not benefit the Debtors. To the contrary, the Rigas Family designed these transactions to fraudulently secrete assets from the Debtors to the Rigas Family's personal interests.

8.      Each of the Defendants actually knew or recklessly disregarded the fact that the Rigas Family was using the Co-Borrowing Facilities to defraud the Debtors, their creditors and other stakeholders. Since well before the closing of the Co-Borrowing Facilities until shortly before the Debtors' bankruptcy filings, many of the Defendants provided significant underwriting, investment banking, advisory and other financial services to the Debtors and the Rigas Family. As a result of their extensive relationship with the Debtors and the Rigas Family, these Defendants obtained confidential information concerning the financial affairs of the Debtors and the Rigas Family. In addition, before each of the Co-Borrowing Facilities closed, the Rigas Family disclosed to the Co-Borrowing Lenders that hundreds of millions of dollars of the loan proceeds would be used to fund personal expenses and investments of the Rigas Family. Defendants knew, or recklessly chose to disregard, the intended fraudulent uses of the Co-Borrowing Facilities.

9.      Worse still, the Co-Borrowing Lenders lent the Debtors billions of dollars with knowledge or reckless disregard of the fact that the Rigas Family was causing the Debtors to fraudulently conceal from the public and other creditors up to $3.4 billion of their balance sheet liabilities under the Co-Borrowing Facilities. Indeed, while each of the Defendants had access to non-public information that disclosed the actual amount of Adelphia's liabilities under the Co-Borrowing Facilities and other bank debt, the Investment Banks induced other creditors

to loan the Debtors billions of dollars based on fraudulent financial statements that grossly understated such obligations. None of these financial statements disclosed the true amount of debt that had been drawn by the Rigas Family (but for which the Debtors were fully liable) under the Co-Borrowing Facilities. Despite their knowledge of the fraudulent structure of the Co-Borrowing Facilities and the Rigas Family's fraudulent conduct, the Co-Borrowing Lenders approved each of the Co-Borrowing Facilities and continued to authorize extensions of credit thereunder.

10. The Agent Banks' *quid pro quo* for funding the Co-Borrowing Facilities was the Rigas Family's promise of lucrative underwriting and other fees to the Investment Banks (each an affiliate of an Agent Bank). To obtain these fees, several of the Agent Banks violated their own lending policies by extending credit in amounts far exceeding institutional exposure limits and by funding the facilities despite the Debtors' massive debt load, which far exceeded that of its competitors. Aware of obvious red flags, many of the Co-Borrowing Lenders merely rubber-stamped the Co-Borrowing Facilities so that their affiliated Investment Banks could earn hundreds of millions of dollars in fees.

11. Defendants BofA, Citibank, Deutsche Bank and others had other dubious reasons for approving the Co-Borrowing Facilities. These banks or their affiliates had advanced members of the Rigas Family hundreds of millions of dollars of personal margin loans secured by Adelphia stock. By approving the Co-Borrowing Facilities and draws thereunder, these Margin Lenders knew that they could rely on the Debtors' ability to repay the margin loans if the Rigas Family could not. When Adelphia's stock plummeted -- after the public disclosure of the fraud in March 2002 -- the Co-Borrowing Lenders continued to fund the Co-Borrowing Facilities despite (or, in some cases, because of) their knowledge that the proceeds would be used to repay

Rigas Family margin calls at the expense of other creditors. Just like the fraudulent uses of the Co-Borrowing Facilities, each of these margin loan payments was made with the intent to defraud creditors, who received no consideration from these transfers.

12.     The fraud at Adelphia, began -- but certainly did not end -- with the Co-Borrowing Facilities. The Debtors used a central cash management system that, as Defendants were well aware, was a vehicle for the Rigas Family to commingle the Debtors' funds with those of unaffiliated entities owned by the Rigas Family, and ultimately to misappropriate those funds. After May 1999, the date the first of the relevant Co-Borrowing Facilities closed, Defendants knew or recklessly disregarded the fact that the Rigas Family used a significant portion of the proceeds of other bank loans for the benefit of the Rigas Family. The Non-Co-Borrowing Lenders -- many of whom also were Co-Borrowing Lenders -- also approved draws directly from Non-Co-Borrowing Facilities to the Rigas Family that they knew did not benefit the Debtors. Several of these loans, although made to the Debtors, were earmarked for the immediate transfer to bank lenders to Rigas Family entities in satisfaction of those entities' independent obligations.

13.     The Agent Banks and Investment Banks saw the Debtors as enormous consumers of financial services and aggressively sought to exploit the Debtors' needs for their personal gain. These Defendants provided extensive advisory services to the Debtors and injected themselves into a position of confidence and trust wherein they offered counsel on numerous business and financial issues. These same Defendants, once having assumed fiduciary duties to the Debtors, almost immediately proceeded to breach those duties by, among other things, facilitating the Debtors' bankruptcy and insolvency.

14.     The Debtors' Chapter 11 bankruptcy filings resulted from the massive fraud of the Rigas Family. The Debtors are deeply insolvent and their unsecured creditors are faced with the prospect that billions of dollars of their claims will not be repaid. In stark contrast, parties to the fraud, the Co-Borrowing Lenders and other Defendants, now seek to stand first in line to be repaid in full in the Debtors' bankruptcy proceedings. This fundamental injustice must be redressed. Accordingly, by this action, the Debtors and the Committee, on behalf of the Debtors and their estates, seek, among other things, to: (i) recover as fraudulent transfers the principal and interest paid by the Debtors on the Co-Borrowing Facilities, (ii) avoid as fraudulent obligations the Debtors' obligations, if any, to repay outstanding Co-Borrowing Facilities and other loans made by Defendants, (iii) recover damages for breaches of fiduciary duties to the Debtors and for aiding and abetting fraud and breaches of fiduciary duties by the Rigas Family, (iv) equitably subordinate, disallow or recharacterize each of the Co-Borrowing Lenders' claims in the Debtors' bankruptcy proceedings, (v) avoid and recover certain fraudulent and preferential transfers made to certain of the Defendants, and (vi) recover damages for violations of the Bank Holding Company Act.

## JURISDICTION AND VENUE

15.     This Court's jurisdiction is founded upon sections 157 and 1334 of title 28 of the United States Code, in that this proceeding arises under title 11 of the United States Code (the "Bankruptcy Code"), or arises in or is related to the above-captioned jointly administered chapter 11 cases under the Bankruptcy Code, which are pending in the United States Bankruptcy Court for the Southern District of New York.

16.     This civil proceeding is a core proceeding under sections 157(b)(2)(A), (B),(C), (D), (H), (K) and (O) of title 28 of the United States Code.

17.     Venue in this Court is appropriate under section 1409(a) of title 28 of the United States Code.

18.     Plaintiffs bring this action pursuant to the authority granted to them in (i) the Stipulation and Order Authorizing the Creditors Committee to Prosecute Claims and Causes of Action against the Pre-Petition Agents and Pre-Petition Secured Lenders, dated July 2, 2003 (the "Authorization Stipulation"), and (ii) the Stipulation and Consent Order, dated October 9, 2002 (as subsequently amended and restated), among plaintiffs, certain of the Agent Banks, certain of the Investment Banks and others, as modified by the Stipulation and Consent Order Modifying Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing and (B) to Utilize Cash Collateral and (II) Granting Adequate Protection to Pre-Petition Secured Parties, dated December 30, 2002.  Contemporaneously with the filing of this Complaint, Plaintiffs are filing a Motion to approve the Authorization Stipulation.

## THE PARTIES AND OTHER KEY PARTICIPANTS

19.     The Committee is the statutory committee of unsecured creditors duly appointed on July 11, 2002 in each of the Debtors' chapter 11 cases by the Office of the United States Trustee for the Southern District of New York.

20.     Adelphia is the debtor in Case No. 02-41729 (REG), which commenced on June 25, 2002 (the "Petition Date").  Adelphia is a corporation organized under the laws of the State of Delaware, with its principal place of business on the Petition Date located in the

Commonwealth of Pennsylvania. The remaining Debtors are the two hundred twenty-nine direct and indirect subsidiaries of Adelphia, organized under the laws of various states, which are debtors in Case Nos. 02-12834 (REG) and 02-41730 (REG) through 02-41957 (REG). In addition to Adelphia, the Debtors include: ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Holdings II, LLC, ACC Investment Holdings, Inc., ACC Operations, Inc., ACC Telecommunications Holdings LLC, ACC Telecommunications LLC, ACC Telecommunications of Virginia LLC, ACC-AMN Holdings, LLC, Adelphia Acquisition Subsidiary, Inc., Adelphia Arizona, Inc., Adelphia Blairsville, LLC, Adelphia Cable Partners, LP, Adelphia Cablevision Associates, LP, Adelphia Cablevision Corp., Adelphia Cablevision of Boca Raton, LLC, Adelphia Cablevision of Fontana, LLC, Adelphia Cablevision of Inland Empire, LLC, Adelphia Cablevision of New York, Inc., Adelphia Cablevision of Newport Beach, LLC, Adelphia Cablevision of Orange County II, LLC, Adelphia Cablevision of Orange County, LLC, Adelphia Cablevision of San Bernardino, LLC, Adelphia Cablevision of Santa Ana, LLC, Adelphia Cablevision of Seal Beach, LLC, Adelphia Cablevision of Simi Valley, LLC, Adelphia Cablevision of the Kennebunks, LLC, Adelphia Cablevision of West Palm Beach III, LLC, Adelphia Cablevision of West Palm Beach IV, LLC, Adelphia Cablevision of West Palm Beach V, LLC, Adelphia Cablevision, LLC, Adelphia California Cablevision, LLC, Adelphia Central Pennsylvania, LLC, Adelphia Cleveland, LLC, Adelphia Communications Corporation, Adelphia Communications International, Inc., Adelphia Communications of California II, LLC, Adelphia Communications of California III, LLC, Adelphia Communications of California, LLC, Adelphia Company of Western Connecticut, Adelphia General Holdings III, Inc., Adelphia GP Holdings, LLC, Adelphia GS Cable, LLC, Adelphia Harbor Center Holdings, LLC, Adelphia Holdings 2001, LLC, Adelphia International II, LLC, Adelphia International III,

LLC, Adelphia Mobile Phones, Inc., Adelphia of the Midwest, Inc., Adelphia Pinellas County, LLC, Adelphia Prestige Cablevision, LLC, Adelphia Telecommunications of Florida, Inc., Adelphia Telecommunications, Inc., Adelphia Wellsville, LLC, Adelphia Western New York Holdings, LLC, Arahova Communications, Inc., Arahova Holdings, LLC, Badger Holding Corporation, Better TV, Inc. of Bennington, Blacksburg/Salem Cablevision, Inc., Brazas Communications, Inc., Buenavision Telecommunications, Inc., Cable Sentry Corporation, California Ad Sales, LLC, CCC-III, Inc., CCC-Indiana, Inc., CCH Indiana, LP, CDA Cable, Inc., Century Advertising, Inc., Century Alabama Corp., Century Alabama Holding Corp., Century Australia Communications Corp., Century Berkshire Cable Corp., Century Cable Holding Corp., Century Cable Holdings, LLC, Century Cable Management Corporation, Century Cable of Southern California, Century Cablevision Holdings, LLC, Century Carolina Corp., Century Colorado Springs Corp., Century Colorado Springs Partnership, Century Cullman Corp., Century Enterprise Cable Corp., Century Exchange, LLC, Century Federal, Inc., Century Granite Cable Television Corp., Century Huntington Company, Century Indiana Corp., Century Investment Holding Corp., Century Investors, Inc., Century Island Associates, Inc., Century Island Cable Television Corp., Century Kansas Cable Television Corp., Century Lykens Cable Corp., Century Mendocino Cable Television Inc., Century Mississippi Corp., Century Mountain Corp., Century New Mexico Cable Television, Century Norwich Corp., Century Ohio Cable Television Corp., Century Oregon Cable Corp., Century Pacific Cable TV Inc., Century Programming, Inc., Century Realty Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Telecommunications, Inc., Century Trinidad Cable Television Corp., Century Virginia Corp., Century Voice and Data Communications, Inc., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Century Wyoming Cable Television

Corp., Century-TCI California Communications, LP, Century-TCI California, LP, Century-TCI Holdings, LLC, Chelsea Communications, Inc., Chelsea Communications, LLC, Chestnut Street Services, LLC, Clear Cablevision, Inc., CMA Cablevision Associates VII, LP, CMA Cablevision Associates XI, LP, Coral Security, Inc., Cowlitz Cablevision, Inc., CP-MDU I LLC, CP-MDU II LLC, E. & E. Cable Service, Inc., Eastern Virginia Cablevision Holdings, LLC, Eastern Virginia Cablevision, LP, Empire Sports Network, LP, FAE Cable Management Corporation, FOP Indiana, LP, FrontierVision Access Partners, LLC, FrontierVision Cable New England, Inc., FrontierVision Capital Corporation, FrontierVision Holdings Capital Corporation, FrontierVision Holdings Capital II Corporation, FrontierVision Holdings, LLC, FrontierVision Holdings, LP, FrontierVision Operating Partners, LLC, FrontierVision Operating Partners, LP, FrontierVision Partners, LP, Ft. Myers Acquisition Limited Partnership, Ft. Myers Cablevision, LLC, Genesis Cable Communications Subsidiary LLC, Global Acquisition Partners, LP, Global Cablevision II, LLC, Grafton Cable Company, GS Cable, LLC, GS Telecommunications LLC, Harron Cablevision of New Hampshire, Inc., Huntington CATV, Inc., Imperial Valley Cablevision, Inc., Kalamazoo County Cablevision, Inc., Key Biscayne Cablevision, Kootenai Cable, Inc., Lake Champlain Cable Television Corporation, Leadership Acquisition Limited Partnership, Louisa Cablevision, Inc., Manchester Cablevision, Inc., Martha's Vineyard Cablevision, LP, Mercury Communications, Inc., Mickelson Media of Florida, Inc., Mickelson Media, Inc., Montgomery Cablevision, Inc., Monument Colorado Cablevision, Inc., Mountain Cable Communications Corporation, Mountain Cable Company, LP, Mt. Lebanon Cablevision, Inc., Multi-Channel TV Cable Company, National Cable Acquisition Associates, LP, Olympus Cable Holdings, LLC, Olympus Capital Corporation, Olympus Communications Holdings, LLC, Olympus Communications, LP, Olympus Subsidiary, LLC, Owensboro Indiana, LP, Owensboro

on the Air, Inc., Owensboro-Brunswick, Inc., Page Time, Inc., Palm Beach Group Cable Joint Venture, Palm Beach Group Cable, Inc., Paragon Cable Television, Inc., Paragon Cablevision Construction Corporation, Paragon Cablevision Management Corporation, Parnassos Communications, LP, Parnassos Holdings, LLC, Parnassos, LP, Pericles Communications Corporation, Pullman TV Cable Co., Inc., RentaVision of Brunswick, Inc., Richmond Cable Television Corporation, Rigpal Communications, Inc., Robinson/Plum Cablevision, LP, S/T Cable Corporation, Sabres, Inc., Scranton Cablevision, Inc., Sentinel Communications of Muncie, Indiana, Inc., Southeast Florida Cable, Inc., Southwest Colorado Cable, Inc., Southwest Virginia Cable, Inc., Star Cable Inc., Starpoint Limited Partnership, SVHH Cable Acquisition, LP, SVHH Holdings, LLC, Tele-Media Company of Hopewell-Prince George, Tele-Media Company of Tri-States, LP, Tele-Media Investment Partnership, LP, Telesat Acquisition Limited Partnership, Telesat Acquisition, LLC, The Golf Club at Wending Creek Farms, LLC, The Main InternetWorks, Inc., The Westover TV Cable Co. Incorporated, Three Rivers Cable Associates, LP, Timotheos Communications LP, TMC Holdings Corporation, TMC Holdings, LLC, Tri-States, LLC, UCA LLC, Upper St. Clair Cablevision, Inc., US Tele-Media Investment Company, Valley Video, Inc., Van Buren County Cablevision, Inc., Warrick Cablevision, Inc., Warrick Indiana, LP, Wellsville Cablevision, LLC, West Boca Acquisition Limited Partnership, Western NY Cablevision, LP, Westview Security, Inc., Wilderness Cable Company, Young's Cable TV Corp and Yuma Cablevision, Inc.

**The Agent Banks And The Investment Banks**

21.     Upon information and belief, Bank of America, N.A. ("BofA") is a national banking association acting out of its branch office located in the State of Texas.  BofA is being

sued individually and as agent for various banks currently or formerly parties to credit agreements described herein.

22. Upon information and belief, Banc of America Securities LLC ("BAS") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of North Carolina. Upon information and belief, BAS is an investment bank that is affiliated, and under common ownership and control, with BofA.

23. Upon information and belief, Bank of Montreal ("BMO") is a banking association organized under the laws of Canada, acting out of its branch office located in the State of Illinois. BMO is being sued individually and as agent for various banks currently or formerly parties to credit agreements described herein.

24. Upon information and belief, BMO Nesbitt Burns Corp. ("BMO NB") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Illinois. Upon information and belief, BMO NB is an investment bank that is affiliated, and under common ownership and control, with BMO.

25. Upon information and belief, Wachovia Bank, National Association (f/k/a First Union National Bank) ("Wachovia") is a national banking association acting out of its branch office located in the State of Illinois. Wachovia is being sued individually and as agent for various banks currently or formerly parties to credit agreements described herein.

26. Upon information and belief, Wachovia Securities, Inc. (f/k/a First Union Securities, Inc.) ("Wachovia Securities") is a corporation organized under the laws of the State of North Carolina, with its principal place of business located in the State of North Carolina. Upon

information and belief, Wachovia Securities is an investment bank that is affiliated, and under common ownership and control, with Wachovia.

27.     Upon information and belief, Citibank, N.A. ("Citibank") is a national banking association that acts out of offices located, among other places, in the State of New York and the State of Delaware.  Citibank is being sued individually and as agent for various banks currently or formerly parties to credit agreements described herein.

28.     Upon information and belief, Citicorp USA, Inc. ("Citicorp") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Citicorp is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

29.     Upon information and belief, Citigroup Financial Products, Inc. (f/k/a Salomon Brothers Holding Company, Inc.) ("SBHC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

30.     Upon information and belief, Citigroup Global Markets Holdings, Inc. (f/k/a Salomon Smith Barney Holdings, Inc.), d/b/a Salomon Smith Barney, Inc. ("SSB"), is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York.  Upon information and belief, SSB is an investment bank that is affiliated, and under common ownership and control, with Citibank, Citicorp and SBHC.

31.     Upon information and belief, ABN AMRO Bank, N.V. ("ABN AMRO") is a banking association organized under the laws of the Netherlands, acting out of its branch office

located in the State of Illinois. ABN AMRO is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

32. Upon information and belief, ABN AMRO Securities LLC ("ABN AMRO Securities") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Upon information and belief, ABN AMRO Securities is an investment bank that is affiliated, and under common ownership and control, with ABN AMRO.

33. Upon information and belief, Bank of New York Co., Inc. ("BONY") is a national banking association acting out of its branch office located in the State of New York. BONY is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

34. Upon information and belief, BNY Capital Corp. ("BNY Capital") is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York. Upon information and belief, BNY Capital is an investment bank that is affiliated, and under common ownership and control, with BONY.

35. Upon information and belief, The Bank of Nova Scotia ("BNS") is a banking association organized under the laws of Nova Scotia, acting out of its branch office located in the State of New York. BNS is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

36. Upon information and belief, Scotia Capital (USA), Inc. ("Scotia Capital") is a corporation organized under the laws of the State of New York, with its principal place of

business located in the State of New York.  Upon information and belief, Scotia Capital is an investment bank that is affiliated, and under common ownership and control, with BNS.

37.     Upon information and belief, Barclays Bank PLC ("Barclays") is a banking association under the laws of the United Kingdom, acting out of its branch office located in the State of New York.  Barclays is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

38.     Upon information and belief, Barclays Capital, Inc. ("Barclays Capital") is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in the State of New York.  Upon information and belief, Barclays Capital is an investment bank that is affiliated, and under common ownership and control, with Barclays.

39.     Upon information and belief, CIBC, Inc. ("CIBC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  CIBC is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

40.     Upon information and belief, CIBC World Markets Corp. ("CIBC Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Upon information and belief, CIBC Securities is an investment bank that is affiliated, and under common ownership and control, with CIBC.

41.     Upon information and belief, JP Morgan Chase & Co. (f/k/a Chase Manhattan Corp.) ("Chase") is a national banking association acting out of its branch office located in the

State of New York. Chase is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

42.        Upon information and belief, Chase Securities, Inc. ("Chase Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Upon information and belief, Chase Securities is an investment bank that is affiliated, and under common ownership and control, with Chase.

43.        Upon information and belief, Credit Lyonnais, New York Branch ("Credit Lyonnais") is a banking association organized under the laws of France, acting out of its branch of in the State of New York. Credit Lyonnais is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

44.        Upon information and belief, Credit Lyonnais Securities (USA), Inc. ("Credit Lyonnais Securities") is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York. Upon information and belief, Credit Lyonnais Securities is an investment bank that is affiliated, and under common ownership and control, with Credit Lyonnais.

45.        Upon information and belief, Credit Suisse First Boston, New York Branch, ("CSFB") is a banking association organized under the laws of Switzerland, acting out of its branch office located in the State of New York. CSFB is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

46.        Upon information and belief, Credit Suisse First Boston (USA) Inc. ("CSFB Securities") is a corporation organized under the laws of the State of Delaware, with its principal

place of business located in the State of New York.  Upon information and belief, CSFB Securities is an investment bank that is affiliated, and under common ownership and control, with CSFB.

47.     Upon information and belief, Deutsche Bank AG (f/k/a Bankers Trust Company) ("Deutsche Bank") is a banking association organized under the laws of Germany, acting out of its branch office located in the State of New York.  Deutsche Bank is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

48.     Upon information and belief, Deutsche Banc Alex Brown, Inc. (f/k/a BT Alex Brown, Inc.) ("Deutsche Bank Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Upon information and belief, Deutsche Bank Securities is an investment bank that is affiliated, and under common ownership and control, with Deutsche Bank.

49.     Upon information and belief, DLJ Capital Funding, Inc. ("DLJ") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  DLJ is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

50.     Upon information and belief, Donaldson Lufkin & Jenrette, Inc. ("DLJ Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Upon information and belief, DLJ Securities is an investment bank that is affiliated, and under common ownership and control, with DLJ.

51.     Upon information and belief, Fleet National Bank ("Fleet") is a national banking association acting out of its branch office located in the Commonwealth of Massachusetts. Fleet is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

52.     Upon information and belief, Fleet Securities, Inc. ("Fleet Securities") is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York. Upon information and belief, Fleet Securities is an investment bank that is affiliated, and under common ownership and control, with Fleet.

53.     Upon information and belief, Merrill Lynch Capital Corp. ("Merrill Lynch") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Merrill Lynch is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

54.     Upon information and belief, Merrill Lynch & Co., Inc. ("Merrill Lynch Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Upon information and belief, Merrill Lynch Securities is an investment bank that is affiliated, and under common ownership and control, with Merrill Lynch.

55.     Upon information and belief, Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Morgan Stanley is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

56. Upon information and belief, Morgan Stanley & Co., Inc. ("Morgan Stanley Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Upon information and belief, Morgan Stanley Securities is an investment bank that is affiliated, and under common ownership and control, with Morgan Stanley.

57. Upon information and belief, PNC Bank Corp. ("PNC Bank") is a national banking association, acting out of its branch office located in the Commonwealth of Pennsylvania. PNC Bank is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

58. Upon information and belief, PNC Capital Markets, Inc. ("PNC Capital Markets") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania. Upon information and belief, PNC Capital Markets is an investment bank that is affiliated, and under common ownership and control, with PNC.

59. Upon information and belief, The Royal Bank of Scotland, plc ("Royal Bank of Scotland") is a banking association organized under the laws of the United Kingdom, acting out of its branch office located in the State of New York. Royal Bank of Scotland is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

60. Upon information and belief, Societe Generale, S.A. ("Societe Generale") is a banking association organized under the laws of France acting out of its branch office located in

the State of New York. Societe Generale is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

61. Upon information and belief, SG Cowen Securities Corporation ("SG Cowen") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York. Upon information and belief, SG Cowen is an investment bank that is affiliated, and under common ownership and control, with Societe Generale.

62. Upon information and belief, SunTrust Banks, Inc. ("SunTrust") is a national banking association acting out of its branch office located in the State of Georgia. SunTrust is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

63. Upon information and belief, SunTrust Securities, Inc. ("SunTrust Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Georgia. Upon information and belief, SunTrust Securities is an investment bank that is affiliated, and under common ownership and control, with SunTrust.

64. Upon information and belief, Toronto Dominion (Texas), Inc. ("TDI") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Texas. TDI is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

65. Upon information and belief, TD Securities (USA) Inc. ("TD Securities") is a corporation organized under the laws of the State of Delaware, with its principal place of

business located in the State of New York. Upon information and belief, TD Securities is an investment bank that is affiliated, and under common ownership and control, with TDI.

66.     Upon information and belief, The Fuji Bank, Limited ("Fuji Bank") is a banking association organized under the laws of Japan, acting out of its branch office located in the State of New York. Fuji Bank is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

67.     Upon information and belief, The Mitsubishi Trust and Banking Corporation ("Mitsubishi Trust") is a corporation organized under the laws of Japan, acting out of its branch office located in the State of New York. Mitsubishi Trust is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

68.     Upon information and belief, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland," New York Branch ("Rabobank") is a banking association organized under the laws of the Netherlands, acting out of its branch office located in the State of New York. Rabobank is being sued individually and as an agent for various banks currently or formerly parties to credit agreements described herein.

69.     BofA, BMO, Wachovia, Citibank, Citicorp, ABN AMRO, BONY, BNS, Barclays, CIBC, Chase, Credit Lyonnais, CSFB, Deutsche Bank, DLJ, Fleet, Merrill Lynch, Morgan Stanley, PNC Bank, Royal Bank of Scotland, Societe Generale, SunTrust, TDI, Fuji Bank, Mitsubishi Trust, and Rabobank are collectively referred to herein as the "Agent Banks."

70.     BAS, BMO NB, Wachovia Securities, SSB, ABN AMRO Securities, BNY Capital Markets, Scotia Capital, Barclays Capital, CIBC Securities, Chase Securities, Credit

Lyonnais Securities, CSFB Securities, Deutsche Bank Securities, DLJ Securities, Fleet Securities, Merrill Lynch Securities, Morgan Stanley Securities, PNC Capital Markets, Royal Bank of Scotland, SG Cowen, SunTrust Securities, and TD Securities are collectively referred to herein as the "Investment Banks."

**The Non-Agent Banks**

71.     Upon information and belief, Bayerische Landesbank Girozentrale ("BLG") is a banking association organized under the laws Germany, acting of if its branch office located in the State of New York.

72.     Upon information and belief, Credit Industriel Et Commercial ("Credit Industriel") is a banking association organized under the laws of France, acting out of its branch office in the State of New York.

73.     Upon information and belief, CypressTree Investment Fund, LLC ("CypressTree") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

74.     Upon information and belief, Debt Strategies, Inc. ("Merrill Lynch Debt Fund") is a corporation organized under the laws of the State of Maryland, with its principal place of business located in the State of New Jersey.

75.     Upon information and belief, DG Bank Deutsche Genossenschaftsbank ("DG Bank") is a banking association organized under the laws of Germany, acting out of its branch office located in the State of New York.

76.     Upon information and belief, Farmers & Merchants Bancorp Inc. ("FMB") is a corporation organized under the laws of the State of Ohio, with its principal place of business located in the State of Ohio.

