UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Adelphia Communications Corp., *et al.*, | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
| _____ | ) |  |
|  | ) |  |
| Adelphia Communications Corp. and its | ) |  |
| Affiliated Debtors and Debtors in Possession | ) | Adversary No. 03-04942 (REG) |
| and Official Committee of Unsecured Creditors | ) |  |
| of Adelphia Communications Corp., | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Bank of America, N.A., *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
| _____ | ) |  |

DECISION ON MOTIONS BY CREDITORS'
COMMITTEE AND EQUITY COMMITTEE TO
PROSECUTE CLAIMS ON BEHALF OF THE
DEBTORS' ESTATES

APPEARANCES:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for Plaintiff Official Committee of Unsecured Creditors
1633 Broadway
New York, NY 10019
By:     David M. Friedman, Esq. (argued)
         Andrew K. Glenn, Esq.
         Adam L. Shiff, Esq.
         Jonathan E. Minsker, Esq.
         Sean C. Shea, Esq.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Counsel for Plaintiff Official Committee of Unsecured Creditors
Fox Plaza, 2121 Avenue of the Stars, 33rd Floor
Los Angeles, CA 90067
By:    Edward T. Attanasio, Esq. (argued)
        David M. Stern, Esq.
        Martin R. Barash, Esq.


WILLKIE FARR & GALLAGHER LLP
Counsel for Plaintiff Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:    Marc Abrams, Esq.
        Brian E. O'Connor, Esq.
        Paul Shaloub, Esq.
        Morris J. Massel, Esq.


BOIES, SCHILLER & FLEXNER LLP
Counsel for Plaintiff Debtors and Debtors in Possession
333 Main Street
Armonk, NY 10504
By:    Philip C. Korologos, Esq. (argued)
        Eric Brenner, Esq.


10 North Pearl Street
Albany, NY 12207
By:    George F. Carpinello, Esq.


BRAGAR WEXLER EAGEL & MORGENSTERN, P.C.
Counsel for Plaintiff Official Committee of Equity Security Holders
885 Third Avenue, Suite 3040
New York, NY 10022
By:    Peter D. Morgenstern, Esq.
        Gregory A. Blue, Esq. (argued)
        Debra Kramer, Esq.
        Kate Webber, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Defendants Wachovia Bank, N.A. and Wachovia Capital Markets, LLC
(f/k/a Wachovia Securities, Inc.)
425 Lexington Avenue
New York, NY 10017
By:     Peter V. Pantaleo, Esq. (argued)
        John J. Kerr, Jr., Esq.
        William T. Russell, Jr., Esq. (argued)
        Sean Thomas Keely, Esq.
        Elisha D. Graff, Esq.

HAYNES AND BOONE, LLP
Counsel for Defendant Bank of America, N.A.
901 Main Street, Suite 3100
Dallas, TX 75202
By:     Robin E. Phelan, Esq. (argued)
        Richard D. Anigian, Esq. (argued)
        Thomas E. Kurth, Esq.

399 Park Avenue, 23rd Floor
New York, NY 10022-4614
By:     Judith Elkin, Esq.

WHITE & CASE LLP
Counsel for Bank of America, N.A.
1155 Avenue of the Americas
New York, NY 10036-2787
By:     Howard S. Beltzer, Esq.
        Glenn M. Kurtz, Esq. (argued)
        Karen M. Asner, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Citibank, N.A. and Citicorp USA, Inc., as Administrative Agent for the
Century TCI Facility
One Chase Manhattan Plaza
New York, NY 10005-1413
By:     Luc A. Despins, Esq. (argued)
        Scott A. Edelman, Esq.
        Brian D. Hail, Esq. (argued)

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Defendant JPMorgan Chase Bank,
  as Administrative Agent for the FrontierVision Lenders
One Chase Manhattan Plaza
New York, NY 10005-1413
By:    James C. Tecce, Esq. (argued)
        Dennis F. Dunne, Esq.
        David R. Gelfand, Esq.
        Thomas A. Arena, Esq.
        Jeffrey L. Nagel, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Defendants Bank of Montreal and Harris Nesbitt Corp.
1675 Broadway
New York, NY 10019
By:    J. Robert Stoll, Esq.
        Robert J. Ward, Esq.
        Jean-Marie L. Atamian, Esq.
        Kenneth E. Noble, Esq. (argued)
        Scott E. Mortman, Esq.

190 South La Salle Street
Chicago, IL 60603-3441
By:    Robert F. Finke, Esq.

LUSKIN, STERN & EISLER LLP
Counsel for The Bank of Nova Scotia
330 Madison Avenue, Suite 3400
New York, NY 10017
By:    Michael Luskin, Esq. (argued)
        Trevor Hoffmann, Esq.

CHADBOURNE & PARKE LLP
Counsel for Defendants Credit Lyonnais New York Branch, Credit Lyonnais Securities
(USA) Inc.,
  and LCM I Limited Partnership
30 Rockefeller Plaza
New York, NY 10112
By:    Andrew P. Brozman, Esq. (argued)
        Janice A. Payne, Esq.
        Jennifer C. DeMarco, Esq.

CLIFFORD CHANCE
Counsel for Defendants CIBC, Inc. and CIBC World Markets
31 West 52nd Street
New York, NY 10019-6131
By:     Margot Schonholtz, Esq.
        Scott T. Talmadge, Esq. (argued)

GIBSON, DUNN & CRUTCHER LLP
Counsel for Merrill Lynch & Co., Inc.
200 Park Avenue
New York, NY 10166-0193
By:     Marshall R. King, Esq. (argued)
        Jonathan M. Landers, Esq.
        Robert F. Serio, Esq.
        Michael J. Passante, Esq.
        Michael J. Riela, Esq.

DUANE, MORRIS & HECKSCHER LLP
Counsel for Defendant SG Cowen Company, LLC (f/k/a SG Cowen Securities Corp.)
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7396
By:     Lawrence J. Kotler, Esq.

WILMER CUTLER PICKERING HALE & DORR, LLP
Counsel for Defendants Credit Suisse First Boston (USA), Inc.
  and The Royal Bank of Scotland PLC
2445 M Street, N.W.
Washington, D.C. 20037
By:     John A. Valentine, Esq. (argued)
        Theresa Titolo, Esq.


399 Park Avenue
New York, NY 10022
By:     Phillip D. Anker, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Counsel for Defendants Thirteen Investment Banks
One Liberty Plaza
New York, NY 10006
By:     Lindsee P. Granfield, Esq. (argued)
        Jennifer L. Kroman, Esq. (argued)
        Mitchell A. Lowenthal, Esq.
        Thomas J. Moloney, Esq.
        David Bober, Esq.
        Jane Kim, Esq.

WINSTON & STRAWN LLP
Counsel for Defendant J.P. Morgan Securities, Inc.
200 Park Avenue
New York, NY 10166-0193
By:     James A. Beha II, Esq.
        Steven M. Schwartz, Esq. (argued)

STROOCK & STROOCK & LAVAN LLP
Counsel for Defendants D.E. Shaw & Co., LLC and D. E. Shaw Laminar Portfolios, LLC
180 Maiden Lane
New York, NY 10038
By:     Brian Cogan, Esq.
        Lewis Kruger, Esq.

BINGHAM MCCUTCHEN LLP
Counsel for Defendant GECC
399 Park Avenue
New York, NY 10022
By:     Alexis Freeman, Esq.

GREENBERG TRAURIG, LLP
Counsel for Defendant Barclays Bank
MetLife Building, 200 Park Avenue
New York, NY 10166
By:     Douglas A. Amedeo, Esq.
        Richard Miller, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street, 21st Floor
New York, NY 10004
By:     Tracy Hope Davis, Esq.


BEFORE:       ROBERT E. GERBER
              UNITED STATES BANKRUPTCY JUDGE

By motion brought in this adversary proceeding under the umbrella of the jointly

administered cases of Adelphia Communications Corporation and its subsidiaries

(collectively, the "Debtors" or "Adelphia") under chapter 11 of the Bankruptcy Code,

Adelphia's Official Committee of Unsecured Creditors (the "Creditors' Committee")

seeks leave of this Court—what is colloquially referred to in this Circuit as "*Housecraft*"

authority[1]—to prosecute claims, as a co-plaintiff with Adelphia, on behalf of the Debtors'

estates. The Creditors' Committee's motion is opposed by the defendants in the action to

be prosecuted—numerous commercial banks and their investment bank affiliates (the

"Defendants")—who are charged with wrongdoing in their dealings with Adelphia's

former management, John, Timothy, Michael and James Rigas (the "Rigases"), against

whom Adelphia brought suit for the looting of the company. The Creditors' Committee's

claims against the Defendants, which are numerous, include, *inter alia*, fraudulent

conveyance claims and claims for aiding and abetting the Rigases' breaches of fiduciary

duty in connection with "co-borrowing" facilities under which Adelphia became liable to

repay the banks for billions of dollars that went to or for the benefit of the Rigases.