77.     Upon information and belief, Fifth Third Bancorp ("Fifth Third") is a corporation organized under the laws of the State of Ohio, with its principal place of business located in the State of Ohio.

78.     Upon information and belief, First Allmerica Financial Life Insurance Company ("First Allmerica") is a corporation organized under the laws of the State of Maine, with its principal place of business located in the State of Maine.

79.     Upon information and belief, Firstar Bank, N.A. ("Firstar Bank") is a national banking association acting out of its branch office located in the State of Illinois.

80.     Upon information and belief, Foothill Income Trust II, L.P. ("Foothill") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in the State of California.

81.     Upon information and belief, Franklin Floating Rate Trust ("Franklin Trust") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of California.

82.     Upon information and belief, Jackson National Life Insurance Company ("Jackson National") is a corporation organized under the laws of the State of Michigan, with its principal place of business located in the State of Michigan.

83.     Upon information and belief, Kemper Floating Rate Fund ("Kemper Fund") is an investment company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in the State of Illinois.

84.     Upon information and belief, KZH Cypresstree-1 LLC ("KZH Cypresstree") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

85.     Upon information and belief, KZH III LLC ("KZH III") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

86.     Upon information and belief, KZH ING-2 LLC ("KZH ING") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

87.     Upon information and belief, KZH Langdale LLC ("KZH Langdale") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

88.     Upon information and belief, KZH Pondview LLC ("KZH Pondview ") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

89.     Upon information and belief, KZH Shoshone LLC ("KZH Shoshone") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

90.	Upon information and belief, KZH Waterside LLC ("KZH Waterside") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

91.	Upon information and belief, Liberty Floating Rate Advantage Fund (f/k/a Liberty-Stein Roe Advisor Floating Rate Advantage Fund) ("Liberty-Stein") is an investment company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in the Commonwealth of Massachusetts.

92.	Upon information and belief, Master Senior Floating Rate Trust ("Merrill Lynch Trust") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

93.	Upon information and belief, Meespierson Capital Corp. ("Meespierson") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

94.	Upon information and belief, Mellon Bank, N.A. ("Mellon Bank") is a national banking association acting out of its branch office located in the State of Texas.

95.	Upon information and belief, Merrill Lynch Senior Floating Rate Fund, Inc. ("Merrill Lynch Floating Rate Fund") is a corporation organized under the laws of the State of Maryland, with its principal place of business located in the State of New Jersey.

96.	Upon information and belief, Natexis Banques Populaires Group ("Natexis") is a banking association organized under the laws of France, acting out of its branch office located in the State of New Jersey.

97.     Upon information and belief, National City Bank of Pennsylvania ("NCBP") is a national banking association, acting out of its branch office located in the Commonwealth of Pennsylvania.

98.     Upon information and belief, North American Senior Floating Rate Fund, Inc. ("Cypress Tree Floating Rate Fund") is an investment company organized under the laws of the State of Maryland, with its principal place of business located in the Commonwealth of Massachusetts.

99.     Upon information and belief, Olympic Funding Trust, Series 1999 ("Olympic Funding") is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

100.     Upon information and belief, Oppenheimer Senior Floating Rate Fund ("Oppenheimer") is an investment company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in the State of New York.

101.     Upon information and belief, Pinehurst Trading, Inc. ("Pinehurst") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

102.     Upon information and belief, Principal Life Insurance Company ("Principal Life") is a corporation organized under the laws of the State of Iowa, with its principal place of business located in the State of Iowa.

103.     Upon information and belief, Riviera Funding LLC ("Riviera Funding") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of North Carolina.

104.     Upon information and belief, Royal Bank of Canada ("Royal Bank of Canada") is a banking association organized under the laws of Canada, acting out of its branch office located in the State of New York.

105.     Upon information and belief, Senior High Income Portfolio, Inc. ("Merrill Lynch Portfolio") is a corporation organized under the laws of the State of Maryland, with its principal place of business located in the State of New Jersey.

106.     Upon information and belief, Stanwich Loan Funding LLC ("Stanwich") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

107.     Upon information and belief, Stein Roe Floating Rate Limited Liability Company ("Stein Roe") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Massachusetts.

108.     Upon information and belief, Sumitomo Mitsui Banking Corporation ("Sumitomo") is a corporation organized under the laws of the Japan, with its principal place of business located in the State of New York.

109.     Upon information and belief, The Dai-Ichi Kangyo Bank, Ltd. ("Dai-Ichi Kangyo") is a banking association organized under the laws of Japan, acting out of its branch office located in the State New York.

110.     Upon information and belief, The Industrial Bank of Japan, Limited ("Industrial Bank of Japan") is a banking association organized under the laws of Japan, acting out of its branch office located in the State of New York.

111.     Upon information and belief, The Toronto-Dominion Bank ("Toronto Dominion") is a banking association organized under the laws of Canada, acting out its branch office located in the State of New York.

112.     Upon information and belief, U.S. Bank National Association ("U.S. Bank") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Nebraska.

113.     Upon information and belief, UBS AG, Stamford Branch ("UBS") is a banking association organized under the laws of Switzerland, acting out of its branch office located in the State of Connecticut.

114.     Upon information and belief, United of Omaha Life Insurance Company ("United of Omaha") is a corporation organized under the laws of the State of Nebraska, with its principal place of business located in the State of Nebraska.

**The Non-Co-Borrowing Banks**

115.     Upon information and belief, Bank One, N.A. ("Bank One") is a national banking association acting out of its branch office located in the State of New York.

116.     Upon information and belief, BankBoston, N.A. ("BankBoston") is a national banking association acting out of its branch office located in the Commonwealth of Massachusetts.

117.     Upon information and belief, Banque Nationale de Paris ("BNP") is a banking association organized under the laws of France, acting out of its branch office located in the State of New York.

118.     Upon information and belief, Bayerische Hypound Vereinsbank AG ("BHV") is a banking association organized under the laws of Germany, acting out of its branch office located in the State of New York.

119.     Upon information and belief, BNP Paribas ("Bank Paribas") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

120.     Upon information and belief, Citizens Bank of Rhode Island ("CBRI") is a national banking association acting out of its branch office located in the State of Rhode Island.

121.     Upon information and belief, Credit Agricole Indosuez ("CAI") is a banking association organized under the laws of France, acting out of its branch office located in the State of New York.

122.     Upon information and belief, Credit Locale de France -- New York Agency ("Credit Locale") is a banking association organized under the laws of France, acting out of its branch office located in the State of New York.

123.     Upon information and belief, Dresdner Bank AG ("Dresdner Bank") is a banking association organized under the laws of Germany, acting out of its branch office located in the State of New York.

124.     Upon information and belief, First Hawaiian Bank ("First Hawaiian") is a national banking association acting out of its branch office located in the State of Hawaii.

125.     Upon information and belief, First National Bank of Chicago ("FNBC") is a national banking association acting out of its branch office located in the State of Illinois.

126.     Upon information and belief, First National Bank of Maryland ("FNBM") is a national banking association acting out of its branch office located in the State of Maryland.

127.     Upon information and belief, General Electric Capital Corporation ("GECC") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

128.     Upon information and belief, Goldman Sachs Credit Partners, L.P. ("GSLP") is a limited partnership organized under the laws of Bermuda, with its principal place of business located in the State of New York.

129.     Upon information and belief, ING Prime Rate Trust (f/k/a Pilgrim America Prime Rate Trust) ("ING Trust") is an investment company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in the State of Arizona.

130.     Upon information and belief, KZH Holding Corporation III ("KZH Holding") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

131.     Upon information and belief, Manufacturers and Traders Trust Company ("MTTC") is a national banking association acting out of its branch office located in the State of New York.

132.     Upon information and belief, Morgan Guaranty Trust Company ("Morgan Guaranty") is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York.

133.     Upon information and belief, Octagon Credit Investors Loan Portfolio ("Octagon") is an investment company organized under the laws of the State of New York, with its principal place of business located in the State of New York.

134.     Upon information and belief, PFL Life Insurance Company ("PFL Life") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

135.     Upon information and belief, Royalton Company ("Royalton") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

136.     Upon information and belief, The Long-Term Credit Bank of Japan ("Long-Term Credit") is a banking association organized under the laws of Japan, acting out of its branch office located in the State of New York.

137.     Upon information and belief, The Travelers Insurance Company ("Travelers") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

138.     Upon information and belief, Union Bank of California, N.A. ("UBC") is a national banking association acting out of its branch office located in the State of California.

139.     Upon information and belief, Van Kampen American Capital Prime Rate Trust ("Van Kampen Trust") is an investment company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located in the State of Illinois.

140.     Upon information and belief, Webster Bank ("Webster Bank") is a national banking association acting out of its branch office located in the State of Connecticut.

141.     Upon information and belief, Goldman Sachs & Co. ("Goldman Sachs") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

142.     Upon information and belief, HSBC Bank USA ("HSBC") is a national banking association, acting out of its branch office located in the State of New York.

143.     Upon information and belief, Key Bank of New York ("Key Bank") is a national banking association, acting out of its branch office located in the State of New York.

**The Assignees**

144.     Upon information and belief, Abbey National Treasury Services is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

145.     Upon information and belief, Addison CDO, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

146.     Upon information and belief, AG Capital Funding is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

147.     Upon information and belief, AIM Floating Rate Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

148.     Upon information and belief, AIMCO CLO Series, 2000-A is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

149.     Upon information and belief, AIMCO CLO Series, 2001-A is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

150.     Upon information and belief, Allstate Investments, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

151.     Upon information and belief, Allstate Life Insurance Co. is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

152.     Upon information and belief, Alpha US Fund II, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

153.     Upon information and belief, Amaranth Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

154.     Upon information and belief, AMMC CDO I, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

155.     Upon information and belief, AMMC CDO II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

156.     Upon information and belief, Apex (IDM) CDO I Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

157.     Upon information and belief, Apex (Trimaran) CDO I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

158.     Upon information and belief, Archimedes Funding II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

159.     Upon information and belief, Archimedes Funding III Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

160.     Upon information and belief, Archimedes Funding IV Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

161.     Upon information and belief, Ares Finance-II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

162.     Upon information and belief, Ares CLO Management LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

163.     Upon information and belief, Ares Leveraged Investment Fund II, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

164.     Upon information and belief, Ares III CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

165.     Upon information and belief, Ares IV CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

166.     Upon information and belief, Ares V CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

167.     Upon information and belief, Ares VI CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

168.     Upon information and belief, Athena CDO Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

169.     Upon information and belief, Aurum CLO 2002 - Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

170.     Upon information and belief, Avalon Capital Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

171.     Upon information and belief, Avalon Capital Ltd. 2 is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

172.     Upon information and belief, B & W Master Tobacco Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

173.     Upon information and belief, Balanced High Yield Fund II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

174.     Upon information and belief, Ballyrock CDO I Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

175.     Upon information and belief, Bear Stearns Investment Products is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

176.     Upon information and belief, Bear, Stearns & Co., Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

177.     Upon information and belief, Blue Square Funding Series 3 is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

178.     Upon information and belief, Boston Income Portfolio is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

179.     Upon information and belief, Broad Foundation is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

180.     Upon information and belief, California Public Employees Retirement System is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

181.     Upon information and belief, Captiva IV Finance Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

182.     Upon information and belief, Caravelle Investment Fund II, L.L.C. is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

183.     Upon information and belief, Carlyle High Yield Partners II, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

184.     Upon information and belief, Centurion CDO II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Minnesota.

185.     Upon information and belief, Centurion CDO III, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Minnesota.

186.     Upon information and belief, Century Interest is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

187.     Upon information and belief, Century Post Petition Interest is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

188.     Upon information and belief, Ceres II Finance Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

189.     Upon information and belief, Charter View Portfolio is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

190.     Upon information and belief, CIGNA Investments, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

191.     Upon information and belief, Citadel Hill 2000 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

192.     Upon information and belief, Clydesdale CLO 2001-1 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

193.     Upon information and belief, Columbus Loan Funding Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

194.     Upon information and belief, Constantinus Eaton Vance CDO V Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

195.     Upon information and belief, Continental Casualty Company is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

196.     Upon information and belief, CSAM Funding I is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

197.     Upon information and belief, CSAM Funding II is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

198.     Upon information and belief, D.E. Shaw & Co. LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

199.     Upon information and belief, D.E. Shaw Laminar Portfolios, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

200.     Upon information and belief, DB Structured Products, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

201.     Upon information and belief, Debt Strategies Fund II, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

202.     Upon information and belief, Debt Strategies Fund III, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

203.     Upon information and belief, Delano Company #274 is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

204.     Upon information and belief, DZ Bank AG Deutsche Zentral-Genossenschaftsbank is a financial institution engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

205.     Upon information and belief, Eaton Vance CDO II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

206.     Upon information and belief, Eaton Vance Institutional Senior Loan Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

207.     Upon information and belief, Eaton Vance Management is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

208.     Upon information and belief, Eaton Vance Senior Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

209.     Upon information and belief, ELC Cayman Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

210.     Upon information and belief, ELC (Cayman) Ltd. CDO Series 1999-I is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

211.     Upon information and belief, ELC (Cayman) Ltd. Series 1999-I is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

212.     Upon information and belief, ELC Cayman Ltd. 1999-III is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

213.      Upon information and belief, ELC (Cayman) Ltd. 2000-I is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

214.      Upon information and belief, ELF Funding Trust I is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

215.      Upon information and belief, ELF Funding Trust III is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

216.      Upon information and belief, Eli Broad is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

217.      Upon information and belief, Emerald Orchard Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

218.      Upon information and belief, Endurance CLO I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

219.      Upon information and belief, Erste Bank New York is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

220.     Upon information and belief, Evergreen Funding Ltd., Co. is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Indiana.

221.     Upon information and belief, FC CBO IV Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

222.     Upon information and belief, Fidelity Advisor Floating Rate High Income Fund (161) is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

223.     Upon information and belief, Fidelity Advisors Series II: Fidelity Advisor Floating Rate High Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

224.     Upon information and belief, Fidelity Charles Street Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

225.     Upon information and belief, Fidelity High Yield Collective is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

226.     Upon information and belief, Fidelity School Street Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

227.     Upon information and belief, First Dominion Funding I is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

228.     Upon information and belief, First Dominion Funding II is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

229.     Upon information and belief, First Dominion Funding III is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

230.     Upon information and belief, Flagship CLO 2001-1 is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

231.     Upon information and belief, Flagship CLO II is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

232.     Upon information and belief, Fortis Capital Corp. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

233.     Upon information and belief, Franklin Advisor, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

234.     Upon information and belief, Franklin CLO I, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

235.     Upon information and belief, Franklin CLO II, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

236.     Upon information and belief, Franklin CLO III, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

237.     Upon information and belief, Franklin Floating Rate Daily Access Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

238.     Upon information and belief, Franklin Floating Rate Master Series is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

239.     Upon information and belief, Franklin Floating Rate Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

240.    Upon information and belief, Galaxy CLO 1999-1 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

241.    Upon information and belief, Gleneagles Trading LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

242.    Upon information and belief, Goldentree Loan Opportunities I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

243.    Upon information and belief, Goldentree Loan Opportunities II, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

244.    Upon information and belief, Goldentree High Yield Master Fund, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

245.    Upon information and belief, Goldentree High Yield Opportunities II, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

246.    Upon information and belief, Grayson & Co. is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

247.     Upon information and belief, Great Point CLO 1999-1 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

248.     Upon information and belief, Greystone CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

249.     Upon information and belief, GSC Recovery IIA, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

250.     Upon information and belief, GT High Yield Value Master Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

251.     Upon information and belief, Halcyon Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

252.     Upon information and belief, Hamilton CDO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

253.     Upon information and belief, Harbour Town Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

254.    Upon information and belief, Harbourview CDO II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Colorado.

255.    Upon information and belief, Harbourview CLO IV, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Colorado.

256.    Upon information and belief, Harch CLO I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Florida.

257.    Upon information and belief, High Income Portfolio is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

258.    Upon information and belief, Highland Legacy Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

259.    Upon information and belief, Highland Loan Funding V Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

260.    Upon information and belief, Highland Offshore Partners is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

261.     Upon information and belief, IBJ Whitehall Funding 2001 Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Delaware.

262.     Upon information and belief, IDS Life Insurance Company is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

263.     Upon information and belief, Indosuez Capital Funding IIA, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

264.     Upon information and belief, Indosuez Capital Funding IV, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

265.     Upon information and belief, ING Pilgrim Senior Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

266.     Upon information and belief, ING Senior Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

267.     Upon information and belief, Investment Fund II LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

268.    Upon information and belief, Investment Partners I is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

269.    Upon information and belief, J.H. Whitney Market Value Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

270.    Upon information and belief, Jissekikun Funding, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

271.    Upon information and belief, Jupiter Loan Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

272.    Upon information and belief, Katonah I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

273.    Upon information and belief, Katonah II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

274.    Upon information and belief, Katonah III Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

275.     Upon information and belief, King Street Capital, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

276.     Upon information and belief, KZH CNC LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

277.     Upon information and belief, KZH Highland-2 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

278.     Upon information and belief, KZH ING-1 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

279.     Upon information and belief, KZH ING-3 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

280.     Upon information and belief, KZH Pamco LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

281.     Upon information and belief, KZH Soleil LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

282.     Upon information and belief, KZH Soleil-2 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

283.     Upon information and belief, KZH Sterling LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

284.     Upon information and belief, Landmark CDO Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

285.     Upon information and belief, LCM I Limited Partnership is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

286.     Upon information and belief, Lehman Commercial Paper, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

287.     Upon information and belief, Longhorn CDO (Cayman) Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

288.     Upon information and belief, Longhorn II CDO (Cayman) Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

289.     Upon information and belief, Magnetite Asset Investors L.L.C. is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

290.     Upon information and belief, Merrill Lynch Debt Strategies Fund II, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

291.     Upon information and belief, Merrill Lynch Global Investment Series: Income Strategies Portfolio is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

292.     Upon information and belief, Mizuho Corporate Bank, Ltd. is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

293.     Upon information and belief, ML CLO XV Pilgrim America (Cayman) Ltd. is a limited partnership investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

294.     Upon information and belief, ML CLO XX Pilgrim America (Cayman) Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

295.     Upon information and belief, Monument Capital Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

296.     Upon information and belief, Morgan Stanley Emerging Markets, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

297.     Upon information and belief, Morgan Stanley Prime Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

298.     Upon information and belief, Mountain Capital CLO I is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

299.     Upon information and belief, Mountain Capital CLO II is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

300.     Upon information and belief, Muirfield Trading, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

301.     Upon information and belief, Muzinich Cashflow CBO II Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Cayman Islands.

302.     Upon information and belief, MW Post Opportunity Offshore Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

303.     Upon information and belief, MW Post Portfolio Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

304.     Upon information and belief, Nationwide Life and Annuity Insurance Company is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

305.     Upon information and belief, Nationwide Mutual Insurance Company is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

306.     Upon information and belief, Nemean CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

307.     Upon information and belief, New Alliance Global CDO, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

308.     Upon information and belief, New York Life Insurance and Annuity Co. is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

309.     Upon information and belief, Nomura Bond & Loan Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

310.    Upon information and belief, Northwoods Capital, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

311.    Upon information and belief, Northwoods Capital II, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

312.    Upon information and belief, Northwoods Capital III, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

313.    Upon information and belief, Nuveen Floating Rate Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

314.    Upon information and belief, Nuveen Senior Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

315.    Upon information and belief, Oak Hill CLO Management I LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

316.    Upon information and belief, Oak Hill Credit Partners I Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

317.     Upon information and belief, Oak Hill Fund II, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

318.     Upon information and belief, Oak Hill Securities Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

319.     Upon information and belief, Opportunity Fund, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

320.     Upon information and belief, Oryx CLO, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

321.     Upon information and belief, Owl Creek Asset Management, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

322.     Upon information and belief, Oxford Strategic Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

323.     Upon information and belief, Pacifica Partners I, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

324. Upon information and belief, Pam Capital Funding L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

325. Upon information and belief, Pamco Cayman Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

326. Upon information and belief, Perry Principals LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

327. Upon information and belief, Phoenix-Goodwin High Yield Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Maryland.

328. Upon information and belief, Pilgrim CLO 1999-1 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

329. Upon information and belief, Pilgrim Senior Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

330. Upon information and belief, Pimco Corporate Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

331.     Upon information and belief, Post Balanced Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

332.     Upon information and belief, Post High Yield L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

333.     Upon information and belief, Post Opportunity Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

334.     Upon information and belief, Post Opportunity Offshore Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

335.     Upon information and belief, PPM Shadow Creek Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

336.     Upon information and belief, PPM-Spyglass Funding Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

337.     Upon information and belief, Providence Capital LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Minnesota.

338.     Upon information and belief, Prudential Insurance Company of America is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New Jersey.

339.     Upon information and belief, Putnam Diversified Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

340.     Upon information and belief, Putnam High Yield Advantage Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

341.     Upon information and belief, Putnam High Yield Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

342.     Upon information and belief, Putnam Master Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

343.     Upon information and belief, Putnam Master Intermediate Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

344.     Upon information and belief, Putnam Premier Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

345. Upon information and belief, Putnam Variable Trust - PVT Diversified Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

346. Upon information and belief, Putnam Variable Trust - PVT High Yield Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

347. Upon information and belief, QDRF Master Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

348. Upon information and belief, Quantum Partners LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

349. Upon information and belief, Race Point CLO, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

350. Upon information and belief, Redwood Master Fund, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

351.     Upon information and belief, Reliance Standard Life Insurance Company is an insurance company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Pennsylvania.

352.     Upon information and belief, Restoration Funding CLO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

353.     Upon information and belief, Rosemont CLO, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

354.     Upon information and belief, Safety National Casualty Corp. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Missouri.

355.     Upon information and belief, Sankaty High Yield Partners II, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

356.     Upon information and belief, Satellite Senior Income Fund, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

357.     Upon information and belief, Sawgrass Trading LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

358.     Upon information and belief, Scudder Floating Rate Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

359.     Upon information and belief, Seaboard CLO 2000 Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Delaware.

360.     Upon information and belief, Seneca Capital, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

361.     Upon information and belief, Senior Debt Portfolio is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

362.     Upon information and belief, Sequils - Centurion V Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

363.     Upon information and belief, Sequils - Cumberland I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

364.     Upon information and belief, Sequils-ING (HBDGM) Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

365.     Upon information and belief, Sequils-Liberty, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

366.     Upon information and belief, Sequils-Magnum Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

367.     Upon information and belief, Sequils-Pilgrim I, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Arizona.

368.     Upon information and belief, Sierra CLO I Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

369.     Upon information and belief, Signature 1A (Cayman, Ltd.) is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

370.     Upon information and belief, Skandinaviska Enskilda Banken (AB) is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

371.     Upon information and belief, SL Loans I Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

372.     Upon information and belief, SOF Investments, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

373.     Upon information and belief, Sprugos Investments IV, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

374.     Upon information and belief, SRF 2000 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

375.     Upon information and belief, SRS Strategies (Cayman), L.P. is limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

376.     Upon information and belief, SRV-Highland, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Texas.

377.     Upon information and belief, Stanfield Arbitrage CDO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

378.     Upon information and belief, Stanfield CLO, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

379.	Upon information and belief, Stanfield Quattro CLO, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

380.	Upon information and belief, Stanfield RMF Transatlantic CDO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

381.	Upon information and belief, State of South Dakota Retirement System is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

382.	Upon information and belief, Stein Roe & Farnham CLO I Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

383.	Upon information and belief, Stephen Adams Living Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

384.	Upon information and belief, SunAmerica Senior Floating Rate Fund, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the Commonwealth of Massachusetts.

385.	Upon information and belief, Syndicated Loan Funding Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

386.     Upon information and belief, The ING Capital Senior Secured High Income Holdings Fund, Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of California.

387.     Upon information and belief, The President & Fellows of Harvard College is an institution engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

388.     Upon information and belief, Third Avenue Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

389.     Upon information and belief, Thracia LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

390.     Upon information and belief, Travelers Corporate Loan Fund, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

391.     Upon information and belief, Tryon CLO Ltd. 2000-1 is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

392.     Upon information and belief, Tuscany CDO Ltd. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Michigan.

393.     Upon information and belief, Tyler Trading, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of North Carolina.

394.     Upon information and belief, University of Chicago is an institution engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

395.     Upon information and belief, Van Kampen Prime Rate Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

396.     Upon information and belief, Van Kampen Senior Floating Rate Fund is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

397.     Upon information and belief, Van Kampen Senior Income Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Illinois.

398.     Upon information and belief, Venture CDO 2002, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

399.     Upon information and belief, Westminster Bank PLC is a financial institution engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Ohio.

400.     Upon information and belief, Whitney Private Debt Fund, L.P. is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

401.     Upon information and belief, Windsor Loan Funding, Limited is a limited partnership engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of New York.

402.     Upon information and belief, Winged Foot Fund Trust is an investment company engaged in the business of, among other things, acquiring bank debt, with its principal place of business located in the State of Connecticut.

403.     The true names, identities and capacities of the Defendants sued herein as John Doe Nos. 1-100; and John Doe, Inc., Nos. 1-100 are unknown to Plaintiffs. These fictitiously named Defendants hold, or at one time held, some or all of the right, title and interest in one or more of the Co-Borrowing and Non-Co-Borrowing Credit Facilities described herein. As and when the names, identities and capacities of these fictitiously named Defendants become known, Plaintiffs will amend this Complaint to set forth these Defendants' true names, identities and capacities and otherwise proceed against them as if they had been named as parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure.

404.     The parties identified in paragraphs 144 through 403, above, are collectively referred to herein as the "Assignees."

**The Rigas Family Entities**

405.     Upon information and belief, Hilton Head Communications, L.P. ("Hilton Head") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania.

406.     Upon information and belief, Highland Prestige of Georgia, Inc. ("Highland Prestige") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania.

407.     Upon information and belief, Highland Video Associates, L.P. ("Highland Video") is a limited partnership organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

408.     Upon information and belief, Highland Communications LLC ("Highland Communications") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

409.     Upon information and belief, Highland Preferred Communications LLC ("Highland Preferred") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

410.     Upon information and belief, Coudersport Cable and Television Company ("CCT") is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

411.     Hilton Head, Highland Prestige, Highland Video, Highland Communications, Highland Preferred, CCT and other entities wholly-owned by the Rigas Family are collectively referred to herein as the "RFEs."  Neither Adelphia nor any of its direct or indirect subsidiaries owned or owns any interest in any of the RFEs.

## FACTS

**A.     The Rigas Family's Ownership And Control Of The Debtors.**

412.     In or about 1952, John Rigas entered the cable business by acquiring a small cable system located in Coudersport, Pennsylvania.  Over the next fifty years, this company, now known as Adelphia Communications Corporation, became the sixth largest cable provider in the United States.

413.     At all relevant times, members of the Rigas Family, principally John Rigas and his three sons, Timothy, Michael and James Rigas (collectively, the "Rigas Family"), with substantial assistance from two senior Adelphia executives, James Brown ("Brown") and Michael Mulcahey ("Mulcahey"), held all of the most senior positions of the Debtors.  John Rigas was Adelphia's President and Chief Executive Officer; Timothy Rigas was Adelphia's Executive Vice-President, Chief Financial Officer, Chief Accounting Officer and Treasurer; Michael Rigas was Adelphia's Executive Vice-President in charge of operations; and James Rigas was Adelphia's Executive Vice-President in Charge of Strategic Planning.  The Rigas Family also controlled the operations of each of Adelphia's direct and indirect subsidiaries and the RFEs, and made, or approved of, the major business decisions on behalf of the Debtors.  The Rigas Family caused the Debtors to engage in all acts or omissions alleged herein to have been

made by the Debtors, with the assistance of Brown, Mulcahey and other senior executives of the Debtors who were complicit in the fraud.