Adelphia's Official Committee of Equity Security Holders (the "Equity

Committee," and together with the Creditors' Committee, the "Committees"), which has

intervened in this action, has joined in the bulk of the claims made by the Creditors'

Committee—all but those premised on insolvency—and, by a supplemental intervenor

complaint, wishes to assert additional claims as well. By a separate, similar motion, the

Equity Committee moves for *STN* authority[2] to assert those additional claims on behalf of

the Debtors' estates. The Defendants likewise oppose the Equity Committee's motion.

---

[1]    *See Glinka v. Murad (In re Housecraft Industries USA, Inc.)*, 310 F.3d 64 (2d Cir. 2002) ("*Housecraft*"). *Housecraft*, the third of the Second Circuit's trilogy of standing-to-sue cases— following *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901 (2d Cir. 1985) ("*STN*") and *Commodore International Ltd. v. Gould (In re Commodore International Ltd.)*, 262 F.3d 96 (2d Cir. 2001) ("*Commodore*")—permits the bankruptcy court to confer standing upon a committee to sue as a co-plaintiff with the debtor on behalf of the estate when the requirements for conferring such standing, discussed below, have been satisfied.

The Court sometimes refers to *STN*, *Commodore* and *Housecraft* as the "*STN* Trilogy."

[2]    *See STN, supra* n.1. As described more fully below, *STN* permits the bankruptcy court to confer standing upon a committee to sue on behalf of the estate when the debtor has failed to bring the action itself, when the requirements for conferring such standing, discussed below, have been satisfied. When the debtor does not itself sue, but consents to a suit on behalf of the estate by a

Perhaps significantly, neither of the Committees' motions is opposed by anyone other than the Defendants in the litigation to be prosecuted. Those with an interest in maximizing the value of the estate—as contrasted to those with an interest in defeating the claims to be asserted here—do not seem to be troubled by the Committees' proposed use of estate resources for the litigation the Committees wish to prosecute.[3]

Though the words used by the Second Circuit in each of the cases in the *STN* Trilogy differ slightly, they share a common underpinning requiring the bankruptcy court to satisfy itself that the prosecution of the proposed litigation by the Committee concerned would be in the best interests of the estate. With the Court having concluded that the Creditors' Committee easily meets those requirements, and that the Equity Committee, though the matter is closer, does so as well, both motions are granted. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in this regard.

---

committee or another, that gives rise to a *Commodore* situation, discussed below. In this case, the Debtors did not oppose the Equity Committee's assertion of the claims it wishes to bring, but neither did they expressly consent to it. While it might be that a non-opposition by a debtor should more appropriately be considered as a consent (and hence trigger a *Commodore*, rather than an *STN*, situation), the Equity Committee has treated its motion as an *STN* motion, and this Court will too.

[3]     In that connection, the Creditors' Committee argues that Defendants who are not creditors of the estates cannot contest the Creditors' Committee's standing. *See* Creditors Committee's Memorandum of Law in Opposition to Objections to Standing and Motions to Dismiss at 92 n.75 ("Cred. Comm. Response"). By reason of the underlying purposes of a *Housecraft* order, the Creditors' Committee is correct in this regard; the interests to be protected by an *STN*, *Commodore*, or *Housecraft* order are those of the estate and its stakeholders, and not the interests (usually diametrically opposite) of a defendant protecting itself from claims by that estate. But here the point is academic, since so many of the Defendants making the same points on this *Housecraft* motion were lenders to the Debtors, and are still creditors. Thus, though their interests are antithetical to the interests of the estate and its large number of non-Defendant creditors and equity holders, the creditor-Defendants do have the requisite standing to be heard.

With that said, the Court necessarily must take the Defendants' protestations as to what is in the interests of the estate with a grain of salt.

Facts

The Court considers the Creditors' Committee motion in the context of a complaint that the Creditors' Committee has already filed and served—to meet a deadline that had been imposed upon it under Adelphia's DIP financing order—with a stipulation that the Defendants' threshold opposition to standing, and substantive 12(b)(6) motions addressed to the Creditors' Committee complaint, would be considered together.[4]  The Court likewise considers the Equity Committee's motion in the context of the supplemental complaint in intervention that the Equity Committee also has already filed and served, with similar understandings.  The factual terrain includes the 12(b)(6) motions that the Defendants have filed, and the foreseeable outcomes on those motions.

The Court also has the benefit of evidentiary matter, submitted by the Committees and the Defendants, principally in the form of documents and deposition testimony taken under Fed. R. Bankr. P. 2004.  But for reasons discussed more fully below, it was inappropriate for the Court to conduct a "mini-trial" or evidentiary hearing on the *Housecraft* or *STN* issues, and it has not made factual findings on disputed issues of fact.  While the Court has engaged in some review of disputed facts, it has done so (perhaps in an excess of caution, as language in *STN* suggests that factual review is not required)[5] only to satisfy itself that there is some factual support for the Committees' allegations—without determining whether those allegations are true—and to satisfy itself that the proposed litigation would be a sensible application of estate resources.

---

[4]        The Court has considered the arguments on the 12(b)(6) motions, and its exercise of its discretion on this motion has been informed by its views at this time to the claims that will and will not survive those motions, but considered it appropriate to issue its determinations here, which are considerably easier, first.

[5]        *See* n.54 *infra*.

The two Committees' complaints are lengthy and detailed—in each case about 250 pages. Without getting into all of the detail that characterizes the allegations of the complaints and the factual record on this motion, the Court notes the most important allegations, and matters the Committees may be able to show, below.

A.

The Rigases are the largest shareholders of Adelphia, which was founded by John Rigas, but they are not its only ones. Much of Adelphia's equity securities are held by the investing public. Adelphia also has billions of dollars in public unsecured debt. Until May 2002, John Rigas, and his sons Timothy, Michael and James Rigas, held Adelphia's most senior management positions. John, Timothy, Michael and James Rigas, along with Peter Venetis, the husband of Ellen Rigas Venetis (John Rigas's daughter), were also Adelphia directors.

In May 2002, after disclosure (or, as some Defendants contend, increased disclosure)[6] in March 2002 and in the weeks thereafter of matters underlying this adversary proceeding—most significantly, the Rigases' use of over $3 billion borrowed from the Defendant commercial banks under the co-borrowing facilities that Adelphia was obligated to repay—the Rigases resigned as officers and directors of Adelphia.

But even before the Rigases' resignations, Adelphia had independent directors. The Committees allege that Adelphia's independent directors were not beholden to the Rigases, and were in a position to prevent the fraudulent conduct alleged in the

---

[6]     Those Defendants contend that many of the matters of which the Committees complain had indeed been publicly disclosed. The Committees dispute that, and argue that the public markets' response to the disclosures in the period March through May 2002 is strong evidence that the matters said to have been disclosed were in fact not disclosed, or were inadequately disclosed. The Court does not now make any findings as to this seemingly significant disputed issue of fact, other than to note that the Committees' contentions in this regard have, at the least, reasonable basis.

complaints if the Rigases and their confederates had not concealed their fraudulent activities.[7]

The Committees' charges are fleshed out in considerably greater detail in their complaints and briefs, and will not be set out at comparable length here. The principal theme of the Committees' claims is that the Defendants knew of the Rigases' wrongful activity, and knowingly and materially assisted in it, because it was profitable for them to do so. The Committees allege that there were years of "concerted action" among the Rigases and the Defendants, which permitted both to enrich themselves at the expense of the Debtors and the Debtors' other creditors and public investors.[8] This "concert of action," the Committees charge, had four main components. First, they charge, the Rigases misused the Debtors' "credit support" to obtain financing for themselves from the banks that were agents for their syndicates (the "Agent Banks") and other lenders to finance the Rigases' lavish lifestyle and personal investments. Second, they charge, the Agent Banks made financial accommodations to the Rigases through co-borrowing facilities structured by the Agent Banks—and, the Committees emphasize, by their affiliated investment banks (the "Investment Banks")—that violated fundamental lending practices (including, it is argued, their own), in order to obtain lucrative fees for their affiliated Investment Banks and thereby obtain a return on capital that was materially in excess of the return that would be associated with commercial banking alone, and which

---

[7]     The Defendants contend that Adelphia's independent directors did know of the uses to which the Rigases planned to utilize the co-borrowing facilities, and of other self-dealing on the part of the Rigases. The Committees dispute this, and once more the Court does not make findings on this motion as to the disputed facts in this regard. At this juncture, the Court can find that each side has evidence that could reasonably be argued to support its position (although the evidence now available is probably much less than all of the relevant evidence that ultimately will be adduced), but the Court cannot make factual findings beyond that.