414. The Rigas Family also maintained a majority of the voting power of Adelphia's shares through its ownership of nearly all of Adelphia's issued and outstanding Class B shares of common stock, each of which carried ten times the voting power of an Adelphia Class A share. At all relevant times, Adelphia's Class A stock and debt securities (along with certain debt securities issued by indirect Adelphia subsidiaries) were publicly traded and listed on one or more national exchanges.

415. Prior to each of their resignations in May 2002, members of the Rigas Family had a majority of the nine seats on Adelphia's Board of Directors and occupied all of its senior management positions. John Rigas was Chairman of the Board of Adelphia, and Michael, Timothy and James Rigas each were directors of Adelphia. A relative of the Rigas Family, Peter Venetis, also was a director and under the control of the Rigas Family.

416. The Rigas Family's ubiquitous position within Adelphia enabled it to conceal the nature and extent of its fraudulent conduct from the independent members of Adelphia's Board of Directors, creditors (other than Defendants) and other constituents. No aspect of the fraud was revealed to Adelphia's independent directors or officers who could have and would have acted to stop the fraud had it been disclosed to them prior to 2002. Indeed, when the fraud was disclosed to the independent directors in March 2002, they acted swiftly to investigate it and ultimately to terminate the Rigas Family's management of the Debtors.

**B.** **The Debtors' Credit Facilities.**

417.     Beginning in 1998, the Debtors and the Rigas Family engaged in an acquisition campaign to expand the Debtors' subscriber base and to become one of the largest cable companies in the country. The Debtors financed these acquisitions by incurring billions of dollars of bank debt and through other debt and equity offerings. As more fully described below, however, the Debtors and the Rigas Family used the bank debt they incurred to perpetrate a massive fraud on creditors other than Defendants. The bank debt facilities outstanding as of the Petition Date are identified below.

**1.** **The Non-Co-Borrowing Facilities.**

**a.** **The Frontiervision Credit Facility.**

418.     Pursuant to a Second Amended and Restated Credit Agreement, dated as of December 19, 1997 (as amended on October 7, 1998, July 15, 1999 and March 2, 2001, the "Frontiervision Credit Agreement"), an Adelphia indirect subsidiary -- Frontiervision Operating Partners, L.P. -- entered into an $800 million facility with various lenders, comprising two separate term loans of $250 million each and a $300 million revolving line of credit. Other indirect subsidiaries of Adelphia, including Frontiervision Capital Corporation, Frontiervision Cable New England, Inc., Adelphia Communications of California III, LLC, FOP Indiana, L.P., and The Maine Internetworks, Inc.,[2] guaranteed the repayment of funds drawn under the facility pursuant to a Subsidiary Guaranty Agreement, dated as of December 19, 1997 (collectively, the "Frontiervision Guaranty Agreements"). Frontiervision Operating Partners, L.P., pledged all of

---

[2]     Each of the Debtors that are obligors, pledgors or guarantors of indebtedness under the Frontiervision Facility are referred to herein as the "Frontiervision Debtors."

its assets (including the stock of its subsidiaries) to secure repayment pursuant to a Security Agreement, as amended, dated as of December 19, 1997 (the "Frontiervision Security Agreement"). Other Adelphia indirect subsidiaries, including Frontiervision Holdings, L.P. and Frontiervision Operating Partners, LLC, guaranteed the repayment of funds drawn under the facility, and pledged their respective partnership interests in Frontiervision Operating Partners, L.P. to secure repayment pursuant to a Partner Pledge Agreement, as amended, dated as of December 19, 1997 (the "Frontiervision Partner Pledge Agreements"). Frontiervision Holdings, L.P., also pledged its holdings in its subsidiary, Frontiervision Operating Partners, LLC, to secure repayment pursuant to a Stock Pledge Agreement, as amended, dated as of December 19, 1997 (the "Frontiervision Stock Pledge Agreement," and together with the Frontiervision Credit Agreement, the Frontiervision Security Agreement, the Frontiervision Guaranty Agreements, the Frontiervision Partner Pledge Agreements and all related agreements, the "Frontiervision Credit Facility").

419.     Chase acted as Administrative Agent, J.P. Morgan Securities, Inc. acted as Syndication Agent, and CIBC acted as Documentation Agent under the Frontiervision Credit Facility. Other defendants participating in the Frontiervision Credit Facility include Morgan Guaranty, BMO, FNBC, Wachovia, Long-Term Credit, UBC, Fleet, Rabobank, ABN AMRO, BankBoston, BONY, Dresdner Bank, Credit Lyonnais, Mellon Bank, Bank Paribas, PNC Bank, Royal Bank of Canada, CBRI, BNP, U.S. Bank, Crestar Bank, First Hawaiian, The Fuji Bank, GECC, Industrial Bank of Japan, Mitsubishi Trust, Sumitomo, SunTrust, Natexis, KZH Holding,

Van Kampen Trust, ING Trust, Merrill Lynch Floating Rate Fund, Octagon, Travelers, CAI, PFL Life, Royalton, and one or more of the Assignees.[3]

420.     As of the Petition Date, approximately $617 million was outstanding under the Frontiervision Credit Facility.

### b.     The Parnassos Credit Facility.

421.     Pursuant to a Credit Agreement, dated as of December 30, 1998 (the "Parnassos Credit Agreement"), Parnassos, L.P., an Adelphia subsidiary, entered into a $700 million Facility with various lenders, comprising a $350 million term loan and a $350 million revolving line of credit.  Other indirect Adelphia subsidiaries, including Parnassos Communications, L.P. and Parnassos Holdings, L.L.C.,[4] pledged their respective partnership interests in Parnassos, L.P. to secure repayment pursuant to a Partners Pledge Agreement, dated as of December 30, 1998 (the "Parnassos Pledge Agreement," and together with the Parnassos Credit Agreement and all related agreements, the "Parnassos Credit Facility").

422.     BNS acted as Administrative Agent, BofA acted as Documentation Agent, and TD Securities acted as Syndication Agent for the Parnassos Credit Facility.  In addition, (i) each of the following acted as Managing Agent:  BMO, Barclays, CIBC, Credit Lyonnais, CSFB, Wachovia, Fleet, PNC Bank, Rabobank and SBHC; and (ii) each of the following acted as Co-Agent:  BLG, Dresdner Bank, MeesPierson, BONY and Lehman Brothers.  Other

---

[3]     The lenders in the Frontiervision Facility are referred to herein collectively as the "Frontiervision Lenders."

[4]     The Debtors that are obligors, pledgors or guarantors of indebtedness under the Parnassos Facility are referred to herein collectively as the "Parnassos Debtors."

Defendants participating in the Parnassos Credit Facility include BHV, BNP, SunTrust, First Hawaiian, FNBM, GSLP, MTTC, U.S. Trust, and one or more of the Assignees.[5]

423.     As of the Petition Date, approximately $623 million was outstanding under the Parnassos Credit Facility.

### c.     The Century-TCI Credit Facility.

424.     Pursuant to a Credit Agreement, dated as of December 3, 1999 (the "Century-TCI Credit Agreement"), Century-TCI California, L.P., an Adelphia subsidiary, entered into a $1 billion Credit Agreement with various lenders, comprising a $500 million term loan and a $500 million revolving line of credit.  Other indirect Adelphia subsidiaries, including Century-TCI California Communications, L.P. and Century-TCI Holdings, LLC,[6] pledged their partnership interests in Century-TCI California, L.P. to secure repayment pursuant to a Pledge Agreement, dated as of December 3, 1999 (the "Century-TCI Pledge Agreement," and together with the Century-TCI Credit Agreement and all related agreements, the "Century-TCI Credit Facility").[7]

425.     Citibank acted as Administrative Agent, Societe Generale and Deutsche Bank Securities were Co-Syndication Agents, SSB was Lead Arranger and Sole Book Manager, and Mellon Bank was Documentation Agent for the Century-TCI Credit Facility.  Other defendants participating in the Century-TCI Credit Facility include BofA, BONY, BNS, Bank One, Chase, CIBC, Credit Lyonnais, Dai-Ichi Kangyo, Mitsubishi Trust, TDI, BMO, Barclays, Credit Locale,

---

[5]     Each of the lenders participating in the Parnassos Facility are referred to herein collectively as the "Parnassos Lenders."

[6]     The Debtors that are obligors, pledgors or guarantors of indebtedness under the Century-TCI Facility are referred to collectively as the "Century-TCI Debtors."

[7]     The Frontiervision, Parnassos and Century-TCI Credit Facilities are referred to herein collectively as the "Non-Co-Borrowing Facilities."  The lenders in the Non-Co-Borrowing Facilities are referred to herein collectively as the "NCB Lenders."

Wachovia, Industrial Bank of Japan, PNC Bank, Webster Bank, and one or more of the Assignees.[8]

426.     As of the Petition Date, approximately $1 billion was outstanding under the Century-TCI Credit Facility.

### 2.     The Co-Borrowing Facilities.

### a.     The UCA/HHC Co-Borrowing Facility.

427.     Pursuant to a Credit Agreement, dated as of May 6, 1999 (the "UCA/HHC Credit Agreement"), six indirect subsidiaries of Adelphia -- UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., Tele-Media Company of Hopewell-Prince George, and SVHH Cable Acquisition, L.P. -- and one RFE -- Hilton Head -- entered into an $850 million Co-Borrowing Facility with various lenders, comprising a $600 million revolving credit loan and a $250 million term loan.  Other indirect Adelphia subsidiaries, including Ultracom of Montgomery County, Inc., Multi-Channel T.V. Cable Company of Virginia, Van Buren County Cablevision, Inc., Valley Cablevision, Inc., Western Reserve Cablevision, Inc., Huntingdon Television Cable Co., Tele-Media Investment Partnership, L.P., and one RFE, Ionian Communications, L.P., guaranteed the repayment of funds drawn under the UCA/HHC Co-Borrowing Facility pursuant to a Subsidiary Guaranty, dated as of May 6, 1999 (the "UCA/HHC Guaranty Agreement").  In addition, to secure repayment of the UCA/HHC Credit Agreement, (i) Adelphia pledged the stock of its indirect subsidiaries UCA Corp. and Grand Island Cable, Inc., (ii) Adelphia subsidiary ACC Operations, Inc. pledged its holdings in

---

[8]     The lenders in the Century-TCI Credit Facility are referred to herein collectively as the "Century-TCI Lenders."

its subsidiary UCA LLC, (iii) indirect Adelphia subsidiaries UCA Corp., UltraCom of Montgomery County, Inc., UCA LLC, SVHH Holdings, Inc., SHHH Acquisition Corp., Eastern Virginia Cablevision Holdings, LLC, Eastern Virginia Cablevision, L.P., Olympus Communications, L.P., Olympus Communications Holdings, LLC and National Cable Acquisition Associates, L.P. pledged the stock of their direct subsidiaries, (iv) RFEs NCAA Holdings, Inc. and Doris Holdings, L.P. pledged their respective holdings in Hilton Head, and (v) RFEs Iliad Holdings, Inc. and Hilton Head pledged their partnership interests in Ionian Communications, L.P., pursuant to an Obligor Pledge Agreement, dated as of May 6, 1999 (the "UCA/HHC Pledge Agreement," and together with the UCA/HHC Credit Agreement, the UCA/HHC Guaranty and all related agreements, the "UCA/HHC Co-Borrowing Facility"). On April 25, 2002, indirect Adelphia subsidiaries Southwest Virginia Cable, Inc., Adelphia Cablevision of Santa Ana, LLC, Adelphia Cablevision of Simi Valley, LLC and Adelphia Central Pennsylvania, LLC became guarantors under the UCA/HHC Guaranty and pledged their membership interests under the UCA/HCC Pledge Agreement.[9]

428.     Wachovia was a lender and acted as the Administrative Agent for the other lenders participating in the UCA/HHC Co-Borrowing Facility. BMO was a lender and acted as the Documentation Agent. PNC Bank was a lender and acted as the Syndication Agent. Wachovia, BMO and PNC Bank were also Arranging Agents and Joint Book Runners.[10]

429.     Upon information and belief, each of the UCA/HHC Agent Banks conducted significant due diligence on the Debtors' businesses prior to closing of the UCA/HHC Co-

---

[9]     The Debtors that are obligors, pledgors or guarantors of indebtedness under the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Debtors."

[10]    The lenders named as agents in the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Agent Banks." The lenders in the UCA/HHC Co-Borrowing Facility are referred to collectively as the UCA/HHC Lenders.

Borrowing Facility and assisted the Debtors in the preparation of an offering memorandum to solicit other Co-Borrowing Lenders to participate in the facility. Upon information and belief, each of the UCA/HHC Agent Banks received compliance certificates from the Debtors evidencing the amounts outstanding under the facility and information about the intended uses of each of the borrowings under the UCA/HHC Co-Borrowing Facility. Upon information and belief, the UCA/HHC Agent Banks were required to, and, in fact, did transmit this information to each of the UCA/HHC Lenders in the ordinary course of business.

430.     Other Defendants participating in the UCA/HHC Facility include: BofA, ABN AMRO, BONY, BNS, Barclays, Chase, CIBC, Rabobank, Credit Lyonnais, CSFB, FMB, SBHC, Franklin Trust, Industrial Bank of Japan, Meespierson, NCBP, Royal Bank of Canada, and one or more of the Assignees.

431.     As of the Petition Date, approximately $831 million was outstanding under the UCA/HHC Co-Borrowing Facility.

### b.     The CCH Co-Borrowing Facility.

432.     Pursuant to a Credit Agreement, dated as of April 14, 2000 (the "CCH Credit Agreement"), two Adelphia indirect subsidiaries -- Century Cable Holdings, LLC and Ft. Meyers Cablevision, LLC -- and one RFE -- Highland Prestige -- entered into a $2.25 billion Co-Borrowing Facility with various Defendants, comprising a $1.5 billion revolving credit facility and a $750 million term loan; an additional $500 million term loan was funded on September 28, 2000 bringing the total amount available under the facility to $2.75 billion. Other indirect Adelphia subsidiaries guaranteed repayment of funds drawn under this facility pursuant to a Guaranty Agreement, dated as of April 14, 2000 (the "CCH Guaranty Agreement") including the

following: Adelphia Cleveland, LLC, Adelphia Prestige Cablevision, LLC, Fort Myers/Gateway, LLC, Tri-States, LLC, Wellsville Cablevision, LLC, Century Colorado Springs Partnership, CMA Cablevision Associates VII, L.P., CMA Cablevision Associates XI, Limited Partnership, Eastern Virginia Cablevision, L.P., Martha's Vineyard Cablevision, L.P., Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Blacksburg/Salem Cablevision, Inc., Brazas Communications, Inc., CDA Cable, Inc., Century Alabama Corp., Century Alabama Holding Corp., Century Berkshire Cable Corp., Century Cable Management Corporation, Century Carolina Corp., Century Cullman Corp., Century Enterprise Cable, Corp., Century Huntington Company, Century Indiana Corp., Century Island Associates, Inc., Century Island Cable Television, Inc., Century Kansas Cable Television Corp., Century Lykens Cable Corp., Century Mendocino Cable Television, Inc., Century Mississippi Corp., Century Mountain Corp.,  Century New Mexico Cable Television Corp., Century Norwich Corp., Century Ohio Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Trinidad Cable Television Corp., Century Virginia Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Century Wyoming Cable Television, Inc., Century Wyoming Cable Television, Corp., Clear Cablevision, Inc., Cowlitz Cablevision, Inc., DVD Marketing Company, Inc., E&E Cable Service , Inc., Enchanted Cable Corporation, Grafton Cable Company, Huntington CATV, Inc., Imperial Valley Cablevision, Inc., Kootenai Cable, Inc., Louisa Cablevision, Inc., Manchester Cablevision, Inc., Mickelson Media, Inc., Mickelson Media of Florida, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Paragon Cablevision Construction Corporation, Paragon Cablevision Management Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., Sentinel Communications of Muncie, Indiana, Inc., Southwest Colorado Cable, Inc., S/T Cable

Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, TMC Holdings Corporation, Valley Video, Inc., Warrick Cablevision, Inc., The Westover T.V. Cable Co., Incorporated, Wilderness Cable Company and Yuma Cablevision, Inc. In addition, Prestige Communications, Inc., an RFE, guaranteed repayment of funds drawn under this facility pursuant to a CCH Guaranty Agreement, dated as of September 27, 2000.[11]

433. In addition, other indirect subsidiaries of Adelphia pledged the stock of their direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a Pledge Agreement, dated April 14, 2000 (the "CCH Pledge Agreement," and together with the CCH Credit Agreement, the CCH Guaranty Agreement, and related agreement, the "CCH Co-Borrowing Facility"), including the following: Tri-States, LLC, Wellsville Cablevision, LLC, Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Brazas Communications, Inc., Century Cable Holding Corp., Century Alabama Holding Corp., Century Huntington Company, Century Indiana Corp., Century Island Cable Television, Inc., Century New Mexico Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Ft. Myers Acquisition Limited Partnership, Mickelson Media, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., S/T Cable Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, and TMC Holdings Corporation. Highland Prestige, an RFE, and each of John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Ellen Rigas also pledged certain of their

---

[11] The Debtors that are obligors, pledgors or guarantors of indebtedness under the CCH Co-Borrowing Facility are referred to collectively as the "CCH Debtors."

interests in direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a separate CCH Pledge Agreement, dated September 27, 2001.

434.     BofA and Chase were lenders and acted as Co-Administrative Agents for the other lenders participating in the CCH Co-Borrowing Facility. TDI was a lender and acted as Syndication Agent under the facility. Barclays was a lender and acted as Arranging Agent. BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais, CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, Rabobank, and SunTrust were lenders and acted as Managing Agents. BAS and Chase Securities acted as Lead Arrangers and Joint Book Managers under the facility. CIBC Securities acted as Documentation Agent.[12]

435.     Upon information and belief, each of the CCH Agent Banks conducted significant due diligence on the Debtors' businesses prior to closing the CCH Co-Borrowing Facility and assisted the Debtors in preparing an offering memorandum to solicit other Co-Borrowing Lenders to participate in the facility. Upon information and belief, each of the CCH Agent Banks received compliance certificates from the Debtors evidencing the amounts outstanding under the facility and information about the intended uses of each of the borrowings under the CCH Co-Borrowing Facility. Upon information and belief, the CCH Agent Banks were required to and, in fact, did transmit this information to each of the CCH Lenders in the ordinary course of business.

436.     Other Defendants participating in the CCH Co-Borrowing Facility include: CIBC, BLG, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, Fifth Third, First

---

[12] The lenders named as agents in the CCH Co-Borrowing Facility are referred to collectively as the "CCH Agent Banks." The lenders in the CCH Co-Borrowing Facility are referred to collectively as the "CCH Lenders."

Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper Fund, KZH III, KZH CypressTree, KZH ING, HZH Langdale, KZH Pondview, KZH Shoshone, KZH Waterside, Liberty-Stein, Meespierson, Mellon Bank, Natexis, NCBP, CypressTree Floating Rate Fund, Olympic Trust, Oppenheimer, Pinehurst, Principal Life, Societe Generale, Stein Roe, U.S. Bank, United of Omaha, and one or more of the Assignees.

437.     As of the Petition Date, approximately $2.5 billion was outstanding under the CCH Co-Borrowing Facility.

### c.     The Olympus Co-Borrowing Facility.

438.     Pursuant to a Credit Agreement, dated as of September 28, 2001 (the "Olympus Credit Agreement"), three indirect Adelphia subsidiaries -- Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, and Adelphia Holdings 2001, LLC -- and two RFEs -- Highland Video and CCT -- entered into a $2.03 billion Co-Borrowing Facility with various Defendants, comprising a $765 million revolving credit facility, a $765 million term loan, and a $500 million term loan.  Other Adelphia indirect subsidiaries, including ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Media VA, Inc., Adelphia Cable Partners, L.P., Adelphia Cablevision Associates, L.P., Adelphia Cablevision of New York, Inc., Adelphia GS Cable, LLC, Arahova Holdings, LLC, Better TV Inc. of Bennington, CCC-III, Inc., CDA Cable, Inc. Century Alabama Corp., Century Alabama Holding Corp., Century Cable Management Corporation, Century Carolina Corp., Century Cullman, Corp., Century Enterprise Cable Corp., Century Huntington Company, Century Kansas Cable Television Corp., Century Lykens Cable Corp., Century Mississippi Corp., Century Norwich Corp., Century Shasta Cable Television Corp., Century Washington Cable Television, Inc., Chelsea Communications, Inc.,

Chelsea Communications, LLC, Cowlitz Cablevision, Inc., Genesis Cable Communications Subsidiary, LLC, GS Cable, LLC, Imperial Valley Cablevision, Inc., Kalamazoo County Cablevision, Inc., Key Biscayne Cablevision, Kootenai Cable, Inc., Mickelson Media of Florida, Mountain Cable Communications Corporation, Mountain Cable Company, L.P., Mt. Lebanon Cablevision, Inc., Multi-Channel T.V. Cable Company, Olympus Cable Holdings LLC, Pericles Communication Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc., Richmond Cable Television Corporation, Rigpal Communications, Inc., Southeast Florida Cable, Inc., Telesat Acquisition, LLC, Three Rivers Cable Associates, L.P., Timotheus Communications, L.P., Upper St. Clair Cablevision, Inc., Valley Video, Inc. Warrick Cablevision, Inc., Warrick Indiana, L.P., West Boca Acquisition Limited Partnership, Wilderness Cable Company, and Yuma Cablevision, Inc., guaranteed repayment of funds drawn under the Olympus Co-Borrowing Facility pursuant to a Guaranty, dated as of September 28, 2001 (the "Olympus Guaranty Agreement"). Each of the following RFEs also signed an Olympus Guaranty Agreement: Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II, LLC, Highland Video and Montgomery Cablevision Associates, L.P.

439. In addition, (i) an indirect Adelphia subsidiary, ACC Operations, Inc., pledged its holdings in Adelphia Cable Partners, L.P., and (ii) other indirect Adelphia subsidiaries, including ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Holdings II, LLC, ACC Media VA, Inc., Adelphia Cable Partners, L.P., Adelphia GS Cable, LLC, Arahova Holdings, LLC, CCCIII, Inc., Century Alabama Holding Corp., Century Shasta Cable Television Corp., Century Washington Cable Television, Inc., Chelsea Communications,

Inc., Chelsea Communications, LLC, Kalamazoo County Cablevision, Inc., Mountain Cable Communications Corporation, Mt. Lebanon Cablevision, Inc., Olympus Cable Holdings LLC, Olympus Cable Holdings LLC, Olympus Communications Holdings, LLC, Olympus Subsidiary, LLC, Pericles Communication Corporation, Rigpal Communications, Inc., Three Rivers Cable Associates, L.P., TMC Holdings LLC, Upper St. Clair Cablevision, Inc., Warrick Cablevision, Inc., and West Boca Acquisition Limited Partnership, pledged the stock of their direct subsidiaries to secure repayment pursuant to a Pledge Agreement, dated as of September 28, 2001 (the "Olympus Pledge Agreement," and together with the Olympus Credit Agreement, the Olympus Guaranty Agreement, and related agreements, the "Olympus Co-Borrowing Facility").[13] Later, each of the following RFEs also signed an Olympus Pledge Agreement: Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II, LLC, Highland Holdings, Highland Video and Montgomery Cablevision Associates, L.P.[14]

440. BMO was a lender and acted as the Administrative Agent for the other lenders participating in the Olympus Co-Borrowing Facility. Wachovia and BNS were lenders and acted as Syndication Agents. Fleet and BONY were lenders and acted as Documentation Agents. BofA, Bankers Trust Company, Citicorp, TDI, Chase, Deutsche Bank, CSFB, Credit Lyonnais, Royal Bank of Scotland, Societe Generale, and Fuji Bank were lenders and acted as Managing

---

[13]    The Debtors that are obligors, pledgors or guarantors of indebtedness under the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Debtors." The UCA/HHC Debtors, the CCH Debtors and the Olympus Debtors are referred to herein collectively as the "Co-Borrowing Debtors."

[14]    The UCA/HHC Co-Borrowing Facility, the CCH Co-Borrowing Facility and the Olympus Co-Borrowing Facility are referred to herein collectively as the "Co-Borrowing Facilities."

Agents.  Wachovia Securities and BNS acted as Lead Arrangers and Joint Book Managers under the facility.[15]

441.     Upon information and belief, each of the Olympus Agent Banks conducted significant due diligence on the Debtors' businesses prior to closing the Olympus Co-Borrowing Facility and assisted the Debtors in preparing an offering memorandum to solicit other Co-Borrowing Lenders to participate in the facility.  Upon information and belief, each of the Olympus Agent Banks received compliance certificates from the Debtors evidencing the amounts outstanding under the facility and information about the intended uses of each of the borrowings under the Olympus Co-Borrowing Facility.  Upon information and belief, the Olympus Agent Banks were required to, and, in fact, did transmit this information to each of the Olympus Lenders in the ordinary course of business.

442.     Other Defendants participating in the Olympus Co-Borrowing Facility include: CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding, Stanwich, Sumitomo, Toronto Dominion, and one or more of the Assignees.

443.     As of the Petition Date, approximately $1.3 billion was outstanding under the Olympus Co-Borrowing Facility.

---

[15]     The lenders named as agents in the Olympus Co-Borrowing Facility are referred to herein collectively as the "Olympus Agent Banks."  The lenders in the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Lenders."  The UCA/HHC Lenders, the CCH Lenders and the Olympus Lenders are referred to herein collectively as the "Co-Borrowing Lenders."  The UCA/HHC Agent Banks, the CCH Agent Banks and the Olympus Agent Banks are referred to herein collectively as the "Agent Banks."

**C.    The Rigas Family Used The Co-Borrowing Facilities To Loot The Debtors.**

**1.    The Unprecedented Structure Of The Co-Borrowing Facilities.**

444.    The Co-Borrowing Facilities were at the heart of the fraud perpetrated by the Rigas Family:  these facilities provided the Rigas Family with the means and opportunity to loot the Debtors and to hide their misconduct from constituents other than Defendants.

445.    Pursuant to each of the Co-Borrowing Facilities, each member of the borrowing group in the facility (a "co-borrower") -- whether a subsidiary of Adelphia or the Rigas Family -- could borrow up to the entire amount of the applicable Co-Borrowing Facility. Each co-borrower was jointly and severally liable for all amounts borrowed by any of the other co-borrowers regardless of whether it received any benefit from such borrowings.  The provision of billions of dollars of co-borrowing loans to unaffiliated entities under these circumstances was unprecedented.  Permitting the RFEs to borrow such substantial amounts -- which they clearly could not repay -- against the credit of the Co-Borrowing Debtors served no legitimate corporate purpose for the Debtors.

446.    Thus, the Debtors and certain of the Co-Borrowing Lenders structured each of the Co-Borrowing Facilities to leverage the Debtors' credit to provide the Rigas Family with access to billions of dollars of loans.  Without the Debtors' credit support, the Rigas Family could not have obtained loans of this magnitude.  Indeed, upon information and belief, the first of the relevant Co-Borrowing Facilities was consummated because the Rigas Family had exhausted its borrowing capacity under several margin loan accounts held at SSB and other Defendants.  Moreover, upon information and belief, each of the Co-Borrowing Lenders and the Investment Banks knew that the Co-Borrowing Facilities would be available to finance the Rigas

Family's purchases of Adelphia securities and other asset acquisitions, to pay off margin loans to the Rigas Family and for other personal uses by the Rigas Family.

447.    The money lent to the RFE co-borrowers conferred no benefit on the Debtors. From the outset, it was clear to the Rigas Family and the Co-Borrowing Lenders that the Debtors would not receive any benefit from those substantial portions of the Co-Borrowing Facilities drawn down by the RFEs.