[8]     Cred. Comm. Response at 5.

was "essential to ensure the profitability of their relationship with Adelphia."[9]   Third, the
Committees charge, the affiliated Investment Banks underwrote securities offerings for
Adelphia and certain of its subsidiaries—without disclosing "the fraud they knew
suffused Adelphia's financial statements"[10]—to raise from public investors the money
that the Debtors could have used to pay back the amounts that the Rigases borrowed from
the Agent Banks.  And fourth, the Committees charge, the Investment Banks used their
purportedly independent analysts to issue materially misleading research reports in order
to artificially inflate both the value of the Adelphia securities underwritten by the
Investment Banks and the value of the "tainted bank debt" being sold by the Agent Banks
in the secondary market.[11]

A major aspect of the Rigases' breaches of fiduciary duty and fraud, as charged
by the Committees, was the Rigases' ostensible efforts to reduce Adelphia's higher than
average leverage by equity infusions, paid for with borrowings upon which Adelphia was
liable—as allegedly masked by heavy use of "off-balance sheet" debt.  The Committees
have adduced evidence of knowledge on the part of some Agent Banks or Investment
Bank affiliates of the off-balance sheet liabilities,[12] in documents that could fairly be said
to show that they had greater knowledge than the public did with respect to Adelphia's
off-balance sheet liabilities, and, arguably, the uses to which their credit support had been
put.

---

[9]      *Id.* at 5-6.

[10]      *Id.* at 6.

[11]      *Id.*

[12]      *See*, *e.g.*, Cred. Comm. Response Exh. 67 at 1; Cred. Comm. Response Exh. 69 (filed under seal).

The Defendants dispute these allegations (along with many of the Committees' more specific allegations with respect to the foregoing) and also raise numerous issues of law. The Defendants' many defenses include, most significantly, as a factual matter, the denial that they knew of any fraud (and that they knew of anything that, if public disclosures had been read more carefully, creditors and investors also would know), and that the facts and transactions underlying the Rigases' fraud were known to Adelphia's independent directors. The Defendants' defenses include, as a legal matter, *inter alia*, assertions that they are not responsible for the uses to which funds borrowed from the defendant commercial banks or raised by the defendant investment banks were put; that the claims asserted by the Committees belong instead to individual investors; and that the wrongful actions of the Rigases should be imputed to the estate's innocent creditors and non-insider equity holders, under the doctrine of *in pari delicto*. The Defendants also dispute, as a matter of law, assertions by the Committees that commercial and investment banks dealing with Adelphia in the manner in which they are alleged to have done so should be deemed to have entered into fiduciary relationships with Adelphia.

As noted above, the Defendants filed numerous 12(b)(6) motions with respect to the Committees' claims. Though the Court's decision on those motions, which necessarily will be lengthy, will have to come at a later date, it is plain to the Court, based on its consideration of the legal issues underlying those motions to date, that while some of the Creditors' Committee's claims will be dismissed, the bulk of them will survive dismissal under Rule 12(b)(6). The Court further believes that while a materially greater percentage of the Equity Committee's claims will not survive the 12(b)(6) motions, some of the Equity Committee's claims will now survive, either because those claims have

apparent support or because the Equity Committee has said what needs to be said to satisfy the pleading requirements for such—even though such claims, after factual development, might not withstand summary judgment motions.

It also is plain to the Court, based on apparently undisputed facts and matters as to which the Committees have made evidentiary showings (by e-mails, other documents, and deposition testimony), that there is, at the least, reasonable basis to conclude that the Committees would succeed in proving material portions of the factual matters they allege.

**B.**

By stipulation dated July 24, 2003, Debtor Adelphia and the Creditors' Committee agreed that they would join as co-plaintiffs to bring this action. They agreed that the Creditors' Committee would take the lead in prosecuting the action, subject to certain Debtor rights, one of which was the Debtors' right to settle the action, pursuant to a plan or otherwise.[13]

---

[13] The stipulation provided, in relevant part:

> 7. The Debtors and the Equity Committee consent to the relief requested in the Committee's Standing Motion.
>
> 8. To the extent the Committee's Standing Motion is granted, the Debtors shall remain a nominal party to the Adversary Proceeding, but shall not be bound by any of the allegations in the Complaint, and the Debtors shall have the right to oppose any proposed amendments to the Complaint, including any amendments to add any additional Lender Claims not included within the Complaint annexed hereto or to eliminate any of the Lender Claims currently identified therein, by seeking appropriate relief through this Court.
>
> 9. To the extent the Committee's Standing Motion is granted, the Debtors and the Creditors' Committee consent to the relief requested in the Equity Committee's Intervention Motion and agree that the Equity Committee, as intervenor, shall not be bound by any of the allegations in the Complaint.
>
> 10. Notwithstanding anything set forth herein, to the extent the Committee's Standing Motion is granted, (a) the

-14-

The Equity Committee intervened in this action, joined in the claims already asserted by Adelphia and the Creditors' Committee (except for those premised on insolvency), and sought *STN* authority to assert additional ones. Adelphia did not join in the additional Equity Committee claims as a co-plaintiff, as it had with respect to the claims brought by the Creditors' Committee, but did not object to their prosecution.

<u>Discussion</u>

<u>A.</u>

The Bankruptcy Code does not, in express terms, authorize committees or individual creditors—as contrasted to trustees and debtors in possession—to sue on behalf of the estate. Nevertheless, the Second Circuit has held that provisions of the Bankruptcy Code imply a qualified right for creditors' committees to sue on behalf of an estate with bankruptcy court approval.[14] The practice of authorizing the prosecution of actions on behalf of an estate by committees, and even by individual creditors,[15] upon a

---

Debtors shall retain the right to compromise and to settle the Lender Claims, whether pursuant to a plan of reorganization or otherwise; and (b) parties-in-interest shall retain the right to oppose such settlement(s), in each case as if this Stipulation and Order never existed and the Debtors had retained exclusive control over the Lender Claims.

[14]    *See STN*, 779 F.2d at 904 ("We agree … that 11 U.S.C. §§ 1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court."). The Third Circuit, sitting *en banc*, has held likewise, finding the implied authority under those sections and also section 503(b)(3)(b), which allows for the priority payment of the expenses of "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." *See Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 560-566 (3d Cir. 2003) *(en banc) ("Cybergenics"), cert. dismissed*, 540 U.S. 1002, 124 S. Ct. 530 (2003).

[15]    *See Housecraft*, 310 F.3d at 71 n.7 ("Numerous courts have granted individual creditors standing to sue in the stead of a trustee or debtor-in-possession.").

showing that such is in the interests of the estate, is one of long standing, and nearly

universally recognized.[16]

The practice, which has been established in the Second Circuit under the *STN*

Trilogy and countless lower court cases, is a salutary (and many might say essential)

element of the chapter 11 process. Debtors sometimes lack the inclination, or the means,

to bring actions that should be prosecuted. They sometimes have higher priorities, or are

distracted by other things. They sometimes have a practical need to avoid confrontation

with entities like their secured lenders, because they need those entities' continuing

cooperation—as, for example, in connection with exit financing. And they sometimes

are limited by DIP financing orders that foreclose or impair their ability to bring claims

against certain entities (such as prepetition secured lenders), so that such claims must be

brought by creditors or not at all. The caselaw authorizing the prosecution of suits on

behalf of estates by committees and creditors, as reflected in the *STN* Trilogy and the

many other cases holding likewise, provides creditors and other stakeholders with the

comfort that potentially valuable (and sometimes critical) claims on behalf of the estate

will be prosecuted—without requiring bankruptcy judges to throw out the baby with the

bath water, resorting to much more draconian or ineffective mechanisms to ensure the

---

[16]    *See, e.g., STN; Commodore; Housecraft; Cybergenics; Louisiana World Exposition v. Federal Insurance Co.,* 858 F.2d 233 (5th Cir. 1988), *reh'g denied,* 864 F.2d 1147 (5th Cir. 1989); *Canadian Pacific Forest Products Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.),* 66 F.3d 1436 (6th Cir. 1995); *Fogel v. Zell,* 221 F.3d 955 (7th Cir. 2000); *Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.),* 199 F.3d 1029 (9th Cir. 1999); *Jefferson County Board of County Commissioners v. Voinovich (In re The V Companies),* 292 B.R. 290 (6th Cir. BAP 2003); *ReGen Capital III, Inc. v. Official Committee of Unsecured Creditors (In re Trism, Inc.),* 282 B.R. 662 (8th Cir. BAP 2002); *Liberty Mutual Insurance Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co., Inc.),* 207 B.R. 899 (9th Cir. BAP 1997) ("*Spaulding Composites*"); *but see United Phosphorus, Ltd. v. Fox (In re Fox),* 305 B.R. 912 (10th Cir. BAP 2004) (with the exception only of the panel decision that was vacated by the Third Circuit in *Cybergenics* after hearing the matter *en banc*, the only appellate decision holding to the contrary).