448.    The RFEs were significantly less creditworthy than the Debtor co-borrowers. The value of cable providers such as the Debtors and the cable RFEs -- and hence their borrowing capacity -- is measured principally by the cash flow generated by their respective subscriber bases. One of the standard valuation methodologies used in the cable industry is a multiple of the number of a company's subscribers. Prior to the closing of each of the Co-Borrowing Facilities, it was clear to the Co-Borrowing Lenders that the RFE co-borrowers had insufficient assets (i.e., subscribers) to repay their respective share of the amounts initially drawn and likely to be drawn thereafter.

449.    Indeed, the RFEs contributed approximately 5% of the subscribers to the Co-Borrowing Facilities despite being entitled to borrow all of the funds thereunder and despite ultimately drawing nearly 60% of the funds available under those facilities.

   **2.    The Debtors And The Rigas Family Intended That The
          Co-Borrowing Facilities Would Be Used For Fraudulent Purposes.**

      **a.    UCA/HHC.**

450.    The Rigas Family did not hide their intent to use the UCA/HHC Co-Borrowers Facility to defraud the Debtors and their creditors. To the contrary, the Rigas Family

disclosed its fraudulent intent to the UCA/HHC Co-Borrowing Lenders. Discussing the UCA/HHC Co-Borrowing Facility before closing, the Debtors informed certain of the Agent Banks that they "specifically intended a portion of the facility to be distributed to the Rigas Family for purposes of participating in the upcoming [Adelphia] equity offering." (emphasis added).

451.     Upon information and belief, the Debtors and the Agent Banks informed the other Co-Borrowing Lenders of this intent before closing. Thus, the UCA/HHC Co-Borrowing Lenders -- who knew that the UCA/HHC Debtors received no benefit from loans to the Rigas Family or the RFEs -- acknowledged and agreed that $250 million of the $850 million of the initial proceeds from the facility would be used by the Rigas Family to purchase equity securities from Adelphia for their personal account. The Debtors also disclosed that the RFE co-borrowers under the UCA/HHC Co-Borrowing Facility were not owned by the Debtors.

452.     Prior to the closing of the UCA/HCC Co-Borrowing Facility, the Debtors and the Rigas Family also disclosed to the UCA/HCC Co-Borrowing Lenders that the assets of the RFEs participating in the facility would be disproportionately small compared to those of the UCA/HHC Debtors. Of the 395,000 subscribers owned by the borrowers participating in the UCA/HHC Co-Borrowing Facility, the sole RFE member of the borrowing group, Hilton Head, contributed just 72,000 subscribers, or approximately 18%. Nonetheless, as of the Petition Date, Hilton Head, an RFE, had drawn approximately $642 million of the $831 million outstanding under the UCA/HHC Co-Borrowing Facility, or 77% of the amount borrowed. No prudent lender would have lent Hilton Head $642 million (or more) without the credit support of the UCA/HHC Co-Borrowing Debtors.

453.     None of the amounts drawn by, or on behalf of, Hilton Head benefited any of the Debtors.

### b.  **CCH.**

454.     The Rigas Family also announced its intent to use the CCH Co-Borrowing Facility to defraud the Debtors.  The Debtors and the Rigas Family expressly advised the CCH Agent Banks that they intended to use the proceeds from the CCH Co-Borrowing Facility to acquire assets for the personal account of the Rigas Family.  In a written invitation to participate in the CCH Co-Borrowing Facility, Adelphia executive James Brown stated:

> The use of proceeds for this facility will be primarily to fund Adelphia's purchase of the Cleveland, Ohio cable system from Cablevision Systems Corporation ($990 mm), to fund Adelphia's purchase of certain cable assets from Prestige Communications ($700mm) <u>and to fund the Rigas families [sic] purchase of certain cable assets from Prestige Communications ($400 mm)</u>.

Letter from James Brown to Agent Banks, dated February 17, 2000 (emphasis added).  Thus, from the outset, the CCH Agent Banks knew that the Debtors intended to draw hundreds of millions of dollars from the facility at closing for the sole benefit of the RFE co-borrowers.

455.     Upon information and belief, the Debtors and the Rigas Family also disclosed to each of the other CCH Lenders that (i) the RFE co-borrowers were not affiliated with the Debtors, and (ii) the Rigas Family intended to use a portion of the funds under the CCH Co-Borrowing Facility to fund the Rigas Family's personal acquisition of the Prestige Systems.  Indeed, based on the substantial participation of CCH Lenders that had participated in the UCA/HHC Co-Borrowing Facility, the CCH Lenders also knew that the Rigas Family had been using the proceeds of other co-borrowing loans for fraudulent purposes.

456.     Moreover, the offering memorandum for the CCH Co-Borrowing Facility informed the CCH Lenders that the number of cable subscribers owned by the RFE co-borrower was disproportionately small compared to the number of subscribers owned by the CCH Debtors and patently insufficient to support repayment of the loans. Of the 1,532,814 subscribers owned by the CCH Co-Borrowing Facility borrowing group, the sole RFE member, Highland Prestige, contributed just 55,831 subscribers, or approximately 3.6% of the total assets supporting the loan. Nonetheless, as of the Petition Date, Highland Prestige had drawn approximately $1.66 billion of the $2.48 billion outstanding under the CCH Co-Borrowing Facility, or 67% of the amount borrowed. No prudent lender would have lent Highland Prestige $1.66 billion (or more) without the credit support of the CCH Co-Borrowing Debtors.

457.     None of the amounts drawn by Highland Prestige benefited any of the Debtors.

### c.     **Olympus**.

458.     The Rigas Family did not conceal its intention to use the Olympic Co-Borrowing Facility for its personal benefit. The offering memorandum distributed to the Olympus Lenders specifically stated that: (i) the initial proceeds would be used to pay at least $152 million of indebtedness owed by RFEs, and (ii) the RFEs were unaffiliated entities. Indeed, based on the substantial overlapping participation of lenders from the UCA/HHC and CCH Co-Borrowing Facilities, the Olympus Lenders knew that the Rigas Family had been using the proceeds of other Co-Borrowing Facilities for fraudulent purposes as more fully described above.

459.     The offering memorandum for the Olympus Co-Borrowing Facility advised the Olympus Lenders that the number of cable subscribers owned by the RFE co-borrowers was disproportionately small compared to the Olympus Debtors and patently insufficient to support repayment of the loans.  Of the 1,566,847 subscribers contributed to the Olympus Co-Borrowing Facility borrowing group as collateral, the two RFE members of the borrowing group, Highland Video and CCT, contributed just 61,335 subscribers, or approximately 3.9% of the total assets supporting the loan.  Nonetheless, as of the Petition Date, Highland Video and CCT had drawn approximately $751.5 million of the $1.27 billion outstanding under the Olympus Co-Borrowing Facility, or 59% of the amount borrowed.  No prudent lender would have lent Highland Video and CCT $751 million (or more) without the credit guaranty of the Olympus Co-Borrowing Debtors.

460.     None of the amounts drawn by Highland Video and CCT benefited any of the Debtors.

### 3.     The Fraudulent Uses Of The Co-Borrowing Facilities By The Rigas Family.

#### a.     The Rigas Family's Purchase Of $1.9 Billion Of Adelphia Securities.

461.     From late 1998 until their resignations in May 2002, the Rigas Family engaged in at least eleven transactions for the purchase of approximately $1.9 billion in securities issued by Adelphia, including common stock and convertible bonds.  The Rigas Family funded many of these transactions directly from the proceeds of the Co-Borrowing Facilities.  Each of these transactions was fraudulent because, as discussed infra, the Debtors received no consideration.  In fact, the Debtors suffered significant harm from these transactions

because the Debtors issued stock to the Rigas Family for zero net value, when such stock could have been sold to third parties to raise fresh capital. As discussed infra, the Rigas Family compounded this harm by using these purchases to create the appearance that the Debtors' liabilities had decreased, when, in fact, they had not.

<blockquote><b>b. The Debtors' Payment Of $252 Million Of<br>Margin Loans On Behalf Of The Rigas Family.</b></blockquote>

462.     From July 2001 until May 2002, the Rigas Family used approximately $252 million from the Co-Borrowing Facilities to make payments on margin loans owed by the members of the Rigas Family on personal margin accounts maintained at Defendants BofA, SSB, Deutsche Bank Securities and Goldman Sachs (the "Margin Lenders"). The Adelphia securities that the Rigas Family purchased with co-borrowing funds secured amounts owed under these margin accounts. A significant amount of the margin payments made by the Rigas Family with funds drawn from the Co-Borrowing Facilities -- approximately $166 million -- occurred after March 27, 2002, the date on which the Rigas Family publicly disclosed its fraudulent concealment of the true amount of Adelphia's liability under the Co-Borrowing Facilities. The Margin Lenders (or their affiliates) that were Co-Borrowing Lenders knew prior to their receipt of the margin payments for the personal benefit of the Rigas Family that such payments came from Co-Borrowing Facilities.

<blockquote><b>c. The Rigas Family's Purchase<br>Of $710 Million Of Cable Systems.</b></blockquote>

463.     On or about July 5, 2000, Highland Holdings, an RFE, acquired various cable systems in Georgia owned by Prestige Communications, Inc. (the "Prestige Acquisition"). The Prestige Acquisition involved various transfers of funds and other assets by which the Rigas

Family, through Highland Holdings, consummated the Prestige Acquisition with approximately $365 million of funds borrowed from the CCH Co-Borrowing Facility, for which the CCH Debtors remained liable.

464.     On or about July 2, 2001, Highland Holdings also acquired various cable systems from the Estate of Bill Daniels (the "Daniels Acquisition").  The Daniels Acquisition also involved various transfers of funds and other assets by which the Rigas Family, through Highland Holdings, consummated the Daniels Acquisition with approximately $345 million of funds borrowed from the CCH Co-Borrowing Facility, for which the CCH Debtors remained liable.

### d.     Other Uses By The Rigas Family Of Funds From The Co-Borrowing Facilities.

465.     The Rigas Family also used funds from the Co-Borrowing Facilities to finance certain non-Adelphia related ventures and to cause Adelphia to enter into other fraudulent transactions with RFEs.

466.     For example, The Rigas Family used at least a portion of the Co-Borrowing Facilities to fund $175 million in expenses for the Buffalo Sabres professional hockey team (formerly owned by an RFE), and to fund expenditures relating to the development of a golf course at Wending Creek Farms on Rigas Family land.

467.     The Rigas Family also caused Adelphia to use at least a portion of the Co-Borrowing Facilities to purchase in non-arms length transactions approximately $40 million in furniture and to purchase timber rights from RFEs.

468.     As of the Petition Date, the Rigas Family fraudulently had used at least $3.4 billion of the $5.6 billion available under the Co-Borrowing Facilities for their own personal enrichment, to the detriment of the Debtors and their other creditors. As more fully discussed <u>infra</u>, the Co-Borrowing Lenders knew of or recklessly disregarded the Rigas Family's fraudulent scheme.

### 4.     **The Rigas Family's Fraudulent Use Of Non-Co-Borrowing Facilities.**

469.     The Rigas Family's fraudulent use of the Debtors' credit facilities did not end with the Co-Borrowing Facilities. The Rigas Family used at least one of the Debtors' other credit facilities to fund personal expenses. In contrast to the Co-Borrowing Facilities, however, these other credit facilities did not explicitly authorize RFEs to access such credit.

470.     The Century-TCI Lenders knew, or recklessly disregarded, the fact that the proceeds of their loans were being used to illegally shift value from the Debtors to the Rigas Family without consideration. In this regard, on October 30, 2001, October 31, 2001, and November 1, 2001, the Debtors drew a total of $490 million from the Century-TCI Facility; upon information and belief, the Rigas Family used these proceeds to pay for purchases of common stock and convertible notes for $408 million in October and November 2001. At or about that time, the Co-Borrowing Facilities were fully drawn. Adelphia therefore requested from Citibank, as the administrative agent for the Century-TCI Credit Facility, a previously unplanned $350 million draw; Adelphia also drew from Century-TCI another $60 million on October 31, and another $80 million on November 1.

471.     Although the Rigas Family acquired $408 million of Adelphia securities in October and November 2001, in reality, the Rigas Family did not pay $408 million or any other

amount to Adelphia. Instead, the Rigas Family merely recycled Century-TCI funds to consummate this stock purchase rather than contributing fresh capital. The Century-TCI Lenders knew or recklessly disregarded the fact that the $408 million draw from the Century-TCI Facility and other draws were used by the Rigas Family for fraudulent purposes.

**D.      The Rigas Family Concealed From Creditors Other Than Defendants
The True Amount Outstanding Under The Co-Borrowing Facilities.**

472.      The Rigas Family's intent to defraud creditors is evidenced by their concealment of the true amounts outstanding under the Co-Borrowing Facilities. In 2000, the Debtors' debt burden caused significant reductions in the Debtors' credit ratings, thereby jeopardizing the Rigas Family's ability to access the capital markets. In August 2000, Moody's observed that the Debtors desperately needed a "deleveraging" event. Consequently, the Rigas Family -- with Defendants' knowledge or reckless disregard -- concocted a ploy to convince the public that Adelphia was deleveraging when its actual debt load was increasing because of the Rigas Family's illicit uses of the Co-Borrowing Facilities. As more fully explained below, while the Debtors -- acting by and through the Rigas Family -- concealed the true extent of their borrowings from other creditors, the Co-Borrowing Lenders knew the correct amounts all along.

**1.      The Debtors Simply Omitted The RFE Uses Of
The Co-Borrowing Facilities And Other Amounts
From Their Balance Sheets.**

473.      At no time prior to March 27, 2002 did the Debtors disclose the true extent of their liabilities under the Co-Borrowing Facilities in filings with the Securities and Exchange Commission ("SEC"). Since May 1999 -- the date the UCA/HHC Co-Borrowing Facility closed -- Adelphia's SEC filings have understated the amount owed under the Co-Borrowing Facilities

by billions of dollars. Moreover, Adelphia and its indirect subsidiaries Arahova Communications, Inc. and Olympus Communications, L.P. each had publicly-traded debt securities. The Rigas Family also caused the SEC filings of these indirect Adelphia subsidiaries to understate the billions of dollars outstanding under the Co-Borrowing Facilities.

474. The Rigas Family consistently omitted from the Debtors' public financial statements amounts borrowed for the exclusive benefit of the RFEs. Yet the Debtors, the Rigas Family and Defendants knew that Generally Accepted Accounting Principles ("GAAP") require a party liable for a debt (whether on a co-borrowing basis or otherwise) to disclose the entire amount of the debt in financial statements regardless of whether the debt was incurred for the benefit of another borrower; GAAP only permits exclusion of debt that has been extinguished. No amounts concealed by the Rigas Family had ever been extinguished.

## 2. The Fraudulent Use Of The CMS.

475. Until May 2002, when the Rigas Family relinquished control of the Debtors, the Debtors used their cash management system ("CMS") to control cash transactions involving each of the Debtors and the RFEs. The CMS was a key instrumentality of the fraud. The use of a central cash management system governing both a public company and unaffiliated entities was unprecedented. Defendants knew or recklessly disregarded the structure and fraudulent use of the CMS. Indeed, it was yet another red flag that they ignored.

476. Defendant Wachovia -- an agent bank or lender in all of the Debtors' credit facilities -- maintained the CMS at all relevant times and the Rigas Family controlled it. The CMS was a central depository (in reality, the Rigas Family's personal piggy bank) for cash generated or obtained by the Debtors from all sources (including borrowings under each of the

Co-Borrowing Facilities, the Non-Co-Borrowing Facilities and the proceeds from the Debtors' debt and equity securities offerings). The Debtors commingled all of their cash with that of the RFEs in the CMS. After the Debtors deposited cash into the CMS, "ownership" of the cash could be transferred through simple journal entries to any RFE. The cash also could be transferred from the CMS to any of a number of bank accounts held in the name of the RFEs.

477. Through the CMS, the Rigas Family misappropriated over $3.4 billion from the Co-Borrowing Facilities for its own benefit. The Debtors' banking and wire transfer records reflect that the Rigas Family obtained funds from the Co-Borrowing Facilities by transferring funds from the CMS to an account maintained at Wachovia by Highland Holdings or some other RFE, followed by a transfer from the RFE either directly to individual members of the Rigas Family or to other RFEs, many of which also maintained accounts at Wachovia. Typically, these transfers occurred on the same business day. Thus, on any given business day in which an RFE received cash transfers from the Debtors, the RFE's account balance at Wachovia would fluctuate from zero, to the amount transferred in from Adelphia, and back to zero after the RFE funneled those funds out to the Rigas Family. Defendant Wachovia, an agent bank or lender under each of the Debtors' credit facilities (including the Co-Borrowing Facilities), thus was in a unique position to observe the fraudulent transfer of funds from the Debtors to the Rigas Family. In accordance with its role as an Agent Bank, Wachovia, upon information and belief, shared its knowledge of these transactions with other Co-Borrowing and NCB Lenders.

### 3. The Rigas Family Falsely Created The Appearance Of A "Deleveraging".

478. The Rigas Family was not content with merely concealing the amounts borrowed by the RFEs under the Co-Borrowing Facilities. In response to market concerns about

the Debtors' increasing debt load, the Rigas Family publicly announced that it would be purchasing Adelphia stock to assist the Debtors with deleveraging -- i.e., significantly reducing debt. At all relevant times, these statements were fraudulent because Adelphia's leverage was increasing and, as discussed infra, the Rigas Family was using its acquisition of Adelphia's securities with Co-Borrowing funds to conceal the Debtors' increasing leverage. Defendants knew of and participated in this scheme through their approval of Co-Borrowing Facility draws to fund the Rigas Family's acquisitions of Adelphia's securities, through their underwriting of debt and equity offerings in which the fraudulent purchases occurred, and through their knowledge and disregard that the purported deleveraging was a sham.

479.    The basic structure of these bogus securities purchase transactions involved:

    ?    a draw down by an RFE under a Co-Borrowing Facility in the amount of the purchase price of the securities to be purchased;

    ?    a transfer from the RFE co-borrower to an RFE that was not a co-borrower;

    ?    a transfer from the non-co-borrowing RFE to the Debtors;

    ?    Adelphia's issuance of securities to the non-co-borrowing RFE -- i.e., the Rigas Family; and

    ?    the Debtors' use of proceeds of the Rigas Family's securities purchase to pay down outstanding debt under the Co-Borrowing Facilities.

480.    As a result of these transactions, the Debtors booked an increase in a shareholders' equity account in the amount it had received from the RFE, and recorded a correlating decrease in the debt outstanding under one or more of the Co-Borrowing Facilities. The decrease, however, was fraudulent. Because the Debtors still remained liable for the co-borrowing funds used by the RFE to purchase Adelphia securities (but failed to disclose that liability), the purpose and effect of the transaction was simply to move the debt purportedly paid

down under the Co-Borrowing Facility off of the Debtors' books and onto the books of the co-borrower RFE in violation of GAAP. Of course, under the terms of the Co-Borrowing Facilities, the Co-Borrowing Debtors remained liable for all amounts drawn by the RFE co-borrowers despite the Rigas Family's fraudulent bookkeeping.

481. From 1999 through 2001, the Investment Banks, by and through analysts, published a series of reports announcing the Rigas Family's purported campaign to delever the Debtors. These reports facilitated the fraud by disseminating the Rigas Family's misleading intentions and actions and verifying them. The Investment Banks knew or recklessly disregarded that the Rigas Family made bogus equity contributions to Adelphia, concealed the actual level of debt and misrepresented their efforts to delever the Debtors.

## E. Defendants Knew Of Or Recklessly Disregarded The Fraud.

### 1. The Rigas Family Specifically Informed Defendants Of Their Fraudulent Activities.

482. Although the Rigas Family concealed their fraud from the public and the Debtors' other creditors, the Rigas Family did not conceal it from Defendants. To the contrary, the Rigas Family could not have accomplished this massive fraud on the Debtors and their creditors without Defendants' substantial and knowing assistance.

483. As set forth above, the Rigas Family disclosed to each of the Co-Borrowing Lenders (prior to closing and thereafter) that a substantial portion of the proceeds would be used for purposes benefiting solely the Rigas Family and the RFEs. This disclosure -- along with the structure of the Co-Borrowing Facilities that the Co-Borrowing Lenders had approved -- gave Defendants actual notice of the misconduct by the Rigas Family. As more fully described below,

many of the Defendants had a much more substantial relationship with the Debtors and the Rigas Family that provided them with significantly more information about the fraud.

### 2. Defendants Knew That The Rigas Family Concealed The Debtors' Co-Borrowing Debt.

484.     The Co-Borrowing Lenders knew or recklessly disregarded that the Debtors' filings with the SEC consistently concealed the true amount of their co-borrowing liability. Obviously, the Co-Borrowing Lenders knew the amount owing under the Co-Borrowing Facilities in which they participated. In addition, since Wachovia and BMO were Agent Banks or lenders under all of the Co-Borrowing and Non-Co-Borrowing Facilities, these institutions also knew the outstanding balances of all of the Debtors' bank debt (as did other lenders participating in the Co-Borrowing and Non-Co-Borrowing Facilities). All of the Co-Borrowing Lenders regularly received compliance certificates from the Debtors evidencing the true amounts outstanding under the Debtors' credit facilities.

485.     Upon information and belief, the Co-Borrowing Lenders performed periodic analyses demonstrating Adelphia's concealment, as caused by the Rigas Family, of billions of dollars under the Co-Borrowing Facilities from the Debtors' balance sheet. For example, on or about March 29, 2001, Defendant Wachovia performed an analysis of Adelphia's total outstanding "bank debt" at the subsidiary level, as of September 30, 2000, under the two Co-Borrowing Facilities then outstanding -- UCA/HHC and CCH -- and under six Non-Co-Borrowing Facilities then outstanding -- Parnassos, Chelsea Communications, Adelphia Cable Partners, Harron Communications, Frontiervision and Century-TCI. Wachovia determined that the Debtors' total "bank debt" as of September 30, 2000 was approximately $5.2 billion.

486.     Adelphia's public filings for the same period, however, disclosed that the Debtors' bank debt, as of September 30, 2000, was approximately $3.8 billion.  Wachovia did not need any "special" access to the Debtors to obtain this information.  To the contrary, all of the Co-Borrowing lenders could have made this calculation based on information readily accessible to them as lenders.  Thus, Wachovia's analysis demonstrates that, many, if not all, Defendants knew or recklessly disregarded that Adelphia was understating its total bank debt in 2000 by approximately $1.4 billion and that Adelphia's leverage was not being reduced as represented.

487.     Moreover, upon information and belief, in early 2002, each of the Agent Banks performed an analysis of Adelphia's total outstanding bank debt, as of September 30, 2001, under the Co-Borrowing and Non-Co-Borrowing Facilities.  Based on the information available to them (and which had been available since 1999), each of the Agent Banks determined that Adelphia's total bank debt was between $6.8 billion and $7.3 billion.

488.     Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt as of September 30, 2001, was approximately $5.4 billion, which included amounts borrowed by an Adelphia subsidiary, Adelphia Business Solutions, Inc. ("ABIZ"), that the Agent Banks did not include in their calculations.  Thus, even including the amounts borrowed by ABIZ, Defendants knew or recklessly disregarded that the Debtors understated their total bank debt by at least $1.4 billion.  Yet the concealment went much further.  Because the SEC filing included significant ABIZ bank debt -- which the Co-Borrowing Agent Banks' analyses excluded -- the Debtors amounts clearly concealed much more than $1.4 billion.

489.     In addition to the information the Agent Banks received as lenders, the Agent Banks and the Investment Banks had additional and ample opportunities to learn all material aspects of the Debtors' business and finances. As more fully set forth below, each of the Agent Banks and the Investment Banks, as the Debtors and the Rigas Family's long-time lenders, investment bankers, underwriters, financial analysts, financial advisors and strategic partners, had access to and possession of significant non-public information concerning the financial affairs of the Debtors, the RFEs and the Rigas Family. Moreover, the Investment Banks had a legal obligation to conduct extensive due diligence in connection with the securities offerings they underwrote.

### 3.     Defendants Knew That The Rigas Family Was Using The CMS To Facilitate The Fraud.

490.     As discussed above, most of the bank accounts through which the Rigas Family caused Adelphia to fraudulently transfer the co-borrowing funds -- principally the CMS and the Rigas Family's personal accounts -- were maintained at Defendant Wachovia. In many instances, Wachovia would fund, or otherwise be aware of, massive draw downs by an Adelphia subsidiary under the Co-Borrowing Facilities on the same day that the Rigas Family deposited or transferred significant amounts, which, in some instances, matched the amounts drawn down under a Co-Borrowing Facility the very same day. As such, Wachovia knew or recklessly disregarded the Rigas Family's fraudulent conduct. Upon information and belief, other Co-Borrowing Agent Banks knew of the fraudulent use of Co-Borrowing Facilities and the shifting of funds via the CMS.

491.     In this regard, records of Adelphia, BofA and Wachovia reflect that, on July 3, 2000, Highland Prestige, an RFE co-borrower, drew $145 million under the CCH Co-Borrowing

Facility. The money was transferred directly from BofA, the administrative agent under the CCH Co-Borrowing Facility, to a Highland Prestige bank account at Wachovia. That same day, Highland Prestige transferred approximately $145 million from the same account to the account of another RFE (not a co-borrower), which used the funds to acquire shares of Adelphia Class B Common Stock.

492.     Upon information and belief, before each of the Co-Borrowing Facilities closed, all of the Co-Borrowing Lenders obtained summaries, reports and other information relating to the CMS. Thus, Defendants knew of, or recklessly disregarded, the existence of the CMS, the commingling of funds in the CMS, and the fraudulent use by the Rigas Family of funds within the CMS. In particular, Wachovia, by virtue of its oversight of the CMS, Highland Holdings accounts and other Rigas Family accounts that received transfers from the CMS, knew or recklessly disregarded the fraudulent nature of the transfers between the Debtors and the RFEs via the CMS.

493.     By contrast, the Debtors, at the direction of the Rigas Family, never informed other creditors, including the holders of public debt securities issued by the Debtors, that the CMS included commingled cash from the Debtors and the RFEs that was being fraudulently diverted from the Debtors for the benefit of the Rigas Family.

**4.     Defendants Knew That The Proceeds Of The
         Non-Co-Borrowing Facilities Were Used For Fraudulent Purposes.**

494.     After May 1999, each of the Co-Borrowing Lenders knew that (i) the Debtors and the RFEs were commingling cash, (ii) the Co-Borrowing Debtors had agreed to be liable for co-borrowing funds drawn by the RFEs, and (iii) the Rigas Family was using the Co-Borrowing

Facilities for personal expenses, including, but not limited to, the purchase of securities issued by Adelphia. The composition of the lenders in the Co-Borrowing Facilities and the Non-Co-Borrowing Facilities substantially overlapped. Once they had indisputable notice of the fraud, the Co-Borrowing Lenders participating in the Non-Co-Borrowing Facilities knew or should have known that the Rigas Family would use the proceeds of the Non-Co-Borrowing Facilities in furtherance of the fraud.