-16-

prosecution of those claims,[17] with the destruction to going concern value and creditor recoveries that would frequently be the result.

In *STN*, the first of the *STN* Trilogy, the Second Circuit confirmed the authority of bankruptcy courts to deputize committees to prosecute litigation on behalf of the estate with the approval of the bankruptcy court.[18]  Approval would be appropriate where the committee presented a colorable claim or claims for relief that on appropriate proof would support a recovery, and where the trustee or debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing.[19]  In considering the failure to bring suit, the lower courts were directed by the Circuit to consider whether an action asserting the proposed claims would be likely to benefit the reorganization estate,[20] and as part of any such analysis, each lower court was directed to "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."[21]

*Commodore* extended the *STN* principles to encompass situations where the debtor in possession, while not prosecuting the litigation itself, *consented* to its prosecution by a committee.  In *Commodore*, the Second Circuit ruled that a committee

---

[17]    *See Cybergenics*, 330 F.3d at 576-579 (considering, and ultimately rejecting, arguments that courts should instead consider possible substitutes for derivative standing for creditors' committees).

[18]    779 F.2d at 904.

[19]    The "unjustifiable" failure of a debtor to bring the suit itself does not require an improper motive for the failure.  Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate.  *See STN*, 779 F.2d at 905; *Official Committee of Unsecured Creditors v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 374 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003).

[20]    *See STN*, 779 F.2d at 905.

[21]    *Id.* at 905-906.

-17-

could appropriately act on behalf of the estate under such circumstances, with the
approval of the bankruptcy court:

> if (1) the committee has the consent of the debtor in
> possession or trustee, and (2) the court finds that
> suit by the committee is (a) in the best interest of
> the bankruptcy estate, and (b) is 'necessary and
> beneficial' to the fair and efficient resolution of the
> bankruptcy proceedings.[22]

The Circuit observed that this approach permitted a reasoned and practicable division of
labor between the creditors' committee and the debtor in possession or trustee, while also
providing bankruptcy courts with significant authority both to manage the litigation and
to check any potential for abuse by the parties.[23]

Then *Housecraft,* the third of the cases in the *STN* Trilogy, extended these
principles further.  As noted above, *Housecraft* permits the bankruptcy court to confer
standing upon a committee to sue *as a co-plaintiff* with the debtor on behalf of the estate,
with the approval of the bankruptcy court.  The bankruptcy court can provide that
approval when the requirements of *Commodore* are satisfied—when the litigation is
"both in the best interest of the bankruptcy estate and necessary and beneficial to the fair
and efficient resolution of the bankruptcy proceedings."[24]

### B.

The Creditors' Committee notes at the outset of its presentation that the Debtors
have joined in its claims.  It properly observes, accordingly, that the Court need only
satisfy itself as to the remainder of the *Housecraft* tests—that the litigation the Creditors'
Committee proposes to bring be (a) in the best interest of the bankruptcy estate and

---

[22]    262 F.3d at 100.

[23]    *See id.*

[24]    *Housecraft*, 310 F.3d at 71 (citing *Commodore*, 262 F.3d at 100).

(b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.

Though the Second Circuit, in *Housecraft* and *Commodore,* applied those standards to the relatively clear factual situations then before it, the Circuit did not dictate more particularized criteria for evaluating those considerations. But it is plain—by the express words used by the Circuit; by examination of the factors the Circuit itself considered; and by other common sense factors that necessarily would have to be considered in determining whether any litigation is in the interest of the bankruptcy estate and necessary and beneficial to the bankruptcy case—that the inquiry must evaluate, at the least,[25] whether the prosecution of the claims is consistent with the maximization of the value of the estate. Additionally, the Ninth Circuit BAP has identified particular factors to be considering in implementing the Ninth Circuit's similar doctrine authorizing the deputization of committees to act on behalf on an estate.[26] To the extent the Ninth Circuit BAP's factors do not overlap with considerations in this Circuit (which, not surprisingly, they do in material respects), the Court considers them as well. The Ninth Circuit BAP's additional factors include whether the deputization of the committee would permit the debtor to concentrate its resources on rehabilitating its business; whether the committee's interests do not conflict with those of the estate; and whether the assignment would prejudice the equality of distribution amongst the debtors' creditors.

---

[25]    The Court says "at the least" because, as in other cases where caselaw has laid down factors for courts to consider in exercising their judgment or discretion, the Court does not regard these factors as necessarily exclusive, and is hardly in a position to rule out the possibility that other factors might be relevant in a given case.

[26]    *See Spaulding Composites, supra* n.16, 207 B.R. at 904.

As part of their differences on the components of the *Housecraft* analysis, the two sides differ sharply on the means and standards by which the Court considers the litigation's prospects. In that connection, the Court is not in a position to fully endorse the position of either side. Several of the Defendants contend that the Court must conduct a *de facto* mini-trial on the merits to determine whether the Creditors' Committee has a probability of success before granting the Creditors' Committee standing.[27] But the Court cannot agree. In *STN*—which, of the three cases in the *STN* Trilogy, most explicitly requires consideration of the merits of the proposed litigation[28]— the Second Circuit explicitly stated that a mini-trial is *not* required,[29] and there is no reason why it would be any more necessary in *Commodore* or *Housecraft* scenarios, especially since they do not even involve differences of views between the committee and debtor in possession as to whether the litigation should be brought.

By the same token, the Creditors' Committee argues that Adelphia's consent to its standing vitiates *any* need to review the merits of the Committees' claims.[30] The Court is not of a mind to go that far. The Creditors' Committee is correct in its observation[31] that the standards enunciated in *Commodore* and *Housecraft*, unlike those in *STN*, do not by

---

[27]    *See* Bank of America and Bank of Nova Scotia's Joint Opposition to Creditor's Committee Motion to Prosecute Claims at 7-15; Objection of JPMorgan to Motion of Official Committee of Unsecured Creditors for Order Approving Stipulation Among Debtors, Creditors' Committee and Equity Committee, Authorizing Creditors' Committee to Prosecute Claims and Causes of Action Against Pre-Petition Agents and Secured Lenders and Granting Equity Committee Right to Intervene at 21; Objection by Defendant Wachovia Bank, National Association to the Motion of the Official Committee of Unsecured Creditors for Standing to File Adversary Complaint at 20.

[28]    *STN* calls for the Court to examine whether the claims are "colorable." *STN*, 779 F.2d at 905. *Commodore* and *Housecraft* do not, by express language, impose that requirement, but as noted below, a need for a somewhat similar inquiry must be implied.

[29]    *See STN*, 779 F.2d at 905 ("We do not mean to suggest that the court need undertake a mini-trial.").

[30]    *See* Cred. Comm. Response at 93-95.

[31]    *See id.* at 94-95.

-20-

their terms call for consideration of the merits, and that the context in which the Circuit

called for a merits inquiry in *STN* involved whether or not the debtor or trustee had

unjustifiably failed to bring suit. But in *Commodore* and *Housecraft* situations as well, a

requirement for some kind of merits inquiry necessarily must be implied, as it is

impossible to determine whether a litigation is in the best interests of an estate without at

least some consideration of the possibilities of success. The standard, as discussed

below, is not a difficult one to meet, but the Court must nevertheless be comfortable that

the committee is not embarking on a senseless enterprise.

Neither *Commodore* nor *Housecraft* speaks to the likelihood of success that

would be required to pass muster. *STN* required the claims to be "colorable,"[32] and that

expression has repeatedly been used in articulating the appropriate standard on both

*STN*[33] and *Commodore/Housecraft*[34] motions. This Court likewise utilizes that standard

here.

Caselaw construing requirements for "colorable" claims has made it clear that the

required showing is a relatively easy one to make. In *STN*, the Second Circuit eschewed

extensive merits review, requiring instead "a colorable claim … for relief that *on*

*appropriate proof* would support a recovery."[35] In this district, on *STN* motions, Chief

Judge Brozman has observed that authorization should be denied only if the claims are

---

[32]    779 F.2d at 905.