**F. Many Defendants Assisted In, Or Recklessly Ignored, The Rigas Family's Fraud To Garner Enormous Fees.**

**1. The Unity Of Interest Between Each Agent Bank And Its Affiliated Investment Bank.**

495. Substantially all of the Agent Banks had Investment Bank affiliates that rendered significant underwriting, investment banking, and other advisory services to the Debtors. The following is a chart setting forth the applicable Defendant Agent Bank and its Defendant Investment Bank affiliate:

| Agent Bank | Investment Bank Affiliate |
|---|---|
| BofA | BAS |
| BMO | BMO NB |
| Wachovia | Wachovia Securities |
| Citibank | SSB |
| ABN AMRO | ABN AMRO Securities |
| BONY | BNY Capital Markets |
| BNS | Scotia Capital |

| Agent Bank | Investment Bank Affiliate |
|---|---|
| Barclays | Barclays Capital |
| CIBC | CIBC Securities |
| Chase | Chase Securities |
| Credit Lyonnais | Credit Lyonnais Securities |
| CSFB | CSFB Securities |
| Deutsche Bank | Deutsche Bank Securities |
| DLJ | DLJ Securities |
| Fleet | Fleet Securities |
| Merrill Lynch | Merrill Lynch Securities |
| Morgan Stanley | Morgan Stanley Securities |
| PNC Bank | PNC Capital Markets |
| Royal Bank of Scotland | Royal Bank of Scotland |
| Societe Generale | SG Cowen |
| SunTrust | SunTrust Securities |
| TDI | TD Securities |

496.     Each Agent Bank shared a unity of interest, conspired, and acted in concert with its affiliated Investment Bank with respect to transactions related to the Debtors and Rigas Family. Each of the Investment Banks, among other things, underwrote numerous Adelphia securities offerings, advised the Rigas Family on structuring various financing transactions for the Debtors and the Rigas Family, and had its purportedly independent analysts issue overly optimistic reports on Adelphia's securities to inflate or maintain the market value of the Rigas Family's stock holdings. While each Agent Bank and its Investment Bank affiliate should have

made independent judgments about whether to lend to the Debtors and to underwrite Adelphia securities, no such independent judgments or decisions were made. Instead, each of the Agent Banks and Investment Banks made decisions based solely on the fee income that would be generated.

497. The Investment Banks and affiliated Agent Banks shared all material information about the Debtors' businesses and finances. Indeed, upon information and belief, each of the underwriting agreements between the Investment Banks and the Debtors expressly authorized information-sharing between the Investment Banks and their Agent Bank affiliates. One of these underwriting agreements provided that:

> The Investment Banks may . . . share any Offering Document, the Information and any other information or matters relating to Company, any assets to be acquired or the transactions contemplated hereby with Bank of America, N.A. ("BofA") and Citibank, N.A. (together with SSBI, "Citi/SSB") and BofA and Citi/SSB affiliates may likewise share information relating to Company, such assets or such transaction with the Investment Banks.

498. Not only did the Agent Banks and Investment Banks share information, each of the institutions worked as a team to ensure that they extracted maximum fee income from the Debtors. For example, BAS "deal teams" for many Adelphia securities offerings included employees of both BAS and BofA. The December 21, 2000 agreement pursuant to which Adelphia retained BAS to act as, among other things, its investment advisor, states: "For purposes of this engagement letter, 'BAS' shall mean Banc of America Securities LLC and/or any affiliate thereof, including BofA, as BAS shall determine to be appropriate to provide the services contemplated herein[.]" Moreover, BofA ultimately approved the Co-Borrowing

Facilities based on the fees received by BAS, and BofA substantially relied upon information provided by BAS in approving each of the Co-Borrowing Facilities.

499.     Similarly, in performing the acts described herein, Citibank, Citicorp, SSB, SBHC, and their affiliates (the "Citigroup Defendants") acted together in pursuit of a common plan, such that each acted on behalf of, and as the agent for, the others.  Among other things, the Citigroup Defendants shared information and worked as a "team" to obtain investment bank engagements and to extend credit to Adelphia, including presenting themselves to the Debtors as a single provider of financing and related services and products.  As part of this approach, the Citigroup Defendants at times conditioned the extension of credit by one or more of them to Adelphia and the Rigas Family on Adelphia's engaging another of them to provide investment banking services, and *vice versa.*

500.     BMO and BMO NB, Wachovia and Wachovia Securities and, upon information and belief, the other Agent Banks and their Investment Bank affiliates also ignored any real distinction between lending and investment banking divisions in their dealing with the Debtors and the Rigas Family.  Adelphia deal teams for these entities also included employees from both lending and investment banking groups, and each Agent Bank approved participation in the Co-Borrowing Facilities based primarily upon the fees being earned by its affiliated Investment Bank.

2. **The Agent Banks And Investment Banks' Close Relationship With The Debtors And The Rigas Family**.

501.    The Agent Banks and Investment Banks' close relationship with the Debtors and the Rigas Family began long before the Co-Borrowing Facilities.  In 1986, Adelphia became a publicly-traded company through an initial public offering ("IPO") of its common stock.

502.    Shortly after Adelphia's IPO, Adelphia, through the Rigas Family, began to establish significant relationships with, upon information and belief, each of the Agent Banks and the Investment Banks and, upon information and belief, other lenders.  Over the next sixteen years, many of the Agent Banks and their affiliated Investment Banks provided significant debt and equity financing, underwriting, investment banking advice and other financial services to Adelphia, to certain of the RFEs, and directly to members of the Rigas Family.  Indeed, the Agent Banks and Investment Banks were intimately involved, on a non-arms length basis, in the Debtors' financial affairs.

503.    The following chart sets forth some of the more recent Adelphia and Rigas Family-related transactions in which certain lead Agent Banks and their affiliated Investment Banks participated:

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| Adelphia Cable Partners Financing | X | X | X | |
| Chelsea Communications Financing | X | X | X | |
| Highland Video (Rigas Family) Financing | | X | X | |
| Hilton Head Communications (Rigas Family) Financing | | | X | |
| $329M Hyperion 13% Discount Notes Offering 2/1996 | X | | | |

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| $200M FrontierVision 11% Senior Subordinated Notes 10/7/1996 | | | X | |
| $300M ACC Senior Notes & Preferred Stock 7/1/1997 | X | | | X |
| $145M Frontiervision Discount Notes 9/19/1997 | | | X | |
| $237.65M 11 7/8% Senior Discount Notes 12/12/1997 | | | X | |
| $800M Frontiervision Credit Facility 12/19/1997 | | X | X | |
| $300M Hyperion Initial Public Offering 5/8/1998 | X | | | X |
| $262M Class A Common Stock Offering 8/1998 | X | | | X |
| $700M Parnassos Credit Facility 12/1998 | X | X | X | |
| Harron Credit Facility 1999 | X | X | X | |
| $372M Class A Common Stock Offering 1/1999 | X | | | |
| $400M Senior Notes Offering 1/8/1999 | X | | | X |
| $494M Class A common 4/1999 | X | | | X |
| $500M Convertible Preferred Offering 4/99 | X | | | X |
| $850M UCA/HHC Co-Borrowing Credit Facility 5/6/1999 | X | X | X | X |
| $350M 7 7/8% Adelphia Senior Notes Offering 6/15/1999 | | X | | X |
| $342 Class A Common Stock Offering 9/30/1999 | X | | X | X |
| November 1999 Hyperion $262.5 Million Common Stock Follow On Offering. | | | | X |
| $500M 9 3/8% Adelphia Bond Offering 11/16/1999 | | X | | X |

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| $500M 5 1/2% Convertible Preferred Offering 1999 | X | | | |
| $1.0B Century/TCI Credit Facility 12/1999 | X | X | X | X |
| $2.25B CCH Co-Borrowing Facility 4/14/2000 | X | X | X | X |
| $750M ACC Senior Bonds Offering 9/15/2000 | X | | | X |
| $500M Add-On To CCH Co-Borrowing Facility 9/2000 | X | X | X | X |
| $1.3B Arahova Bridge Loan 1/3/2001 | X | | | X |
| M&A Advisory Services 2/2001 | X | | | X |
| $863M 6% Convertible Notes Offering 1/18/2001 | X | | | X |
| $821M Class A Common Stock Offering 1/18/2001 | X | | | X |
| $575M 3 ¼% Convertible Subordinated Notes Offering 4/20/2001 | X | X | | X |
| $1.0B 10 1/4% Senior Notes Offering 6/7/2001 | X | X | | X |
| $2.03B Olympus Co-Borrowing Facility 9/28/2001 | X | X | X | X |
| $500M 10 1/4% Senior Notes Offering 10/19/2001 | | X | | |
| Rigas Family Private Banking/Broker | X | | X | X |

504.     The other Investment Banks also participated in numerous Adelphia-related financings. For example:

- ABN AMRO Securities underwrote Adelphia's September 2000 offering of senior notes;

- Barclays Capital underwrote Adelphia's June 1998 offering of senior notes, Adelphia's November 1998 offering of senior notes, Adelphia's January 1998 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- BNY Capital Markets underwrote Adelphia's November 1999 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- Chase Securities underwrote ABIZ's December 1996 offering of senior notes and warrants, Adelphia's November 1999 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- CIBC Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, and Adelphia's October 2001 offering of senior notes;

- Credit Lyonnais Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, ABIZ's November 1999 offering of Class A common stock, Adelphia's September 2000 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- CSFB Securities underwrote Adelphia's August 1998 offering of Class A common stock, Adelphia's November 1998 offering of senior notes, Adelphia's January 1999 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, Adelphia's October 1999 offering of senior notes, Adelphia's November 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, Adelphia's January 2001 offering of Class A common stock, and Adelphia's October 2001 offering of senior notes;

- Deutsche Bank Securities underwrote Adelphia's October 1999 offering of limited partnership interests in Century-TCI, Adelphia's October 1999 offering of senior notes, and Adelphia's November 2001 offering of Class A common stock;

- DLJ Securities underwrote Adelphia's May 1992 offering of Class A common stock, Adelphia's October 1999 offering of Class A common stock, and ABIZ's November 1999 offering of Class A common stock;

- Fleet Securities underwrote Adelphia's September 2000 offering of senior notes, and Adelphia's October 2001 offering of senior notes;

- Merrill Lynch Securities underwrote ABIZ's 1996 offering of Class A common stock, and Adelphia's October 1999 offering of Class A common stock;

- Morgan Stanley Securities underwrote Adelphia's October 1999 offering of Class A common stock, Adelphia's September 2000 offering of senior notes, Adelphia's January 2001 offering of Class A common stock, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's November 2001 offering of Class A common stock;

- PNC Capital Markets underwrote Adelphia's November 1999 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- Royal Bank of Scotland underwrote Adelphia's October 2001 offering of senior notes;

- Scotia Capital underwrote Adelphia's November 1998 offering of senior notes, Adelphia's November 1999 offering of senior notes, Adelphia's September 2000 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- SG Cowen underwrote Adelphia's October 1999 offering of Class A common stock, Adelphia's October 1999 offering of limited partnership interests in Century-TCI, Adelphia's September 2000 offering of senior notes, and Adelphia's April 2001 offering of convertible subordinated notes;

- SunTrust Securities underwrote Adelphia's September 2000 offering of senior notes; and

- TD Securities underwrote Adelphia's July 1997 offering of senior notes and Series A preferred stock, Adelphia's August 1998 offering of Class A common stock, Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of senior notes, Adelphia's November 1999 offering of senior notes, Adelphia's September 2000 offering of senior notes, and Adelphia's October 2001 offering of senior notes.

505.    Thus, the Agent Banks -- acting in concert with their Investment Bank affiliates -- did much more than just lend money to the Debtors on a purportedly arms-length basis.  In addition to offering substantial advice to assist the Debtors and the Rigas Family in accessing the commercial lending and capital markets, certain of the Agent Banks, including BofA, BMO and Citibank, participated in structuring the Co-Borrowing Facilities and other

credit facilities for the Debtors in a manner that enabled the RFEs to strip assets from the Debtors.

506.     Moreover, in addition to their underwriting services, certain of the Investment Banks rendered substantial financial advisory services to the Debtors and, after reviewing the Debtors' confidential and proprietary information, advised the Debtors on financing acquisitions and their business plans.  For example, BAS and SSB acted as mergers and acquisitions advisors to the Debtors for various acquisitions of cable systems around the country.  In connection with those services, BAS, SSB and other Investment Banks had their Agent Bank affiliates offer bridge loans to finance the Debtors' acquisitions.

507.     By providing their lending, underwriting and financial advisory services as one unit -- without recognizing a distinction between their lending and capital markets groups -- the Agent Banks and their affiliated Investment Banks provided "one-stop shopping" for all the Debtors' financial needs.  As a result, the Investment Banks and the Agent Banks, together, became the Debtors' trusted financial advisors and fiduciaries.

508.     Moreover, the Agent Banks and the Investment Banks made no meaningful distinction between the Debtors, the Rigas Family, and the RFEs.  Indeed, they realized that the key to doing business with Adelphia was to satisfy the personal financial whims of the Rigas Family.  Internal documents of each of the Agent Banks and the Investment Banks reflect that their relationship with the Debtors was in reality a relationship with the Rigas Family.  For example, BofA and BAS and BMO and BMO NB often referred to their business with the Debtors and the Rigas Family as part of a "Rigas Family" connection, and the Citigroup Defendants often referred to Adelphia and the Rigas Family interchangeably.

509.     As a direct result of the Agent Banks' intimate relationship with the Rigas Family and the sweetheart deals they made -- i.e., the provision of loans under the Co-Borrowing Facilities in exchange for exorbitant investment banking fees -- the Co-Borrowing Facilities were not "arms-length" lending transactions.  In addition to working jointly with the Rigas Family to create the fraudulent structure of the Co-Borrowing Facilities, the Agent Banks acquiesced to lending terms (duration, interest rates, etc.) that were not the result of arms-length negotiations, but effectively were dictated by the Rigas Family to the Agent Banks.

510.     The Agent Banks acceded to these terms because of the promise of lucrative fees to the Investment Banks, which was their primary motivation in their dealings with the Debtors.  The "Rigas Family" connection was extremely lucrative for each of the Agent Banks and the Investment Banks.  Upon information and belief, the lead Agent Banks and Investment Banks under the Co-Borrowing Facilities -- BofA, BAS, Wachovia, Wachovia Securities, BMO, BMO NB, Citibank and SSB -- earned hundreds of millions of dollars in investment banking and other fees from the Debtors primarily since the first Co-Borrowing Facility closed.

511.     This fee income provided the Agent Banks and Investment Banks with a compelling motivation to assist the Rigas Family in their fraudulent activities or to turn a blind eye to them.  Each Agent Bank knew that the fees to its affiliated Investment Bank depended upon participation in the Co-Borrowing Facilities: members of the Rigas Family expressly conditioned the granting of investment banking business on participation in the Co-Borrowing Facilities.

512.     Thus, many of the Agent Banks approved the Co-Borrowing Facilities even though their total credit exposure to the Debtors and the Rigas Family exceeded lending policy

limits. In almost every instance when this occurred, each of the Agent Banks approved a special exception to the exposure limit principally based on the fees to be earned by their affiliated Investment Bank. For example, Defendant BMO approved its participation in the Olympus Co-Borrowing Facility despite exceeding its house exposure limit for Adelphia and the Rigas Family by more than $200 million. BMO approved this enormous exposure limit exception based upon, among other things, its frustration at being excluded from a $1.3 billion bridge loan to an Adelphia subsidiary and related securities offerings -- which went to Defendants BofA/BAS, Citibank/SSB and others -- and by its desire to obtain a lead role for BMO NB in underwriting future Adelphia securities offerings.

513.    Wachovia and Citibank also authorized exposure exceptions in connection with their approval of the Olympus Co-Borrowing Facility and justified those exceptions based upon "future capital markets opportunities." SSB authorized margin loans for the Rigas Family that were outside house limits with a similar motive.

514.    The Rigas Family clearly recognized that offering the enticement of investment banking fees would cause the Agent Banks to participate in the Co-Borrowing Facilities. In his February 17, 2000 letter to the Agent Banks regarding the CCH Co-Borrowing Facility, James Brown stated that:

> All of the lead managers and co-managers of each of these credit facilities are expected to have an opportunity to play <u>a meaningful role in either the ADLAC or ABIZ public security offerings</u>.

(emphasis added). Thus, by agreeing to participate in the CCH Co-Borrowing Facility, among others, the Agent Banks all but insured that their affiliated Investment Banks would garner substantial fees.

**G.** **Defendants Rewarded The Rigas Family With Extensive Margin Loans.**

515. One of the most significant and consistent demands made by the Rigas Family -- and enticements offered by the Agent Banks and Investment Banks to win business -- was the provision of margin loans to finance the Rigas Family's purchase of Adelphia securities. The substantial margin loans provided by Defendants Citigroup, BofA and Deutsche Bank Securities also provided a strong motive for their participation in the Co-Borrowing Facilities: they would always have a second, secured source of repayment if the Rigas Family defaulted on the margin loans.

516. The margin loans -- much like the Rigas Family's use of the Co-Borrowing Facilities -- were pivotal to enable the Rigas Family to retain voting control over Adelphia during a period of rapid growth through acquisitions. As Adelphia issued additional stock in connection with these acquisitions, the Rigas Family needed additional cash to purchase Adelphia stock to avoid dilution of their controlling interest. Citigroup, BofA, Deutsche Bank Securities and other defendants knew that the Rigas Family used the margin loans and the Co-Borrowing Facilities to maintain control over Adelphia.

**H.** **The Investment Banks' Fraudulent Solicitation Of The Debtors' Notes.**

517. At all relevant times, each of the Investment Banks had affiliates that were Co-Borrowing and Non-Co-Borrowing Lenders.

518. As underwriters of offerings of debt securities issued to the public by Adelphia and its direct and indirect subsidiaries, the Investment Banks had a legal obligation to

ensure that Adelphia and its direct and indirect subsidiaries disclosed all material information about the Debtors' business to prospective purchasers of such debt securities.

519.     Since May 1999, when the UCA/HHC Co-Borrowing Facility closed, the Investment Banks have underwritten the following public offerings of debt securities:

| Debt Security | Issuer | Date | Underwriters |
|---|---|---|---|
| $500 million 9.375% Senior Notes due 11/15/09 | Adelphia | 11/1999 | CSFB Securities, SSB, BNY Capital Markets, Chase Securities, BMO NB, PNC Capital Markets, Scotia Capital, TD Securities |
| $745 million 10.875% Senior Notes due 10/1/10 | Adelphia | 9/2000 | SSB, BAS, Chase Securities, Morgan Stanley Securities, Scotia Capital, TD Securities, ABN AMRO Securities, Barclays Capital, Credit Lyonnais Securities, Fleet Securities, PNC Capital Markets, SG Cowen, SunTrust Securities |
| $1.0 billion 6.0% Convertible Subordinated Notes due 2/15/06 | Adelphia | 1/2001 | SSB, BAS |
| $975 million 3.25% Convertible Subordinated Notes due 5/1/21 | Adelphia | 4/2001 | SSB, BAS, BMO NB, Wachovia Securities, Morgan Stanley Securities, BNY Capital Markets, Credit Lyonnais Securities, Chase Securities, Scotia Capital, SG Cowen |
| $1.0 billion 10.250% Senior Notes due 6/15/11 | Adelphia | 6/2001 | SSB, BAS, BMO NB, CIBC Securities, CSFB Securities, Deutsche Bank Securities, Chase Securities, TD Securities |
| $500 million 10.250% Senior Notes due 11/1/06 | Adelphia | 10/2001 | CSFB Securities, BMO NB, BNY Capital Markets, CIBC Securities, Credit Lyonnais Securities, Fleet Securities, Mizuho International plc, Scotia Capital, SG Cowen, TD Securities, Royal Bank of Scotland |

520.     The amount of Debtors' senior bank debt was a material factor in any investor's decision whether to purchase the debt securities, particularly because such securities would be junior in right of payment to the senior bank debt. All of the purchasers of the debt

securities referred to above relied on accurate disclosure of the amount of the Debtors' senior bank debt.

521.     None of the prospectuses for the debt securities noted above contained accurate disclosures with respect to the amounts outstanding under the Co-Borrowing Facilities. Indeed, the standard practice in these offerings was simply to incorporate by reference the Debtors' most recent SEC filings.  Nonetheless, the Investment Banks knew or recklessly disregarded the gross understatement of the amount outstanding under the Co-Borrowing Facilities in these filings.

522.     The Investment Banks focused significantly more effort on generating fee income than ensuring appropriate disclosure of the Co-Borrowing Facilities.  At all relevant times, the Investment Banks and their Agent Bank affiliates shared all material information and due diligence regarding the Debtors, the RFEs and the Rigas Family.  The Investment Banks and Agent Banks did not properly maintain the "information walls" that would prohibit the sharing of such information.  To the contrary, the Investment Banks and Agent Banks needed to and, in fact, did share information to maximize their ability to garner additional fees.  Thus, uncovering the fraud would have been as simple as requesting from the Debtors -- or their Agent Bank affiliates -- the amounts outstanding under the Debtors' credit facilities and comparing those amounts with the Debtors' SEC filings.  The Investment Banks either obtained this information from their affiliated lenders (which would have provided actual notice of the fraud) or the Investment Banks recklessly failed to do so.

523.     The debt securities solicited by the Investment Banks were issued on a structurally subordinated basis to the Co-Borrowing Facilities.  Thus, the purchasers of the debt

securities -- the parties to whom the Investment Banks provided, or recklessly permitted the Debtors to provide, misleading and false information -- would suffer the first losses if the Debtors' businesses collapsed under the weight of the undisclosed debt burden and massive fraud. The structurally subordinated debt securities also ensured that the Co-Borrowing Lenders would have more credit support to ensure repayment of their loans.

## I.    The Fraud Is Disclosed.

524.    On or about March 27, 2002, members of the Rigas Family announced that they had concealed from the public approximately $2.3 billion of the co-borrowing Debtors' liability. Later, that amount was increased to approximately $3.4 billion. On or about April 1, 2002, Adelphia failed to file its Annual Reports on Form 10-K with the SEC as required by applicable regulations. The failure timely to file the 10-K triggered an Event of Default under the Co-Borrowing Facilities.

525.    Notwithstanding the Rigas Family's concealment of $3.4 billion of debt and the default under the Co-Borrowing Facilities, the Co-Borrowing Lenders, and in particular BofA, Citibank and/or Citicorp and Deutsche Bank -- each being, upon information and belief, acutely aware of the Rigas Family's significant liabilities with respect to their margin accounts at BofA, SSB and Deutsche Bank Securities -- continued to approve borrowing requests under the Co-Borrowing Facilities. Worse still, the Co-Borrowing and NCB Lenders knew that the Debtors would use most, if not all, of the post-disclosure, post-default borrowings to fund margin payments owed by the Rigas Family and the RFEs to the Margin Lenders. Thus, the Co-Borrowing Lenders allowed the Rigas Family to borrow funds under the senior Co-Borrowing

Facilities -- on which Adelphia was obligated -- to pay off the junior margin loans -- on which only the Rigas Family was obligated.

526.     Faced with the harshly critical public reaction to the disclosure of the fraud at the Debtors, BofA, BMO, Wachovia, the Citigroup Defendants and their respective affiliates issued internal status reports.  None of the status reports expressed any shock -- let alone surprise -- about the situation at the Debtors.  To the contrary, each of these institutions acknowledged that they had always known all the material (and previously undisclosed) facts about the Co-Borrowing Facilities.

**J.     The Inevitable Result Of The Fraud:  The Debtors File Chapter 11**.

527.     Saddled with the massive debt burden of loans that were intended to benefit only the Rigas Family (and which, in fact, did only benefit the Rigas Family), on June 25, 2002 the Debtors filed petitions pursuant to Chapter 11 of the Bankruptcy Code in this Court.

**K.     Indictment Of The Rigas Family**.

528.     On July 24, 2002, John Rigas, Timothy Rigas, and Michael Rigas, along with Brown and Mulcahey, were arrested in connection with a criminal complaint filed by the United States Attorney for the Southern District of New York and were charged with nine counts of bank, securities and wire fraud.  On September 23, 2002, each of them was indicted.

529.     The criminal complaint against these members of the Rigas Family alleges, among other things, that they "looted Adelphia on a massive scale, using the company as the Rigas Family's personal piggy bank, at the expense of public investors and creditors," and that the Rigas Family "fraudulently concealed [their] self-dealing from the public."  The criminal

complaint also alleges that the Rigas Family concealed their self-dealing by, among other things, failing to accurately disclose Adelphia's liabilities under the Co-Borrowing Facilities and using co-borrowing funds -- for which the Co-Borrowing Debtors remained liable -- to acquire Adelphia securities to mislead the public into believing that Adelphia was reducing its consolidated leverage.

530.     Recently, Brown and another former Adelphia executive, Timothy Werth, pleaded guilty to charges resulting from their participation in the Rigas Family's fraud.

## FIRST CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)**

531.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

532.     The UCA/HHC Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the UCA/HHC Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility (the "UCA/HHC Co-Borrowing Obligations").

533.     To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed liens, security interests, mortgages, and pledges of their respective property to the UCA/HHC Lenders (the "UCA/HHC Co-Borrowing Security Interests").

534.     With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing

Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

535.     The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

536.     In incurring the UCA/HHC Co-Borrowing Obligations and granting the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

537.     At the time the UCA/HHC Co-Borrowing Obligations were incurred and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Debtors knew or recklessly disregarded the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

538.     In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the UCA/HHC

Debtors' leverage was being reduced when, in fact, the UCA/HHC Debtors' debts under the UCA/HHC Co-Borrowing Facility were increasing.

539.    The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

540.    The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests. All of the UCA/HHC Co-Borrowing Lenders received their interest in the Co-Borrowing Obligations and the Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

541.    By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $400 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers
### Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

542.     Plaintiffs reallege paragraphs 1 through 530 and 532 through 533 as if fully set forth herein.

543.     The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

544.     To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors granted the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

545.     With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the UCA/HHC Co-Borrowing Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

546.     The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

547.     When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the

UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

548.     The UCA/HHC Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs.  The UCA/HHC Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs.  Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.  The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.  The UCA/HHC Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

549.     The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

550.     The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their

interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

551.     By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $400 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## THIRD CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)**

552.     Plaintiffs reallege paragraphs 1 through 530 and 532 through 533 as if fully set forth herein.

553.     The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

554.     To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

555. At least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

556. The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests of the UCA/HHC Co-Borrowing Debtors in property.

557. The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

558. The UCA/HHC Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs. Each of The UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder. At the time the UCA/HHC Co-Borrowing Obligations were incurred and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Debtors knew or recklessly disregarded the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility.

559.     The UCA/HHC Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

560.     In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility from the public and creditors other than the UCA/HHC Co-Borrowing Lenders.  Thus, the UCA/HHC Co-Borrowing Debtors knew that the incurrence of the UCA/HHC Co-Borrowing Facility and the UCA/HHC Co-Borrowing Security Interests would severely inhibit the UCA/HHC Co-Borrowing Debtors' ability to repay other creditors.

561.     The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

562.     The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

563.     At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.

These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

564.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FOURTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers
### Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

565.     Plaintiffs reallege paragraphs 1 through 530 and 532 through 533 as if fully set forth herein.

566.     The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

567.     To secure the repayment of the UCA/HHC Co-Borrowing Facility, the UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests.

568.     The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests of the UCA/HHC Co-Borrowing Debtors in property.

569.     When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

570.     With each of the UCA/HHC Lender's knowledge, reckless disregard and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  The UCA/HHC Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs. Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

571.     The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

572.     The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.   The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

573.     The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

574.     At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

575.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided,

recovered, and preserved for the benefit of the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FIFTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)**

576.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

577.     The CCH Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the CCH Co-Borrowing Lenders in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility (the "CCH Co-Borrowing Obligations").

578.     To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the CCH Lenders (the "CCH Co-Borrowing Security Interests").