[33]    *See Official Committee of Unsecured Creditors of the Debtors v. Austin Financial Services, Inc.
(In re KDI Holdings, Inc.)*, 277 B.R. 493, 507-508 (Bankr. S.D.N.Y. 1999) (Gonzalez, J.)
("*KDI*"); *Official Committee of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson
United Bank (In re America's Hobby Center, Inc.),* 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)
(Brozman, C.J.) ("*America's Hobby Center*").

[34]    *See In re iPCS, Inc.,* 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003) (Drake, J.) ("*iPCS*"); *In re Valley
Park, Inc.,* 217 B.R. 864, 869 & n.4 (Bankr. D. Mont. 1998) (Peterson, C.J.); *In re Colfor, Inc.,*
1998 WL 70718, *2 (Bankr. N.D. Ohio 1998) (Williams, J.) ("*Colfor*").

[35]    779 F.2d at 905 (emphasis added).

"facially defective,"[36] and Judge Gonzalez has noted that in determining whether there is

a colorable claim, the court must engage in an inquiry that is "much the same as that

undertaken when a defendant moves to dismiss a complaint for failure to state a claim.[37]

Outside this district, on *Commodore* motions, the *Colfor* court observed,

consistent with the common meaning of "colorable,"[38] that the claims to be asserted

should be "plausible" or "not without some merit,"[39] and the *iPCS* court, consistent with

*KDI*, noted that the requisite inquiry would be "much the same as that undertaken when a

defendant moves to dismiss a complaint for failure to state a claim."[40]

<u>C.</u>

Applying the factors in the caselaw described above, the Court determines that the

Creditors' Committee has easily satisfied the requisite standards.

*1.      Colorable Claims?*

The Creditors' Committee has put forth an extraordinarily detailed complaint,

painting a picture that—if proven—could establish that the Defendants were the

recipients of fraudulent conveyances costing the Debtors' estates billions of dollars, and

that the Agent Banks and Investment Banks were guilty of a classic aiding and abetting

of the Rigases' wrongful activities.  It is plain to this Court that the Creditors' Committee

has much more than satisfactorily alleged a complicity with the Rigases that went

---

[36]      *America's Hobby Center*, 223 B.R. at 288.

[37]      *KDI*, 277 B.R. at 508 (quoting *America's Hobby Center*, 223 B.R. at 282).

[38]      *See American Heritage College Dictionary* (4th Ed. 2004) (one of whose definitions, the one
relevant here, is "seemingly true or genuine; plausible").  "Plausible," in turn, is defined as
"seemingly or apparently valid, likely, or acceptable; credible." *Id.*

[39]      1998 WL 70718, at *2 (citations omitted).  In a different procedural context, but one also requiring
consideration of whether claims were "colorable," the court noted that "[a ]colorable claim (one
seemingly valid and genuine) is not a difficult standard to meet." *In re Midway Airlines, Inc*., 167
B.R. 880, 884 (Bankr. N.D. Ill. 1994).

[40]      297 B.R. at 291 (quoting *America's Hobby Center*, 223 B.R. at 282).

considerably beyond ordinary business transactions and routine business dealings—and

that the Creditors' Committee, if its proof could substantiate its allegations, could show,

*inter alia*, knowing substantial assistance to the Rigases in connection with the co-

borrowing facilities, motivated by the Agent Banks' and Investment Banks' economic

self-interest in their Adelphia relationship—which, at the time, was in material respects a

relationship with the Rigases individually.

Of course, the Defendants have already asserted numerous defenses, and

undoubtedly will have those and more things to say as the litigation goes on.  The

Creditors' Committee's allegations have not yet been proven, if they ever will be, and

some of its claims (such as those premised on insolvency) may turn out to rest on

predicates that may not be established, or that may be established for some entities in the

Adelphia capital structure but not others.  But the great bulk of the matters that underlie

the Creditors' Committee's claims will involve issues of fact and context, all requiring

further factual development and inquiry, and, quite possibly, trial.

In opposing the motion, the Defendants, or a subset of them, challenged or sought

to advance their explanations as to aspects of the Creditors' Committee's allegations or

proof, or to argue additional facts—such as those underlying contentions that appropriate

disclosure had, in fact, been made; that the public should not have been fooled; and even

that there had been no fraud at Adelphia at all.  The Defendants also moved against the

great bulk of the Creditors' Committee's claims for relief, challenging the legal theories

on which the Creditors' Committee would proceed.  But the Defendants' arguments in

the former category, relating to factual challenges, factual explanations, and factual

supplements, are, as the Court has just noted, simply one side's position on disputed

issues of fact.[41]  And the Defendants' legal contentions, while they will likely result in

12(b)(6) dismissal of some of the claims, fall far short of being "show-stopper" issues

that could presage defeat for the Creditors' Committee in the litigation as a whole,

especially before factual inquiry.

One of those legal contentions, important because so many of the Defendants

devote so much time and energy to it, warrants express mention here.  Relying upon the

Second Circuit's decision in *Shearson Lehman Hutton, Inc. v. Wagoner,*[42] and its

progeny[43] (decided under New York and Connecticut law), and the Third Circuit's

---

[41]      For instance, the Court is not in a position now to find, if it ever will be, that the Committees'
factual claims with respect to non-disclosure as to the co-borrowing facilities will lack merit.  It
appears to be true, as the Defendants argue, that the facilities that we now know to be the co-
borrowing facilities were disclosed.  It might even be that the underlying agreements (which
would identify co-borrowers we now know to be Rigas Family Entities (as defined in Cred.
Comm. Compl. ¶¶ 405-411)) were exhibits to Adelphia's SEC filings.  But they were disclosed in
a manner that, at least arguably, masked the fact that the Rigases and the Rigas Family Entities
intended to, and did, draw down the vast majority of the loan funds for their own purposes without
any benefit to Adelphia itself.

Disclosure that advised that "affiliates" would participate in the borrowing did not, in any way
now known to this Court, reveal that the "affiliates" to which the disclosure was referring were
Rigas Family Entities.  Even assuming, as the Court does for the purposes of this analysis, that by
reason of the way "affiliates" might be defined for purposes of the federal securities law
disclosure, "affiliates" referred to the Rigases and Rigas Family Entities, the Committees are
entitled to argue that such was, at most, a half-truth, and a materially misleading disclosure—a
contention that would seemingly be supported by the market's reaction when more facts became
known.  The Court does not now make factual findings or draw legal conclusions with respect to
any of this, of course, but it can and does find that the Committees have, at the least, given the
Court comfort that they may be able to make the showing they say they can make, and that
contentions by the Defendants that the Court should find the Committees' claims unworthy of
pursuit are unpersuasive.

[42]      944 F.2d 114 (2d Cir. 1991) ("*Wagoner*").

[43]      *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir. 1995) ("*Hirsch*"), *aff'g Hirsch v.
Arthur Andersen & Co.,* 178 B.R. 40 (D. Conn. 1994) (Cabranes, C.J.); *Mediators, Inc. v. Manney
(In re Mediators, Inc.),* 105 F.3d 822 (2d Cir. 1997) ("*Mediators*"); *Wight v. Bankamerica Corp.,*
219 F.3d 79 (2d Cir. 2000) ("*Wight*"); *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett
Funding Group, Inc.)* 336 F.3d 94 (2d Cir. 2003); *CEPA Consulting Ltd. v. King Main Hurdman
(In re Wedtech Securities Litigation)* 138 B.R. 5 (S.D.N.Y. 1992) (Sand, J.*); Wechsler v.
Squadron, Ellenoff, Plesent & Sheinfeld, LLP,* 212 B.R. 34 (S.D.N.Y. 1997) (Knapp, J. and Peck,
M.J.), *related subsequent proceeding reported at* 994 F. Supp. 202 (S.D.N.Y. 1998); *Goldin v.
Primavera Familienstiftung, TAG Associates, Ltd. (In re Granite Partners, L.P.),* 194 B.R. 318
(Bankr. S.D.N.Y. 1996) (Bernstein, J.); *Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co.,
Inc.),* 280 B.R. 794 (Bankr. S.D.N.Y. 2002) (Beatty, J.); *Tese-Milner v. Beeler (In re Hampton
Hotel Investors, L.P.),* 289 B.R. 563 (Bankr. S.D.N.Y. 2003) (Gerber, J.) ("*Hampton Hotel*");

decision in *Official Committee of Unsecured Creditors. v. R.F. Lafferty & Co., Inc.*[44]

(decided under Pennsylvania law), the Defendants ask this Court now to conclude that by

reason of the "*Wagoner* Rule,"[45] the Creditors' Committee's litigation would be

pointless.  The Defendants contend that the second prong of the *Wagoner* Rule—which

immunizes defendants from liability for otherwise actionable wrongful conduct on "*in*

*pari delicto*" grounds, by imputation to a bankruptcy trustee or deputized creditors'

committee of the predecessor management's wrongful conduct—absolves the Defendants

from any liability they might otherwise have here, as a matter of law.