579.     With the CCH Co-Borrowing Lenders' knowledge, reckless disregard and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

580.     The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

581.     In incurring the CCH Co-Borrowing Obligations and granting the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

582.     At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact that the CCH Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

583.     In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the CCH Debtors' leverage was being reduced when, in fact, the CCH Debtors' debts under the CCH Co-Borrowing Facility were increasing.

584.     The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

585.     The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the Co-Borrowing Obligations and the Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

586.     By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $600 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SIXTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)**

587.     Plaintiffs reallege paragraphs 1 through 530 and 557 through 558 as if fully set forth herein.

588.     The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

589.     To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors granted the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing Lenders.

590.     With each of the CCH Co-Borrowing Lender's knowledge, reckless disregard and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the CCH Co-Borrowing Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  A substantial portion of this amount was incurred by paid in the year preceding the Petition Date.

591.     The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests of the CCH Co-Borrowing Debtors in property.

592.     When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

593. The CCH Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs. The CCH Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder. The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs. The CCH Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

594. The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

595. The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

596. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is

not less than $600 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

### SEVENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)**

597.　　Plaintiffs reallege paragraphs 1 through 530 and 557 through 558 as if fully set forth herein.

598.　　The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

599.　　To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing Lenders.

600.　　At least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

601.    The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

602.    The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

603.    The CCH Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility and both would be jointly and severally liable for all borrowings thereunder. At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact that the CCH Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility.

604.    The CCH Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

605.    In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility

from the public and creditors other than the CCH Co-Borrowing Lenders. Thus, the CCH Co-Borrowing Debtors knew that the incurrence of the CCH Co-Borrowing Facility and the CCH Co-Borrowing Security Interests would severely inhibit the CCH Co-Borrowing Debtors' ability to repay other creditors.

606.    The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

607.    The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

608.    At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

609.    By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and

preserved for the benefit of the Debtors' estates, and (ii) all CCH Co-Borrowing Security

Interests securing CCH Co-Borrowing Obligations should be avoided, recovered, and preserved

for the benefit of the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing

Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and

preserved for the benefit of the Debtors' estates, and (ii) all CCH Co-Borrowing Security

Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family

should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with

all interest paid in respect of the obligations avoided hereunder.

## EIGHTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers**
**Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)**

610.     Plaintiffs reallege paragraphs 1 through 530 and 557 through 558 as if fully

set forth herein.

611.     The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing

Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing

Facility.

612.     To secure the repayment of the CCH Co-Borrowing Facility, the CCH Co-

Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests.

613.     The incurrence of the CCH Co-Borrowing Obligations and the grant of the

CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-

Borrowing Debtors.

614.     When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

615.     With each of the CCH Lender's knowledge, reckless disregard and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. The CCH Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

616.     The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

617.     The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

618.     The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security

Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

619.     At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

620.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## NINTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)**

621.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

622.     The Olympus Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the Olympus Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the Olympus Co-Borrowing Facility (the "Olympus Co-Borrowing Obligations").

623.     To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the Olympus Lenders (the "Olympus Co-Borrowing Security Interests").

624.     With the Olympus Co-Borrowing Lenders' knowledge, reckless disregard and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

625.     The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

626.    In incurring the Olympus Co-Borrowing Obligations and granting the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

627.    At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility.  The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

628.    In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the Olympus Debtors' leverage was being reduced when, in fact, the Olympus Debtors' debts under the Olympus Co-Borrowing Facility were increasing.

629.    The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

630.     The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Co-Borrowing Obligations and the Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

631.     By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $500 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## TENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)**

632.     Plaintiffs reallege paragraphs 1 through 530 and 622 through 623 as if fully set forth herein.

633.     The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

634. To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors granted the Olympus Co-Borrowing Security Interests to the Olympus Co-Borrowing Lenders.

635. With each of the Olympus Co-Borrowing Lender's knowledge, reckless disregard and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Olympus Co-Borrowing Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

636. The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

637. When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged, or were about to engage in business or a transaction for which any property remaining with the Olympus Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

638. The Olympus Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs. The Olympus Co-Borrowing Credit Agreement specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs. Each of the Olympus Co-Borrowing Debtors and

the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder. The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs. The Olympus Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

639.    The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

640.    The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests. All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

641.    By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $500 million, should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be

avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## ELEVENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)**

642.     Plaintiffs reallege paragraphs 1 through 530 and 622 through 623 as if fully set forth herein.

643.     The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

644.     To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests to the Olympus Co-Borrowing Lenders.

645.     At least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

646.     The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests of the Olympus Co-Borrowing Debtors in property.

647.     The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests with the actual intent to

delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

648.     The Olympus Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs. Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder.  At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility.

649.     The Olympus Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

650.     In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility from the public and creditors other than the Olympus Co-Borrowing Lenders. Thus, the Olympus Co-Borrowing Debtors knew that the incurrence of the Olympus Co-Borrowing Facility and the Olympus Co-Borrowing Security Interests would severely inhibit the Olympus Co-Borrowing Debtors' ability to repay other creditors.

651.     The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

652.     The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

653.     At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

654.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code,  (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided,

recovered, and preserved for the benefit of the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## TWELFTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)

655.     Plaintiffs reallege paragraphs 1 through 530 and 622 through 623 as if fully set forth herein.

656.     The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

657.     To secure the repayment of the Olympus Co-Borrowing Facility, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests.

658.     The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests of the Olympus Co-Borrowing Debtors in property.

659.     When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Olympus

Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

660.     With each of the Olympus Lender's knowledge, reckless disregard and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. The Olympus Co-Borrowing Credit Agreements specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs. Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

661.     The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

662.     The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard and/or consent.

663.     The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests. All of the Olympus Co-Borrowing Lenders received their interest in the

Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

664.     At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

665.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## THIRTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers
### Under 11 U.S.C. §§ 548, 550 and 551 Against Century-TCI Lenders)

666.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

667.     The Century-TCI Debtors borrowed from, and incurred the obligation to pay

indebtedness to, the Century-TCI Lenders in the approximate amount of $1 billion pursuant to

the Century-TCI Facility (the "Century-TCI Obligations").

668.     To secure the repayment of the Century-TCI Obligations, the Century-TCI

Debtors conveyed security interests and pledges in their respective property to the Century-TCI

Lenders (the "Century-TCI Security Interests").

669.     With each of the Century-TCI Lender's knowledge, reckless disregard and/or

consent, at least $408 million from the Century-TCI Credit Facility was used by the Rigas

Family to purchase common stock and convertible notes (the "Century-TCI Transfer") in the

year preceding the Petition Date.

670.     In consummating the Century-TCI Transfer, the Debtors intended to delay,

hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or

after the date that the Century-TCI Transfer was incurred or the Century-TCI Security Interests

for the Century-TCI Transfer were granted.  The Debtors knew that the Century-TCI Transfer

would benefit solely the Rigas Family.

671.     The Century-TCI Obligations Lenders' conduct was recklessly indifferent and

in bad faith.  By virtue of their substantial participation in the Co-Borrowing Facilities, the

Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Century-TCI Facility would not be used in furtherance of the fraud.

672. The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

673. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FOURTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against Century-TCI Lenders)

674. Plaintiffs reallege paragraphs 1 through 530 and 667 through 669 as if fully set forth herein.

675. The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

676.     To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors granted the Century-TCI Security Interests.

677.     With each of the Century-TCI Lender's knowledge, reckless disregard and/or consent, at least $490 million from the Century-TCI Credit Facility was used to consummate the Century-TCI Transfer in the year preceding the Petition Date.

678.     The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

679.     The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

680.     When the Century-TCI Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

681.     The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Transfer and the Century-TCI Security Interests securing the Century-TCI Transfers.  All of the Century-TCI Lenders received their interest in the Century-TCI Transfer with full knowledge of the facts relating to such transfers.

682.     By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FIFTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against Century-TCI Lenders)

683.     Plaintiffs reallege paragraphs 1 through 530 and 667 through 669 as if fully set forth herein.

684.     The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

685.     To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

686.     With each of the Century-TCI Lender's knowledge, reckless disregard and/or consent, at least $408 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.

687.     In consummating the Century-TCI Transfer, the Century-TCI Debtors intended to delay, hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.  The Century-TCI Debtors knew or recklessly disregarded the fact that the Century-TCI Transfer would benefit solely the Rigas Family.

688.     The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith.  By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash.  The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

689.     The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

690.     The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Transfer and the Century-TCI Security Interests securing the Century-TCI Transfer.  All of the Century-TCI Lenders received their interest in the Century-TCI Transfer with full knowledge of the facts relating to such transfer.

691.     At all times relevant hereto, there were actual creditors of the Century-TCI Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the

right to void the Century-TCI Transfer and the Century-TCI Security Interests securing the Century-TCI Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

692.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Transfers should be avoided, recovered, and preserved for the benefit of the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoidesd hereunder.

## SIXTEENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers Under
11 U.S.C. §§ 544(b), 550 and 551 Against The Century-TCI Lenders)**

693.     Plaintiffs reallege paragraphs 1 through 530 and 667 through 669 as if fully set forth herein.

694.     The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

695.     To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

696.     With each of the Century-TCI Lender's knowledge, reckless disregard and/or consent, at least $408 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.

697.     When the Century-TCI Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

698.     The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

699.     The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

700.     The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Transfer and the Century-TCI Security Interests securing the Century-TCI Transfer. All of the Century-TCI Lenders received their interest in the Century-TCI Transfer with full knowledge of the facts relating to such transfer.

701.     At all times relevant hereto, there were actual creditors of the applicable Debtors holding unsecured claims allowable against the Century-TCI Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others,

have the right to void the Century-TCI Transfer and the Century-TCI Security Interests securing the Century-TCI Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

702.     By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer should be avoided, recovered, and preserved for the benefit of the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SEVENTEENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)**

703.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

704.     Upon information and belief, one or more of the Debtors made the following transfers to Fleet individually and/or as agent for other banks (the "Fleet Payments") on account of a debt owed by one or more RFEs:

| Date | Amount |
|------|--------|
| 06/14/99 | $157,505.17 |
| 06/14/99 | $161,913.29 |
| 06/30/99 | $21,303.81 |
| 06/30/99 | $202,258.54 |
| 07/09/99 | $156,679.11 |
| 07/09/99 | $162,739.35 |
| 08/03/99 | $139,021.81 |
| 08/03/99 | $180,396.65 |
| 09/01/99 | $152,269.48 |
| 09/01/99 | $167,148.98 |
| 10/01/99 | $148,602.59 |
| 10/01/99 | $170,815.87 |

| Date | Amount |
|---|---|
| 11/01/99 | $143,095.63 |
| 11/01/99 | $176,322.83 |
| 12/01/99 | $44,015.73 |
| 12/01/99 | $149,398.61 |
| 12/01/99 | $170,019.85 |
| 12/01/99 | $405,965.93 |
| 01/03/00 | $125,103.83 |
| 01/03/00 | $194,314.63 |
| 01/31/00 | $188,569.70 |
| 01/31/00 | $200,325.63 |
| 03/01/00 | $111,827.33 |
| 03/01/00 | $177,068.00 |
| 03/22/00 | $18,583,541.96 |
| 03/31/00 | $160,614.20 |
| 03/31/00 | $178,281.13 |
| 05/01/00 | $150,472.40 |
| 05/01/00 | $188,422.93 |
| 05/31/00 | $156,388.61 |
| 05/31/00 | $182,506.72 |
| 07/03/00 | $147,528.03 |
| 07/03/00 | $191,367.30 |
| 07/31/00 | $146,882.85 |
| 07/31/00 | $180,774.81 |
| 08/31/00 | $149,454.86 |
| 08/31/00 | $178,202.80 |
| 09/29/00 | $161,869.22 |
| 09/29/00 | $165,788.44 |
| 10/30/00 | $151,483.11 |
| 10/30/00 | $176,174.55 |
| 11/29/00 | $158,142.17 |
| 11/29/00 | $169,515.49 |
| 12/29/00 | $159,229.30 |
| 12/29/00 | $168,428.36 |
| 01/26/01 | $156,692.54 |
| 01/26/01 | $171,225.39 |
| 02/26/01 | $152,129.31 |
| 02/26/01 | $175,788.62 |
| 03/28/01 | $141,651.85 |
| 03/28/01 | $186,266.08 |
| 04/27/01 | $197,456.04 |
| 04/27/01 | $130,461.89 |
| 05/25/01 | $108,915.30 |
| 05/25/01 | $219,002.63 |
| 06/25/01 | $111,426.03 |
| 06/25/01 | $216,491.90 |

| Date | Amount |
|------|--------|
| 07/26/01 | $104,317.12 |
| 07/26/01 | $183,726.12 |
| 08/28/01 | $109,979.92 |
| 08/28/01 | $178,063.32 |
| 09/28/01 | $98,005.49 |
| 09/28/01 | $190,037.75 |
| 10/30/01 | $80,309.15 |
| 10/30/01 | $207,734.09 |
| 11/30/01 | $217,426.50 |
| 11/30/01 | $70,616.74 |
| 12/31/01 | $64,275.98 |
| 12/31/01 | $223,767.26 |
| 01/31/02 | $205,635.55 |
| 01/31/02 | $60,581.08 |
| 03/01/02 | $54,269.61 |
| 03/01/02 | $211,947.02 |
| 04/01/02 | $58,308.49 |
| 04/01/02 | $207,908.14 |
| 05/01/02 | $56,198.30 |
| 05/01/02 | $210,018.33 |
| **Total** | $30,572,385.13 |

705.     Upon information and belief, the Fleet Payments were made on account of a debt owed by an RFE related to the Buffalo Sabres. The Fleet Payments were earmarked by the Debtors to pay Fleet on account of this debt.

706.     The Fleet Payments were transfers of an interest of one or more of the Debtors in property.

707.     The Debtors made the Fleet Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the Fleet Payments were made. The Debtors received no consideration for the Fleet Payments. Instead, the Fleet Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

708.     Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

709.     At all times relevant hereto, there were actual creditors of the Debtors that made the Fleet Payments.  These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

710.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## EIGHTEENTH CLAIM FOR RELIEF
### (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)

711.     Plaintiffs reallege paragraphs 1 through 530 and 704 as if fully set forth herein.

712.     One or more of the Debtors made the Fleet Payments on account of a debt owed by an RFE.  Upon information and belief, this debt related to the Buffalo Sabres.  The Fleet Payments were earmarked by the Debtors to pay Fleet on account of this debt.

713.     The Fleet Payments were transfers of an interest of one or more of the Debtors in property.

714.     The Debtors made the Fleet Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur,

or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

715.     Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

716.     At all times relevant hereto, there were actual creditors of the applicable Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

717.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## NINETEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers
### Under 11 U.S.C. §§ 548 and 550 Against Fleet)

718.     Plaintiffs reallege paragraphs 1 through 530 and 704 as if fully set forth herein.

719.     One or more of the Debtors made the Fleet Payments on account of a debt owed by an RFE.  Upon information and belief, this debt related to the Buffalo Sabres.  At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

720.     Upon information and belief, the Fleet Payments were made on account of a debt owed by an RFE related to the Buffalo Sabres. The Fleet Payments were earmarked by the Debtors to pay Fleet on account of this debt.

721.     The Fleet Payments were transfers of an interest of one or more of the Debtors in property.

722.     The Debtors made the Fleet Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the Fleet Payments were made. The Debtors received no consideration for the Fleet Payments. Instead, the Fleet Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

723.     Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

724.     By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTIETH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers
Under 11 U.S.C. §§ 548 And 550 Against Fleet)**

725.     Plaintiffs reallege paragraphs 1 through 530 and 704 as if fully set forth herein.

726. One or more of the Debtors made the Fleet Payments on account of a debt owed by an RFE. Upon information and belief, this debt related to the Buffalo Sabres. The Debtors earmarked the Fleet Payments to pay Fleet on account of such debt. At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

727. The Fleet Payments were transfers of an interest of one or more of the Debtors in property.

728. The Debtors made the Fleet Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

729. Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

730. By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

731. Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

732.     Upon information and belief, one or more of the Debtors made the following payments to HSBC, individually and/or as agent for certain other banks (the "HSBC Payments") on account of a debt owed by one or more RFEs:

| Date | Amount |
|------|--------|
| 06/28/99 | $306,503.02 |
| 06/28/99 | $32,278.50 |
| 12/01/99 | $615,085.56 |
| 12/01/99 | $66,690.50 |
| 03/22/00 | $769,264.25 |
| 03/22/00 | $10,826,133.67 |
| **Total** | $12,615,955.50 |

733.     Upon information and belief, this debt related to the Buffalo Sabres.  The Debtors earmarked the HSBC Payments to pay HSBC on account of this debt.

734.     The HSBC Payments were transfers of an interest of one or more of the Debtors in property.

735.     The Debtors made the HSBC Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the HSBC Payments were made.  The Debtors received no consideration for the HSBC Payments.  Instead, the HSBC Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

736.     HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

737.     At all times relevant hereto, there were actual creditors of the Debtors that made the HSBC Payments.  These creditors have the right to void the HSBC Payments under

applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

738.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

739.     Plaintiffs reallege paragraphs 1 through 530 and 732 as if fully set forth herein.

740.     Upon information and belief, one or more of the Debtors made the HSBC Payments on account of a debt owed by one or more RFEs. Upon information and belief, this debt related to the Buffalo Sabres, which was owned by an RFE. The HSBC Payments were earmarked by the Debtors to pay HSBC on account of such debt.

741.     The HSBC Payments were transfers of an interest of one or more of the Debtors in property.

742.     The Debtors made the HSBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

743.     HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

744.     At all times relevant hereto, there were actual creditors of the Debtors that made the HSBC Payments.  These creditors have the right to void the HSBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

745.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-THIRD CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers
Under 11 U.S.C. §§ 544(b) and 550 Against Key Bank)**

746.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

747.     One or more of the Debtors made the following payments to Key Bank, individually and/or as agent for certain other banks (the "Key Bank Payments"):

| Date | Amount |
|------|--------|
| 06/28/99 | $104,433.13 |
| 06/28/99 | $176,870.26 |
| 06/28/99 | $93,650.81 |
| 06/28/99 | $10,739.75 |
| 12/01/99 | $91,040.39 |
| 12/01/99 | $171,809.80 |
| 12/01/99 | $205,016.85 |
| 12/01/99 | $22,189.42 |
| 03/22/00 | $3,902,444.49 |
| **Total** | $4,778,194.90 |

748.     Upon information and belief, the Key Bank Payments were made on account of debts owed by one or more RFEs related to the Buffalo Sabres.  The Key Bank Payments were earmarked by the Debtors to pay Key Bank in respect of such debts.

749.     The Key Bank Payments were transfers of an interest of one or more of the Debtors in property.

750.     The Debtors made the Key Bank Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the Key Bank Payments were made.  The Debtors received no consideration for the Key Bank Payments.  Instead, the Key Bank Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

751.     Key Bank was the initial and/or immediate or mediate transferee of the Key Bank Payments.

752.     At all times relevant hereto, there were actual creditors of the Debtors that made the Key Bank Payments.  These creditors, among others, have the right to void the Key Bank Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

753.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Key Bank Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-FOURTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers
### Under 11 U.S.C. §§ 544(b) and 550 against Key Bank)

754.     Plaintiffs reallege paragraphs 1 through 530 and 747 as if fully set forth herein.

755.     One or more of the Debtors made the Key Bank Payments on account of a debt owed by one or more RFEs relating to the Buffalo Sabres. The Key Bank Payments were earmarked by the Debtors to pay Key Bank in respect of such debt.

756.     The Key Bank Payments were transfers of an interest of one or more of the Debtors in property.

757.     The Debtors made the Key Bank Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

758.     Key Bank was the initial and/or immediate or mediate transferee of the Key Bank Payments.

759.     At all times relevant hereto, there were actual creditors of the Debtors that made the Key Bank Payments. These creditors have the right to void the Key Bank Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

760.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the

Bankruptcy Code, the Key Bank Payments should be avoided, recovered, and preserved for the

benefit of the Debtors' estates.

## TWENTY-FIFTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers
### Under 11 U.S.C. §§ 544(b) and 550 Against BNS)

761.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

762.     One or more of the Debtors made the following payments to BNS,

individually and/or as agent for certain other banks (the "BNS Payments"):

| Date | Amount |
|---|---|
| 01/29/99 | $915,711.27 |
| 03/01/99 | $50,000.00 |
| 03/31/99 | $2,059,232.18 |
| 03/31/99 | $5,000,000.00 |
| 04/30/99 | $1,490,402.98 |
| 04/30/99 | $190,000,000.00 |
| 06/30/99 | $119,075.34 |
| 07/02/99 | $185,000,000.00 |
| 09/30/99 | $78,561.64 |
| 09/30/99 | $171,061.63 |
| 10/08/99 | $245,200.00 |
| 10/08/99 | $180,000,000.00 |
| 12/31/99 | $133,150.68 |
| 02/16/00 | $1,609,190.63 |
| 03/03/00 | $50,000.00 |
| 03/31/00 | $5,000,000.00 |
| 03/31/00 | $701,079.17 |
| 05/15/00 | $2,310,609.38 |
| 06/30/00 | $621,959.72 |
| 06/30/00 | $6,250,000.00 |
| 07/17/00 | $1,735,551.56 |
| 09/22/00 | $12,306.25 |
| 10/02/00 | $565,272.92 |
| 10/02/00 | $6,250,000.00 |
| 10/16/00 | $2,553,829.69 |

| Date | Amount |
|------|--------|
| 12/15/00 | $1,662,750.00 |
| 12/29/00 | $115,576.39 |
| 12/29/00 | $6,250,000.00 |
| 01/02/01 | $314,157.64 |
| 03/12/01 | $2,391,412.50 |
| 04/20/01 | $50,000.00 |
| 04/02/01 | $293,058.59 |
| 04/02/01 | $6,250,000.00 |
| 05/02/01 | $48,572.92 |
| 06/12/01 | $2,011,760.25 |
| 06/29/01 | $72,389.24 |
| 06/29/01 | $8,750,000.00 |
| 09/12/01 | $1,624,546.45 |
| **Total** | $622,756,419.02 |

763.     The BNS Payments were made on account of debts owed by one or more RFEs.  The BNS Payments were earmarked by the Debtors to pay BNS in respect of such debt.

764.     The BNS Payments were transfers of an interest of one or more of the Debtors in property.

765.     The Debtors made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the BNS Payments were made.  The Debtors received no consideration for the BNS Payments. Instead, the BNS Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

766.     BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

767.     At all times relevant hereto, there were actual creditors of the Debtors that made the BNS Payments.  These creditors have the right to void the BNS Payments under

applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

768.    By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the BNS Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-SIXTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Transfers
Under 11 U.S.C. §§ 544(b) and 550 Against BNS)**

769.    Plaintiffs reallege paragraphs 1 through 530 and 762 as if fully set forth herein.

770.    The BNS Payments were made on account of debts owed by one or more RFEs.  The BNS Payments were earmarked by the Debtors to pay BNS in respect of such debt.

771.    The BNS Payments were transfers of an interest of one or more of the Debtors in property.

772.    The Debtors made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

773.    BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

774.     At all times relevant hereto, there were actual creditors of the Debtors that made the BNS Payments. These creditors have the right to void the BNS Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

775.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the BNS Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers
### Under 11 U.S.C. §§ 548 and 550 Against BNS)

776.     Plaintiffs reallege paragraphs 1 through 530 and 762 as if fully set forth herein.

777.     One or more of the Debtors made the BNS Payments. At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date. The BNS Payments were earmarked by the Debtors to pay BNS in respect of such debt.

778.     The BNS Payments were transfers of an interest of one or more of the Debtors in property.

779.     The Debtors made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the BNS Payments were made. The Debtors received no consideration for the BNS Payments.

Instead, the BNS Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

780. BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

781. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, at least $10,446,935.69 the BNS Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-EIGHTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS)

782. Plaintiffs reallege paragraphs 1 through 530 and 762 as if fully set forth herein.

783. One or more of the Debtors made the BNS Payments. At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date. The BNS Payments were earmarked by the Debtors to pay BNS in respect of such debt.

784. The BNS Payments were transfers of an interest of one or more of the Debtors in property.

785. The Debtors made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur,

or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

786.    BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

787.    By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, at least $10,446,935.69 the BNS Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## TWENTY-NINTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)**

788.    Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

789.    One or more of the Debtors made the following payments to CIBC, individually and as agent for certain other banks (the "CIBC Payments"):

| Date | Amount |
|---|---|
| 01/04/99 | $386,511.67 |
| 01/04/99 | $222,000,000.00 |
| 01/19/99 | $103,000,000.00 |
| 03/15/99 | $207,333.33 |
| 03/15/99 | $100,000,000.00 |
| 03/31/99 | $134,794.52 |
| 03/31/99 | $245,029.11 |
| 04/07/99 | $315,947.92 |
| 04/07/99 | $262,500,000.00 |
| 04/29/99 | $62,029.11 |
| 05/06/99 | $110,609.05 |
| 05/06/99 | $16,181.51 |
| **Total** | $688,978,436.22 |

790.     The CIBC Payments were on account of a debt of Hilton Head, an RFE.  The CIBC Payments were earmarked by the Debtors to pay CIBC in respect of such debt.

791.     The CIBC Payments were transfers of an interest of one or more of the Debtors in property.

792.     The Debtors made the CIBC Payments with the actual intent to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that the CIBC Payments were made.  The Debtors received no consideration for the CIBC Payments.  Instead, the CIBC Payments were made by the Debtors with the intent to benefit solely the Rigas Family and one or more RFEs.

793.     CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

794.     At all times relevant hereto, there were actual creditors of the Debtors that made the CIBC Payments.  These creditors have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

795.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

# THIRTIETH CLAIM FOR RELIEF

## (Avoidance and Recovery of Constructively Fraudulent Transfers
## Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)

796.    Plaintiffs reallege paragraphs 1 through 530 and 789 as if fully set forth herein.

797.    The CIBC Payments were made on account of debts owed by Hilton Head, an RFE.  The CIBC Payments were earmarked by the Debtors to pay CIBC in respect of such debt.

798.    The CIBC Payments were transfers of an interest of one or more of the Debtors in property.

799.    The Debtors made the CIBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

800.    CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

801.    At all times relevant hereto, there were actual creditors of the Debtors that made the CIBC Payments.  These creditors, among others, have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

802.     By virtue of the foregoing, pursuant to sections 544(b) and 550 of the

Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the

benefit of the Debtors' estates.

## THIRTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 548 and 550 Against the Margin Lenders)

803.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

804.     The Rigas Family and/or the RFEs incurred certain margin loans (the "Margin

Loans") to the Margin Lenders.  The Margin Loans were secured by stock and other securities

owned by the Rigas Family, including securities issued by Adelphia.