In its response, the Creditors' Committee properly assumes that to the extent that

the state law underlying the federal court decisions[46] in *Wagoner* and its progeny is

applicable and remains good law, *Wagoner* and its Second Circuit progeny are binding

---

    *Picard v. Taylor (In re Park South Securities, LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005) (Drain, J.); *Official Committee of Unsecured Creditors of Grumman Olson Industries, Inc. v. McConnell (In re Grumman Olson Industries, Inc.)*, --- B.R. ---, 2005 WL 2044907 (Bankr. S.D.N.Y. August 25, 2005) (Bernstein, C.J.) ("*Grumman Olson*").

[44]    267 F.3d 340 (3d Cir. 2001) ("*Lafferty*").

[45]    The *Wagoner* Rule, which has two prongs, generally provides (1) that a bankruptcy trustee (or other estate representative) steps into the shoes of the debtor, with the ability to assert claims to the extent (but only the extent) the debtor could, and (2) that (subject to exceptions that may be applicable here) misconduct by a debtor's personnel is imputed to the trustee; when that is the case, a trustee lacks standing to assert claims on behalf of the estate against a third party.  *See Hampton Hotel*, 283 B.R. at 567, 573-576 (explaining and applying the *Wagoner* Rule to a case with several similarities to this case, but also some significant differences).

[46]    *See Hirsch,* 72 F.3d at 1093 ("'Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, *inter alia,* on the rights of the debtor and on certain rights of the debtor's creditors …. Whether the rights belong to the debtor or the individual creditors is a question of *state* law." (emphasis added) (quoting *St. Paul Fire and Marine Insurance Co. v. PepsiCo, Inc.*, 884 F.2d 688 (2d Cir. 1989)); *Mediators,* 105 F.3d at 825 ("In a bankruptcy proceeding, *state* law determines whether a right to sue belongs to the debtor or to the individual creditors.") (emphasis added) (citation omitted); *Wight,* 219 F.3d at 86 ("In a bankruptcy proceeding, *state* law—here the law of New York—'determines whether a right to sue belongs to the debtor or to the individual creditors.'") (emphasis added) (citation omitted); *Bondi v. Bank of America Corp. (In re Parmalat Securities Litigation)*, --- F. Supp. 2d ---, 2005 WL 1923839, *5 & nn. 46-47 (S.D.N.Y. Aug. 5, 2005) (Kaplan, J.) ("*Parmalat*") ("[*Wagoner*], to whatever extent it may be relevant to the *in pari delicto* issue, is an application of New York law …. The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether [their representative] is subject to a defense of *in pari delicto*, is governed by the law of North Carolina.  *Wagoner* simply is not controlling here.").

authority on this Court. But the Creditors' Committee argues that there are nevertheless
several reasons why the *in pari delicto* doctrine and the *Wagoner* rule would not bar
recovery on behalf of the Adelphia Debtors here, even under the Second Circuit
decisions. First the Creditors' Committee notes that the "adverse interest" exception to
the *in pari delicto* and *Wagoner* Rule defenses precludes imputation where the agents
were acting to advance their own interests, and not those of the debtor[47]—as the Rigases
are alleged to have done here. Then the Creditors' Committee notes another exception to
the application of *in pari delicto*: that an *in pari delicto* defense does not bar recovery by
the estate upon a showing of one or more decision makers that could have stopped the
fraud or breaches of fiduciary duty[48]—as Adelphia's independent directors, shortly
before Adelphia's bankruptcy, at least assertedly (and possibly without dispute) could do
here, and did do here.

The Creditors' Committee further argues that since the determination as to what is
or is not property of the estate (such as a cause of action for injury to the estate) is
measured, under section 541 of the Bankruptcy Code, *as of the time of filing*, where (as
here) the wrongdoing insiders were ousted prior to the filing, an *in pari delicto* defense
would not apply. And the Creditors' Committee finally argues—reasoning, with some
force, that Pennsylvania law would apply to the tort claims in this case—that the
Pennsylvania Supreme Court has rejected the application of *in pari delicto* when its effect
would be to penalize a victim debtor (and hence its innocent creditors), and that the better
reasoned federal analyses under Pennsylvania law have done likewise.

---

[47]    *See, e.g., Hampton Hotel*, 289 B.R. at 567.

[48]    Strictly speaking, this is an exception to the "sole actor" exception to the "adverse interest"
exception to the *in pari delicto* doctrine. It is unnecessary, for the purposes of the discussion of
this motion, to become immersed in that level of detail here.

The Creditors' Committee's final two points—that under traditional Bankruptcy Code section 541 analysis, the prepetition ouster of the insider wrongdoers would make *in pari delicto* inapplicable,[49] and that Pennsylvania would not respect *in pari delicto* defenses under the facts presented here[50]—have considerable merit, and could make the first two points academic. But it will be unnecessary for this Court to decide them on this motion. That is so because the Committees' first two points—as to the "adverse interest" and "innocent decision-maker" exceptions—will be incapable of resolution under Rule 12(b)(6), and will require factual inquiry. Even assuming, without now deciding, that Pennsylvania law were to regard *in pari delicto* as having any application to claims by innocents on behalf of a bankruptcy estate,[51] it is at least arguable, given the facts of

---

[49]  *See Lafferty*, 267 F.3d at 355-357 (regarding section 541 analysis as depending on the nature of the debtor's interests "as of the commencement of the case").

[50]  *Compare Lafferty*, 340 F.3d at 354-360 (decision of two judge majority finding *in pari delicto* applicable to bar suit by a creditors' committee) *with Lafferty*, 340 F.3d at 360-363 (Cowen, J., dissenting) (finding *in pari delicto* no bar to the creditors' committees' suit, and reasoning, *inter alia*, that the *in pari delicto* issue is in truth not one of standing, but rather the applicability of an affirmative defense); *Waslow v Grant Thornton LLP (In re Jack Greenberg, Inc.)*, 240 B.R. 486 (Bankr. E.D. Pa. 1999) (Sigmund, J.) ("*Jack Greenberg*") (rejecting *in pari delicto* defense in action brought against accountants by chapter 7 trustee); and, arguably most importantly, the decision of the Pennsylvania Supreme Court in *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 555, 244 A.2d 10, 14 (Pa. 1968) ("*Universal Builders*") (holding that *in pari delicto* doctrine should be applied cautiously and should not be applied if its application would produce an inequitable result, and that denying a plaintiff bankruptcy trustee recovery in that case would result in the enrichment of the defendant "at the expense of innocent creditors of the bankrupt Universal"). The Creditors' Committee also notes that the effort to invoke the *in pari delicto* defense on a motion to dismiss was rejected, at least initially, in the Pennsylvania state court action brought by Adelphia against Deloitte & Touche, Adelphia's former auditor.

Though this Court does not know why, the *Lafferty* majority failed to address the Pennsylvania Supreme Court's decision in *Universal Builders*, which seemingly would have been highly relevant. *Jack Greenberg*, which this Court regards as more thoroughly reasoned than the decision of the *Lafferty* majority, considered *Universal Builders* at length, *see* 240 B.R. at 504-505, noting the obvious implications of that Pennsylvania Supreme Court decision on a matter of this nature. Not being bound by the decision of the *Lafferty* majority on a matter of Pennsylvania state law (or even a matter of federal law), this Court believes that it should follow the Pennsylvania Supreme Court's decision in *Universal Builders*, and Judge Sigmund's decision in *Jack Greenberg*.

[51]  It is important to note, as Chief Judge Bernstein of this Court has observed, that the *Wagoner* Rule (at least as discussed by many litigants and some courts) is one of standing, and *in pari delicto* is not one of standing but rather an equitable defense applicable in some cases where the plaintiff has

which this Court has already become aware while supervising Adelphia's action against
the Rigases, and observing the Government's criminal prosecution of John, Timothy, and
Michael Rigas, that the Creditors' Committee will be able to make the necessary factual
showing to make out the "adverse interest" exception.[52]  In any event, the Creditors'
Committee has satisfactorily pleaded the facts necessary to trigger the exception, and that
will present an issue of fact, plainly inappropriate for determination under Rule 12(b)(6).