805.     In the year preceding the Petition Date, the Debtors made the following

payments to the Margin Lenders in respect of the Margin Loans in the following amounts (the

"Margin Loan Payments"):

| Transferee | Date | Amount |
|---|---|---|
| SSB | 07/12/01 | $1,373,414.95 |
| SSB | 09/26/01 | $6,121,277.47 |
| SSB | 10/03/01 | $1,165,173.09 |
| SSB | 10/03/01 | $6,380,378.00 |
| SSB | 10/09/01 | $1,829,412.00 |
| SSB | 10/11/01 | $1,963,150.00 |
| SSB | 10/15/01 | $610,501.00 |
| SSB | 10/17/01 | $8,522,889.00 |
| SSB | 10/19/01 | $1,162,960.00 |
| SSB | 11/02/01 | $357,891.00 |
| SSB | 11/05/01 | $3,488,580.00 |
| SSB | 11/16/01 | $4,127,767.00 |
| SSB | 03/28/02 | $2,994,394.00 |
| SSB | 04/03/02 | $10,678,982.02 |
| SSB | 04/04/02 | $48,401.00 |
| SSB | 04/05/02 | $5,232,869.00 |

| Transferee | Date | Amount |
|------------|------|--------|
| SSB | 04/08/02 | $5,174,727.00 |
| SSB | 04/09/02 | $3,750,223.00 |
| SSB | 04/10/02 | $2,296,648.00 |
| SSB | 04/12/02 | $145,358.00 |
| SSB | 04/17/02 | $203,500.00 |
| SSB | 04/18/02 | $5,494,214.00 |
| SSB | 04/19/02 | $2,936,520.00 |
| SSB | 04/24/02 | $959,360.00 |
| SSB | 04/26/02 | $1,409,463.00 |
| SSB | 04/29/02 | $755,859.00 |
| SSB | 05/10/02 | $5,000,000.00 |
| | Subtotal | $84,183,911.53 |
| | | |
| BofA | 07/31/01 | $714,277.78 |
| BofA | 10/05/01 | $2,920,211.35 |
| BofA | 10/31/01 | $622,441.93 |
| BofA | 01/28/02 | $410,692.69 |
| BofA | 01/28/02 | $1,764.29 |
| BofA | 02/22/02 | $6,056,078.54 |
| BofA | 04/01/02 | $232,551.14 |
| BofA | 04/01/02 | $41,023,710.11 |
| | Subtotal | $51,981,727.83 |
| Goldman Sachs | 08/17/01 | $1,700,000.00 |
| Goldman Sachs | 08/23/01 | $2,700,000.00 |
| Goldman Sachs | 08/29/01 | $2,100,000.00 |
| Goldman Sachs | 09/18/01 | $5,000,000.00 |
| Goldman Sachs | 09/20/01 | $500,000.00 |
| Goldman Sachs | 09/21/01 | $5,000,000.00 |
| Goldman Sachs | 09/25/01 | $350,000.00 |
| Goldman Sachs | 09/25/01 | $(350,000.00) |
| Goldman Sachs | 09/25/01 | $3,500,000.00 |
| Goldman Sachs | 09/27/01 | $1,750,000.00 |
| Goldman Sachs | 10/01/01 | $4,500,000.00 |
| Goldman Sachs | 10/03/01 | $2,500,000.00 |
| Goldman Sachs | 11/15/01 | $150,000.00 |
| Goldman Sachs | 11/19/01 | $75,000.00 |
| Goldman Sachs | 02/21/02 | $2,352,592.00 |
| Goldman Sachs | 02/22/02 | $798,926.00 |
| Goldman Sachs | 03/28/02 | $6,359,647.00 |
| Goldman Sachs | 03/29/02 | $3,886,669.00 |
| Goldman Sachs | 04/02/02 | $3,934,629.00 |
| Goldman Sachs | 04/03/02 | $2,786,446.00 |
| Goldman Sachs | 04/04/02 | $1,705,815.00 |

| Transferee | Date | Amount |
|------------|------|--------|
| Goldman Sachs | 04/05/02 | $2,245,631.00 |
| Goldman Sachs | 04/12/02 | $4,296,928.00 |
| Goldman Sachs | 04/15/02 | $2,180,853.00 |
| Goldman Sachs | 04/22/02 | $1,554,668.00 |
| Goldman Sachs | 04/23/02 | $971,667.00 |
| Goldman Sachs | 04/29/02 | $43,185.00 |
| Goldman Sachs | 05/09/02 | $266,522.00 |
| | Subtotal | $62,859,178.00 |
| | | |
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 04/03/02 | $264,793.11 |
| Deutsche Bank | 04/03/02 | $20,391.66 |
| | Subtotal | $50,285,184.77 |
| | | |
| | Grand Total | $249,310,002.13 |

806.     In making the Margin Loan Payments, the Debtors intended to delay, hinder and defraud any entity to which the Debtors were or became indebted, on or after the date that such payments were made. The Debtors received no consideration for the Margin Loan Payments. To the contrary, the Margin Loan Payments were made for the sole purpose of benefiting the Rigas Family.

807.     The Margin Lenders knew or recklessly disregarded the fact that the Rigas Family intended to cause Adelphia to repay the Margin Loans and that Adelphia and its creditors received no consideration from the Margin Loan Payments.

808.     By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, all Margin Loan Payments made on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## THIRTY-SECOND CLAIM FOR RELIEF

### (Violation of the Bank Holding Company Act Against
### the Agent Banks and the Investment Banks)

809.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

810.     Each of the Agent Banks is either or both of the following: (a) an insured bank as defined in section 1813(h) of title 12 of the United States Code, or (b) an institution organized under the laws of the United States, a State, the District of Columbia or any territory of the United States which both accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others, and is engaged in the business of making commercial loans.

811.     Each of the Agent Banks is a "bank" within the meaning of sections 1841(c) and 1971 of title 12 of the United States Code.

812.     Each of the Investment Banks and its affiliated Agent Bank is a subsidiary of the same bank holding company.

813.     At various times herein, the Agent Banks conditioned their extensions of credit to the Debtors, and/or fixed or varied the consideration thereof, and/or otherwise required the Debtors in conjunction with the foregoing to obtain some additional credit, property, or service from a bank holding company of such bank or from, among other entities, the Investment Banks.

814.     As a result of the activities of the Agent Banks, the Debtors have suffered damage.

815. Pursuant to section 1975 of title 12 of the United States Code, the Debtors are entitled to recover an amount that is three times the amount of the damages sustained in an amount to be determined at trial, plus costs and attorneys' fees.

## THIRTY-THIRD CLAIM FOR RELIEF

**(Equitable Disallowance of Defendants' Claims or, Alternatively, Equitable Subordination Under 11 U.S.C. § 510(c) Against all Defendants)**

816. Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

817. As alleged herein, each of the Co-Borrowing Lenders and each of the Investment Banks engaged in wrongful conduct directed towards the Debtors and its arms-length creditors.

818. Each of the Co-Borrowing Lenders entered into the Co-Borrowing Facilities and authorized funding thereunder despite actual knowledge, or reckless disregard, of the fact that the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars (for which the Co-Borrowing Debtors would remain liable), that the Rigas Family intended to, and did, use those funds for their own benefit, and that the Debtors concealed the true extent of their liabilities under the Co-Borrowing Facilities. The Co-Borrowing Lenders were similarly aware of the fraudulent uses of the Non-Co-Borrowing Facilities as alleged herein.

819. Prior to the consummation of the Co-Borrowing Facilities, each of the Agent Banks conducted extensive due diligence on behalf of themselves and the other Co-Borrowing Lenders. Similarly, the Agent Banks obtained extensive due diligence about the Debtors from the Investment Banks that underwrote one or more securities offerings on behalf of the Debtors.

After each of the Co-Borrowing Facilities closed, the Agent Banks and the other Co-Borrowing Lenders obtained compliance certificates from the Debtors as required by the Co-Borrowing Agreements. Upon information and belief, the Agent Banks were authorized to obtain compliance certificates and other information on behalf of the other Co-Borrowing Lenders as well. Upon information and belief, the Agent Banks were obligated to, and did, transmit to the other Co-Borrowing Lenders compliance certificates and other information about the Co-Borrowing Debtors' borrowings under the Co-Borrowing Facilities and other indebtedness. To the extent that any of the Co-Borrowing Lenders or the NCB Lenders did not know of, or recklessly disregard, the massive fraud at the Debtors, the knowledge and wrongful conduct of the Agent Banks should be imputed to each of the other Co-Borrowing Lenders and the NCB Lenders by virtue of the agency relationship among them.

820.     For their part, the Investment Banks earned hundreds of millions of dollars of fees providing structured finance advice to Adelphia and underwriting and marketing Adelphia's securities. In the process, each of the Investment Banks induced purchasers of those securities to rely on various offering materials that were materially misleading.

821.     Indeed, at all times during the marketing of Adelphia's securities, each of the Investment Banks either knew, recklessly disregarded, or were intentionally blind to the fact that the offering materials contained material misrepresentations and omissions regarding the business and financial condition of the Debtors, including, without limitation, the extent of the Debtors' leverage. Indeed, none of the offering materials made any disclosure of the extensive fraud the Rigas Family was perpetrating at Adelphia, including the failure to disclose the true amounts outstanding under the Co-Borrowing Facilities. The Investment Banks induced investors to rely on those false and deceptive representations about the Debtors' financial

condition in making their decisions to extend credit to Adelphia and other Debtors by purchasing debt securities.

822.    Moreover, many of the Investment Banks had their purportedly independent analysts issue knowingly or recklessly misleading reports on Adelphia's securities to inflate the market value of the Rigas Family's holdings, the bonds issued by Adelphia and its direct and indirect subsidiaries, and the portion of the Debtors' credit facilities that their affiliated Agent Banks were selling in the secondary loan market.

823.    Thus, with respect to the wrongful conduct directed at the Debtors and their arms-length creditors, each Investment Bank and its affiliated Agent Bank acted as a single unit. Indeed, many of the Investment Banks and the Agent Banks held themselves out to the Debtors as unitary organizations offering underwriting and related financial advisory services, along with traditional credit banking services.

824.    Each of the Co-Borrowing Lenders acted callously and with reckless disregard of the consequences of its inequitable conduct. Each of the Co-Borrowing Lenders intended to syndicate all or a substantial portion of its interest in the Co-Borrowing Facilities to other institutions. By and through the syndication, each of the Co-Borrowing Lenders attempted to eliminate the significant risk of exposure to the continuing fraud being perpetrated by the Rigas Family.

825.    Moreover, the Co-Borrowing Lenders assisted the Rigas Family in creating the fraudulent structure of the Co-Borrowing Facilities or ratified this fraudulent structure through their participation in the Co-Borrowing Facilities, and took advantage of the fraudulent structure for their own personal gain.

826.     At all relevant times, the Debtors had significant obligations to make principal and interest payments to the holders of public debt securities issued by Adelphia and certain of its direct and indirect subsidiaries.  As a holding company, Adelphia relied almost exclusively on the cash flow generated from cable subscribers at its indirect operating subsidiaries to fulfill those payment obligations.

827.     Upon information and belief, with the assistance of certain of the Co-Borrowing Lenders, the Rigas Family caused the Debtors to structure each of the Debtors' credit facilities, including the Co-Borrowing Facilities, so that all borrowings would be made by Adelphia's indirect operating subsidiaries, not the parent holding company, Adelphia.  In this way, all revenues generated by the Debtors' operations -- revenues that the Debtors' bondholders relied upon for payment of principal and interest -- would first be available to the Debtors' lenders, including Defendants.

828.     Because the Rigas Family intended to use the Co-Borrowing Debtors' credit to access billions of dollars from the Co-Borrowing Facilities, and knew that the Co-Borrowing Lenders would only give them such access if an Adelphia-related entity remained liable for amounts used by the Rigas Family, the Rigas Family gave the Co-Borrowing Lenders priority over creditors of Adelphia's indirect holding company subsidiaries for repayment of the obligations fraudulently incurred by the Rigas Family under the Co-Borrowing Facilities by structuring the Co-Borrowing Facilities so that all borrowings occurred at the operating subsidiary level.

829.     Each of the Co-Borrowing Lenders knew of the fraudulent manner in which the Rigas Family structured the Co-Borrowing Debtors' participation in the Co-Borrowing

Facilities. Indeed, upon information and belief, in light of Adelphia's significant public debt, the Co-Borrowing Lenders would not have approved the Co-Borrowing Facilities absent the purported priority afforded to them by the fraudulent structuring of such facilities. Each of the Co-Borrowing Lenders approved each of the Co-Borrowing Facilities, and their participation in other Adelphia-related credit facilities, based upon, among other things, the structural priority that the Co-Borrowing Lenders purportedly would have over Adelphia's bondholders for repayment of the loans.

830. Defendants' misconduct similarly has damaged all of the Debtors' arms-length unsecured creditors, who extended credit without knowledge of Defendants' actions and who, unlike Defendants, played no role in damaging the Debtors. Indeed, without the Defendants' inequitable conduct, the Debtors' arms-length unsecured creditors would not have acquired Adelphia's securities or extended credit to the Debtors.

831. If the Co-Borrowing Lenders' claims for payment were allowed, those claims would consume a substantial portion of the value of the Debtors' estates, while the Debtors' arms-length creditors -- who invested pursuant to false and deceptive offering materials -- and other unsecured claims, will receive a substantially smaller distribution.

832. The Investment Banks' involvement in the deceptive marketing of Adelphia's securities and the Co-Borrowing Lenders' consummation of the Co-Borrowing Facilities at a senior level to the interests of the Debtors' arms-length creditors constituted inequitable conduct and reduced those creditors' chances of being repaid in full, or in substantial part, on their claims.

833. The Co-Borrowing Lenders received an unfair advantage over the Debtors' arms-length creditors by virtue of their misconduct. The Co-Borrowing Lenders agreed to

provide the Co-Borrowing Facilities on the condition that the Investment Banks receive lucrative underwriting engagements from Adelphia. The Co-Borrowing Lenders made loans pursuant to the Co-Borrowing Facilities knowing that the Debtors' arms-length creditors would be the first to incur losses from any expected deterioration in the Debtors' value. The Co-Borrowing Lenders' favorable treatment is a result of the inequitable conduct of the Defendants. Therefore, if the Co-Borrowing Lenders' claims are not disallowed or equitably subordinated to those of the Debtors' arms-length creditors, the Co-Borrowing Lenders will be unjustly enriched and the Debtors' arms-length creditors will be financially damaged.

834. There are substantial assets at the Debtors including, but not limited to, equipment, accounts receivable, human resources, contract rights, avoidance actions and derivative actions that could be used to satisfy the claims of unsecured creditors if the Co-Borrowing Lenders' claims are equitably disallowed or subordinated.

835. Equitable subordination of each of the Co-Borrowing Lender's claims is consistent with the Bankruptcy Code.

836. By reason of the foregoing, (a) Plaintiffs are entitled to judgment equitably disallowing the Investment Banks and the Co-Borrowing Lenders' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, Plaintiffs are entitled to judgment (i) subordinating the Investment Banks and the Co-Borrowing Lenders' claims to the prior payment in full of the claims of unsecured creditors of the Debtors, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of the Debtors' estates.

## THIRTY-FOURTH CLAIM FOR RELIEF

### (Recharacterization of Debt as Equity Against the Co-Borrowing Lenders)

837.    Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

838.    At least $2 billion of the proceeds of the Co-Borrowing Facilities were used by the Rigas Family to finance the purchases of Adelphia's common and preferred stock and to maintain voting control over the Debtors (the "Co-Borrowing Stock Purchases").  Most, if not all, of the Co-Borrowing Stock Purchases were disclosed to the public as equity contributions by the Rigas Family.  In economic reality, the Co-Borrowing Stock Purchases were sham transactions because the Rigas Family used the Co-Borrowing Facilities to finance the purchases rather than contributing new capital to the enterprise.

839.    At the time of the Co-Borrowing Stock Purchases, the Co-Borrowing Lenders knew or recklessly disregarded the fact that the Debtors were undercapitalized.  The Debtors lacked sufficient capital to conduct their businesses and operations in the ordinary course of business.

840.    The Co-Borrowing Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Co-Borrowing Facilities for the Co-Borrowing Stock Purchases with the ultimate purpose of maintaining voting control.  In connection with these purchases, the Rigas Family would fraudulently record an increase in shareholders' equity on the Debtors' financial statements and a decrease in the amount of the Debtors' indebtedness under the Co-Borrowing Facilities.  The indebtedness from such uses of the Co-Borrowing Facilities would be shifted to an RFE, notwithstanding the fact that the Debtors remained liable for all

draw downs under the Co-Borrowing Facilities. The Co-Borrowing Lenders knew of or recklessly disregarded this course of conduct.

841. Because of their consent to the Co-Borrowing Stock Purchases and the misrepresentations to third parties about the economic reality of these transactions, the Co-Borrowing Lenders should be estopped from claiming that the Co-Borrowing Stock Purchases by the Rigas Family were anything other than what the Rigas Family and the Debtors characterized them to be: equity contributions to Adelphia.

842. By virtue of the foregoing, the Court should recharacterize that portion of the Co-Borrowing Facilities used for the purchase of stock as an equity contribution to Adelphia, which portion Plaintiffs believe is at least $2 billion.

## THIRTY-FIFTH CLAIM FOR RELIEF

### (Recharacterization of Debt as Equity Against the Century-TCI Lenders)

843. Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

844. In October and November 2001, at least $400 million of the proceeds of the Century-TCI Facility were used by the Rigas Family to finance the close of the Rigas Family's purchases of Adelphia's common stock and convertible bonds to maintain voting control over the Debtors (the "Century-TCI Purchases"). Adelphia and the Rigas Family mischaracterized the Century-TCI Purchases in their public disclosures as equity contributions by the Rigas Family. In economic reality, the Century-TCI Purchases were sham transactions because the Rigas Family used the Century-TCI Facility to finance the purchases rather than contributing new capital to the enterprise.

845.     At the time of the closing of the Century-TCI Purchases, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors were undercapitalized.  At that time, the Debtors lacked sufficient capital to conduct their businesses and operations in the ordinary course of business.

846.     In connection with the Century-TCI Purchases, in January 2001 the Rigas Family recorded an increase in shareholders' equity on the Debtors' financial statements and a corresponding receivable of equal amount owing to the Debtors from the RFE purchaser of the securities.  The Rigas Family at that time intended to close this transaction (i.e., pay the receivable when it came due in October 2001) with co-borrowed funds.

847.     In October 2001, however, the Co-Borrowing Facilities had reached their limits, and no liquidity was available to close the transaction.  Consequently, the Rigas Family caused the Debtors instead to draw on the liquidity available under the Century-TCI Facility to extinguish the receivable and close the Century-TCI Purchases.  Citibank and the other Century-TCI Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Century-TCI Facility for the Century-TCI Purchases.

848.     Because of their consent to, and/or role in the facilitation of, the Century-TCI Purchases and the misrepresentations to third parties about the economic reality of these transactions, Citibank and the other Century-TCI Lenders should be estopped from claiming that the Century-TCI Stock Purchases by the Rigas Family were anything other than what the Rigas Family and the Debtors characterized them to be:  equity contributions to Adelphia.

849.     By virtue of the foregoing, the Court should recharacterize that portion of the Century-TCI Facility used for the purchase of stock as an equity contribution to Adelphia, which portion Plaintiffs believe is at least $400 million.

## THIRTY-SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against the Agent Banks and the Investment Banks)

850.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

851.     A relationship of trust and confidence existed between the Debtors and each of the Agent Banks and Investment Banks as a result of, among other things, the roles each of the Agent Banks and Investment Banks played in the Debtors' financial affairs as, among other things, the Debtors' lenders, underwriters and financial advisors.

852.     As a result, each of the Agent Banks and each of the Investment Banks owed the Debtors fiduciary duties of good faith, fidelity and undivided loyalty.

853.     As a result of the conduct alleged herein, each of the Agent Banks breached its fiduciary duties to the Debtors by, among other things, approving participation in each of the Co-Borrowing Facilities and authorizing funding thereunder despite actual or constructive knowledge that: (i) the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars on the Debtors' credit (for which the Debtors would remain liable); (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors; and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

854.     As a result of the conduct alleged herein, each of the Investment Banks breached its fiduciary duties to the Debtors by, among other things, underwriting Adelphia's securities offerings and failing to fully inform Adelphia's independent Board of Directors despite actual or constructive knowledge that: (i) the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars on the Debtors' credit (for which the Debtors would remain liable); (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors; and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

855.     In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey acted in a manner that was adverse to the interests of the Debtors. However, the Rigas Family, Brown and Mulcahey were not the "sole actors" with respect to the Debtors. Rather, there were independent directors at Adelphia who would have brought the activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised by any of the Agent Banks or the Investment Banks.

856.     The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality. In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

857.     Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed the public generally because, among other things:  (i) public investors and arms-length creditors relied upon Adelphia's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arms-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors.  Each of the Agent Banks authorized its participation in, and funding under, the Co-Borrowing Facilities, and each of the Investment Banks participated in underwritings of Adelphia's securities, despite its knowledge or reckless disregard of the wrongful conduct of the Rigas Family.

858.     By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-SEVENTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty
### Against the Agent Banks and the Investment Banks)

859.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

860.     Each member of the Rigas Family breached his fiduciary duties to the Debtors as officers and directors of Adelphia by, among other things, causing the Debtors to enter into

the fraudulently structured Co-Borrowing Facilities, causing certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used for the sole benefit of the Rigas Family, using such funds for purposes that provided no benefit to the Debtors, and failing to fully inform the independent members of Adelphia's Board of Directors of the circumstances surrounding such conduct.

861.     Each of Brown and Mulcahey breached his fiduciary duties to the Debtors as officers of Adelphia by, among other things, causing the Debtors to enter into the fraudulently structured Co-Borrowing Facilities, causing certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used solely for the benefit of the Rigas Family, and failing to fully inform the independent members of Adelphia's Board of Directors of the circumstances surrounding such conduct.

862.     As a result of the conduct alleged herein, each of the Agent Banks and each of the Investment Banks aided and abetted the foregoing breaches of fiduciary duties by substantially assisting in those breaches with knowledge of their unlawfulness.

863.     In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey acted in a manner that was adverse to the interests of the Debtors. However, the Rigas Family, Brown and Mulcahey were not the "sole actors" with respect to the Debtors. Rather, there were independent directors at Adelphia who would have brought the activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised by any of the Agent Banks or the Investment Banks.

864.     The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of

morality.  In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

865.     Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed the public generally because, among other things:  (i) public investors and arms-length creditors relied upon Adelphia's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arms-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors.  Each of the Agent Banks authorized its participation in, and funding under, the Co-Borrowing Facilities, and each of the Investment Banks participated in underwritings of Adelphia's securities, despite its knowledge or reckless disregard of the wrongful conduct of the Rigas Family.

866.     By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-EIGHTH CLAIM FOR RELIEF

### (Aiding and Abetting Fraud Against the Agent Banks and the Investment Banks)

867.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

868.     As a result of the conduct alleged herein, each member of the Rigas Family and each of Brown and Mulcahey made fraudulent misrepresentations and omissions of material facts by, among other things, causing the Debtors to enter into the fraudulently structured Co-Borrowing Facilities and failing to disclose to Adelphia's independent Board of Directors the true purpose and effect of the facilities, causing certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used for the sole benefit of the Rigas Family, using such funds for purposes that provided no benefit to the Debtors, and failing to fully inform the independent members of Adelphia's Board of Directors of the circumstances surrounding such conduct.

869.     Each member of the Rigas Family and each of Brown and Mulcahey made such representations and omissions of material facts with the actual intent that the Debtors rely upon them.

870.     The Debtors reasonably relied upon such representations and omissions of material fact to their detriment.

871.     As a result of the conduct alleged herein, each of the Agent Banks and each of the Investment Banks aided and abetted the foregoing fraudulent conduct by substantially assisting in such conduct with knowledge of its unlawfulness.

872. In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey acted in a manner that was adverse to the interests of the Debtors. However, the Rigas Family, Brown and Mulcahey were not the "sole actors" with respect to the Debtors. Rather, there were independent directors at Adelphia who would have brought the activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised by any of the Agent Banks or the Investment Banks.

873. The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality. In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

874. Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed the public generally because, among other things: (i) public investors and arms-length creditors relied upon Adelphia's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arms-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors. Each of the Agent Banks authorized its participation in, and funding under, the

Co-Borrowing Facilities, and each of the Investment Banks participated in underwritings of Adelphia's securities, despite its knowledge or reckless disregard of the wrongful conduct of the Rigas Family.

875.     By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-NINTH CLAIM FOR RELIEF

### (Gross Negligence Against The Agent Banks)

876.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

877.     By virtue of its fiduciary duty, special relationship and/or superior knowledge with respect to the Debtors, each of the Agent Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as lenders, and (ii) to keep the Debtors fully informed of material facts concerning its services.

878.     Each of the Agent Banks breached its duty by, among other things, approving participation in each of the Co-Borrowing Facilities and authorizing funding thereunder despite actual or constructive knowledge that (i) the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars on the Debtors' credit (for which the Debtors would remain liable), (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors, and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

879.      Each of the Agent Banks breached its duties to the Debtors so that its affiliated Investment Bank could earn millions of dollars of transaction fees for underwriting and financial advisory services in connection with Adelphia's issuance of securities.

880.      The conduct of each of the Agent Banks caused the Debtors and the Debtors' arms-length creditors significant harm.  Among other things, had any of the Agent Banks disclosed to Adelphia's independent directors the material information it possessed with respect to, among other things, the fraudulent structure of the Co-Borrowing Facilities, the Rigas Family's fraudulent use of co-borrowing funds and the Rigas Family's failure to cause Adelphia to accurately disclose its liabilities under the Co-Borrowing Facilities, Adelphia's Board of Directors would not have authorized such facilities.

881.      Thus, as a result of each of the Agent Bank's breaches, the Debtors became insolvent, further insolvent, inadequately capitalized and/or unable to pay its debts as they would become due in the ordinary course of its business and affairs.

882.      The conduct of each of the Agent Banks was wrongful and without justification or excuse.  In addition, the acts and omissions of each of the Agent Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

883.      Moreover, the conduct of each of each of the Agent Banks harmed the public generally because, among other things:  (i) public investors and arms-length creditors relied upon Adelphia's public filings, which each of the Agent Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the each of the Agent Bank's affiliated Investment Bank involved numerous investors that publicly

traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arms-length creditors relied on each of the Agent Bank's affiliated Investment Bank to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors. Each of the Agent Banks participated in the Co-Borrowing Facilities despite its knowledge or reckless disregard of the wrongful conduct of the Rigas Family.

884. By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## FORTIETH CLAIM FOR RELIEF

### (Gross Negligence Against The Investment Banks)

885. Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

886. By virtue of its fiduciary duty, special relationship and/or superior knowledge with respect to the Debtors, each of the Investment Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as underwriters and/or financial advisors, and (ii) to keep the Debtors fully informed of all material facts concerning its services.

887. Each of the Investment Banks breached its duties by, among other things, underwriting Adelphia's securities offerings and failing to keep Adelphia's independent Board of Directors fully informed of all material facts despite actual or constructive knowledge that (i) each of the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access

to billions of dollars on the Debtors' credit (for which the Debtors would remain liable), (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors, and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

888.     Each of the Investment Banks breached its duties to the Debtors so that it could earn millions of dollars of transaction fees for its underwriting and financial advisory services in connection with Adelphia's issuance of securities.

889.     The conduct of each of the Investment Banks caused the Debtors and the Debtors' creditors significant harm.  Among other things, had any of the Investment Banks disclosed to Adelphia's independent directors the material information it possessed with respect to, among other things, the Rigas Family's fraudulent use of co-borrowing funds and the Rigas Family's failure to cause The Debtors to accurately disclose its liabilities under the Co-Borrowing Facilities, Adelphia's Board of Directors would not have authorized such facilities.

890.     Thus, as a result of each of the Investment Bank's breaches, the Debtors became insolvent, further insolvent, inadequately capitalized and/or unable to pay its debts as they would become due in the ordinary course of its business and affairs.

891.     The conduct of each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality.  In addition, the acts and omissions of each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

892.    Moreover, the conduct of each of each of the Investment Banks harmed the public generally because, among other things:  (i) public investors and arms-length creditors relied upon Adelphia's public filings, which each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arms-length creditors relied on each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors.  Each of the Investment Banks participated in underwritings of the Debtors' securities, despite its knowledge or reckless disregard of the wrongful conduct of the Rigas Family.