Likewise, the Creditors' Committee has satisfactorily pleaded the facts necessary
to trigger the "innocent decision-maker" exception.  Determining whether that exception
applies, in light of the totality of the circumstances concerning the knowledge and actions
of Adelphia's outside directors (and their actions, in particular, in the period March
through May 2002, when they made supplemental disclosures and ousted the Rigases),
will present an issue of fact.[53]

Some of the matters alleged by the Creditors' Committee—*e.g.*, that the
Defendants themselves owed fiduciary duties to Adelphia (as contrasted to aiding and
abetting breaches of fiduciary duty by the Rigases), and that Defendants are liable here
for losses suffered by investors in Adelphia debt offerings (as contrasted to losses

---

standing.  *See Grumman Olson*, 2005 WL 2044907, at *5 n.5.  The two separate concepts should
not be confused.

[52]  *See, e.g., Parmalat* (denying 12(b)(6) motion seeking to invoke *in pari delicto* as defense to claims
by an estate for aiding and abetting insider's breach of fiduciary duty):

> By any standard, theft from a corporation by insiders is self
> dealing by the insiders and not in any sense in the interest of
> the entity. The insiders' actions and knowledge in engaging in
> such conduct therefore cannot be imputed to the company.
> Accordingly, to the extent that the complaint alleges that
> [defendant] BoA assisted the insiders in stealing from
> Parmalat, *in pari delicto* does not apply.

--- F. Supp. 2d at ---, 2005 WL 1923839, at *8.

[53]  *See, e.g., Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242
(S.D.N.Y. 1987) (Sand, J.) (denying motion to dismiss, in light of factual issues as to applicability
of "adverse interest" exception).

suffered by Adelphia itself, whose stakeholders will share in the Debtors' value in accordance with priorities under law, under a chapter 11 plan)—may not withstand the Defendants' pending 12(b)(6) motions. But the bulk of the Creditors' Committee's claims would, if proven, provide valid bases for relief. Those claims should be evaluated on their respective merits.

Additionally, the Creditors' Committee has put forward some of its proof. Though it is not clear that the Court needs to,[54] the Court has reviewed that evidence, some of which was referred to above. Though the Court does not need to find (and does not now find) that the Creditors' Committee has established a likelihood of success, it can and does find that that the Creditors' Committee's claims have at least some factual support.

It should be remembered, of course, that a determination on an *STN* or *Housecraft* motion that claims are colorable simply satisfies a condition for permitting the issues to be decided where they should be decided—in the plenary litigation itself, where the need to prove allegations will remain, and where factual and legal claims and defenses can and will be considered on their individual merits.

2.   *Permitting Debtor to Concentrate Its Resources
     on Rehabilitating Business*

The first of the other factors identified by the Ninth Circuit BAP in *Spaulding Composites* is whether the prosecution of the estate's claims by a committee would permit the debtor to concentrate is resources on rehabilitating its business. That factor plainly supports granting the Creditors' Committee standing.

---

[54]   *See STN*, 779 F.2d at 905; *America's Hobby Center*, 223 B.R. at 282; *KDI*, 277 B.R. at 508; and *iPCS*, 297 B.R. at 291 (in each case looking to whether the allegations, *if proven*, would support recovery).

The Adelphia chapter 11 cases have been complex, and it is fair to say, though an understatement, that the Debtors have had their hands full. Among many other things, the Debtors have been busy, at various times during these cases (and particularly when these claims, if they were to be made, had to be brought):

    ?? Stabilizing the Debtors' business, particularly in light of accounting uncertainties that resulted from the Debtors' management in the Rigas era;

    ?? Prosecuting claims against the Rigases, which the Debtors needed to do intensively if they were to have any hope of prevailing over billions of dollars in competing claims;

    ?? Trying to avoid an indictment by the Justice Department of the corporate enterprise, and to defeat a very large claim by the SEC;

    ?? Addressing the competing desires of stakeholders, with both negotiating and litigation discovery demands, initially with respect to controversies between creditors and equity holders, and later (and currently) in connection with intercreditor disputes; and, perhaps most significantly,

    ?? Devoting extraordinary time and effort to the marketing of the Debtors' business, which ultimately led to the prospective sale to Comcast and Time Warner.

Suit by the Creditors' Committee has freed up the Debtors to address these important concerns.

3.    *Do Committee Interests Conflict With Those of the Estate?*

Considering the second factor in *Spaulding Composites*, there is no conflict whatever. To the contrary, the effort by the Creditors' Committee, if successful, would

*augment* the Debtors' estates (or reduce their liabilities), with no adverse consequences whatever. The reservation by the Debtors of the ability to settle these cases protects the estates from the non-existent conflict even more.

4.    *Would Assignment Prejudice the Equality*
      *of Distribution Amongst Creditors?*

Considering the fourth[55] factor in *Spaulding Composites*, this factor is essentially inapplicable here. The circumstances where it would really be relevant—if those bringing the litigation would get a disproportionate share of any recovery—are wholly absent here, where those with rights to distributions in the Debtors' estates will share in the value of those estates (as augmented by any recoveries the Committees can garner) in accordance with the usual statutory priorities. No member of either Committee will receive any additional consideration because of such Committee's representation of the estates. This factor is relevant, in the Court's view, principally where the proponents of the litigation wish to sidestep the normal equality of distribution amongst creditors, or to circumvent statutory priorities. While, under such circumstances, that would be a matter of concern for this and many other bankruptcy courts tipping against granting authority, it has no application here.

5.    *Is Litigation Consistent With Maximization*
      *of Value of Estate?*

While, as noted, extensive merits inquiry on a motion of this character is not required, this Court believes that any "best interests of the estate" analysis requires consideration of whether the proposed litigation is consistent with the maximization of

---

[55]    The third *Spaulding Composites* factor, whether the litigation would maximize the value of the debtor's estates—a variant of which, in this Court's view, is the factor of the greatest importance under any Circuit's criteria for examining the issues—overlaps with traditional Second Circuit criteria and requires consideration under something of a totality of the circumstances analysis. Accordingly, the Court has saved it for last.

the estate.[56]  This factor, in the Court's view, gets to the nub of the issue, and strongly

favors granting leave here.  While the Defendants plainly have defenses that will require

serious consideration, and likely will have more to say when the facts are explored, the

substantial sums to be recovered—which are, of course, a function of the damage done to

Adelphia and its stakeholders—more than justify the substantial sums that prosecuting

the litigation would cost.  The Creditors' Committee is correct in its assertion[57] that if it is

successful, the recovery will augment the estates by billions of dollars, at a relatively

modest cost.  And it is equally correct in its assertion that denying it standing could result

in the waste of one of the estate's most valuable assets.[58]  Even recognizing that some of

the Committees' claims will not withstand motion and that others will be subject to proof,

the Committees have satisfied the Court that the litigation has enough of a chance to be

successful, to be much more than a reasonable economic bet.

6.    *Other Factors*

    Sometimes other factors, though not specifically or extensively identified in

earlier caselaw, nevertheless should appropriately be considered.  One such factor is

whether prosecution of the litigation would impede the Debtors' reorganization or assist

it.  Here the prosecution of the litigation would, at the least, not impede the Debtors'

reorganization.  Under all plan proposals advanced to date, the claims to be litigated

would not need to be resolved prior to confirmation.  To the contrary, those Defendants

---

[56]    The Court says "consistent with" the maximization because of the limits on the extent of
factfinding on motions of this character, and because in many cases (as here) the bankruptcy court
will be hearing the plenary litigation and will not want to prematurely judge the merits.  Use of a
"consistent with" maximization standard ensures that claims worthy of consideration are
prosecuted without enlisting the Court as an ally of the estate in the value maximization effort.

[57]    Cred. Comm. Response at 98.

[58]    *See Housecraft*, 310 F.3d at 71 ("[W]hile the Agreement [between debtor and secured creditor
providing for a joint lawsuit on behalf of the estate] did not guarantee the estate any recovery, *the
estate could not have recovered anything … in its absence*.") (emphasis added).

who are entitled to plan distributions will receive them, subject only to the duty to pay the

distributions back, or otherwise to make payment, to the extent any liability is

established.  Reorganization would not be a hostage to the determination of this litigation,

and no delay to emergence from chapter 11 will result from the pendency of the proposed

litigation.  And while the Debtors plainly have many responsibilities that they will

necessarily have to meet to achieve a successful reorganization, the incremental burdens

on the Debtors as a consequence of the prosecution of the litigation, as discussed above,

would be modest in comparison to the prospective gains.