893.    By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## FORTY-FIRST CLAIM FOR RELIEF

### (Declaratory Judgment Against the CCH Co-Borrowing Lenders)

894.    Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

895.    The CCH Credit Agreement provides, among other things:

> Notwithstanding any contrary provision, it is the intention of the Borrowers, the Lenders, and the Administrative Agent that the amount of the Obligation for which any Borrower is liable shall be, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar Laws applicable to such Borrower.  Accordingly, notwithstanding anything to the contrary

contained in this Agreement or any other agreement or instrument executed in connection with the payment of any of the Obligations, the amount of the Obligation for which any Borrower is liable shall be limited to an aggregate amount equal to the largest amount that would not render such Borrower's obligations hereunder subject to avoidance under *Section 548* of the *United States Bankruptcy Code* or any comparable provision of any applicable state Law.

(CCH Credit Agreement, Section 9.6) (original emphasis).

896.    Defendants BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais, CSFB, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, SunTrust, CIBC, BLG, Rabobank, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, DLJ, Fifth Third, First Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper Fund, KZH III, KZH CypressTree, KZH ING, KZH Langdale, KZH Pondview KZH Shoshone, KZH Waterside, Liberty-Stein, Meespierson, Mellon Bank, Natexis, NCBP, CypressTree Floating Rate Fund, Olympic Trust, Oppenheimer, Pinehurst, Principal Life, Societe Generale, Stein Roe, U.S. Bank and United of Omaha are parties to the CCH Loan Agreement.

897.    As a result of the conduct alleged herein, all or a significant portion of the Obligations (as defined in the CCH Credit Agreement) under the CCH Credit Agreement are subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provision of any applicable state law.

898.    There is a bona fide dispute among the parties concerning their rights and obligations under the CCH Credit Agreement.

899.    Plaintiffs are entitled to a declaration that, under the CCH Credit Agreement, the Debtors are not liable for any of the Obligations under the CCH Credit Agreement in excess of those permitted by the CCH Credit Agreement.

# FORTY-SECOND CLAIM FOR RELIEF

## (Declaratory Judgment Against the Olympus Co-Borrowing Lenders)

900.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

901.     The Olympus Credit Agreement provides, among other things:

> Notwithstanding any contrary provision, it is the intention of the Borrowers, the Lenders, and the Administrative Agent that the amount of the Obligation for which any Borrower is liable shall be, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar Laws applicable to such Borrower. Accordingly, notwithstanding anything to the contrary contained in this Agreement or any other agreement or instrument executed in connection with the payment of any of the Obligations, the amount of the Obligation for which any Borrower is liable shall be limited to an aggregate amount equal to the largest amount that would not render such Borrower's obligations hereunder subject to avoidance under *Section 548* of the *United States Bankruptcy Code* or any comparable provision of any applicable state Law.

(Olympus Credit Agreement, Section 9.6) (original emphasis.)

902.     Defendants BMO, Wachovia, BNS, Fleet, BONY, BofA, Citicorp, TDI, Chase, Deutsche Bank, CSFB, Credit Lyonnais, Royal Bank of Scotland, Societe Generale, Fuji Bank, CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding, Stanwich, Sumitomo and Toronto Dominion are parties to the Olympus Credit Agreement.

903.     As a result of the conduct alleged herein, all or a significant portion of the Obligations (as defined in the Olympus Credit Agreement) under the Olympus Credit Agreement are subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provision of any applicable state law.

904.	There is a bona fide dispute among the parties concerning their rights and obligations under the Olympus Credit Agreement.

905.	Plaintiffs are entitled to a declaration that, under the Olympus Credit Agreement, the Debtors are not liable for any of the Obligations under the Olympus Credit Agreement in excess of those permitted by the Olympus Credit Agreement.

## FORTY-THIRD CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547 and 550 Against the Century-TCI Lenders)

906.	Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

907.	On or within the ninety-day period preceding the Petition Date, the Century-TCI Lenders received payments of principal, interest and fees in the amount of at least $4,000,240.45 from the Century-TCI Debtors (the "Century-TCI Payments").

908.	The Century-TCI Payments were transfers of an interest in the property of the Century-TCI Debtors.

909.	Each of the Century-TCI Debtors was insolvent as of the date of the Century-TCI Payments.

910.	As a result of the Century-TCI Payments, the Century-TCI Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

911.	By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the Century-TCI Payments should be avoided, recovered and preserved for the benefit of the Century-TCI Debtors' estates.

## FORTY-FOURTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under
### 11 U.S.C. §§ 547 and 550 Against the Parnassos Lenders)

912.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

913.     On or within the ninety-day period preceding the Petition Date, the Parnassos Lenders received payments of principal, interest and fees in the amount of at least $25,370,318.41 from the Parnassos Debtors (the "Parnassos Payments").

914.     The Parnassos Payments were transfers of an interest in the property of the Parnassos Debtors.

915.     Each of the Parnassos Debtors was insolvent as of the date of the Parnassos Payments.

916.     As a result of the Parnassos Payments, the Parnassos Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

917.     By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the Parnassos Payments should be avoided, recovered and preserved for the benefit of the Parnassos Debtors' estates.

## FORTY-FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the UCA/HHC Lenders)

918.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

919.    The UCA/HHC Lenders approved the UCA/HHC Facility and authorized funding thereunder despite their knowledge that, among other things: the structure of the UCA/HHC Facility allowed the Rigas Family to use proceeds of the facility for their own benefit, with no benefit to the Debtors; the RFE co-borrowers contributed a disproportionately small number of the assets from which the UCA/HHC Lenders could expect repayment; and the Rigas Family intended to, and in fact did, use funds from the UCA/HHC Facility for their own purposes, with no benefit to the Debtors.

920.    Despite their knowledge, at the closing of the UCA/HHC Facility, the UCA/HHC Lenders received the UCA/HHC Security Interests and, thereafter, received principal and interest payments from the Debtors on funds drawn down by the Rigas Family, for which the Debtors received no benefit. Moreover, the UCA/HHC Lenders seek to recover from the Debtors principal and interest payments on amounts drawn by the Rigas Family under the UCA/HHC Facility, for which the Debtors received no benefit.

921.    By reason of the foregoing, the UCA/HHC Lenders have been unjustly enriched at the Debtors' expense.

922.    The Debtors have no adequate remedy at law.

923.    Equity and good conscience compels the UCA/HHC Lenders to: (i) terminate the UCA/HHC Co-Borrowing Security Interests, (ii) return to the Debtors all amounts paid by the Debtors in respect of funds drawn under the UCA/HHC Co-Borrowing Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the UCA/HHC Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from

the Debtors for amounts drawn under the UCA/HHC Co-Borrowing Facility by the Rigas Family.

## FORTY-SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the CCH Co-Borrowing Lenders)

924.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

925.     The CCH Co-Borrowing Lenders approved the CCH Co-Borrowing Facility and authorized funding thereunder despite their knowledge that, among other things: the structure of the CCH Co-Borrowing Facility allowed the Rigas Family to use proceeds of the facility for their own benefit, with no benefit to the Debtors; the RFE co-borrower contributed a disproportionately small number of the assets from which the CCH Lenders could expect repayment; and the Rigas Family intended to, and in fact did, use funds from the CCH Co-Borrowing Facility for their own purposes, with no benefit to the Debtors.

926.     Despite their knowledge, at the closing of the CCH Co-Borrowing Facility, the CCH Lenders received the Century Security Interests and, thereafter, received principal and interest payments from the Debtors on funds drawn down by the Rigas Family, for which the Debtors received no benefit.  Moreover, the CCH Lenders seek to recover from the Debtors principal and interest payments on amounts drawn by the Rigas Family under the CCH Co-Borrowing Facility, for which the Debtors received no benefit.

927.     By reason of the foregoing, the CCH Lenders have been unjustly enriched at the Debtors' expense.

928.     The Debtors have no adequate remedy at law.

929.     Equity and good conscience compels the CCH Lenders to:  (i) terminate the CCH Co-Borrowing Security Interests, (ii) return to the Debtors all amounts paid by the Debtors in respect of funds drawn under the CCH Co-Borrowing Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the CCH Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from the Debtors for amounts drawn under the CCH Co-Borrowing Facility by the Rigas Family.

## FORTY-SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the Olympus Lenders)

930.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

931.     The Olympus Lenders approved the Olympus Facility and authorized funding thereunder despite their knowledge that, among other things:  the structure of the Olympus Facility allowed the Rigas Family to use proceeds of the facility for their own benefit, with no benefit to the Debtors; the RFE co-borrower contributed a disproportionately small number of the assets from which the Olympus Lenders could expect repayment; and the Rigas Family intended to, and in fact did, use funds from the Olympus Facility for their own purposes, with no benefit to the Debtors.

932.     Despite their knowledge, at the closing of the Olympus Facility, the Olympus Lenders received the Olympus Security Interests and, thereafter, received principal and interest payments from the Debtors on funds drawn down by the Rigas Family, for which the Debtors received no benefit.  Moreover, the Olympus Lenders seek to recover from the Debtors principal and interest payments on amounts drawn by the Rigas Family under the Olympus Facility, for which the Debtors received no benefit.

933.    By reason of the foregoing, the Olympus Lenders have been unjustly enriched at the Debtors' expense.

934.    The Debtors have no adequate remedy at law.

935.    Equity and good conscience compels the Olympus Lenders to: (i) terminate the Olympus Security Interests, (ii) return to the Debtors all amounts paid by the Debtors in respect of funds drawn under the Olympus Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the Olympus Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from the Debtors for amounts drawn under the Olympus Co-Borrowing Facility by the Rigas Family.

## FORTY-EIGHTH CLAIM FOR RELIEF

### (Equitable Estoppel Against the Co-Borrowing Lenders)

936.    Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

937.    As alleged herein, each of the Co-Borrowing Lenders and each of the Investment Banks engaged in wrongful conduct directed towards the Debtors and its arms-length creditors.

938.    Each of the Co-Borrowing Lenders entered into the Co-Borrowing Facilities and authorized funding thereunder despite actual knowledge, or reckless disregard of the fact, that the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars (for which the Co-Borrowing Debtors would remain liable), that the Rigas Family intended to, and did, use those funds for their own benefit, and that the Debtors concealed the true extent of their liabilities under the Co-Borrowing Facilities. The Co-

Borrowing Lenders were similarly aware of the fraudulent uses of the Non-Co-Borrowing Facilities as alleged herein.

939.    Prior to the consummation of the Co-Borrowing Facilities, each of the Agent Banks conducted extensive due diligence on its own behalf and on behalf of the other Co-Borrowing Lenders.  Similarly, each of the Agent Banks approved participation in the Co-Borrowing Facilities to obtain millions of dollars of investment banking fees for its affiliated Investment Bank, and obtained extensive due diligence about the Debtors from its Investment Bank (which underwrote one or more of the Debtors' securities offerings).  After each of the Co-Borrowing Facilities closed, the Agent Banks and the other Co-Borrowing Lenders obtained compliance certificates from the Debtors as required by the Co-Borrowing Agreements.  Upon information and belief, the Agent Banks also were authorized to obtain compliance certificates and other information on behalf of the other Co-Borrowing Lenders.  Upon information and belief, the Agent Banks were obligated to, and did, transmit to the other Co-Borrowing Lenders information about the Co-Borrowing Debtors' borrowings under the Co-Borrowing Facilities and other indebtedness.  To the extent that any of the Co-Borrowing Lenders did not know of, or recklessly disregard, the massive fraud at the Debtors, the knowledge and wrongful conduct of the Agent Banks should be imputed to each of the other Co-Borrowing Lenders by virtue of the agency relationships among them.

940.    For their part, the Investment Banks -- as a result of, among other things, the efforts of the Agent Banks -- earned hundreds of millions of dollars of fees providing structured finance advice to Adelphia and underwriting and marketing Adelphia's securities.  In the process, each of the Investment Banks induced purchasers of those securities to rely on various offering materials that were materially misleading.

941.     Indeed, at all times during the marketing of Adelphia's securities, each of the Investment Banks either knew, recklessly disregarded or were intentionally blind to the fact that the offering materials contained material misrepresentations and omissions regarding the business and financial condition of the Debtors, including, without limitation, the extent of the Debtors' leverage.  Indeed, none of the offering materials made any disclosure of the extensive fraud the Rigas Family was perpetrating at Adelphia, including the failure to disclose the true amount of the Co-Borrowing Obligations.  The Investment Banks induced investors to rely on those false and deceptive representations about the Debtors' financial condition in making their decisions to extend credit to Adelphia and other Debtors by purchasing debt securities.

942.     Moreover, each of the Investment Banks had its purportedly independent analysts issue knowingly misleading reports on Adelphia's securities to inflate the market value of the Rigas Family's holdings, the bonds issued by Adelphia and its direct and indirect subsidiaries, and the portion of the Debtors' credit facilities that its affiliated Agent Bank was selling in the secondary loan market.

943.     Thus, with respect to the wrongful conduct directed at the Debtors and their arms-length creditors, each Investment Bank and its affiliated Agent Bank acted as a single unit. Indeed, many of the Investment Banks and the Agent Banks held themselves out to the Debtors as unitary organizations offering underwriting and related financial advisory services, along with traditional credit banking services.

944.     Moreover, each of the Co-Borrowing Lenders intended to syndicate all or a substantial portion of their interest in the Co-Borrowing Facilities to other institutions.  By and

through the syndication, each of the Co-Borrowing Lenders attempted to eliminate the significant risk of exposure to the continuing fraud being perpetrated by the Rigas Family.

945.     The foregoing conduct amounts to a knowing misrepresentation and/or concealment of material facts from the independent members of Adelphia's Board of Directors, with the intention that the Debtors act upon such conduct.

946.     As alleged above, the independent members of Adelphia's Board of Directors lacked knowledge of the true facts and would have taken action to thwart the foregoing conduct had they been fully informed.  Indeed, the independent members of Adelphia's Board of Directors -- and thus, the Debtors -- relied upon the conduct of the Co-Borrowing Lenders and the Investment Banks by, among other things, approving the Co-Borrowing Facilities and continuing to allow the Debtors -- and, as a result of the foregoing fraudulent conduct, the Rigas Family -- to draw funds thereunder.

947.     By reason of the foregoing inequitable conduct, the Co-Borrowing Lenders should be estopped from retaining and enforcing the Co-Borrowing Security Interests, from retaining principal and interest payments made by the Debtors in respect of amounts drawn down under the Co-Borrowing Facilities for the benefit of the Rigas Family, and from seeking to recover outstanding principal and interest payments from the Debtors with respect to funds drawn under the Co-Borrowing Facilities for the benefit of the Rigas Family.

## FORTY-NINTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under
### 11 U.S.C. §§ 547, 550 and 551 Against the Frontiervision Lenders)

948.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

949.     In the ninety-day period preceding the Petition Date, the Frontiervision Debtors granted to the Frontiervision Lenders as collateral all or a portion of the stock, limited liability company interests or partnership interests, as applicable, or assets of the following entities (the "Frontiervision Collateral Transfers"):   Adelphia Communications of California III, LLC, FOP Indiana, L.P., and The Maine Internetworks, Inc.

950.     In the ninety-day period preceding the Petition Date, the Frontiervision Lenders perfected the Frontiervision Collateral Transfers by, among other things, filing financing statements pursuant to the Uniform Commercial Code ("UCC").

951.     In the ninety-day period preceding the Petition Date, the Frontiervision Lenders received payments of interest in the amount of at least $16,842,141.40 (the "Frontiervision Payments").

952.     The Frontiervision Collateral Transfers, the perfection of the Frontiervision Collateral Transfers and the Frontiervision Payments were transfers of an interest in the property of the applicable Debtors (the "Frontiervision Preferential Transfers").

953.     Each of the Debtors was insolvent as of the Date of the Frontiervision Preferential Transfers.

954.     As a result of the Frontiervision Preferential Transfers, the Frontiervision Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

955.     By virtue of the foregoing, pursuant to sections 547, 550 and 551 of the Bankruptcy Code, all of the Frontiervision Preferential Transfers should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## FIFTIETH CLAIM FOR RELIEF

**(Avoidance and Recovery of Voidable Preferences Under
11 U.S.C. §§ 547 and 550 Against the CCH Lenders)**

956.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

957.     In the ninety-day period preceding the Petition Date, the CCH Lenders received payments of principal, interest and fees in the amount of at least $520,020,641.72 (the "CCH Payments").

958.     The CCH Payments were transfers of an interest in the property of the applicable Debtors (the "CCH Preferential Transfers").

959.     Each of the Debtors was insolvent as of the date of the CCH Preferential Transfers.

960.     As a result of the CCH Preferential Transfers, the CCH Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

961.     By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the CCH Preferential Transfers should be avoided, recovered, and preserved for the benefit of the Debtors' estates.

## FIFTY-FIRST CLAIM FOR RELIEF

**(Avoidance and Recovery of Voidable Preferences Under
11 U.S.C. §§ 547, 550 and 551 Against the Olympus Lenders)**

962.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

963.     In the ninety-day period preceding the Petition Date, the Olympus Debtors granted to the Olympus Lenders as collateral all or a portion of the capital stock or assets of Starpoint, Limited Partnership, Three Rivers Cable Associate L.P., Cable Sentry Corporation, Coral Security, Inc., Westview Security, Inc., Lake Champlain Cable Television Corporation, Young's Cable TV Corp, and ACC Cable Communications FL-VA, LLC (the "Olympus Collateral Transfers").

964.     In the ninety-day period preceding the Petition Date, the Olympus Lenders perfected the Olympus Collateral Transfers by, among other things, filing financing statements pursuant to the UCC, obtaining possession of the applicable stock certificates or using other means provided by applicable state law.

965.     In the ninety-day period preceding the Petition Date, the Olympus Lenders received payments of principal, interest and fees in the amount of at least $14,025,192.86 (the "Olympus Payments").

966.     The Olympus Collateral Transfers, the perfection of the Olympus Collateral Transfers and the Olympus Payments were transfers of an interest in the property of the applicable Debtors (the "Olympus Preferential Transfers").

967.     Each of the Debtors was insolvent as of the Date of the Olympus Preferential Transfers.

968.     As a result of the Olympus Preferential Transfers, the Olympus Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

969.     By virtue of the foregoing, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, all of the Olympus Preferential Transfers should be avoided, recovered and preserved for the benefit of the Debtors' estates.

## FIFTY-SECOND CLAIM FOR RELIEF

**(Avoidance and Recovery of Voidable Preferences Under
11 U.S.C. §§ 547, 550 and 551 Against the UCA/HHC Lenders)**

970.     Plaintiffs reallege paragraphs 1 through 530 as if fully set forth herein.

971.     In the ninety-day period preceding the Petition Date, the UCA/HHC Debtors granted to the UCA/HHC Lenders as collateral all or a portion of the capital stock or assets of Southwest Virginia Cable, Inc. Adelphia Central Pennsylvania, LLC, Adelphia Cablevision of Santa Ana LLC, and Adelphia Cablevison of Simi Valley LLC (the "UCA/HHC Collateral Transfers").

972.     In the ninety-day period preceding the Petition Date, the UCA/HHC Lenders perfected the UCA/HHC Collateral Transfers by, among other things, filing financing statements pursuant to the UCC, obtaining possession of the applicable stock certificates or using other means provided by applicable state law.

973.     In the ninety-day period preceding the Petition Date, the UCA/HHC Lenders received payments of principal, interest and fees in the amount of at least $25,707,881.96 (the "UCA/HHC Payments").

974.    The UCA/HHC Collateral Transfers, the perfection of the UCA/HHC Collateral Transfers and the UCA/HHC Payments were transfers of an interest in the property of the applicable Debtors (the "UCA/HHC Preferential Transfers").

975.    Each of the Debtors was insolvent as of the date of the UCA/HHC Preferential Transfers.

976.    As a result of the UCA/HHC Preferential Transfers, the UCA/HHC Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

977.    By virtue of the foregoing, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, all of the UCA/HHC Preferential Transfers should be avoided, recovered and preserved for the benefit of the Debtors' estates.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs:

(i)     on its First Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(ii)    on its Second Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the

Petition Date, and all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(iii)     on its Third Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates:  (A) (i) all UCA/HHC Co-Borrowing Obligations, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(iv)     on its Fourth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates:  (A) (i) all UCA/HHC Co-Borrowing Obligations, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(v)     on its Fifth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and

all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(vi)     on its Sixth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(vii)     on its Seventh Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates:  (A) (i) all CCH Co-Borrowing Obligations, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(viii)     on its Eighth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates: (A) (i) all CCH Co-Borrowing Obligations, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all CCH Co-Borrowing Security Interests

securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(ix)     on its Ninth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(x)     on its Tenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates all Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(xi)     on its Eleventh Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates: (A) (i) all Olympus Co-Borrowing Obligations, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(xii)     on its Twelfth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of the estates: (A) (i) all Olympus Co-Borrowing Obligations, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(xiii)    on its Thirteenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of the estates (i) the Century-TCI Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer, together with all interest paid in respect of the obligations avoided hereunder;

(xiv)     on its Fourteenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of the estates (i) the Century-TCI Transfers, and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer, together with all interest paid in respect of the obligations avoided hereunder;

(xv)      on its Fifteenth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of the estates (i) the Century-TCI Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer, together with all interest paid in respect of the obligations avoided hereunder;

(xvi)     on its Sixteenth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of the estates (i) the

Century-TCI Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Transfer, together with all interest paid in respect of the obligations avoided hereunder;

(xvii)     on its Seventeenth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Fleet Payments;

(xviii)     on its Eighteenth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Fleet Payments;

(xix)     on its Nineteenth Claim for Relief, pursuant to sections 548 and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates at least $3,121,043.89;

(xx)     on its Twentieth Claim for Relief, pursuant to sections 548 and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates at least $3,121,043.89;

(xxi)     on its Twenty-First Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the HSBC Payments;

(xxii)     on its Twenty-Second Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the HSBC Payments;

(xxiii)     on its Twenty-Third Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Key Bank Payments;

(xxiv)     on its Twenty-Fourth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Key Bank Payments;

(xxv)     on its Twenty-Fifth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the BNS Payments;

(xxvi)     on its Twenty-Sixth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the BNS Payments;

(xxvii)     on its Twenty-Seventh Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates at least $10,446,935.69;

(xxviii)     on its Twenty-Eighth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates at least $10,446,935.69;

(xxix)     on its Twenty-Ninth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the CIBC Payments;

(xxx)     on its Thirtieth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the CIBC Payments;

(xxxi)     on its Thirty-First Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates all Margin Payments made on or within one year preceding the Petition Date;

(xxxii)     on its Thirty-Second Claim for Relief, pursuant to section 1975 of title 12 of the United States Code, an amount that is three times the amount of the damages sustained, in an amount to be determined at trial, plus costs and attorneys' fees;

(xxxiii)     on its Thirty-Third Claim for Relief, (a) judgment equitably disallowing Defendants' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, judgment: (i) subordinating Defendants' claims to the prior payment in full of the claims of unsecured creditors of the Debtors, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of the Debtors' estates;

(xxxiv)     on its Thirty-Fourth Claim for Relief, recharacterizing that portion of the Co-Borrowing Facilities used for the purchase of stock as an equity contribution to Adelphia in an amount not less than $2 billion;

(xxxv)     on its Thirty-Fifth Claim for Relief, recharacterizing that portion of the Century-TCI Facility used for the purchase of stock as an equity contribution to Adelphia in an amount not less than $400 million;

(xxxvi)     on its Thirty-Sixth Claim for Relief, awarding Plaintiffs damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxvii)    on its Thirty-Seventh Claim for Relief, awarding Plaintiffs damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxviii)   on its Thirty-Eighth Claim for Relief, awarding Plaintiffs damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxix)     on its Thirty-Ninth Claim for Relief, awarding Plaintiffs damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xl)        on its Fortieth Claim for Relief, awarding Plaintiffs damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xli)       on its Forty-First Claim for Relief, granting Plaintiffs a declaration that the Debtors are not liable for any of the Obligations under the CCH Credit Agreement in excess of those permitted by the CCH Credit Agreement;

(xlii)      on its Forty-Second Claim for Relief, granting Plaintiffs a declaration that the Debtors are not liable for any of the Obligations under the Olympus Credit Agreement in excess of those permitted by the Olympus Credit Agreement;

(xliii)     on its Forty-Third Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates, the Century-TCI Payments;

(xliv)     on its Forty-Fourth Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates, the Parnassos Payments;

(xlv)     on its Forty-Fifth Claim for Relief, terminating the UCA/HHC Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the UCA/HHC Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the UCA/HHC Co-Borrowing Lenders, and terminating any purported right of the UCA/HHC Lenders to payment from the Debtors for amounts drawn under the UCA/HHC Co-Borrowing Facility by the Rigas Family;

(xlvi)     on its Forty-Sixth Claim for Relief, terminating the CCH Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the CCH Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the CCH Co-Borrowing Lenders, and terminating any purported right of the CCH Lenders to payment from the Debtors for amounts drawn under the CCH Co-Borrowing Facility by the Rigas Family;

(xlvii)     on its Forty-Seventh Claim for Relief, terminating the Olympus Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the Olympus Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the Olympus Co-Borrowing Lenders, and terminating any

purported right of the Olympus Lenders to payment from the Debtors for amounts drawn under the Olympus Co-Borrowing Facility by the Rigas Family;

(xlviii)    on its Forty-Eighth Claim for Relief, estopping the Co-Borrowing Lenders from retaining and enforcing the Co-Borrowing Security Interests, from retaining principal and interest payments made by the Debtors in respect of amounts drawn down under the Co-Borrowing Facilities for the benefit of the Rigas Family, and from seeking to recover outstanding principal and interest payments from the Debtors with respect to funds drawn under the Co-Borrowing Facilities for the benefit of the Rigas Family;

(xlix)    on its Forty-Ninth Claim for Relief, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Frontiervision Preferential Transfers;

(l)    on its Fiftieth Claim for Relief, avoiding, recovering, and preserving for the benefit of the Debtors' estates the CCH Preferential Transfers;

(li)    on its Fifty-First Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the Olympus Preferential Transfers;

(lii)    on its Fifty-Second Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of the Debtors' estates the UCA/HHC Preferential Transfers;

(liii)    awarding Plaintiffs pre-judgment interest on its claims together with its costs and attorneys' fees, to the fullest extent allowed by law; and

(liv)    awarding Plaintiffs such other and further relief as the Court may deem just and proper and appropriate to redress the harm caused by Defendants' conduct.

Dated: New York, New York
     July 6, 2003

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By:   /s/  David M. Friedman
       David M. Friedman (DF-4278)
       Daniel B. Goldman (DG-4503)
       Andrew K. Glenn (AG-9934)
       Jonathan E. Minsker (JM-8535)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel for the Official Committee
  of Unsecured Creditors as to all claims
  except for claims against Defendants
  Citibank, N.A.; Citicorp USA, Inc.; Citigroup
  Financial Products, Inc.; Citigroup Global
  Markets Holdings, Inc.; CIBC, Inc.; CIBC
  World Markets Corp.; Rabobank Nederland,
  New York; and Key Bank of New York

KLEE, TUCHIN, BOGDANOFF
  & STERN LLP

By:   /s/  David M. Stern
       David M. Stern (DS-3689)
       Martin R. Barash (MB-2251)
       Edward T. Attanasio (EA-1488)
2121 Avenue of the Stars
33rd Floor
Los Angeles, California 90067
Tel: (310) 407-4000
Fax: (310) 407-9090

Counsel for the Official Committee
  of Unsecured Creditors as to all claims
  against Defendants Citibank, N.A.; Citicorp

USA, Inc.; Citigroup Financial Products, Inc.;
Citigroup Global Markets Holdings, Inc.;
CIBC, Inc.; CIBC World Markets Corp.;
Rabobank Nederland, New York; and Key
Bank of New York