Another factor is that, early in these cases, when the Debtors sought and obtained

their DIP financing, the Debtors' prepetition secured lenders, who were "primed" by the

postpetition financing, required provisions in the DIP financing order cutting off issues

on which the Debtors could litigate against those lenders (all or most of which are

Defendants here), and setting a time limit by which any claims against the lenders by

committees or individual creditors had to be brought.[59]  It was necessary (and typical) for

the Debtors to accede to such a provision, and for the Court to approve it.  Provisions of

that character are common in DIP financing orders in chapter 11 cases (at least where

prepetition lenders are asked to make concessions to permit the postpetition financing),

but bankruptcy courts normally approve them only where *some* entity—typically a

creditors' committee—has the ability to assert those claims.[60]  If the Court were then to

---

[59]    *See* DIP Financing Order ¶ 15.  That paragraph, which runs nearly two pages and is too lengthy to
quote in full, provided in substance, as relevant here, for the Debtors' stipulations as to their
prepetition secured lenders' rights, and for those stipulations to be binding against the entirety of
the estate unless litigation (either to challenge liens or to assert any other claims or causes of
action) was commenced against the prepetition secured lenders by prescribed dates.  It also
expressly acknowledged the right of any official committee to request standing to bring claims
belonging to the Debtors' estates.

[60]    *See* S.D.N.Y. Gen. Order No. M-274, "Guidelines for Financing Requests," "Extraordinary
Provisions," ¶ 3:

deprive the Creditors' Committee of standing, that would undercut one of the critical

premises upon which those limitations were approved in these chapter 11 cases.  It would

deprive the estates of the opportunity to pursue claims that, whether or not they

ultimately will be meritorious, plainly deserve to be pursued.

7.      *"Best Interests of the Estate" and
        "Necessary and Beneficial" Overview*

Upon the foregoing analysis, it is obvious to the Court—and not just true on

balance—that the prosecution of the litigation by the Creditors' Committee here would be

in the best interests of the estate.  That determination is, to be blunt about it, an easy one.

The potential recoveries would be enormous; the cost of prosecution will be relatively

modest (by the standards of the amount at stake); and the bulk of the Creditors'

Committee claims will easily withstand 12(b)(6) motions, and (to the extent the Court

needs to consider this) have factual support.

## D.

The analysis with respect to the additional claims to be brought by the Equity

Committee is similar, though considerably closer—principally because the Equity

Committee's additional claims, in material respects, push the envelope vis-à-vis their

underlying legal and factual predicates.

---

The Court will not consider as extraordinary the debtor's
stipulation as to validity, perfection, enforceability, priority
and non-avoidability of a prepetition lender's claim and liens,
and the lack of any defense thereto, provided that:

> (a) the Official Committee of Unsecured Creditors
> (the "Committee"), appointed under section 1102 of
> the Bankruptcy Code, has a minimum of 60 days (or
> such longer period as the Committee may obtain for
> cause shown before the expiration of such period)
> from the date of the order approving the appointment
> of counsel for the Committee to investigate the facts
> and bring any appropriate proceedings as
> representative of the estate ....

-34-

In its intervenor complaint, the Equity Committee asserts claims against the Agent Banks on the co-borrowing facilities under RICO; against Salomon Smith Barney and certain other underwriters of Adelphia securities for breach of contract, negligence, and related claims; against the Agent Banks for fraudulent concealment; and against the Agent Banks for fraud.[61]

The Equity Committee's RICO claims, which are plainly the most dramatic, in many respects push the envelope the most. The Equity Committee alleges that Adelphia itself was one of the two RICO enterprises that are alleged, and that the Agent Banks, by their lending facilities, thereby met the requisite requirements for acquiring or maintaining their interests in, and control of, the enterprise. Even assuming (as the Court believes it should for the purposes of these motions) that the Creditors' Committee can prove what it has alleged on these motions, it is not clear that the Equity Committee will be able to do likewise on the incremental claims the Equity Committee wishes to assert. In particular, it is not clear whether, after the facts are developed, the Equity Committee will be able to show that the co-borrowing facilities led to the requisite degree of acquisition and/or control, and for the Equity Committee to meet RICO's continuity requirement. Yet the Equity Committee's intervenor complaint has made the necessary allegations to state a prima facie case. And since *STN* states explicitly, in connection with its colorable claim requirement, that a colorable claim is one "that on appropriate proof would support recovery," addressing any shortcomings in proof likely would be appropriate, at the earliest, on summary judgment and not motions under 12(b)(6).

---

[61]    The Creditors' Committee made a demand on the Debtors to bring the additional claims, but the Debtors refused to do so. The Equity Committee states, however (and on this record it appears to be undisputed), that the Debtors have never indicated that they believe the Equity Committee's additional claims to be invalid. As noted, the Debtors neither support nor oppose the Equity Committee's request for standing to bring the additional claims.

The Equity Committee's claims against Salomon Smith Barney, for breach of contract and negligence in connection with a fairness opinion Salomon Smith Barney provided with respect to the amounts paid by the Rigases for their Adelphia stock, plainly raise, at the least, colorable issues. And the Equity Committee's breach of contract claims against the other Defendant Investment Banks, while weaker, are again more appropriately determined at the time of summary judgment, or thereafter, and not on motions to dismiss.

However, while the Equity Committee's claims for conspiracy to commit fraud are colorable at this stage in the litigation, the claims against the Agent Banks for common law fraud and fraudulent concealment (as contrasted to aiding and abetting breaches of fiduciary duty and fraud) likely will not withstand motion, for lack of representations and omissions when under the duty to speak, and as the essence of the claims is a failure to tell others at Adelphia things that the Rigases already knew.

Thus, while some of the Equity Committee's claims will likely not survive 12(b)(6) motions, and while others—especially the RICO claims—will be at some substantial risk at the time of motions for summary judgment, some of the Equity Committee's claims have potential promise. Those in the latter two categories are at least colorable.

But while the ultimate prognosis may not be particularly optimistic for all but a few of the Equity Committee's claims, the "ultimate prognosis" is not the test, as the discussion above makes clear. And the Court necessarily must consider the fact that the Equity Committee does not propose asserting its supplemental claims in isolation, but rather as an adjunct to the claims the Creditors' Committee will assert. As the Equity

Committee fairly observes, its motion does not present the Court with the more common

cost-benefit analysis where the cost of an independent full-blown litigation must be

analyzed. Here the Court must consider the *incremental* cost of permitting the Equity

Committee to pursue the additional claims it wishes to assert. And here the incremental

cost of prosecuting the Equity Committee's claims will be quite small—at least in the

context of the claims already to be asserted by the Creditors' Committee, and the

potential rewards of success on even one of the Equity Committee's claims.

Factors unrelated to the strengths of the prospective claims themselves, discussed

above in connection with the claims to be asserted by the Creditors' Committee, are in all

material respects identical when applied to the incremental claims to be asserted by the

Equity Committee. And the Court once more observes that no non-Defendant

stakeholder opposes the assertion by the Equity Committee of its claims.

Thus, as the bulk of the Equity Committee's claims are colorable, and given the

relatively modest incremental expense to the estate that would result from the Equity

Committee's prosecution of its claims, the Court finds that the prosecution of these

claims too would be in the best interests of the estate.

Conclusion

It is plain that on *Housecraft* and *STN* motions the Committees do not have to

show a likelihood of success on the merits. Rather, those proposing to pursue litigation

on behalf of an estate must give the Court comfort that their litigation will be a sensible

expenditure of estate resources. That means, as a practical matter, providing the Court

with a predicate for concluding that the claims will, if proven, provide a basis for

recovery, and that the proposed litigation will not be a hopeless fling. It also means, as a

practical matter, that the prospective rewards can reasonably be expected to be

-37-

commensurate with the litigation's foreseeable cost.  But no more than that is required, and the Court must be mindful of the purposes for its inquiry.  It is not for the protection of defendants sued or to be sued by a committee on behalf of an estate, whose defenses can be fully and fairly considered in the plenary litigation to be prosecuted—just as they would if the defendants had been sued by a debtor (or a nondebtor) directly.  Rather, the purpose of the bankruptcy court's gatekeeper role is to protect the *estate*, to ensure that the litigation reasonably can be expected to be a sensible expenditure of estate resources, and will not impair reorganization.

The Committees have provided this Court with more than sufficient comfort that their litigation is a sensible endeavor.  Indeed, they have satisfied the Court not only that this litigation is consistent with maximizing the value of the estate, but that it is necessary to achieve that goal.  Accordingly, both Committees are granted leave to assert their respective claims on behalf of the Debtors' estates.  This determination is, of course, without prejudice to any of the Defendants' rights on any issues in the litigation so brought.

SO ORDERED.

Dated:  New York, New York                    *s/Robert E. Gerber*
        August 30, 2005                       United States Bankruptcy Judge

-38-