UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| *Adelphia Communications Corp., et al.,* | ) | Case No. 02-41729 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
| Adelphia Communications Corp. and its Affiliated Debtors and Debtors in Possession and Official Committee of Unsecured Creditors of Adelphia Communications Corp., | ) | Adversary No. 03-04942 (REG) |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Bank of America, N.A., *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

_____


DECISION AND ORDER ON MOTIONS TO DISMISS


APPEARANCES:


KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Counsel for Plaintiff Official Committee of Unsecured Creditors
1633 Broadway
New York, NY 10019
By:    David M. Friedman, Esq. (argued)
       Andrew K. Glenn, Esq.
       Adam L. Shiff, Esq.
       Jonathan E. Minsker, Esq.
       Sean C. Shea, Esq.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Counsel for Plaintiff Official Committee of Unsecured Creditors
Fox Plaza, 2121 Avenue of the Stars, 33rd Floor
Los Angeles, CA 90067
By:     Edward T. Attanasio, Esq. (argued)
          David M. Stern, Esq.
          Martin R. Barash, Esq.

WILLKIE FARR & GALLAGHER LLP
Counsel for Plaintiff Debtors and Debtors in Possession
787 Seventh Avenue
New York, NY 10019-6099
By:     Marc Abrams, Esq.
          Brian E. O'Connor, Esq.
          Paul Shaloub, Esq.
          Morris J. Massel, Esq.

BRAGAR WEXLER EAGEL & MORGENSTERN, P.C.
Counsel for Plaintiff Official Committee of Equity Security Holders
885 Third Avenue, Suite 3040
New York, NY 10022
By:     Peter D. Morgenstern, Esq.
          Gregory A. Blue, Esq. (argued)
          Debra Kramer, Esq.
          Kate Webber, Esq.

SIMPSON THACHER & BARTLETT LLP
Counsel for Defendants Wachovia Bank, N.A. and Wachovia Capital Markets, LLC
(f/k/a Wachovia Securities, Inc.)
425 Lexington Avenue
New York, NY 10017
By:     Peter V. Pantaleo, Esq. (argued)
          John J. Kerr, Jr., Esq.
          William T. Russell, Jr., Esq. (argued)
          Sean Thomas Keely, Esq.
          Elisha D. Graff, Esq.

HAYNES AND BOONE, LLP
Counsel for Defendant Bank of America, N.A.
901 Main Street, Suite 3100
Dallas, TX 75202
By:    Robin E. Phelan, Esq. (argued)
        Richard D. Anigian, Esq. (argued)
        Thomas E. Kurth, Esq.

399 Park Avenue, 23rd Floor
New York, NY 10022-4614
By:    Judith Elkin, Esq.

WHITE & CASE LLP
Counsel for Bank of America, N.A.
1155 Avenue of the Americas
New York, NY 10036-2787
By:    Howard S. Beltzer, Esq.
        Glenn M. Kurtz, Esq. (argued)
        Karen M. Asner, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Citibank, N.A. and Citicorp USA, Inc., as Administrative Agent for the
Century TCI Facility
One Chase Manhattan Plaza
New York, NY 10005-1413
By:    Luc A. Despins, Esq. (argued)
        Scott A. Edelman, Esq.
        Brian D. Hail, Esq. (argued)

MILBANK, TWEED, HADLEY & MCCLOY LLP
Counsel for Defendant JPMorgan Chase Bank, as Administrative Agent for the FrontierVision
Lenders
One Chase Manhattan Plaza
New York, NY 10005-1413
By:    James C. Tecce, Esq. (argued)
        Dennis F. Dunne, Esq.
        David R. Gelfand, Esq.
        Thomas A. Arena, Esq.
        Jeffrey L. Nagel, Esq.

MAYER, BROWN, ROWE & MAW LLP
Counsel for Defendants Bank of Montreal and Harris Nesbitt Corp.
1675 Broadway
New York, NY 10019
By:    J. Robert Stoll, Esq.
       Robert J. Ward, Esq.
       Jean-Marie L. Atamian, Esq.
       Kenneth E. Noble, Esq. (argued)
       Scott E. Mortman, Esq.


190 South La Salle Street
Chicago, IL 60603-3441
By:    Robert F. Finke, Esq.


LUSKIN, STERN & EISLER LLP
Counsel for The Bank of Nova Scotia
330 Madison Avenue, Suite 3400
New York, NY 10017
By:    Michael Luskin, Esq. (argued)
       Trevor Hoffmann, Esq.


CHADBOURNE & PARKE LLP
Counsel for Defendants Credit Lyonnais New York Branch, Credit Lyonnais Securities
(USA) Inc. and LCM I Limited Partnership
30 Rockefeller Plaza
New York, NY 10112
By:    Andrew P. Brozman, Esq. (argued)
       Janice A. Payne, Esq.
       Jennifer C. DeMarco, Esq.


CLIFFORD CHANCE
Counsel for Defendants CIBC, Inc. and CIBC World Markets
31 West 52nd Street
New York, NY 10019-6131
By:    Margot Schonholtz, Esq.
       Scott T. Talmadge, Esq. (argued)

iv

GIBSON, DUNN & CRUTCHER LLP
Counsel for Merrill Lynch & Co., Inc.
200 Park Avenue
New York, NY 10166-0193
By:    Marshall R. King, Esq. (argued)
       Jonathan M. Landers, Esq.
       Robert F. Serio, Esq.
       Michael J. Passante, Esq.
       Michael J. Riela, Esq.

DUANE, MORRIS & HECKSCHER LLP
Counsel for Defendant SG Cowen Company, LLC (f/k/a SG Cowen Securities Corp.)
One Liberty Place, Suite 4200
Philadelphia, PA 19103-7396
By:    Lawrence J. Kotler, Esq.

WILMER CUTLER PICKERING HALE & DORR, LLP
Counsel for Defendants Credit Suisse First Boston (USA), Inc. and The Royal Bank of
Scotland PLC
2445 M Street, N.W.
Washington, D.C. 20037
By:    John A. Valentine, Esq. (argued)
       Theresa Titolo, Esq.

399 Park Avenue
New York, NY 10022
By:    Phillip D. Anker, Esq.

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Counsel for Defendants Thirteen Investment Banks
One Liberty Plaza
New York, NY 10006
By:    Lindsee P. Granfield, Esq. (argued)
       Jennifer L. Kroman, Esq. (argued)
       Mitchell A. Lowenthal, Esq.
       Thomas J. Moloney, Esq.
       David Bober, Esq.
       Jane Kim, Esq.

WINSTON & STRAWN LLP
Counsel for Defendant J.P. Morgan Securities, Inc.
200 Park Avenue
New York, NY 10166-0193
By:    James A. Beha II, Esq.
       Steven M. Schwartz, Esq. (argued)

v

STROOCK & STROOCK & LAVAN LLP
Counsel for Defendants D.E. Shaw & Co., LLC and D. E. Shaw Laminar Portfolios, LLC
180 Maiden Lane
New York, NY 10038
By:    Brian Cogan, Esq.
       Lewis Kruger, Esq.

BINGHAM MCCUTCHEN LLP
Counsel for Defendant GECC
399 Park Avenue
New York, NY 10022
By:    Alexis Freeman, Esq.

GREENBERG TRAURIG, LLP
Counsel for Defendant Barclays Bank
MetLife Building, 200 Park Avenue
New York, NY 10166
By:    Douglas A. Amedeo, Esq.
       Richard Miller, Esq.

## Table of Contents

Facts ................................................................................................................................. 1

I. Rule 12(b)(6) standards ............................................................................................. 4

II. Creditors' Committee Claims ................................................................................... 5

   A.   Fraudulent Transfer Claims  (Claims 1-12 (Co-Borrowing Lenders)
   Claims 13-16 (Century-TCI Lenders)  Claims 17-24 (Sabres Lenders HSBC,
   Fleet & Key)  Claims 25-28 (Bank of Nova Scotia)  Claims 29-30 (CIBC)
   Claim 31 (Margin Lenders)) ...................................................................................... 5

      1.   Intentional Fraudulent Transfers (Co-Borrowing Lenders)
         (Claims 1, 3, 5, 7, 9, 11)................................................................................ 6

      2.   Constructive Fraudulent Transfers (Co-Borrowing Lenders)
         (Claims 2, 4, 6, 8, 10, 12)............................................................................. 8

      3.   Intentional Fraudulent Transfers (Century-TCI Lenders) (Claims 13, 15),
         (Bank of Nova Scotia (Claims 25, 27))
         (CIBC (Claim 29)) (Margin Lenders (Claim 31)) ............................................... 11

      4.  Constructive Fraudulent Transfers  (Century-TCI Lenders (Claims 14, 16))
         (Bank of Nova Scotia (Claims 26, 28)),
         (CIBC (Claim 30)) .......................................................................................... 12

   B.   Aiding and Abetting Breach of Fiduciary Duty Claims  (Claim 37).................... 13

     1. Choice of Law..................................................................................................... 14

     2. Extent to Which Aiding and Abetting Is Actionable in Pennsylvania................. 18

     3. In Pari Delicto .................................................................................................... 23

     4. Statute of Limitations Defenses ......................................................................... 44

     5. Possible  Exceptions—Particular Defendant Groups .......................................... 47

   C.   Aiding and Abetting Fraud Claims  (Claim 38)....................................................... 49

   D.   Breach of Fiduciary Duty Claims  (Claim 36)......................................................... 52

     1. Bank Agents Generally ...................................................................................... 53

     2. FrontierVision/Parnassos/Century-TCI Facilities............................................... 55

     3. CCH Facility ....................................................................................................... 56

     4. Investment Banks................................................................................................. 57

   E.   Gross Negligence Claims  (Claim 39 (Agent Banks)
   Claim 40 (Investment Banks)) ................................................................................. 60

   F.   Equitable Subordination and Disallowance Claims  (Claim 33) .......................... 61

     1. Equitable Subordination...................................................................................... 62

     2. Equitable Disallowance. ...................................................................................... 67

   G.   Recharacterization of Debt as Equity Claims  (Claim 34 (Co-Borrowing
   Lenders)  Claim 35 (Century-TCI Lenders)) ........................................................ 71

   H.   Bank Holding Company Act Claims  (Claim 32)................................................. 74

   I.    Equitable Estoppel   (Claim 48) ........................................................................... 79

   J.    Unjust Enrichment Claims  (Claims 45-47).......................................................... 80

   K.   Preference Claims  Claims 43 (Century-TCI)
      Claim 44 (Parnassos)
      Claim 49 (FrontierVision)
      Claim 50 (CCH)
      Claim 51 (Olympus)
      Claim 52 (UCA/HHC)).................................................................................... 81

L.   Declaratory Judgment Claims  (Claim 41 (CCH Facility)
     Claim 42 (Olympus Facility)) ........................................................................... 84
M.   Sabres Claims  (Claims 17-24) ........................................................................... 84
III.  Remaining Contentions ......................................................................................... 85
Conclusion ........................................................................................................................ 85

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this adversary proceeding under the umbrella of the chapter 11 cases of

Adelphia Communications Corporation and its subsidiaries, the Creditors Committee and

Equity Committee assert claims, on behalf of the Adelphia Estate, against the Estate's

bank lenders and investment banks.  Defendants have moved to dismiss the great bulk of

the claims under Fed.R.Civ.P. 12(b)(6).

The motions are granted in part and denied in part, as set forth more specifically

below and in the table accompanying this decision.

Facts

The facts that have been alleged in this adversary proceeding were set forth

generally in the Court's decision granting the Creditors' Committee and Equity

Committee standing to sue,[1] and need not be set out at comparable length here.  In

general, the two committees bring this suit against numerous commercial banks and their

investment bank affiliates (the "Defendants"), charging wrongdoing on the part of the

Defendants in their dealings with Adelphia's former management, John, Timothy,

Michael and James Rigas (the "Rigases"), and Rigas family entities ("RFEs"), against

whom Adelphia brought suit for the looting of the company.

The Creditors' Committee's claims include claims for aiding and abetting the

Rigases' breaches of fiduciary duty—principally in connection with three "co-

---

[1]    *See In re Adelphia Commc'ns Corp.*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (the "*Housecraft Decision*").

1

borrowing" facilities[2] under which Adelphia became liable to repay the banks for billions

of dollars that went to or for the benefit of the Rigases and RFEs.  A prominent feature of

the aiding and abetting claims—which are asserted against both bank lenders and their

investment bank affiliates—is the allegation that the co-borrowing loans, in and of

themselves, would not provide an acceptable risk adjusted return on capital, and the

participation of the investment banks is an important aspect of the alleged wrongful

conduct.  In general terms, it is alleged that the bank lenders and investment bank

affiliates entered into the co-borrowing arrangements motivated by the much greater

profitability of the investment banking side of the transactions.

The Creditors' Committee also asserts numerous Bankruptcy Code chapter 5

claims, for intentionally and constructively fraudulent transfers, or preferences—related

to incurring and/or paying down the debt on the co-borrowing facilities, other borrowing

facilities which are similarly alleged to have benefited the Rigases, and paydowns to

certain lenders of margin debt incurred by or for the benefit of the Rigases.

The Creditors' Committee also seeks to equitably subordinate and/or disallow,

and to recharacterize, bank lenders' claims, and asserts a variety of additional claims—

including claims for breach of fiduciary duty (asserting that the bank lenders and

investment banks *themselves* had fiduciary duties to the estate, as contrasted to aiding and

---

[2]       The three co-borrowing facilities were the UCA/Hilton Head ("UCA/HHC") facility, put in place
in May 1999; the Century Cable Holdings ("CCH") facility, put in place in April 2000; and the
Olympus facility, put in place in September 2001.  Their administrative agents were Wachovia,
Bank of America and Bank of Montreal, respectively.  Each facility also had other agents (dealing
with particular functions) and syndicate members, and at least commonly a bank lender might be a
lender in more than one facility.

abetting the Rigases' breaches of fiduciary duty); violation of the Bank Holding

Company Act; gross negligence; unjust enrichment and equitable estoppel.[3]

The Creditors' Committee complaint names approximately 380 defendants, who

are, variously, agents on bank lending facilities, investment banks, bank lenders who

were original members of bank syndicates, and bank lenders who became such because

they were acquirors of bank debt. In key definitions, "Agent Banks" is defined to include

Defendants Wachovia, Bank of America and Bank of Montreal (the administrative agents

on the three co-borrowing facilities),[4] Citibank, Chase and The Bank of Nova Scotia (the

agents on the three *non*-co-borrowing facilities), and 18 other banks or entities that are

alleged to have played agent roles, of one type another, for bank lenders. "Investment

Banks" is defined to include approximately 24 investment banks that are alleged to be

affiliated, or under common control, with the Agent Banks. "Non-Agent Banks" is

defined to include approximately 70 commercial banks, insurance companies and

investors which the Court understands to be original bank lenders under various bank

debt facilities. "Assignees" is defined to include approximately another 160 entities that

are alleged to be in the business of acquiring bank debt.

The bottom line conclusion with respect to the viability of each claim (by

Defendant or Defendant group, where applicable), as a result of the analysis that follows,

appears in the accompanying table. Discussion of the various claims, grouped by

concept, follows.

---

[3]      Additionally, the Estate's Equity Committee, by a supplemental intervenor complaint, joins in the
bulk of the claims made by the Creditors' Committee—all but those premised on insolvency—and
asserts additional claims as well, premised on the federal RICO statute and state law claims. The
Defendants' motions to dismiss the Equity Committee claims will be addressed in a separate
opinion.

[4]      *But see* n.148 *infra*, addressing ambiguity in definition of "Agent Banks."

## I.

## Rule 12(b)(6) standards

Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim

showing that the pleader is entitled to relief, in order to give the defendant fair notice of

what the ... claim is and the grounds upon which it rests."[5]  While a complaint attacked

by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations,[6] a

plaintiff's obligation to provide the grounds of his entitlement to relief "requires more

than labels and conclusions, and a formulaic recitation of a cause of action's elements

will not do."[7]

Factual allegations must be enough to raise a right to relief "above the speculative

level."[8]  But Rule 12(b)(6) "does not countenance…dismissals based on a judge's

disbelief of a complaint's factual allegations."[9]  To the contrary, a complaint's factual

allegations are presumed true, and are construed in favor of the pleader.[10]  As the

Supreme Court held in *Scheuer v. Rhodes:*

> When a federal court reviews the sufficiency of a
> complaint, before the reception of any evidence
> either by affidavit or admissions, its task is
> necessarily a limited one.  The issue is not whether
> a plaintiff will ultimately prevail but whether the
> claimant is entitled to offer evidence to support the
> claims.  Indeed it may appear on the face of the

---

[5]    *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1959 (May 21, 2007) ("*Bell Atlantic*") (internal quotations omitted), quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957), effectively overruled in other respects by *Bell Atlantic.*

[6]    *Id.* citing *Conley*, 355 U.S. at 47.

[7]    *Id.*

[8]    *Id.*

[9]    *Id.* at 1965, quoting *Nietzke v. Williams*, 490 U.S. 319, 327 (1989).

[10]    *See, e.g., Luedke v. Delta Air Lines, Inc.,* 159 B.R. 385, 389 (S.D.N.Y.1993) (Patterson, J.) (applying this standard, denying motion to dismiss third-party complaint).

> pleadings that a recovery is very remote and
> unlikely but that is not the test.[11]

Once a claim has been stated adequately, it may be supported by showing "any set

of facts consistent with the allegations in the complaint."[12]  However, "a complaint can

be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an

affirmative defense if the defense appears on the face of the complaint."[13]  Furthermore,

on a motion to dismiss, a court may consider certain documents in addition to the

complaint, including the contents of any documents attached to the complaint or

incorporated by reference; matters as to which the court can take judicial notice; and

documents in the possession of the non-moving party (the Creditors' Committee here) or

documents which the non-moving party knew of or relied on in connection with its

complaint.[14]

## II.

## Creditors' Committee Claims

A.    *Fraudulent Transfer Claims*
       *(Claims 1-12 (Co-Borrowing Lenders)*
       *Claims 13-16 (Century-TCI Lenders)*
       *Claims 17-24 (Sabres Lenders HSBC, Fleet & Key)*
       *Claims 25-28 (Bank of Nova Scotia)*
       *Claims 29-30 (CIBC)*
       *Claim 31 (Margin Lenders))*

In its first 31 claims, the Creditors' Committee seeks to avoid alleged intentional

and constructive fraudulent transfers made by various of the Debtors to the Co-

---

[11]    416 U.S. 232, 236 (1974).

[12]    *Bell Atlantic*, 127 S. Ct. at 1960.

[13]    *Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403, *4 (Stein, J.) ("*Buckley*") (citing
       *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d
       147, 158 (2d Cir. 2003) ("*Color Tile*")) (other internal citations omitted).

[14]    *See In re Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (Bernstein, C.J.).

Borrowing Lenders (Claims 1 through 12); to the Century-TCI Lenders (Claims 13

through 16); to Bank of Nova Scotia (Claims 25 through 28); to CIBC (Claims 29 and

30) and to the Margin Lenders (Claim 31).  These claims seek to avoid:  (a) such

Debtors' obligations to repay amounts used by Rigas entities with no equivalent benefit

to the Debtors; (b) security interests pledged by the Debtors to secure such obligations;

and (c) principal and interest the Debtors paid on behalf of the Rigases.  For the reasons

that follow, the claims for intentional fraudulent transfers must survive.  The claims for

constructive fraudulent transfer also must survive at this time, despite the very substantial

possibility that some or all of them may have to be dismissed in later proceedings in this

action in which the Debtors concerned may be shown to have been solvent.

### 1.  *Intentional Fraudulent Transfers (Co-Borrowing Lenders) (Claims 1, 3, 5, 7, 9, 11)*

Claims for intentionally fraudulent transfers are alleged under the Bankruptcy

Code's fraudulent transfer provision, Code section 548(a)(1)(A), and applicable state law,

through section 544(b) of the Code—which (subject to an exception inapplicable here)

gives the trustee the ability to avoid transfers voidable under "applicable law."  They

allege transfers with the actual intent to hinder, delay or defraud the Debtors' creditors.

While the Court agrees that Fed.R.Civ.P. 9(b) must be satisfied for claims asserting

intentional fraudulent transfers, it believes that the allegations have been pled with

adequate particularity—including those with respect to intent, especially since it is the

transferor's, not the transferee's, intent that matters on an intentional fraudulent transfer

claim.[15]

---

[15]    *See Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear, Inc.),* 119 B.R. 416, 423 (S.D.N.Y. 1990).

The allegations here may be sufficient to establish liability for intentional fraudulent transfers if such allegations can be proven.  The Court agrees with the Creditors' Committee that insolvency is not an element of a claim to avoid an *intentional* fraudulent transfer, and therefore need not be pleaded.[16]

The Court also agrees that the requisite intent may be established by an intent to *defraud* creditors, as well as an intent to hinder or delay them.   And a general scheme or plan to strip the debtor of its assets that does not have the primary purpose of defrauding creditors has been held to support a finding of fraudulent intent.[17]  In light of the need to determine the exact circumstances surrounding the Rigases' incurring the obligations they did on behalf of Adelphia, for their own benefit and the benefit of the RFEs, it would be inappropriate to dismiss such claims on motion.  On a motion to dismiss, even before a motion for summary judgment, the Court does not believe that it can or should now determine what will almost certainly be a litigated factual issue as to the nature of the Rigases' fraudulent intent.[18]

Similar considerations apply to fundamentally factual contentions such as those that the bank lenders on the co-borrowing facilities provided full value, and that bank

---

[16]    *See Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201 (2d Cir. 1991) (under New York fraudulent conveyance statute, insolvency "need not be pleaded or proved where a conveyance is attacked as made with intent to defraud creditors"); *In re Le Café Crème, Ltd.*, 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (Brozman, C.J.) (same).

[17]    *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 504 (N.D. Ill. 1988) ("A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent").

[18]    *See Golden Budha*, 931 F.2d at 201-202 ("Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind.")

7

lenders cannot be held responsible for the diversion of part of that value to the Rigases.[19]

The viability of such arguments may turn on the facts surrounding the negotiation and

structuring of the co-borrowing facilities, and, among many other things, facts

surrounding the structuring of the facilities to give the RFEs themselves the ability to be

borrowers under the facilities while obligating the Debtors to repay RFE debt—as

compared and contrasted, say, to giving the Debtors alone the right to borrow, from

which borrowed funds, after the borrowing, the Rigases might then be free to loot.

Whether the Rigases' use of co-borrowed funds was, as some Defendants argue,

"unrelated"[20] is yet to be determined.  Contentions like these raise factual issues.  At this

juncture the intentional fraudulent transfer claims must survive.

### 2. Constructive Fraudulent Transfers (Co-Borrowing Lenders) (Claims 2, 4, 6, 8, 10, 12)

The Creditors' Committee also asserts six claims (two each with respect to the

three co-borrowing facilities, under each of section 548(a)(1)(B) and state law) against

co-borrowing lenders for constructive fraudulent transfers.  While the Court has some

uncertainty as to the extent to which these claims will ultimately be successful after

solvency can be considered as a factual matter, they cannot be dismissed now.

Under familiar principles, claims for constructive "fraudulent" transfers are not

really claims for "fraud" as that term usually is understood.[21]  Instead, under applicable

---

[19]    *See, e.g.,* Wachovia Br. at 18 ("If creditors were defrauded, it was not by the Debtors' entering into the Co-Borrowing Facilities, but by the *subsequent* looting of ACC by the Rigases….") (emphasis in original).

[20]    *See id.* at 18-19.

[21]    Thus the pleading must satisfy Fed.R.Civ.P. 8 standards, but not the higher standards under Fed.R.Civ.P. 9(b).  *See In re White Metal Rolling & Stamping Co.*, 222 B.R. 417, 428-429 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) ("Although tagged with the title 'fraudulent,' fraud has nothing to do with the constructive fraudulent transfer claim."  It is rather "based on the transferor's financial condition and the sufficiency of the consideration provided by the transferee.").

federal or state law (any differences being immaterial, at least at this stage), a claim for

constructive fraudulent transfer requires allegations that a debtor (1) transferred an

interest in property, or incurred an obligation, in exchange for less than reasonably

equivalent value,[22] and (2) either was insolvent (or rendered insolvent as a result of the

transfer);[23] was engaged in business or a transaction (or was about to engage in business

or a transaction) for which any property remaining with the debtor was an unreasonably

small capital;[24] or intended to incur, or believed that it would incur, debts that would be

beyond its ability to pay as such debts matured.[25]

 The Creditors' Committee alleges with respect to each co-borrowing facility that

the Debtors "did not receive any value, let alone reasonably equivalent value, in

exchange for the obligations they incurred, the security interests they granted, and the

principal and interest they paid to the [Defendants] in respect of funds used by the Rigas

Family."[26] The Defendants against whom these claims are alleged seek their dismissal on

motion, principally based on contentions that that there was no existing creditor of the

Debtors in question into whose shoes the Creditors' Committee could stand; that the

Defendants provided reasonably equivalent (or, indeed, full) value (and that the use of the

loan proceeds was the Debtors' problem, not the bank lenders'); and that the relevant

Debtors were solvent.

 But these contentions, whatever their ultimate merit might be, do not provide

bases for dismissal on motion. First, with respect to the existing creditor requirement, the

---

[22] *See* Bankruptcy Code section § 548(a)(1)(B)(i).

[23] *See id.* § 548(a)(1)(B)(ii)(I).

[24] *See id.* § 548(a)(1)(B)(ii)(II).

[25] *See id.* §548(a)(1)(B)(ii) (III).

[26] Cred. Comm. Br. at 166 (apparent typographical error corrected).

Creditors' Committee has made the necessary allegations.  If the allegations turn out not

to be true, that can be addressed at the summary judgment stage.  Then, with respect to

the equivalent value requirement, the Creditors' Committee has disclaimed an intent to

assert constructive fraudulent transfer claims for the component of the value provided

under the co-borrowing facilities that actually benefited the Debtors (as contrasted to the

Rigases)—obviating an obvious concern that this Court otherwise would have—and has

made it clear that it is asserting these claims only for the value that went to or for the

benefit of the Rigases.[27]

Finally, but significantly, substantially all, if not all, of the bank lender

Defendants contend that the constructive fraudulent transfer claims must be dismissed by

reason of their borrowers' solvency.[28]  But the Court does not believe that the insolvency

issue can be considered under the present 12(b)(6) motions, for several reasons.  First,

and most fundamentally, the Creditors' Committee has made the necessary allegations as

to insolvency in its complaint, and a 12(b)(6) motion is not the proper means to determine

disputed issues of fact.  Secondly, the solvency of individual Debtors could be affected

by intercompany obligations.  While these were compromised, under the recently

confirmed and effective Plan, leaving most of the Debtors solvent, the Court is not now

in a position to say, on a 12(b)(6) motion, how that compromise should be factored in as

part of the necessary solvency analysis.  It may well require Debtor-by-Debtor analysis to

determine the extent to which insolvency drops out of the picture as a consequence of the

---

[27]     *Id.* at 172 n.123 ("As discussed above, the transfers challenged as fraudulent are the actual draws
under these facilities that were used by the Rigas Family….")

[28]     These contentions will require serious consideration in future proceedings—since the Court now
knows, with the benefit of hindsight, that under the Debtors' recently confirmed (and now
effective) reorganization plan, many unsecured creditor classes (including many classes of
creditors of obligors in the co-borrowing facilities) received payment of their principal and
prepetition interest in full—an outcome materially at odds with contentions of insolvency.

settlement of interdebtor disputes, or should be analyzed by means other than the

settlement outcome.[29]  Finally, the Creditors' Committee has also pleaded *inadequate*

*capitalization* as one of the premises upon which its constructive fraudulent transfer

claims would rest, which might not necessarily be resolved by the ultimate ability of

particular Debtors to pay their creditors in full on their prepetition claims.

      *3.  Intentional Fraudulent Transfers (Century-TCI Lenders)*
         *Claims 13, 15), (Bank of Nova Scotia (Claims 25, 27))*
         *(CIBC (Claim 29)) (Margin Lenders (Claim 31))*

Intentional fraudulent transfer claims are also asserted against the Century-TCI

Lenders.  They differ from those discussed above, however, as the Century-TCI facilities

were not co-borrowing facilities.  But the Creditors' Committee alleges that "at least

$408 million" of the proceeds from the Century-TCI facility was used by the Rigases to

purchase common stock and convertible notes in the year preceding the Petition Date (in

a transaction referred to as the "Century-TCI Transfer"), and that this constituted an

intentionally fraudulent transfer.

As the Court understands the Creditors' Committee complaint, the Creditors'

Committee does not seek to invalidate the incurrence of debt, or the grant of security

interests, for the *entirety* of the Century-TCI Obligations (which were approximately

$1 billion), but rather seeks to invalidate that debt and its related security interests only to

the extent of the $408 million that was used by the Rigases for the securities purchases.

The necessary allegations are present, and the Century-TCI intentional fraudulent transfer

---

[29]    That is particularly so since the co-borrowing lenders' liens were for the most part on stock of
various of the Debtors, held by their respective Debtor parents (as contrasted to hard assets), and it
is at least possible that solvency of parents of various Debtors (which would be affected by the
value of the stock they held) could be affected by the intercompany obligations (and resulting
solvency) of their subsidiaries.

claims cannot be dismissed on motion, for the reasons set forth in connection with the

similar claims against the co-borrowing facility bank lenders.

The Creditors' Committee also asserts intentional fraudulent transfer allegations

against:

- Bank of Nova Scotia, for its receipt (on its own account or as agent) of approximately $623 million in payments that are alleged to be "made on account of debts owed by one or more RFEs," and to have been earmarked by the Debtors to pay Bank of Nova Scotia with respect to Rigas RFE debt;[30]

- CIBC (individually and as agent for certain other banks) for approximately $689 million, that were paid to CIBC on account of a debt by Hilton Head, an RFE, charging generally that the Debtors received no consideration for the CIBC payments, and that these instead were made by the Debtors with the intent to benefit the Rigases and one or more RFEs; and

- the Margin Lenders,[31] for in excess of $249 million for payments made by the Debtors in the year preceding the Petition Date to the various Margin Lenders on account of the Rigases' margin debt.

The Court's analysis with respect to the intentional fraudulent transfer allegations

against the co-borrowing lenders is also applicable to these claims, and thus they too

cannot be dismissed on a 12(b)(6) motion.

4. *Constructive Fraudulent Transfers*
   *(Century-TCI Lenders (Claims 14, 16)), (Bank of Nova Scotia (Claims 26,*
   *28)), (CIBC (Claim 30))*

The Creditors' Committee similarly makes constructive fraudulent transfer

allegations against the Century-TCI lenders, Bank of Nova Scotia and CIBC. The

Court's analysis with respect to the constructive fraudulent transfer allegations against

---

[30]    While Bank of Nova Scotia was the administrative agent for the Parnassos facility, the allegations with respect to Claims 25 through 28, asserting intentional and constructive fraudulent transfers with respect to receipt of payments by Adelphia of RFEs' debt, do not make reference to the Parnassos facility.

[31]    Salomon Smith Barney, Bank of America, Goldman Sachs and Deutsche Bank Securities.

the co-borrowing lenders is also applicable here, and thus these claims too cannot be

dismissed on a 12(b)(6) motion.

B.    *Aiding and Abetting Breach of Fiduciary Duty Claims*
      *(Claim 37)*

Claim 37 charges the Agent Banks and the Investment Banks with aiding and

abetting the Rigases' breaches of fiduciary duty.  All Defendants move to dismiss this

claim.  They contend that Pennsylvania law applies to the tort claims in this case, and that

Pennsylvania does not recognize the tort of aiding and abetting a breach of fiduciary

duty.  They also argue that under principles of *in pari delicto*, as articulated in the Second

Circuit's decision in *Shearson Lehman Hutton, Inc. v. Wagoner*,[32] and its progeny[33]

(decided under Connecticut, New York and Texas law), and decisions by the Third

Circuit and Pennsylvania district courts[34] (under Pennsylvania law), the Estate cannot

---

[32]    944 F.2d 114 (2d Cir. 1991) ("*Wagoner*").

[33]    *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ("*Hirsch* "), *aff'g Hirsch v. Arthur Andersen & Co.*, 178 B.R. 40 (D. Conn. 1994); *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) ("*Mediators*"); *Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) ("*Wight*"); *Color Tile,* 322 F.3d 147; *Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)* 336 F.3d 94 (2d Cir. 2003); *CEPA Consulting Ltd. v. King Main Hurdman (In re Wedtech Sec. Litig.)* 138 B.R. 5 (S.D.N.Y.1992); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld*, LLP, 212 B.R. 34 (S.D.N.Y.1997), *related subsequent proceeding reported at* 994 F.Supp. 202 (S.D.N.Y.1998); *Goldin v. Primavera Familienstiftung, TAG Assoc., Ltd. ( In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr. S.D.N.Y.1996); *Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co., Inc.)*, 280 B.R. 794 (Bankr. S.D.N.Y. 2002); *Tese-Milner v. Beeler (In re Hampton Hotel Investors, L.P.)*, 289 B.R. 563 (Bankr. S.D.N.Y. 2003) (Gerber, J.) ("*Hampton Hotel*"); *Picard v. Taylor (In re Park South Securities, LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005); *Official Comm. of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnell (In re Grumman Olson Indus., Inc.)*, 329 B.R. 411 (Bankr. S.D.N.Y. 2005) ("*Grumman Olson*").

[34]    *See Official Comm. of Unsecured Creditors. v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340 (3d Cir. 2001) ("*Lafferty*"); *Seitz v. Detweiler, Hershey & Assocs. (In re CitX Corp.),* 2005 WL 1388963 (E.D. Pa. June 7, 2005), *aff'd on other grounds*, 448 F.3d 672 (3d Cir. 2006) ("*CitX*"), and *Official Comm. of Unsecured Creditors of Allegheny Health, Education & Research Foundation v. Pricewaterhouse Coopers, L.L.P.*, 2007 WL 141059 (W.D. Pa. Jan. 17, 2007) ("*Allegheny Health*"), respectively.  Two other decisions under Pennsylvania law, *Buckley, supra* n.14, and *Waslow v. Grant Thornton LLP (In re Jack Greenberg, Inc.)*, 240 B.R. 486 (Bankr. E.D. Pa. 1999) ("*Jack Greenberg*"), are to the contrary.  All are discussed below.

recover, even if Defendants acted wrongfully.[35]  The Court agrees that Pennsylvania law

should apply to the tort claims, but otherwise must reject those contentions.

    *1.  Choice of Law*

    The Creditors' Committee argues that the Court need not make a choice of law

determination now, contending that there is an insufficient difference in the law of those

jurisdictions whose law is arguably applicable to warrant making a decision at this early a

stage.  It would be convenient to agree, but the Court cannot do so.  Choice of law issues

are potentially significant because aiding and abetting breaches of fiduciary duty is a

well-established tort under the law of Delaware and New York—the principal contenders

as alternative jurisdictions whose law might be applied.[36]  But under Pennsylvania law,

the issue is not as one-sided, and requires more extensive discussion.  Thus, the Court

believes that it must focus on choice of law issues now.

    The Court discussed choice of law issues at considerable length in its decision in

*Lois/USA*,[37] and will not discuss them at comparable length here.  Applying the choice of

law principles of New York, the forum state, and under the "interests analysis" and

"significant contacts" principles described in *Lois/USA*, the Court believes that as a

general matter, the law applicable to the tort claims in this case should be the law of

---

[35]    They also make a variety of other arguments, contending that the claims against them are barred by the statute of limitations, and that they cannot be sued in tort under the "Economic Loss Doctrine," where the "gist of the action" arises from a contractual relationship.  The statute of limitations issues are addressed in Section II(B)(4) below.  The "Economic Loss Doctrine" contentions, which border on the frivolous under the facts presented here, can be rejected in a footnote.  The Creditors' Committee's claims, fairly read, charge the Defendants with knowing and material assistance in grievous violations of fiduciary duty, not in defective performance under a contract.

[36]    That is so by reason of the incorporation of Adelphia Communications Corporation and many of its subsidiaries in Delaware, and contractual choice-of-law provisions making obligations subject to New York law.

[37]    *See Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Finance Servicing Corp. (In re Lois/USA, Inc.),* 264 B.R. 69, 90-109 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("*Lois/USA*").

14

Pennsylvania, where Adelphia had its principal place of business, and where the injury should be deemed to have been suffered. But the caselaw in New York, the forum state, requires consideration of whether there should be an exception with respect to the claims for aiding and abetting breaches of corporate fiduciary duty.

The New York cases that address choice of law issues applicable to claims for aiding and abetting breaches of corporate fiduciary duty are split on whether the law of the *state of incorporation* or the law of the *state with the greatest interests* applies. Many apply the law of the state of incorporation to claims for aiding and abetting breaches of corporate fiduciary duty, just as they apply the law of the state of incorporation to claims of breaches of corporate fiduciary duty themselves.[38] Their analysis rests on the "internal affairs" doctrine, which is "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."[39]

But other New York cases apply traditional tort conflicts of laws principles.[40] With varying depths of analysis, they turn on the fact that the aiding and abetting issues

---

[38]    *See Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 986 (E.D.N.Y. 1988), *vacated in part on other grounds*, 714 F.Supp. 1285 (E.D.N.Y. 1989); *Lou v. Belzberg*, 728 F.Supp. 1010, 1023 (S.D.N.Y. 1990); *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 60 F.Supp.2d 123, 129 (S.D.N.Y. 1999); *Renaissance Cosmetics v. Dev. Specialists*, 277 B.R. 5, 14 (S.D.N.Y. 2002), *overruled with respect to another issue, Mt. McKinley Ins. Co. v. Corning Inc.,* 399 F.3d 436, 446 (2d Cir. 2005); *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 2006 WL 278138, at *12 (S.D.N.Y.); *Buckley*, 2007 WL 1491403, at *13.

[39]    *Edgar v. MITE Corp.,* 457 U.S. 624, 645 (1982).

[40]    *See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,* 17 F.Supp.2d 275, 306 (S.D.N.Y. 1998); *Solow v. Stone*, 994 F.Supp. 173, 177 (S.D.N.Y. 1998); *Cromer Finance Ltd. v. Berger,* 2003 WL 21436164, **8-9 (S.D.N.Y. 2003).

do not involve determination of internal corporate governance matters themselves, as a primary violation of a fiduciary duty obligation has been taken as a given.[41]

Unfortunately, none of the cases in either line of authority seems to address the cases in the other line.  And all are at the district court level; the Second Circuit has not spoken on the matter, nor have New York's state courts.

After considering the matter, the Court believes that it should follow the latter line of authority—in accordance with *Solow*, *Granite Partners* and *Cromer Finance*—and treat the aiding and abetting claims like the other tort claims, applying the law of the jurisdiction with the greatest interest in the dispute.  The New York Court of Appeals has rejected "any automatic application of the so-called 'internal affairs' choice-of-law rule."[42]  "[I]n certain circumstances 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'"[43]  Thus, in considering whether to apply the "internal affairs" doctrine, New York courts consider whether the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own

---

[41]   Typifying that approach is the analysis by Chief Judge Mukasey in *Solow*.  After noting the rule that claims for breach of fiduciary duty would be subject to the law of the state of incorporation, he continued:

> The same choice-of-law analysis would not seem to apply to plaintiff's remaining claims for aiding and abetting the breach of fiduciary duty and tortious interference with contract. These two claims are not directed against the administrators in their capacity as officers or directors of [the Delaware corporation], but rather as independent actors. … [T]hese two claims raise garden-variety tort issues.  In tort cases, New York courts apply the law of the jurisdiction with the greatest interest in the dispute.

994 F.Supp. at 177.

[42]   *Greenspun v. Lindley*, 36 N.Y.2d 473, 478, (1975); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 192 (S.D.N.Y. 2006) ("*Montreal Pension Plan*").

[43]   *Montreal Pension Plan ,*446 F.Supp.2d at 192 (citations omitted).

16

corporations.[44]  For this Court, that inquiry translates into one inquiring as to whether the

state of incorporation has an interest superior to that of the state where the injury was

suffered when non-fiduciaries are alleged to have wrongfully assisted breaches of

fiduciary duty by insiders.

In this case, the Court sees little reason to conclude that the state of

incorporation—Delaware, for most of the Debtors—has such an interest, and thus to

conclude that the "internal affairs" doctrine should be applied.  There are no compelling

reasons to apply the "internal affairs" doctrine here, since the claims do not involve

"matters peculiar to the relationships among or between the corporation and its current

officers, directors, and shareholders."[45]  Here determination of the aiding and abetting

issues does not involve a determination as to the nature or extent of the fiduciary duties

that were owed by the Rigases or other Adelphia management, or the extent to which

fiduciary duties were breached.[46]  There is no risk that different courts might reach

different conclusions as to the applicable standards for appropriate officer or director

conduct, or as to claims for failure to satisfy these standards.  This case instead involves

basic principles of tort secondary liability, as established in the current *Restatement*[47]

---

[44]     *BBS*, 60 F.Supp.2d at 129, citing *Hart v. General Motors Corp.*, 517 N.Y.S.2d 490, 494 (1st Dep't 1987).

[45]     *Edgar,* 457 U.S. at 645.

[46]     These are issues that would presumably be subject to Delaware law if disputed, but at least as between the parties in this adversary proceeding, primary violations of fiduciary duty by the Rigases are a given.  The Court does not now need to decide what it would do if the existence of a primary violation of fiduciary duty were debatable, or issues as to secondary liability and primary liability were intertwined.

[47]     Restatement 2d of Torts §876 provides, in relevant part:

> For harm resulting to a third person from the tortious conduct
> of another, one is subject to liability if he
>
> …

17

(which applies to many different types of torts), and which principles are applicable to alleged aiding and abetting of *many types of* primary violations of duty—of which a breach by a corporate officer or director is only one.

The Court rules, accordingly, that Pennsylvania law should be applied to determine issues relating to the aiding and abetting clams.

### 2. *Extent to Which Aiding and Abetting Is Actionable in Pennsylvania*

The Defendants then argue that aiding and abetting breaches of fiduciary duty is not actionable under the law of Pennsylvania.  Because the Pennsylvania Supreme Court—which has not spoken on the matter either way—has not "recognized or adopted" a cause of action for aiding and abetting a breach of fiduciary duty (or section 876(b) of the *Restatement 2d of Torts* ("*Restatement*"), which would support the existence of such a cause of action), Defendants argue that, in Pennsylvania,[48] the cause of action does not exist.

The Court disagrees.  It notes—as have two district courts in the Eastern District of Pennsylvania, in very recent decisions[49] (each in very extensive analysis)—that the federal cases addressing the Pennsylvania law as to this issue have been split.[50]  But this

---

                    (b) knows that the other's conduct constitutes a
                    breach of duty and gives substantial assistance or
                    encouragement to the other so to conduct himself…

[48]    The Defendants seemingly accept that a cause of action for aiding and abetting a breach of fiduciary duty is, without question, recognized in Delaware, New York, and many other jurisdictions.

[49]    *See Reis v. Barley, Snyder, Senft & Cohen LLC,* 2007 WL 1098505, *12 (E.D. Pa. Apr. 2, 2007); *Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC,* 2007 WL 1118322, *11 (E.D. Pa. Apr. 13, 2007).

[50]    Federal court decisions recognizing the existence of a cause of action for aiding and abetting a breach of fiduciary duty include *Chicago Title,* 2007 WL 1118322, at *10-*11; *Reis,* 2007 WL 1098505, at *12; *Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, 417-418 (E.D. Pa. 2006); *Adena, Inc. v. Cohn,* 162 F.Supp.2d 351 (E.D. Pa. 2001); *Stone St. Servs., Inc. v. Daniels,*

Court further notes, as have the *Reis, Chicago Title* and many other courts, that the tort of

aiding and abetting breaches of fiduciary duty has been recognized in Pennsylvania lower

courts.  And most importantly, this Court believes, consistent with the analysis of the

*Reis* and *Chicago Title* courts, that the inquiry is not whether the Pennsylvania Supreme

Court has *already* recognized the existence of the cause of action, but rather whether the

Pennsylvania Supreme Court would do so if presented with the issue.[51]  The Court agrees

with their prediction that the Pennsylvania Supreme Court would hold in accordance with

section 876 of the *Restatement* and recognize the tort, and thus agrees with the many

decisions that have concluded that aiding and abetting breaches of fiduciary duty is

actionable in Pennsylvania.

This Court starts with the recognition—a matter as to which both sides agree—

that the Pennsylvania Supreme Court has not decided whether aiding and abetting

another's wrongful conduct is a tort in Pennsylvania.  But the issue has been decided by

---

2000 WL 1909373, *3 (E.D. Pa. Dec. 29, 2000); *Kaiser v. Stewart,* 1997 WL 476455, **16-17 (E.D. Pa. Aug. 19, 1997); *Schuykill Skyport Inn, Inc. v. Rich,* 1996 U.S. Dist. LEXIS 12655, **120-121 (E.D. Pa. Aug. 21, 1996); *SDK Invs., Inc. v. Ott,* 1996 WL 69402, *12 n.16 (E.D. Pa. 1996); *Pierce v. Rosetta Corp.,* 1992 WL 165817, *8 (E.D. Pa. June 12, 1992). *Krasny v. Bagga (In re Jamuna Real Estate, LLC)* 2007 WL 1207156, *28 (Bankr. E.D. Pa. Apr. 25, 2007).

Courts refusing to recognize causes of action for aiding and abetting breach of fiduciary duty or fraud include *Stanziale v. Pepper, Hamilton, LLP (In re Student Fin. Corp.),* 335 B.R. 539, 551 (D. Del. 2005) ("*Student Finance*"); *WM High Yield Fund v. O'Hanlon,* 2005 WL 1017811, *15 (E.D. Pa. Apr. 29, 2005); *Flood v. Makowski,* 2004 WL 1908221, *36 (M.D. Pa. Aug. 24, 2004); *Daniel Boone Area Sch. Dist. v. Lehman Bros, Inc.,* 187 F.Supp.2d 400, 413 (W.D. Pa. 2002); *Klein v. Boyd,* 1996 WL 675554, *33 (E.D. Pa. Nov. 19, 1996); *S. Kane & Son Profit Sharing Trust v. Marine Midland Bank,* 1996 WL 325894, *9 (E.D. Pa. June 13, 1996); *Jack Greenberg,* 240 B.R. at 524 (aiding and abetting fraud).

As the *Reis* court noted, one judge considering this matter may have recently changed his position with respect to aiding and abetting. 2007 WL 1098505 at *12.  In *Flood,* one of the cases cited in the preceding paragraph in this footnote, the court refused to recognize a cause of action for aiding and abetting breach of a fiduciary duty because it had not been recognized by the Supreme Court of Pennsylvania.  However, in the recent decision of *Doe v. Liberatore,* 2007 WL 809639 (M.D. Pa. Mar. 19, 2007), the same judge addressed a claim for aiding and abetting sexual abuse case torts on the merits, applying standards articulated in *Koken v. Steinberg,* 825 A.2d 723 (Pa. Commw. Ct. 2003) and *Restatement* section 876, seemingly regarding the tort claim as potentially viable if the facts supported it, without reference to his prior decision in *Flood.*

[51]      *See* 2007 WL 1098505 at *4, and 2007 WL 1118322 at *11, respectively.

the Pennsylvania Commonwealth Court[52] and at least two Courts of Common Pleas in

Pennsylvania,[53] all of which have recognized the viability of the tort of aiding and

abetting, assuming that the requisite allegations have been made.

In *Koken*, Pennsylvania's Insurance Commissioner, acting in her capacity of

liquidator of an insurance company, sued Deloitte & Touche, the insurance company's

auditor, for, among other things, aiding and abetting the company's officers in breaching

their fiduciary duties.  Defendant Deloitte moved to dismiss the aiding and abetting

claim, under Pennsylvania's equivalent of a demurrer, on the contention that there was no

such right of action in Pennsylvania.  The *Koken* court disagreed.  It noted that the

existence of the tort was supported by section 876 of the *Restatement,* quoting

section 876 in full.  The *Koken* court then quoted, at some length, the Pennsylvania

Supreme Court's decision in *Skipworth by Williams v. Lead Industries Association, Inc.*[54]

In *Skipworth*, the Pennsylvania Supreme Court affirmed a trial court's determination that

a litigant had been deficient in making the showings required under *Restatement*

section 876, but after first quoting a portion of *Restatement* section 876 as describing the

"concert of action theory" whose requirements had to be satisfied—without any hint of

dissatisfaction or concern with *Restatement* section 876 or its requirements.  Reading

*Skipworth* the same way this Court does, the *Koken* court continued:

---

[52]    *See Koken,* 825 A.2d at 731.

[53]    *See Lichtman v. Taufer,* 2004 WL 1632574, *8 (Pa. Com. Pl. Phila. July 13, 2004) (recognizing
aiding and abetting breach of fiduciary duty as tort, citing *Koken* and *Restatement* section 876, but
finding allegations of knowledge of insiders' duties and breach of those duties, and of substantial
assistance, inadequate); *Cruz v. Roberts,* 70 Pa. D. & C.4th 225, 235, 2005 WL 1349615,
*1349615 (Pa.Com.Pl. Lancaster Jan 26, 2005) (recognizing aiding and abetting child abuse as a
tort, citing *Koken* and *Restatement* section 876, but finding allegations of common scheme or plan
and substantial assistance or encouragement inadequate).

[54]    690 A.2d 169 (1997).

20

> Our Supreme Court addressed Section 876 in
> *Skipworth* ... and this Court is convinced by this
> language in *Skipworth* that Section 876 is a viable
> cause of action in Pennsylvania.[55]

The *Koken* court ruled, accordingly (after first considering whether the allegations there

passed muster under the requirements of *Restatement* section 876):

> [T]he Liquidator has stated a cause of action against
> Deloitte for aiding and abetting a breach of
> fiduciary duty pursuant to Section 876 of the
> *Restatement* (Second) of Torts.[56]

This Court then turns to the federal cases, where claims for aiding and abetting

breaches of fiduciary duty have been asserted more frequently. Persuasive, in this

Court's view, are the recent decisions in *Reis* and *Chicago Title,* each of which, after

extensive analysis, predicted that the Pennsylvania Supreme Court would recognize a

claim for aiding and abetting breach of fiduciary duty.

When the Pennsylvania Supreme Court has not spoken on an issue, a federal court

considering a claim based on Pennsylvania state law must predict how the state high

court would rule.[57] As the *Reis* court observed:

> If the Pennsylvania Supreme Court has not
> addressed a precise issue, a prediction must be
> made, taking into consideration relevant state
> precedents, analogous decisions, considered dicta,
> scholarly works, and any other reliable data tending
> convincingly to show how the highest court in the
> state would decide the issue at hand. … The
> opinions of intermediate state courts are not to be
> disregarded by a federal court unless it is convinced

---

[55]   *Koken*, 825 A.2d at 732.

[56]   *Id.*

[57]   *See Reis*, 2007 WL 1098505, at *11.

21

by other persuasive data that the highest court in the
state would decide otherwise.[58]

Similarly, the *Chicago Title* court, after noting the duty of a federal court

analyzing a state law issue to predict how the state high court would rule, was mindful of

guidance it received with respect to this from the Third Circuit in two earlier

decisions[59]—noting, with respect to a question of Pennsylvania law, that "[i]n making

this prediction, proper regard must be given to the decisions of Pennsylvania's lower state

courts."[60]   It went on to quote the Third Circuit's observation in *Rolick*:

> Although lower state court decisions are not
> controlling on an issue on which the highest court
> of the state has not spoken, federal courts must
> attribute significant weight to these decisions in the
> absence of any indications that the highest state
> court would rule otherwise.[61]

The *Chicago Title* court then discussed *Koken*, at length, and observed that "[t]he

vast majority of district courts in this Circuit have reached the same conclusion."[62]   And

it continued:

> After reviewing all relevant precedent, the Court is
> persuaded that the Pennsylvania Supreme Court
> would recognize the tort of aiding and abetting
> breach of fiduciary duty.  Prior to *Koken,* where the
> Commonwealth Court of Pennsylvania expressly
> recognized the cause of action, the Superior Court
> of Pennsylvania has twice discussed aiding and
> abetting under section 876(b) of the Second
> Restatement of Torts favorably.  ...  Furthermore,
> after *Koken,* at least one lower state court has

---

[58]   2007 WL at 1098505, at *10 (internal quotations and citations omitted) (quoting *Nationwide Mutual Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000)).

[59]   *See Rolick v. Collins Pine Co.,* 925 F.2d 661, 664 (3d Cir. 1991) and *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273-74 (3d Cir. 1985).

[60]   *Chicago Title*, 2007 WL 1118322, at *11.

[61]   *Id.*

[62]   *Id.*

> expressly recognized the tort. ...  Having found no
> reason why the Pennsylvania Supreme Court would
> rule otherwise, the Court joins other courts in this
> district and finds that aiding and abetting breach of
> fiduciary duty constitutes a viable cause of action in
> Pennsylvania.[63]

The Court elects to follow *Koken*, *Reis*, *Chicago Title* and the other cases holding similarly.  The Court cannot agree with a Defendant's assertion that *Koken* "remains the outlier on this issue."[64]  *Koken* is consistent with, and indeed influenced, the many decisions of Pennsylvania federal courts that followed it, and is consistent with dozens, if not hundreds, of cases around the country.  Rather, it is *Daniel Boone* and the cases holding similarly that have become the "outlier on this issue," particularly with the passage of time and with the many cases that have gone the other way.  The fact that a cause of action has not been expressly endorsed by the Pennsylvania Supreme Court hardly suggests to this Court that it would be rejected, especially when the underlying principle appears in the *Restatement* and is so established in so many states.

### 3.  In Pari Delicto

The Defendants then argue, relying upon the "*Wagoner* Rule,"[65] and variations of it, that the Creditors' Committee's aiding and abetting claims must be dismissed.  They contend that the second prong of the *Wagoner* Rule—which immunizes defendants from liability for otherwise actionable wrongful conduct on *in pari delicto* grounds, by imputation to a bankruptcy trustee or deputized creditors' committee of the predecessor

---

[63]     *Id.* (citations omitted).

[64]     Wachovia Reply Br. 32.

[65]     While the *Wagoner* Rule has not been consistently defined, it is most commonly understood to consist of two prongs, generally providing that (1) a bankruptcy trustee (or other estate representative) steps into the shoes of the debtor, and has standing only to assert claims that the debtor could, and (2) (subject to exceptions that may be applicable here) misconduct by a debtor's personnel is imputed to the trustee.

management's wrongful conduct—absolves the Defendants from any liability they might

otherwise have here, as a matter of law.

But the Creditors' Committee argues that there are several reasons why *in pari
delicto* doctrine and the *Wagoner* Rule might not bar recovery on behalf of the Adelphia

Debtors here. The Court agrees.

### a. Preliminary Matters

Preliminarily, however, the Court makes two observations. First, it notes that

properly viewed, matters involving the application of *in pari delicto* doctrine to state law

claims of aiding and abetting breaches of fiduciary duty are matters of agency law and

equity doctrine—not involving ownership of a cause of action, or standing to sue.[66] The

latter concerns, where applicable, relate to the first prong the *Wagoner* Rule (addressing

standing), not to the second prong (addressing equitable defense), and the first prong is

not an issue in this case. State law determines whether a right to sue belongs to the

---

[66]    *See Lafferty*, 267 F.3d at 346 ("An analysis of standing does not include an analysis of equitable
defenses, such as *in pari delicto.* Whether a party has standing to bring claims and whether a
party's claims are barred by an equitable defense are two separate questions, to be addressed on
their own terms."); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d
1145, 1149-1150 (11th Cir. 2006) ("*PSA*") (same, quoting *Lafferty*); *Moratzka v. Morris* (*In re
Senior Cottages of Am.*, 482 F.3d 997, 1002-1004 (8th Cir. 2007) ("*Senior Cottages*") ("Although
*Wagoner* has been followed in the Second Circuit, it has also been criticized for characterizing an
*in pari delicto* defense as a standing issue. … Several other circuits have declined to conflate the
constitutional standing doctrine with the *in pari delicto* defense. … We agree with the First, Third,
Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the
corporation does not deprive the corporation of standing to sue the third parties, though it may
well give rise to a defense that will be fatal to the action.") (citations omitted); *Grumman Olson*,
329 B.R. at 424 n.5 (noting that while litigants and courts sometimes refer to standing and *in pari
delicto* concerns interchangeably, they are not the same).

While in its earlier decision in *Hampton Hotel*, this Court quoted and relied on the language in the
earlier decisions of the Second Circuit that had merged standing and *in pari delicto* concerns, *see*
289 B.R. at 574 (quoting *Mediators* and *Wight*), and this Court thus said that a finding of *in pari
delicto* would defeat standing, this Court doubts that the Second Circuit would continue to so hold
after review of the newer cases, especially its own decision in *Color Tile* and the Eighth Circuit's
decision in *Senior Cottages*. On a state law determination where the early Second Circuit
decisions are not binding, this Court believes that it should follow the more recent and refined
thinking on the matter of standing, which makes it clear that matters of standing and of equitable
defenses to claims asserted by those who have standing are different things.

debtor or to the individual creditors,[67] and here, under Pennsylvania law, there could be

no serious question that claims for breaches of fiduciary duty by the Rigases would be for

injuries to the *corporation*,[68] and claims of aiding and abetting those breaches of

fiduciary duty would be likewise.[69]   Therefore, under Pennsylvania law the Debtors and

Creditors' Committee have standing to bring this action, satisfying the first prong of the

*Wagoner* Rule.

   Second, the Court notes that matters involving the application of *in pari delicto*

doctrine to state law claims for aiding and abetting breaches of fiduciary duty are matters

of *state* law.[70]   As Judge Kaplan noted in *Parmalat*:

> [Defendant Bank of America] … appears to contend
> that *Wagoner* stands also for the proposition that a
> third party that is complicit in wrongdoing of the
> former management of a bankrupt company may
> assert the misconduct of the company's former
> management as a defense to a claim against it by the
> bankrupt estate.   But there is a fundamental problem
> with the Bank's use of *Wagoner*.   The case, to
> whatever extent it may be relevant to the *in pari
> delicto* issue, is an application of New York law.
> The question whether the Parmalat Debtors are
> chargeable with the fraud allegedly perpetrated by

---

[67]   *See Color Tile*, 322 F.3d at 156.

[68]   *See Lafferty*, 267 F.3d at 348 ("it is well established, under Pennsylvania law, that where fraud, mismanagement or other wrong damages a corporation's assets, a shareholder does not have a direct cause of action. … Rather, it is the corporate body that suffers the primary wrong and, consequently, it is the *corporate body* that possesses the right to sue." …"[A] corporation can suffer an injury unto itself, and any claim it asserts to recovery for that injury is independent and separate from the claims of shareholders, creditors, and others.") (citations omitted, emphasis added).

[69]   Although *Lafferty* did not address this issue, the Court is confident that a Pennsylvania court would hold similarly for aiding and abetting breaches of fiduciary duty.   *See, e.g., Senior Cottages*, 482 F.3d at 1002 ("If the corporation owned a cause of action against the principal who breached a duty, it follows that it also owns the cause of action for aiding and abetting the principal's breach") (applying Minnesota law).

[70]   *See Allegheny Health*, 2007 WL 141059, at *8 ("We look to state law to ascertain when wrongful conduct should be imputed to a corporation."); *Bondi v. Bank of Am. Corp. (In re Parmalat Sec. Litig.),* 383 F.Supp.2d 587, 595 (S.D.N.Y. 2005) (Kaplan, J.) ("*Parmalat*") (same).

the companies' former management, and thus
whether [the trustee] is subject to a defense of *in
pari delicto,* is governed by the law of North
Carolina. *Wagoner* simply is not controlling here.[71]

The Second Circuit's decisions in *Wagoner* and its progeny were decided under

Connecticut, New York and Texas law, and thus properly are considered here only to the

extent that they are persuasive;[72] for reasons discussed above, Pennsylvania law is

applicable here.[73]

With that as backdrop, the Court then considers the propriety of dismissal on

motion on *in pari delicto* grounds. The Court agrees with the Creditors' Committee that

under the facts of this case, *in pari delicto* cannot provide a basis for dismissal on motion.

### b. Applicable State Law

First, turning to the Pennsylvania law, it appears that the Pennsylvania Supreme

Court has eschewed blind reliance on agency doctrine, and instead has looked to the

extent to which application of *in pari delicto* is equitable under the circumstances. In

*Universal Builders, Inc. v. Moon Motor Lodge, Inc.,*[74] the Pennsylvania Supreme Court

---

[71]   383 F.Supp.2d at 595.

[72]   *See id.* ("At most [*Wagoner*] is potentially persuasive authority regarding New York's treatment
of … the imputation of an agent's acts or knowledge to its principal.").

[73]   In a law review article that has achieved considerable attention, Davis, *"Ending the Nonsense:
The In Pari Delicto Doctrine Has Nothing to Do With What Is § 541 Property of the Bankruptcy
Estate,"* 21 Emory Bankr. Dev. J. 519 (2005) ("*Davis*"), Professor Davis argues that determining
whether *in pari delicto* should bar claims on behalf of a bankruptcy estate should be a matter of
federal law. *Id.* at 543. But the Court believes that at least as a general matter, that is not so, and
does not need to decide the extent to which there might be exceptions. Construing section 541 is,
of course, a matter of federal bankruptcy law in the first instance, but (as Professor Davis notes, *id.*
at 542-543) section 541 issues call for the Court to consider applicable nonbankruptcy law, usually
state law, "[u]nless some federal interest requires a different result." *See Butner v. United States,*
440 U.S. 48, 55 (1979). Here, where the bundle of rights under state law that was acquired by the
Creditors' Committee *already includes* ownership of the cause of action, and, already includes
state law providing that innocents need not be burdened with an *in pari delicto* defense, the Court
does not need to decide whether there here should be a different result.

[74]   244 A.2d 10, 13-14 (Pa. 1968) ("*Universal Builders*").

considered the extent to which a debtor's unclean hands[75] should be applied to penalize the innocent creditors of a debtor in bankruptcy, and was unwilling to approve such an effort. It cited three separate reasons why the debtor's unclean hands would not necessarily bar recovery.

First, the *Universal Builders* court found a basis for distinction between charging a litigant with responsibility for his *own* unclean hands and charging a *principal* with the unclean hands of its agent based solely on agency theory. Although the *Universal Builders* court recognized that a plaintiff's manufacturing of evidence might bar recovery under the unclean hands doctrine, it noted that the evidence "was manufactured not by the plaintiff, but by an officer of the plaintiff corporation, now in bankruptcy."[76] It continued, significantly, that "[t]he attribution of one party's unclean hands to another party is not based on simple agency principles."[77] After noting the potential unfairness of such a result (quoting eloquent language by Learned Hand speaking to that unfairness, which had started as a dissenting opinion but which ultimately became a unanimous opinion of the Second Circuit),[78] the Pennsylvania Supreme Court concluded that "[i]n this case, appellant offers no persuasive reasons for imputing [the insider's] conduct to the bankrupt corporation, nor do we see any such reasons ourselves."[79]

---

[75]    As relevant to this case, the Court regards references to "clean hands," "unclean hands" and "*in pari delicto*" as alternative ways of saying the same thing.

[76]    *Universal Builders,* 244 A.2d at 13-14.

[77]    *Id.* at 13.

[78]    *See Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir. 1934) (L. Hand, dissenting), *cert. denied*, 293 U.S. 596 (1934), *dissent adopted as opinion of the court on rehearing,* 107 F.2d 944 (2d Cir. 1939) (*per curiam*), *cert. denied,* 308 U.S. 621 (1939) ("*Art Metal Works*") ("Whenever the question has come up, it has been held that immoral conduct to be relevant, must touch and taint the plaintiff *personally*.") (emphasis added).

[79]    *Universal Builders*, 244 A.2d at 13-14.

Second, the *Universal Builders* court held that assuming, for the sake of argument, that the insider's conduct should be imputed to his bankrupt company, the application of the unclean hands doctrine to deny relief was "within the discretion of the chancellor."[80]  It continued:

> Where the rights of innocent parties are involved, the doctrine should be applied cautiously … and the doctrine should not be invoked if its application will produce an inequitable result. …. To deny plaintiff recovery in this case would result in the enrichment of [the defendant] at the expense of innocent creditors of the bankrupt [debtor].  This is an inequitable result and thus we are not persuaded that the clean hands doctrine should be applied.[81]

---

[80]    *Id.* at 14.

[81]    *Id.*  The Pennsylvania Supreme Court was not unique in coming to that view.  In *Scholes v. Lehmann*, 56 F.3d 750, 753-755 (7th Cir. 1995), the Seventh Circuit considered an *in pari delicto* defense to a suit by a receiver against third parties in a fraudulent conveyance action.  Speaking through Judge Posner, it observed:

> The appointment of the receiver removed the wrongdoer from the scene.  The corporations were no more [the wrongdoing insider] Douglas's evil zombies.  Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors.… The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.

> Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated.

*Id.* at 755 (citations omitted).  *See also FDIC v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir. 1995) (*per curiam*) ("*O'Melveny Circuit*").  Applying California law to the claims of the FDIC, as the receiver to a failed savings and loan, against a law firm for malpractice and breach of fiduciary duty, the Ninth Circuit observed:

> We recognize that, in general, "[a] receiver occupies no better position than that which was occupied by the person or party for whom he acts ... and any defense good against the original party is good against the receiver." … However, this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver. … While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law.  Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall.  This is justifiable as against

28

Third, the *Universal Builders* court noted that although it has been said that the unclean hands doctrine applies in courts of law as well as in courts of equity, it generally had been held that the doctrine operates only to deny equitable, and not legal, remedies.[82] The *Universal Builders* court saw no reason to apply unclean hands doctrine to deny the plaintiff a legal right.[83]

This Court thus believes that under the law of Pennsylvania, as articulated in *Universal Builders*, consideration of the applicability of the doctrine of unclean hands or *in pari delicto* is not a mechanical application of the law of agency, but rather involves discretionary attention to the fairness of applying it to the facts in a given case.  And that is a matter that includes as a factor the extent to which it would be "at the expense of innocent creditors."

### c.  Applicable Federal Law

Several cases in the federal courts have considered the application of *in pari delicto* doctrine under Pennsylvania law to claims brought on behalf of insolvent estates—*Lafferty*, at the court of appeals level, *Buckley, Allegheny Health* and *CitX*, at the district court level, and *Jack Greenberg*, at the bankruptcy court level.  In *Lafferty*, the Third Circuit, in a 2-1 decision, found *in pari delicto* applicable to bar an action by a

---

the wrongdoer himself, not against the wrongdoer's innocent creditors.

*Id.* at 19 (citations omitted).

The Court notes these cases not because they bear on what the Pennsylvania law is—the *Universal Builders* court has already determined that—but because considerations of this character may bear on the exercise of discretion of a court in determining whether or not to apply *in pari delicto* in cases, like this one, where taking those matters into account is permitted under the underlying state law.

[82]   *Universal Builders,* 244 A.2d at 14.

[83]   *Id.*

creditors' committee;[84] the dissenter regarded *in pari delicto* to be no bar to the creditors'

committee suit.[85]  In *Allegheny Health* and *CitX*, district courts in Pennsylvania ruled in

accordance with the decision of the *Lafferty* majority.  But in *Jack Greenberg*, which

preceded each of those decisions (but which was not meaningfully addressed in *Lafferty*,

*Allegheny Health*, and *CitX*, to the extent it was addressed at all), Judge Sigmund of the

Eastern District of Pennsylvania Bankruptcy Court ruled, in a lengthy and thoughtful

opinion, that under Pennsylvania law, *in pari delicto* would not necessarily bar a

chapter 7 trustee's suit on behalf of a debtor estate.  And in *Buckley,* Judge Stein of the

district court in this district ruled similarly, denying 12(b)(6) motions to dismiss on *in*

*pari delicto* grounds.[86]

    In *Jack Greenberg,* Judge Sigmund assumed that a trustee standing in the shoes of

the corporation would normally take no greater rights than the debtor.[87]  But she observed

that while that was the beginning of the analysis, it was not the end.[88]  She observed that:

> The refusal of Pennsylvania's highest court in
> *Universal Builders* to allow the invocation of the
> equitable defense of unclean hands against a
> bankruptcy trustee when its application would
> produce an inequitable result (*i.e.,* application of the
> defense would result in harm to innocent third
> parties) convinces me that there are circumstances
> when the trustee's position as plaintiff is different
> from that of the corporation, even when bringing
> the corporation's claim.[89]

---

[84]     *See* 267 F.3d at 354-360.

[85]     *See id.* at 360-363 (Judge Cowen, dissenting).

[86]     *Buckley*, 2007 WL 1491403 at *8.

[87]     *Jack Greenberg*, 240 B.R. at 506.

[88]     *Id.*

[89]     *Id.* at 505-506.

Rather than blindly applying agency doctrine, Judge Sigmund took a more nuanced approach. After consideration of the Pennsylvania law, discussed in the preceding section, she determined:

> Therefore, I conclude that Pennsylvania's Supreme Court would reject the notion that equitable defenses can never be raised against a trustee plaintiff but rather would allow a court applying Pennsylvania law discretion to bar use of the defense when under the circumstances presented, it concludes that its invocation would produce an inequitable result.[90]

Judge Stein's analysis in *Buckley* was similar in several respects. He too considered the Pennsylvania state law, including *Universal Builders* and *Jack Greenberg*, and the cases, discussed below, that had ruled that *in pari delicto* would bar a suit by a creditors' committee.[91] He further considered the cases that had addressed exceptions to the viability of an *in pari delicto* defense in those jurisdictions where the *in pari delicto* doctrine is applied.[92] He ruled that the viability of the *in pari delicto* defense could not be evaluated on a 12(b)(6) motion,[93] as the defense could not provide a basis for dismissal on motion when fact-specific determinations were required. He did so principally by reference to the exceptions to the *in pari delicto* doctrine (discussed in the section that follows), but also by reason of his observation, based on his consideration of *Universal Builders*, among other cases, that he would have to "take into account equitable considerations when deciding whether to apply the doctrine of *in pari delicto*,"

---

[90]    *Id.*

[91]    *See Buckley*, 2007 WL 1491403, at *8, *9 and *10, respectively.

[92]    *See id.* at *5-*7, *9.

[93]    *See id.* at *5.

31

and the objectives of tort liability, which would include the deterrence of future wrongdoing.[94]

The *Lafferty* court did not address or even mention *Universal Builders*, but ruled, by a 2-1 majority, that *in pari delicto* would bar a creditors' committee suit. Intentionally or otherwise, it never reached an analysis of the Pennsylvania law on equitable defenses.[95] Instead, the *Lafferty* majority was of the view that in evaluating a claim brought by a trustee, a court—which the majority regarded as bound by what it perceived to be the plain language of section 541, which defines the property of the estate[96]—could not consider post-petition events that might affect an equitable defense of *in pari delicto*. Therefore, the *Lafferty* majority reasoned, a trustee appointed after the commencement of the case had to be subject to the same defenses as the debtor at the commencement of the case. The *Lafferty* majority further reasoned that because the appointment of an innocent successor (the Committee) took place after the commencement of the bankruptcy case, the court had to evaluate the *in pari delicto* defense without regard to whether the Committee was an innocent successor. The *Lafferty* court then held that *in pari delicto* barred Committee's recovery.[97]

---

[94]     *Id.* at *8.

[95]     *See Lafferty*, 267 F.3d at 355-358.  However, the *Lafferty* court applied Pennsylvania law on imputation of knowledge to corporate victims.  *See id.* at 358.

[96]     Many parts of section 541 are not even arguably relevant to this controversy.  With exceptions as provided in sections 541(b) and 541(c)(2), which are not relevant here, section 541 provides, in relevant part:

> (a) The commencement of a case under section 301 … of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
>> (1) … all legal or equitable interests of the debtor in property as of the commencement of the case….

[97]     *Lafferty*, 267 F.3d at 356-357.

With respect, this Court cannot agree with such a view.[98]  Section 541(a) provides that it includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  The *Lafferty* majority properly recognized that "these legal and equitable interests include causes of action,"[99] and in actions brought by the trustee as successor to the debtor's interest under section 541, the "trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor."[100]  But at that point, in this Court's view, the *Lafferty* majority should have stopped.  Instead, it read more into section 541 than what section 541 says.

While section 541 is relevant to any analysis of the *ownership* of the cause of action, and standing to assert it (the first prong of analyses like that undertaken under the *Wagoner* Rule), section 541 is not relevant to the *in pari delicto* analysis (the second prong)—which presupposes that the trustee or creditors committee has taken title to the cause of action, and is enforcing it under state or other nonbankruptcy law.  As one commentator has properly observed:

> While an issue of standing has a bearing on whether the estate can bring that cause of action, an equitable defense to that cause of action has absolutely no bearing on whether the estate can bring the action.[101]

---

[98]    Rather, this Court agrees in result with Judge Cowen, dissenting in *Lafferty*, in part for the reasons he articulated, *see* 267 F.3d at 360-363, and in part for the reasons set forth above and below.  The *Allegheny Health* and *CitX* courts, each of which likewise took an agency approach, did not address either *Universal Builders* or *Jack Greenberg*, or the underlying law or principles discussed in either of them.  Both relied heavily on the decision of the *Lafferty* majority.  They are likewise unpersuasive to this Court, by reason of their failures to address *Universal Builders* and *Jack Greenberg*, and the reasons set forth in this section.

[99]    *Lafferty*, 267 F.3d at 356, *citing, inter alia, Collier, ¶* 323.02[1].

[100]    *Id.* (internal quotations omitted).

[101]    Alam, "*Fraudulent Advisors Exploit Confusion in the Bankruptcy Code:  How In Pari Delicto Doctrine Has Been Perverted to Prevent Recovery for Innocent Creditors,*" 77 Am. Bankr. L. J. 305, 321-322 (2003) ("*Alam*").

33

Alam noted the reasoning of the Fifth Circuit when that court had discussed the *in pari delicto* defense in *In re Educators Group Health Trust*.[102]  The *Educators Group* court distinguished between the assertion of a claim by a plaintiff and an affirmative defense to that claim:

> Implicit in this argument is the notion that a debtor cannot raise a cause of action for which the defendants may have a valid defense on the merits ... [W]e cannot find any support for the proposition that a defense on the merits of a claim brought by the debtor precludes the debtor from *bringing* the claim.  That the defendant may have a valid defense on the merits of a claim brought by the debtor goes to the resolution of the claim, and not to the ability of the debtor to assert the claim.  The latter, of course determines what is, or is not, property of the bankruptcy estate. [103]

The *Educators Group* court went on to say:

> Thus, property of the estate—the bundle of rights to a certain asset—is affected by the limiting phrase "as of the commencement of the case" in § 541 of the Bankruptcy Code.  The existence of equitable defenses with respect to certain potential beneficiaries of the litigation is, however, not the focus of that limiting phrase.  Here, *in pari delicto* has a bearing on the strength or weakness of the claim, but no bearing on ownership of that claim.[104]

Also, the *Lafferty* majority court made an improper jump, in this Court's view, with an unduly broad statement of the law—based, in turn, on broad language in one of its earlier decisions, and in *Collier*, on which its unduly broad statement was based.  The *Lafferty* majority continued:  "Conversely, the trustee is, of course, subject to the same

---

[102]   *Id. quoting* 25 F.3d 1281 (5th Cir. 1994) ("*Educators Group*").

[103]   25 F.3d at 1286.

[104]   *Id.*

defenses as could have been asserted by the defendant had the action been instituted by the debtor."[105]

What the *Lafferty* and *Hays* courts should have said, in this Court's view, was that "[t]he trustee is … subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor, *to the extent the defenses can be imposed under the nonbankruptcy law under which the cause of action lies.*"  Greater precision was required by reason of the need to incorporate the applicable state law or other nonbankruptcy law *in its entirety*, and also to recognize (though the *Lafferty* court blurred the distinction) that defenses (especially equitable and affirmative ones) properly would be considered only after it had been determined that the trustee "owns" the cause of action—what section 541 addresses.

This Court's differences with the *Lafferty* majority's section 541 analysis are prompted not only by the analysis in the Fifth Circuit's decision in *Educators Group,* but also by the Supreme Court's decision in *O'Melveny & Myers v. FDIC,*[106] issued the year before the Ninth Circuit's later decision in *O'Melveny Circuit*, evaluating *in pari delicto* under California law.  There the FDIC had succeeded to a cause of action that previously belonged to the failed S&L, under a federal statute, 12 U.S.C. §1821, whose relevant subsection[107] was similar to the first part of Bankruptcy Code section 541(a)(1),[108] and had been judicially interpreted to provide that the receiver would "obtain the rights 'of

---

[105]   *Lafferty,* 267 F.3d at 356, quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 (3d Cir. 1989) (internal brackets deleted).  *Hays,* in turn, had quoted language from an earlier version of *Collier,* at ¶ 323.02[4].  That paragraph no longer exists, but the same language appears in the present *Collier,* at ¶ 323.03[2].

[106]   512 U.S. 79 (1994) ("*O'Melveny-Supreme*").

[107]   *See* 12 U.S.C. § 1821(d)(2)(A)(i).  It provided that "the [FDIC] shall, ... by operation of law, succeed to all rights, titles, powers, and privileges of the insured depository institution."

[108]   "all legal or equitable interests of the debtor in property…"

the insured depository institution' *that existed prior to receivership*."[109]   In the Opinion of

the Court, in which all nine justices joined, the Supreme Court held that *state law* would

determine the extent to which imputation should be applied.[110]   The Court did not hold,

and it apparently was not even argued,[111] that § 1821(d)(2)(A)(i) would be relevant to *in*

*pari delicto* or other defenses to a claim; § 1821(d)(2)(A)(i) simply gave the FDIC

ownership of the claim.

Then, and quite relevant here, four justices in *O'Melveny-Supreme*, concurring,

observed that:

> It would be entirely proper for a state court of
> general jurisdiction to fashion a rule of agency law
> that would protect creditors of an insolvent
> corporation from the consequences of wrongdoing
> by corporate officers even if the corporation itself,
> or its shareholders, would be bound by the acts of
> its agents.[112]

And the concurring justices continued, very significantly:

> Because state law provides the basis for respondent
> FDIC's claim, that law also governs both the
> elements of the cause of action and its defenses.
> Unless Congress has otherwise directed, the federal
> court's task is merely to interpret and apply the
> relevant rules of state law.[113]

Here Congress has not "otherwise directed."  Section 541 has carveouts from its

definition of property of the estate (which are not relevant here) but, like 12 U.S.C.

§ 1821(d)(2)(A)(i), is silent as to any defenses that might be applicable under applicable

---

[109]    *O'Melveny-Supreme*, 512 U.S. at 86 (emphasis added).

[110]    *Id.* at 84-85.

[111]    What the FDIC had argued instead was that in light of its role in protecting the national public
interest, federal common law should apply, and the FDIC should be treated differently than a non-
governmental receiver.  *See* FDIC Br. in *O'Melveny & Myers v. FDIC,* 1994 WL 190960, *10.

[112]    *O'Melveny-Supreme*, 512 U.S. at 90.

[113]    *Id.*

state law.[114]  Like the U.S. Code provision vesting the FDIC with the "rights, titles,

powers and privileges of the insured depository institution,"[115] section 541 confirms the

grant of *ownership* of causes of action to the insolvent estate representative, but places no

federal limits on the application of state law in determining defenses that might be good

against the estate.

Pennsylvania's unclean hands doctrine would not deprive trustees of ownership of

the causes of action they pursued, and would give courts flexibility to determine whether

they should apply agency doctrine to impose equitable defenses that might be asserted in

response to such claims.  If the highest court of a state has made a determination that it

does not wish to penalize innocent creditors for the conduct of prior management when a

trustee sues a third party under state law for otherwise actionable injury to an insolvent

corporation, the state's determination of its law must be respected, and there is nothing in

the Bankruptcy Code requiring (or even authorizing) a federal court to disregard the

state's determination in that regard.[116]  As *O'Melveny-Supreme* teaches, all of the

parties—trustee and defendants alike, and the courts that adjudicate their rights—take the

state law as defining the litigants' rights and applicable defenses, except where a federal

statute provides otherwise.

---

[114]    Bankruptcy Code section 108 does have such provisions, see n. 139 *infra*—cutting back on statute of limitations defenses that might otherwise be asserted under state law—but, if anything, the presence of section 108 shows how Congress could have imposed more extensive provisions relating to defenses, but did not do so.

[115]    12 U.S.C. § 1821(d)(2)(A)(i).

[116]    Thus, while the Court shares Professor Davis' views as to the injustice of much of the law of *in pari delicto*, the Court is doubtful that it would agree with his argument that the Bankruptcy Code imposes a federal rule invalidating the imposition of *in pari delicto*, and the Court is not now ruling that the Bankruptcy Code trumps state law in that respect.  The Code could be amended to provide for such a result, and many might argue that such would be good policy, but the Code does not address it (in either direction) now.

And here it does not.  The "explicit language of section 541"[117] *does not*, as the two judges in the *Lafferty* majority said, "direct[] courts to evaluate defenses as they existed at the commencement of the bankruptcy."[118]  The language of section 541 says nothing whatever about evaluating defenses.  It speaks instead to *what* is the property of the estate, and, in cases where the distinction is relevant, *when* property becomes (or ceases to become) property of the estate.[119]  Legislative history quoted by the *Lafferty* majority[120] is not a substitute for a rewriting of the statute, and while the example the legislative history used—claims barred under the statute of limitations—is, without exceptions of which this Court is aware, an accurate statement of the law, the legislative history merely discusses an example of *adhering* to the applicable state law, not disregarding it.

---

[117]    *Lafferty*, 267 F.3d at 356.

[118]    *Id.*

[119]    For that reason, the Court is unpersuaded by *PSA*, cited by Defendants with their supplemental authorities, which upheld an invocation of *in pari delicto* (under Georgia law) based on its perception of what section 541 said, and used plain meaning analysis to justify its result. *See* 437 F.3d at 1150 ("section 541 is unambiguous, and the language of our laws is the law.")  This Court agrees that section 541 is unambiguous, but it is unambiguous only in giving the Estate its bundle of rights.  It does not speak, one way or another, to the rights state law thereby confers upon estates or to the assertion of defenses to claims owned by estates, and thus does not trump state law in that regard.

In a recent article, a commentator has made the same observations this Court has.  See McGrane, "*The Erroneous Application of the Defense of In Pari Delicto to Bankruptcy Trustees*," 29 Cal. Bankr. J. 275, 283-84 (2007) ("There is nothing, plain or otherwise, stated in the actual text of section 541(a) that addresses whether or not the defense of *in pari delicto* should be made applicable to bankruptcy trustees. … Section 541(a), quoted above, says absolutely nothing about who stands in anyone else's shoes, or about how a postpetition debtor's rights to property are no greater than its prepetition predecessor-in-interest.").

The Court is similarly unpersuaded by *Sender v. Buchanan (In re Hedged-Investments Assocs., Inc.)*, 84 F.3d 1281 (10th Cir. 1996), involving claims under Colorado law, upon which the *Lafferty* majority also relied.  *Hedged Investments'* section 541 analysis suffers from the same infirmities as the *Lafferty* and *PSA* analyses, discussed above.

[120]    *See* 267 F.3d at 356.

While the *Lafferty* court noted that the Creditors' Committee was relying on *Jack Greenberg* on the *in pari delicto* issue,[121] it nevertheless failed substantively to discuss why *Jack Greenberg* might be wrong in any way. The failures to address *Universal Builders* (though it was discussed at length in *Jack Greenberg*) and *Jack Greenberg* itself, especially collectively, materially undercut *Lafferty*'s persuasive authority. This Court cannot bring itself to agree with the decision of the *Lafferty* majority.[122]

On a matter of state law, the views of a federal court, even a Circuit Court of Appeals, cannot trump those of a state's highest court. Not being bound by the *Lafferty* majority, *Allegheny Health* or *CitX* decisions on a matter of Pennsylvania state law on which the Pennsylvania Supreme Court has spoken[123] (or by their views of section 541 doctrine), this Court believes that it instead must follow the Pennsylvania Supreme Court's decision in *Universal Builders*, and should follow the federal decisions in *Educators Group*, *Buckley* and *Jack Greenberg*.[124]

---

[121]    *See id.* at 355.

[122]    The *Allegheny Health* and *CitX* courts, each of which likewise took an agency approach, did not address either *Universal Builders* or *Jack Greenberg*, or the underlying law or principles discussed in either of them. Both relied heavily on the decision of the *Lafferty* majority. They are likewise unpersuasive to this Court, by reason of their failures to address *Universal Builders* and *Jack Greenberg*, and the reasons set forth in this section.

[123]    Several relatively recent cases have discussed *in pari delicto* doctrine under the law of other states. *See Tolz v. Proskauer Rose LLP (In re Fuzion Tech. Group, Inc.)*, 332 B.R. 225 (Bankr. S.D. Fla. 2005) ("*Fuzion*") (Florida law); *Hill v. Gibson Dunn & Crutcher, LLP (In re MS55, Inc.)*, 338 B.R. 883 (Bankr. D. Colo. 2006) ("*MS55*") (Colorado law); *Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*, 353 B.R. 324 (Bankr. D.D.C. 2006) ("*Greater Southeast*") (D.C. law); *Claybrook v. Broad and Cassel, P.A. (In re Scott Acquisition Corp.)*, 2007 WL 676692 (Bankr. D. Del. 2007) ("*Scotty's*") (Florida law). The *Fuzion* court, after considering the analysis in *O'Melveny* and *Scholes*, regarded imposition of *in pari delicto* unjust when applied to a bankruptcy trustee (and also considered the adverse interest exception discussed below to be potentially applicable), and declined to grant a motion for summary judgment. The courts in *MS55*, *Greater Southeast* and *Scotty's* granted motions to dismiss or for summary judgment on *in pari delicto* grounds. But none of the latter decided the issues before them in the face of state law which, like Pennsylvania's, made *in pari delicto* discretionary with respect to claims asserted by trustees or innocent estate representatives. The latter are distinguishable for that reason.

[124]    It is true, as commentators have noted, that the imposition of the equitable doctrine of *in pari delicto* often victimizes the innocent and produces wholly inequitable results. *See Alam*, 77 Am.

### d. Other Matters

The Court fully understands the reluctance of the Pennsylvania Supreme Court in

*Universal Builders*, of Judge Hand (and, later, the Second Circuit) in *Art Metal Works,*

and of the court in *Jack Greenberg* to blindly apply principles of agency to what is and

should be an equitable or substantive[125] defense.  But even if *Lafferty* were binding on

this Court in this case, the Court would agree with the Creditors' Committee that issues

of fact as to the application of *in pari delicto* would be present here that would preclude

dismissal on motion in this case.

First, even if the *Lafferty* majority were correct in its section 541 analysis,

*Lafferty* would be unavailing for the Defendants here.  In *Lafferty*, the majority ruled as it

did based on the fact that the creditors' committee there had "ask[ed] us to consider post-

petition events, namely, the removal of the Shapiro family and their co-conspirators from

the Debtors' management, as well as the Committee's status as an innocent successor,

---

Bankr. L.J. at 306, 308 (noting that courts have applied the *in pari delicto* doctrine "to the detriment of the real victims and to the benefit of wrongdoers," and that "the fundamental question is whether fraudulent management is still in a position to recover for the injury they created.  If they are not, courts must disregard the web of legal fictions created by bankruptcy and agency law and hold *in pari delicto* to be inapplicable").  *See also Davis*, 21 Emory Bankr. Dev. J. at 521-522 (quoting Judge Posner's observations in *Scholes*, quoted at n.81 *supra*).

But while the Court is sensitive to these concerns, the Court does not here have to decide how it would address them if the applicable state law were different.  Here the Pennsylvania Supreme Court has stated that that consideration of the fairness of applying *in pari delicto* to trustees suing on behalf of innocent creditors is permissible.  This Court has no occasion now to consider whether it would rule the same way if a state's highest court were silent on the issue, and has no occasion to consider whether the highest courts of other states would rule similarly.

[125]   If, by way of example, there are *substantive* consequences as a result of insiders' wrongful conduct—as, for example, there might be where a corporate insider gives an outside auditor a false representation, leading the auditor astray—it seems to the Court that a misled defendant should have the right to raise that as a defense.  If such facts, or analogous ones, are present in this case, the Court believes that Defendants should have the ability to raise them when the facts are developed.  *See Davis*, 21 Emory Bankr. Dev. J. at 545 ("While the mere availability under state law of the *in pari delicto* defense should be irrelevant to whether a cause of action is property of a debtor's estate, the debtor's conduct should be assessed directly for its impact, if any, on the cause itself.")  Obviously, matters like these are quite distinct from mechanical applications of agency doctrine.

when weighing the equities of the *in pari delicto* defense."[126]  It continued that "[t]he

plain language of section 541, however, prevents courts from taking into account events

that occur after the commencement of the bankruptcy case."[127]

But even if the "plain language" of section 541 said what the *Lafferty* majority

said it did, in this case, unlike *Lafferty*, there is no occasion to consider post-petition

events—as the Rigases and their confederates resigned or were discharged before the

Adelphia chapter 11 cases were filed.  Consideration of their departure does not require

the Court to consider post-petition events.   The critical fact on which the *Lafferty*

majority premised its entire section 541 analysis is lacking here.  With the guilty insiders

having been displaced before the filing date, there is not even an arguable statutory or

caselaw basis upon which to ignore the fairness considerations articulated in *Universal*

*Builders*, *O'Melveny-Supreme*, *Art Metal Works*, *O'Melveny-Circuit*, *Scholes, Buckley*

and *Jack Greenberg*.

Then the Creditors' Committee notes, properly, that even if cases like *Wagoner*

and its progeny and *Lafferty* were applicable and binding, the "adverse interest"

exception to the *in pari delicto* defense would preclude imputation where the agents were

acting to advance their own interests, and not those of the debtor,[128] as the Rigases are

alleged to have done here.  The Defendants do not dispute that this exception exists and

may be applicable in some cases, but they contend that under the facts here, the Debtors

---

[126]     267 F.3d at 356-57.  *See also id.* at 355-56 ("The first question is whether post-petition events may
be considered when evaluating a claim in bankruptcy.")

[127]     *Id.* at 357.

[128]     *See, e.g., Hampton Hotel*, 289 B.R. at 567.

benefited along with the Rigases from the alleged wrongful conduct, and that dismissal

on motion accordingly is required.

The adverse interest exception ultimately may not turn out to be supportable here,

either as a fact or mixed question of fact and law.  But it is incapable of resolution on

motion.[129]  This Court is not of a mind to hold at this point in time, on motion, that even a

peppercorn of benefit to a corporation from the wrongful conduct would provide total

dispensation to defendants knowingly and substantially assisting insider misconduct that

is overwhelmingly adverse to the corporation.  Upon review of all the facts, it may be

appropriate to regard the adverse interest exception as fully applicable, or it may be

appropriate to regard it as applicable to a subset of the Creditors' Committee's claims.

While there is language in several of the cases to the effect that the agent must

"totally" abandon his interest to qualify for the exception,[130] other cases articulate the

standard as whether the wrongdoing is done "primarily" for the personal benefit of the

officer.[131]  And even under the more demanding standard, how one evaluates "totally"

when aspects of the claims or damages might potentially be considered separately could

be subject to fair debate—especially where a material element of the insider's wrongful

conduct involves looting.[132]  Except in relatively clear cases, an adverse interest

determination, in this Court's view, requires consideration of factual context.[133]

---

[129]    *See Buckley*, 2007 WL 1491403, at *6-*8 (finding issue of fact as to applicability of adverse
         interest exception, and denying 12(b)(6) motion to dismiss in part for that reason).

[130]    *See, e.g., Buckley*, 2007 WL 1491403, at *7, and cases cited therein.

[131]    *See Baena v. KPMG LLC*, 453 F.3d 1, 7 (1st Cir. 2006) (under Massachusetts law).

[132]    *See Parmalat*, 383 F.Supp.2d at 599 (denying 12(b)(6) motion seeking to invoke *in pari delicto* as
         defense to claims by an estate for aiding and abetting insider's breach of fiduciary duty).  As Judge
         Kaplan noted:

              By any standard, theft from a corporation by insiders is self
              dealing by the insiders and not in any sense in the interest of

Here the Creditors' Committee complaint alleges transactions that were grievously adverse to the Debtors, and at least largely for the benefit of management. Much of the Rigases' conduct easily could be regarded as looting the company. These matters raise issues of fact as to whether or not the adverse interest exception should apply. While the Defendants will no doubt wish to argue that even a very modest benefit to the corporation should absolve Defendants from all liability for otherwise actionable conduct, and there is language in several of the cases that may support that view, the Court believes that such a conclusion should be reached, if ever, only after consideration on a factual record as to exactly what happened—and in particular the extent to which the Rigases on the one hand, or Adelphia as an entity, on the other, benefited from the wrongful conduct and whatever assistance Defendants may have provided.[134]

Finally, the Creditors' Committee notes another exception to the application of *in pari delicto*: that an *in pari delicto* defense does not bar recovery by the estate upon a showing of one or more decision makers that could have stopped the fraud or breaches of fiduciary duty—as Adelphia's independent directors, shortly before Adelphia's bankruptcy, at least assertedly could do here, and did do here. Here the Creditors'

---

the entity. The insiders' actions and knowledge in engaging in such conduct therefore cannot be imputed to the company. Accordingly, to the extent that the complaint alleges that [defendant] BoA assisted the insiders in stealing from Parmalat, *in pari delicto* does not apply.

*See also Baena*, 453 F.3d at 8.

[133]   *See Baena*, 453 F.3d at 8 ("If there were raw facts at issue that (if credited by a factfinder) might make out a claim for looting, or if the case for imputation were merely a close one, we might agree with the trustee's argument and leave this question to the factfinder."); *Buckley*, 2007 WL 1491403, at *5 (quoting *Baena*).

[134]   The analysis in *In re CBI Holding Co.*, 318 B.R. 761 (S.D.N.Y. 2004), cited by Defendants as part of their supplemental authorities, merely exemplifies why this Court addresses this component of the issues as it has. The *CBI* analysis, which was after trial, was heavily factual. *See id.* at 763-765.

Committee has more than satisfactorily pleaded the facts necessary to trigger the

"innocent decision-maker" exception.  Determining whether that exception applies, in

light of the totality of the circumstances concerning the knowledge and actions of

Adelphia's outside directors (and their actions, in particular, in the period March through

May 2002, when they made supplemental disclosures and ousted the Rigases), will

present an issue of fact.[135]

### 4.  Statute of Limitations Defenses

Many Agent Banks and Investment Banks also argue that the aiding and abetting

claims, to the extent they arose before June 2000, are barred under the statute of

limitations, and must be dismissed under Rule 12(b)(6) for that reason as well.  However,

the motions to dismiss on statute of limitations grounds are denied.  They too raise issues

of fact.

The Court starts with the statute of limitations borrowing statute of New York, the

forum state,[136] CPLR § 202.  It provides that where a plaintiff is not a New York resident

(as here),[137] the court should apply the shorter of New York's period of limitations or the

---

[135]  *See, e.g., Buckley,* 2007 WL 1491403, at *6; *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.),* 81 B.R. 240, 242 (S.D.N.Y.1987) (in each case denying motion to dismiss, in light of factual issues as to applicability of "adverse interest" exception).

[136]  Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations.  *See Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 29-30 (S.D.N.Y. 2002) ("*G-I Holding*").

[137]  For this analysis, the Creditors' Committee should be deemed to be a resident of Pennsylvania, the principal place of business of Adelphia.  *See G-I Holding*, 277 B.R. at 30 ("When a bankruptcy trustee sues as a representative of the estate of a bankrupt corporation, it is the residency of the corporation which is applicable.")  That is even more appropriate where, as here, the Creditors' Committee is joined as a plaintiff by the Debtors and Debtors-in-Possession.

statute of limitations applicable where the plaintiff resides.  The Court then looks to the

statute of limitations for torts in Pennsylvania, where the Debtors reside.[138]

The parties appear to agree that Pennsylvania's statute of limitations applicable to

the claims for aiding and abetting breach of fiduciary duty is two years.  And since it is

shorter than the New York alternative, it is the relevant statute of limitations here.  But as

in many states, Pennsylvania statute of limitations law includes related doctrines which

determine when the statute of limitations begins to run, or have the effect of tolling the

statute or otherwise permitting lawsuits after the time under which it otherwise would

expire.[139]

---

[138]   The Court is unpersuaded by the Creditors' Committee's argument that the Florida statute of
limitations should apply (*see* Cred. Comm. Citibank Claims Br. 74), based on its argument that
Adelphia maintained its bank account in Florida, from which funds went to the Rigases.  Adelphia
money was not stored in that account, as a kind of bailment; account balances represented a debt
to Adelphia, which was located in Pennsylvania, and actions involving diverted cash were only a
portion (albeit a significant portion) of the totality of the injury Adelphia suffered, at its principal
place of business.

The Court is likewise unpersuaded that it should apply the statute of limitations of another state, or
of multiple states, based on an argument that the "domicile" of some Adelphia subsidiaries might
be in states other than Pennsylvania.  There are no allegations in the complaint that any Adelphia
subsidiaries were under independent control, or directed by the Rigases or anyone else in different
states.

[139]   There is a separate tolling provision applicable to claims asserted on behalf of an estate in a
bankruptcy case, as a consequence of Bankruptcy Code section 108(a).  It provides, in relevant
part:

> (a) If applicable nonbankruptcy law … fixes a period within
> which the debtor may commence an action, and such period
> has not expired before the date of the filing of the petition, the
> trustee may commence such action only before the later of—
>
>> (1) the end of such period, including any
>> suspension of such period occurring on or
>> after the commencement of the case; or
>>
>> (2) two years after the order for relief.

The chapter 11 cases of Adelphia Communications Corporation and most of its subsidiaries were
filed on June 25, 2002, the date of the order for relief in these voluntary cases.  The claims in this
adversary proceeding were brought within two years thereafter.  As a practical matter, then, claims
are timely if they were not time-barred as of the June 25, 2002 filing date.

One of these is the "adverse domination" tolling doctrine. "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."[140]  In *RTC v. Farmer*, Judge Rendell (at the time still a district judge) considered this doctrine when denying statute of limitations motions for summary judgment.  As she then observed, "[t]he doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."[141]  In this Court's view, a corporation likewise cannot reasonably be expected to pursue a claim against those who *aided and abetted* the controlling wrongdoers, or acted in concert with them, until the controlling wrongdoers are no longer in control.

When Judge Rendell decided *Farmer*, no Pennsylvania state court had explicitly accepted or rejected the adverse domination doctrine.[142]  But for reasons set forth at considerable length in her decision, she predicted that the Pennsylvania Supreme Court would do so.[143]  As a consequence, she held that a fact issue existed as to whether adverse domination doctrine applied to toll the Pennsylvania statutue of limitations on the RTC's claims.[144]

So far as the parties' briefing has revealed and the Court can tell, the Pennsylvania courts still have not addressed the issue.   But in the Court's view, the

---

[140]     *RTC v. Farmer*, 865 F.Supp. 1143, 1151 (E.D. Pa. 1994)

[141]     *Id.*

[142]     *Id.*  However, several federal courts in the Eastern District of Pennsylvania had noted in dicta that Pennsylvania recognizes the adverse domination doctrine.  *See id.* at n.7.

[143]     *See id.* at 1151-1158.

[144]     *See id.* at 1158.

*Farmer* analysis is persuasive. For the reasons set forth in *Farmer*, the Court regards it as highly likely that the Pennsylvania Supreme Court would apply the doctrine of adverse domination in this case,[145] and with respect not just to any claims against the Rigases, but also to claims against others who allegedly aided and abetted them. Though the Court will no doubt wish to consider independent directors' knowledge of the Rigases' activities and independent directors' ability to "induce[] the corporation to initiate suit,"[146] it is at least arguably unreasonable to expect Adelphia to have sued entities allegedly aiding and abetting Rigas breaches of fiduciary duty for as long as Adelphia was operating under the Rigases' watch—which was at least seemingly the case until some time in the period from March to May, 2002.

For all of these reasons, this Court, like Judge Rendell, regards the statute of limitations issues as presenting an issue of fact. Just as Judge Rendell denied summary judgment dismissing *Farmer* on statute of limitations grounds, this Court will deny dismissal under Rule 12(b)(6).[147]

### 5.  Possible  Exceptions—Particular Defendant Groups

However, with respect to particular defendant groups, there are separate bases upon which dismissal of the aiding and abetting claims must be considered, apart from arguments addressed above. Those bases involve lack of participation in alleged wrongful activity, typically because a Defendants' participation was in a non-co-borrowing facility, or because it preceded later allegedly wrongful acts.

---

[145]    *See id.* at 1152-1153.

[146]    *Id.* at 1156.

[147]    Under these circumstances, the Court does not need now to address alternative bases under which the Pennsylvania statute of limitations might have been tolled or equitably tolled, or started to run at a later time, by reason of "fraudulent concealment" or the "discovery rule."

47

Bank of Nova Scotia, the agent on the Parnassos facility, notes that the Parnassos facility was not a co-borrowing facility, and was fully funded in 1998, before the first of the co-borrowing facilities. Here there are no allegations sufficient to show aiding and abetting of Rigas breaches of fiduciary duties in connection with the Parnassos facility, and these claims must be dismissed, for reasons apart from those discussed above.[148]

Similarly, Defendant Chase, the Administrative Agent for the FrontierVision facility, notes that the FrontierVision facility was not a co-borrowing facility, and was fully funded back in 1997, well before Adelphia even acquired the FrontierVision debtors, predating Adelphia's acquisition of FrontierVision by almost two years. Chase argues that claims premised on co-borrowings are inapplicable to it, and there are no separate allegations as to what, insofar as aiding and abetting is concerned, the FrontierVision lenders did that was wrong. The Court agrees. Assuming that claims for aiding and abetting breaches of fiduciary duty were asserted in connection with the FrontierVision facility,[149] they must be dismissed.

Then the Court must consider the aiding and abetting claims against Citibank, the agent on the Century-TCI Facility. The allegations with respect to aiding and abetting breaches of fiduciary duty by action or inaction concerning the Century-TCI facility, which was not a co-borrowing facility, are so thin as to be nonexistent. To the extent

---

[148]    As noted by Bank of Nova Scotia in its brief (see page 27), "Agent Banks" is defined in two different ways in the Creditors' Committee complaint—in a first way (¶ 69) that expressly includes Bank of Nova Scotia, and in a second way (¶ 440, n.15) that would include only agents for the co-borrowing facilities, and not cover the agents on other facilities. In oral argument on the motions to dismiss, the Creditors' Committee's counsel said that only preference claims had been asserted in connection with the Parnassos facility (*see* Hrg. Tr. Day 2 at 273-74) ("the lenders of Parnassos are defendants in one claim, a single preference claim"), suggesting that claims for aiding and abetting breaches of fiduciary duty had not been asserted in connection with the Parnassos facility. In any event, to the extent aiding and abetting claims were asserted with respect to the Parnassos facility, they must be dismissed.

[149]    *See id.*

48

Claim 37 was intended to cover acts in connection with the Century-TCI facility, it must
be dismissed.

As previously noted, many Defendants were involved in more than one facility.
Paragraph 494 of the Creditors' Committee Complaint refers to that, and alleges
generally that once they had indisputable notice of fraud, the co-borrowing lenders
participating in the non-co-borrowing facilities knew or should have known that the
Rigases would use the proceeds of the non-co-borrowing facilities in furtherance of the
fraud. But that has little, if any, relevance to the aiding and abetting claims asserted in
connection with the FrontierVision and Parnassos facilities—each of which was funded
*before* any of the co-borrowing facilities came into existence. If members of those
groups have liability as a consequence of their participation in connection with co-
borrowing facilities, that is a separate matter. Dismissal of the FrontierVision and
Parnassos facility claims here is limited to acts in connection with those particular
facilities. To the extent that Defendants who were agents, lenders or investment banks in
connection with the FrontierVision and Parnassos facilities were participants in other
facilities—*e.g.*, co-borrowing facilities—any such other claims must rise or fall on their
separate merits.

C.    *Aiding and Abetting Fraud Claims*
      *(Claim 38)*

In Claim 38, directed at the Agent Banks and the Investment Banks, the
Creditors' Committee charges those Defendants with aiding and abetting the Rigases'
fraud. It charges generally that the Rigases, Brown and Mulcahey made fraudulent
misrepresentations and omissions of material facts:

> by, among other things, causing the Debtors to enter
> into the fraudulently structured Co-Borrowing

49

> Facilities and failing to disclose to Adelphia's
> independent Board of Directors the true purpose
> and effect of the facilities, causing certain RFEs to
> draw down in excess of $3.4 billion under the Co-
> Borrowing Facilities to be used for the sole benefit
> of the Rigas Family, using such funds for purposes
> that provided no benefit to the Debtors, and failing
> to fully inform the independent members of
> Adelphia's Board of Directors of the circumstances
> surrounding such conduct.[150]

The Court does not need to decide, and does not now decide, whether Pennsylvania would recognize the tort of aiding and abetting fraud, as a general matter (a matter as to which courts have split)—or, assuming that Pennsylvania would do so, whether Pennsylvania would also find actionable fraud where the claims are based on nondisclosure to independent directors of facts known to insider directors of a company. For assuming, *arguendo*, that Pennsylvania would conclude that actionable torts have been alleged in each of those respects, the Court finds failures to plead the bases for the alleged aiding and abetting of a fraud with the particularity that Fed.R.Civ.P. 9(b) requires.

Pleading a claim for aiding and abetting fraud, in the many jurisdictions where such a tort is recognized, at least normally requires allegations showing a primary violation (an underlying fraud) and a secondary violation (the aiding and abetting). Here the allegations lack the requisite particularity in each respect.

Starting with the primary allegations of fraud,[151] as to which actionable nondisclosure is the underlying theory,[152] the Court agrees with the Defendants' Rule

---

[150]    Cred. Comm. Cmplt. ¶ 868.

[151]    The Court notes, preliminarily, that some of the allegations of ¶ 868 of the Complaint potentially support a claim for fraud, and others do not. "[C]ausing the Debtors to enter into the fraudulently structured Co-Borrowing Facilities" satisfactorily alleges a primary violation of *breach of*

9(b) concerns. Assuming, without deciding, that matters of imputation of insider knowledge could be satisfactorily addressed and that claims for fraud could lie based on nondisclosure to independent directors, the fraud claims have not been pleaded with the particularity that Rule 9(b) requires. The claim is that the Rigases failed "to fully inform" the independent members of Adelphia's Board of Directors "of the circumstances surrounding such conduct." That allegation is too vague, especially when the essence of that claim is that the Rigases failed to "*fully*" inform independent members of the Board. Where the claims are based on nondisclosure, the complaint must state what was not disclosed, and to whom, when and under what circumstances, and must flesh out the basis for the nuance "fully" inform.

The Court has similar, and perhaps more serious, concerns as to the Rule 9(b) deficiencies of the effort to impose secondary liability, for the aiding and abetting of the alleged fraud. If there are allegations concerning the knowledge, if any, of Defendants regarding what the Rigases told and did not tell the independent directors, and the extent to which the Defendants knew that the Rigases were concealing things from the independent directors, the Court has missed them. In the Court's view, they must be provided in order to satisfy Rule 9(b).

Claim 38, for aiding and abetting fraud, is dismissed with leave to replead. Such determination is without prejudice to the rights of parties to file, or oppose, motions to dismiss or for summary judgment if the Creditors' Committee hereafter repleads.

---

*fiduciary duty*, but does not allege a primary violation of *fraud*. Only the latter allegations in the quoted paragraph may be argued to do that.

[152]    The Complaint alleges neither affirmative misstatements nor failures to include facts necessary to make representations that actually were made not misleading. Because the Rigases, Brown and Mulcahey, as officers and (in the case of the Rigases) directors, had fiduciary duties, it is arguable that they had a duty to speak, and their silence might be actionable.

D.    *Breach of Fiduciary Duty Claims*
      *(Claim 36)*

In Claim 36, the Creditors' Committee asserts claims against the Agent Banks and

Investment Banks for breach of fiduciary duty.  The Committee alleges as part of Claim

36 that "[a] relationship of trust and confidence existed between the Debtors and each of

the Agent Banks and Investment Banks as a result of, among other things, the roles each

of the Agent Banks and Investment Banks played in the Debtors' financial affairs as,

among other things, the Debtors' lenders, underwriters and financial advisors."[153]  As a

result, the Creditors' Committee alleges that each of the Agent Banks and each of the

Investment Banks "owed the debtors fiduciary duties of good faith, fidelity and undivided

loyalty."[154]

This claim, then, asserts that the Agent Banks and Investment Banks *themselves*

owed fiduciary duties to the Debtors—as contrasted to Claim 37, previously discussed,

which charges them with aiding and abetting officers and directors of the Debtors, who

without question would owe such fiduciary duties.

The Creditors' Committee complaint includes some, but not many, allegations

with respect to bases upon which the alleged fiduciary duties are said to exist, among the

530 preceding paragraphs that are incorporated by reference at the outset of Claim 36.

As relied on by the Creditors' Committee in its brief, they include allegations that the

Debtors "placed their trust and confidence" in the Agent Banks and Investment Banks "to

use their superior expertise in complex financial transactions to devise, structure, and

execute the type of bundled financial transactions involved here in a manner that would

---

[153]    Cred. Comm. Cmplt. ¶ 851.

[154]    *Id.* ¶ 852.

benefit the Debtors;"[155] and that "[b]y accepting the obligation to provide expert advice

to the Debtors on how to structure and conduct these transactions, the [Agent Banks and

Investment Banks] entered into a fiduciary relationship that required them to provide that

advice and to perform their duties properly."[156]

All of the Agent Banks and Investment Banks have moved to dismiss Claim 36,

asserting that on the allegations of the Creditors' Committee complaint (and in one case

on documents that must be considered in connection with it), they owed no such fiduciary

duties.  With respect to the Agent Banks, the Court agrees.  However, the Court cannot

dismiss claims against most of the Investment Banks on a motion under Rule 12(b)(6).

Breach of fiduciary duty is a tort, and in the absence of contractual agreement

establishing the existence or nonexistence of the underlying fiduciary duty, the Court

believes conflicts of law principles applicable to torts should apply.[157]  In such a

situation, interests analysis doctrine makes the application of Pennsylvania law

appropriate, except in instances where the parties agreed to apply the law of another

state.[158]

### 1.  *Bank Agents Generally*

Under Pennsylvania law, a fiduciary relationship arises when one party places

confidence in another, resulting in the latter party exercising superiority and influence

---

[155]    Cred. Comm. Br. at 182.

[156]    *Id.* at 182-83.

[157]    *See* Section II(B)(1), *supra*.

[158]    As discussed below, Adelphia's loan documents on the CCH facility, as to which Bank of
America was the agent, expressly addressed whether fiduciary duties would exist, and the loan
documents had contractual choice of law provisions calling for application of the law of New
York.  But the Court does not regard that arguable inconsistency as significant, as it believes that
either state, when considering whether a fiduciary duty exists in the first place, would place great
(if not controlling) weight on what the parties actually agreed to.  Except in instances where the
parties agreed to have the existence or nonexistence of a fiduciary relationship determined under
New York law, the Court sees no basis for a determination that New York law would govern.

over the former.[159]  Under Pennsylvania law, a lender is not ordinarily the fiduciary of a

borrower.[160]  But a lender may owe a fiduciary duty to a borrower if the lender gains

substantial control over the borrower's business affairs.[161]  Control over the borrower is

demonstrated when there is evidence that the lender was involved in the actual day-to-

day management and operations of the borrower, or had the ability to compel the

borrower to engage in unusual transactions.[162]

     While recognizing the general rule that a lender-borrower relationship is not, as a

general matter, a fiduciary relationship, the Creditors' Committee argues that its claims

satisfy the exception.  But the pleaded facts do not satisfactorily establish exceptions

here.

     The allegations of the complaint do not assert control by the Agent Banks, or any

of the Debtors' lenders, of the type discussed in the Pennsylvania cases—as that

expression is commonly understood or as might be found as a consequence of

involvement in "actual day-to-day management and operations" of Adelphia.  Rather,

they allege a material assistance by the Bank Agents (and their Investment Bank

affiliates) to the Rigases in connection with the *Rigases*' control over Adelphia, as

motivated by the alleged substantial rewards to the Agent Banks (and, in particular, their

Investment Bank affiliates) that would be the consequence of giving the Rigases what

they wanted.  As noted above, the Court regards the latter conduct as potentially

---

[159]   *See Bohm v. Commerce Union Bank of Tennessee*, 794 F.Supp. 158, 164 (W.D. Pa. 1992); *Temp-Way Corp. v. Cont'l Bank,* 139 B.R. 299, 317-18 (E.D. Pa. 1992); *Yohe v. Yohe*, 353 A.2d 417, 421 (Pa. 1976).

[160]   *See Bohm,* 794 F.Supp. at 164; *Temp-Way,* 139 B.R. at 318.

[161]   *Id.*

[162]   *Id.*

actionable, if the allegations can be proven, by means of claims like Claim 37.[163]  But

allegations of the requisite control over the Debtors that would be required to establish a

fiduciary duty under Pennsylvania law are lacking.  It is the distinction between helping

the Rigases in their exercise of their control, by means of wrongful conduct, and actually

exercising the control to direct Debtor affairs.

The Creditors' Committee also points to an aspect of a manifestation of control—

unusual transactions.  And the Court does not doubt that, especially as a matter of

pleading, the co-borrowing facilities here would satisfy this requirement.  But the

Creditors' Committee fails sufficiently to address the other aspect required to invoke this

element—"the ability to *compel* the borrower to engage" in the unusual transaction in

question.  The Creditors' Committee complaint alleges many instances where the Agent

Banks facilitated the Rigases' efforts, but it does not allege that the Bank Agents *made*

the Rigases do what they did.

### 2. *FrontierVision/Parnassos/Century-TCI Facilities*

Additional deficiencies exist with respect to the FrontierVision, Parnassos and

Century-TCI facilities, none of which was a co-borrowing facility.  As previously noted,

the aiding and abetting allegations with respect to the Bank Agents on the non-co-

borrowing facilities are so thin as to be nonexistent.  They are equally so with respect to

the fiduciary duty claims.  The necessary allegations of control are particularly lacking

here.

---

[163]        *See* Section II(B), *supra*.

*3. CCH Facility*

Another deficiency exists with respect to one of the Agent Banks, Bank of

America. The loan agreement for the CCH facility provides, in relevant part:

> The Agents and the Lenders have no fiduciary
> relationship with or fiduciary duty to any Loan
> Party or Subsidiary thereof arising out of or in
> connection with the Loan Documents, and the
> relationship between Agents and the Lenders on the
> one hand, and Loan Parties and their Subsidiaries,
> on the other hand, in connection with the Loan
> Documents is solely that of a debtor and creditor.[164]

This language could hardly be clearer. The "Loan Documents" establish, and define, the

relation between the agents on the CCH facility and the Debtors, and underlie the loan

transactions underlying the CCH facility lenders' alleged wrongful conduct. Even if the

general allegations vis-à-vis the Bank Agents might otherwise be sufficient to establish a

basis for finding a fiduciary relationship, this express agreement that there was no

fiduciary relationship would have to trump it.

The Creditors' Committee argues, in this connection, that the parties' specific

agreement as to the nonexistence of a fiduciary relationship "has no effect on the

Committee's breach of fiduciary duty claims"[165] because the alleged fiduciary duties

"arose prior to and independent of the Loan Documents to which the disclaimer is

limited."[166] This contention is unpersuasive. First, and importantly, the co-borrowing

facilities were put in place by means of the Loan Documents. The Creditors' Committee

cannot turn black into white by conclusorily alleging that they were "independent."

---

[164]    CCH Credit Agreement, Joint Appendix 69, ¶ 11.5. If like language appeared in the loan
documents for any other facility, the affected Bank Agent did not note it, or the Court missed it.

[165]    *See* Cred. Comm. Br. at 187 n.137.

[166]    *Id.*

Second, even if a fiduciary relationship had otherwise existed before the execution of the

Loan Documents, the Loan Documents represented the parties' latest thinking on the

existence or nonexistence of a fiduciary relationship—changing the nature of their

relationship if and to the extent necessary, just as the words of a contract with an

integration clause trump any earlier understandings or agreements.  By the time the CCH

facility lenders funded their loan, the nature of their relationship with the Debtors was

expressly defined, and they had negated the existence of the fiduciary relationship that

now is argued to exist.

### 4. Investment Banks

The Investment Banks, which have likewise moved to dismiss, make arguments

somewhat similar to those by the Agent Banks.  But they do so without the benefit of the

substantial body of caselaw speaking to the nonexistence of fiduciary relations as

between lenders and borrowers.  The Investment Banks properly note that their status as

underwriters for Adelphia securities offerings does not give rise to a fiduciary

relationship.  But they must address the Creditors' Committee's allegations that their

relationship with the Debtors was not, as a factual matter, limited to underwriting sales of

securities, and that Investment Banks served as advisors to the Debtors as well.

The Creditors' Committee argues that the Investment Banks "structured, they

strategized, they helped on all capital raising issues.[167]  And as noted above, the

Creditors' Committee charges that Investment Banks accepted an obligation "to provide

expert advice" to the Debtors "on how to structure and conduct" the relevant financial

transactions.  Viewed in the context of the differences in roles as between commercial

---

[167]      *See* Arg. Tr. Day #2 at 258.

banks and investment banks, the Complaint makes allegations of a character, which, if proven, might as a general matter support the existence of a fiduciary duty based on the assumption of such an advisory role—though in this Court's view, the advice would have to relate to what was in *Adelphia's* interests, as contrasted to simply how to raise money from the public, in securities offerings or otherwise.  With the complaint having made the advice allegations noted above, the Court does not believe that, as a general matter, the claims asserting the existence of a fiduciary duty on the part of the Investment Banks here can be dismissed on motion.

This case is similar in some significant respects to a decision in this district by Judge Pauley, who was likewise asked to decide a 12(b)(6) motion, in a plenary action arising out of the *SmarTalk* bankruptcy case in Delaware.[168]  *SmarTalk*, like this case, was a civil action brought by a creditors' committee against an investment bank and others charging, *inter alia*, the existence of a fiduciary duty on the part of an investment bank, DLJ Securities, to the debtor *SmarTalk*.[169]  And there, as here, the claim was based on advice the defendant investment bank provided to the debtor.  Judge Pauley declined to dismiss the claims on motion, based on the assertion that there could be no fiduciary duty as a matter of law.  He held:

> The DLJ Defendants' argument that the Committee is attempting "to establish a *per se* rule that would create a fiduciary relationship between every investment banker and its clients" misses the point. … The issue is not whether the Committee has established the existence of a fiduciary duty as a matter of law, but whether it has pled sufficient

---

[168]   *See Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.*, 2002 WL 362794 (S.D.N.Y. 2002) ("*SmarTalk*").

[169]   The advice concerned the acquisition of another company, Worldwide Direct, Inc., in a merger transaction.

facts that may support a finding that such a duty
existed between the parties, often a fact-specific
inquiry reserved for a jury.[170]

Here too, for most of the investment banks, the existence, or a nonexistence, of

fiduciary duties running from Investment Banks to the Debtors will turn on a fact-specific

inquiry.

In its preceding discussion, the Court said "as a general matter" and "for most of

the investment banks" because it appears that Adelphia and at least two investment banks

expressly agreed, by contract, that no fiduciary duties would exist.[171]   For reasons set

forth above, addressing analogous claims with respect to Bank of America (one of the

Agent Bank Defendants), fiduciary duty claims asserted against those Defendants (and

any other banks with similar express agreements) must be dismissed.[172]

---

[170]    2002 WL 362794, at *9.  Judge Pauley noted that in similar contexts, courts had rejected efforts to
dismiss breach of fiduciary claims as a matter of law, holding that a fiduciary relationship may
exist between an investment bank and its client.  *Id.* (citing *Frydman & Co. v. Credit Suisse First
Boston Corp.,* 272 A.D.2d 236, 236-37 (1st Dep't 2000) (reversing dismissal of breach of
fiduciary duty claim by potential acquirer against investment bank advisory firm), *Wiener v.
Lazard Freres & Co.,* 241 A.D.2d 114, 122 (reversing dismissal of breach of fiduciary duty claim
by members of real estate partnership against investment bank advisory firm, notwithstanding
presence of a commitment letter detailing the nature of the parties' contractual relationship) and
*BNY Capital Markets, Inc. v. Moltech Corp.,* No. 99 Civ. 11754 (GEL), 2001 WL 262675, at *7
(S.D.N.Y. March 14, 2001) (noting that "several New York authorities have held that under
various factual circumstances, a fiduciary relationship can arise within an investment banking
context")).

The Court notes that *SmarTalk* was decided under New York law, and that here the Court has
concluded that Pennsylvania law would apply.  But the Investment Banks have brought no case to
the Court's attention suggesting that the Pennsylvania courts would consider the existence of a
fiduciary relationship to be foreclosed as a matter of law, or that they would regard the issue as
calling for any less of a factual inquiry.

[171]    *See* Engagement Letter, dated December 21, 2000, among Adelphia Communications Corporation,
Banc of America Securities LLC and Salomon Smith Barney Inc. ¶9 ("This Engagement Letter
contains the entire agreement between the parties relating to the subject matter hereof and
supersedes all oral statements and prior writings with respect thereto… This Engagement Letter is
not intended to create a fiduciary relationship among the parties hereto.").

[172]    The Court cannot rule out the possibility that there may be other investment banks with similar
language of which the Court is unaware.  To the extent there is language in other contracts
likewise disclaiming the existence of a fiduciary relationship, the Court's ruling with respect to
any other Defendants similarly situated is the same.

For the foregoing reasons, the motions to dismiss Claim 36 are granted for those investment banks whose agreements provided that no fiduciary duties would exist. The motions of the remainder of the investment banks are denied.

E.    *Gross Negligence Claims*
      *(Claim 39 (Agent Banks)*
      *Claim 40 (Investment Banks))*

In Claim 39, the Creditors' Committee asserts claims for gross negligence against the Agent Banks, and in Claim 40, the Creditors' Committee asserts like claims against the Investment Banks. Each starts with the assumption that the relevant defendant group had a fiduciary duty to the Debtors, and/or a "special relationship and/or superior knowledge with respect to the Debtors"[173]—which the Court can only regard as euphemisms for the same thing. Claim 39 then goes on to allege breaches of that duty by the Agent Banks, "by…approving participating in each of the Co-Borrowing Facilities and authorizing funding thereunder,"[174] with knowledge of wrongful conduct on the part of the Rigases, while failing to disclose to Adelphia's independent directors Agent Bank knowledge of that conduct.[175] It continues with additional scienter allegations to the effect that the Agent Bank acts were committed "with actual malice and/or a wanton and willful disregard of the Debtors' rights," and harmed public investors and the public generally.[176]

Claim 40 goes on to allege breaches of the previously pleaded duty by Investment Banks in a similar fashion, though instead of making reference to participating in and

---

[173]    Cred. Comm. Cmplt. ¶¶ 877, 886.

[174]    *Id.* ¶ 878.

[175]    *Id.* ¶ 880.

[176]    *Id.* ¶¶ 882-83.

funding the Co-Borrowing Facilities, it speaks of the Investment Bank's role in

underwriting securities offerings.[177]

The Agent Banks' motions to dismiss Claim 39 must be granted. Aside from any

other deficiencies that Claim 39 might have as a matter of law,[178] the Court has ruled, as

discussed immediately above, that the duty predicate for Claim 39 is lacking. Though in

the strictest sense, one might argue that the fiduciary duty alleged to exist in Claim 36 is

not quite the same as the duty alleged to exist and underlie the gross negligence claims

alleged in Claim 39, any differences are, in this Court's view, immaterial. And the

Creditors' Committee has failed to allege or argue any basis in negligence law for the

duties that must underlie any negligence claim other than the arguments that the Court

already has considered.

The Investment Banks have similarly moved to dismiss Claim 40, but just as the

Court denied their motions to dismiss Claim 36, the Court believes that it cannot dismiss

Claim 40 on motion, except for those whose agreements negated the existence of a

fiduciary duty. With the Investment Banks allegedly having undertaken to provide the

Debtors with advice, duties to the Debtors may exist, and gauging the propriety of their

conduct will involve factual issues.

F.    *Equitable Subordination and Disallowance Claims
      (Claim 33)*

In Claim 33, the Creditors' Committee seeks to equitably subordinate, and also to

equitably disallow, all of the Defendants' claims. Some Defendants move to dismiss the

---

[177]    *Id.* ¶ 887.

[178]    *E.g.,* claims for harm to public investors or the public generally would plainly belong to any actual
investors or others personally injured, and not to the Debtors or the Debtors' official committees,
suing on the Debtors' behalf.

61

equitable subordination claims, and all move to dismiss the equitable disallowance

claims.  With limited exceptions, discussed below, the motions of both types are denied.

### 1. Equitable Subordination

The doctrine of equitable subordination permits a bankruptcy court to consider

whether "notwithstanding the apparent legal validity of a particular claim, the conduct of

the claimant in relation to other creditors is or was such that it would be unjust or unfair

to permit the claimant to share pro rata with the other claimants of equal status."[179]

Equitable subordination is expressly authorized under the Code.  Section 510(c) of the

Code provides that notwithstanding subsections (a) and (b) of section 510:[180]

> (c) [A]fter notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

"Principles of equitable subordination" are not defined or fleshed out in the

Bankruptcy Code.  They have their origins in caselaw, most significantly the seminal

Supreme Court decision in *Pepper v. Litton*,[181] which the House Report on the proposed

Code expressly cited.[182]  When Congress enacted the modern Code, it was "intended that

---

[179]   *In re 80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.),* 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (Bernstein, C.J.) ("*80 Nassau Assocs.*"); *Lois/USA,* 264 B.R. 69, 132 (Bankr. S.D.N.Y. 2001) (quoting *80 Nassau Assocs.*).

[180]   These other subsections relate to contractual subordination and claims for rescission or damages relating to purchases or sales of securities, respectively, and are not applicable here

[181]   308 U.S. 295 (1939).

[182]   *See* 4 *Collier* ¶ 510.05 n.2.

the term 'principles of equitable subordination' follow existing case law and leave to the

courts development of this principle."[183]

Caselaw has continued to develop the "principles of equitable subordination," and

the cases provide standards for courts to apply when considering requests for equitable

subordination.  Courts in this district, and elsewhere, regularly apply the standards set

forth in the Fifth Circuit's decision in *Mobile Steel*,[184] even though *Mobile Steel*, like

*Pepper*, was a case under the former Act.  *Mobile Steel* sets forth a three-part standard for

determining whether equitable subordination is appropriate—whether:  (a) the claimant

engaged in some type of inequitable conduct; (b) the misconduct caused injury to the

creditors or conferred an unfair advantage on the claimant; and (c) equitable

subordination of the claim is consistent with bankruptcy law.[185]

As this Court noted in *Lois/USA*, "[w]ithout question, cases of this character are

fact intensive."[186]  Nevertheless, substantial caselaw has developed in this area, both in

this district and elsewhere, laying out standards for when imposition of equitable

subordination is appropriate.[187]

As relevant here, that caselaw establishes that:

> Inequitable conduct is that conduct which may be
> lawful, yet shocks one's good conscience.  It means,
> *inter alia*, a secret or open fraud, lack of faith or
> guardianship by a fiduciary; an unjust enrichment,
> not enrichment by bon chance, astuteness or
> business acumen, but enrichment through another's

---

[183]   124 Cong. Rec. H11,095 (Sept. 28, 1978); S17,412 (Oct. 6, 1978).

[184]   *In re Mobile Steel Co*., 563 F.2d 692, 700-701 (5th Cir. 1977).

[185]   *See id.* at 700.  *See also Lois/USA*, 264 B.R. at 132-133; *80 Nassau Assocs.,* 169 B.R. at 837; *In re Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997).

[186]   264 B.R. at 134.

[187]   *Id.*

> loss brought about by one's own unconscionable,
> unjust, unfair, close or double dealing or foul
> conduct.[188]

As Chief Judge Bernstein of this Court noted in *80 Nassau Associates*,

> The inequity which will entitle a bankruptcy court
> to regulate the distribution to a creditor, by
> subordination or other equitable means, need not
> therefore be specifically related to the creditor's
> claim, either in its origin or its acquisition, but it
> may equally arise out of any unfair act on the part
> of the creditor, which affects the bankruptcy results
> to other creditors and so makes it inequitable that he
> should assert a parity with them in the distribution
> of the estate....[189]

Here the Creditors' Committee alleges and argues, among other things, that the

Defendants "knowingly or recklessly" assisted the Rigases in siphoning value out of the

Debtors through the Co-Borrowing Facilities, and "cemented their senior creditor status

when they knew that other creditors were providing capital on a junior basis without

having the same information about the Rigas Family's conduct."[190]  The Creditors'

Committee argues, accordingly, that the Defendants "thereby improved their rights of

recovery to the detriment of other creditors."[191]

Particularly in the aggregate, the Creditors' Committee's allegations[192] paint a

picture that, if proven, could establish the requisite inequitable conduct, and meet the

higher standards for doing so where the creditor whose claim is to be subordinated is not

an insider.  The Court is well aware that Defendants have many defenses to these claims,

---

[188]   *80 Nassau Assocs.*, 169 B.R. at 837 (quoting *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985)) (other citations omitted).

[189]   *Id.* at 838 (quoting *In re Kansas City Journal-Post Co.,* 144 F.2d 791, 803-04 (8th Cir. 1944)); *accord Mobile Steel,* 563 F.2d at 700.

[190]   Cred. Comm. Br. at 230-231.

[191]   *Id.* at 231.

[192]   *See*, in particular, Cred. Comm. Cmplt. ¶¶ 482-526, 532-609.

but the Court must note again its observation in *Lois/USA* that "cases of this character are fact intensive."[193]  The defenses are factual ones and/or efforts to apply facts to the caselaw in this area.  The Court is not in a position to conclude, as a matter of law, that under no circumstances could the Creditors' Committee establish the required inequitable conduct.  The nature of the underlying conduct (and, at least arguably, any resulting injury) will have to be fleshed out as a factual matter—a task that is, of course, inappropriate when considering motions under Rule 12(b)(6).

The second requirement—harm to unsecured creditors—likewise raises factual issues.  Plainly many unsecured creditors in the Adelphia cases suffered an injury; the issue will be whether they were *the right* creditors.  With the benefit of hindsight, the Court believes it to be the case that many, and perhaps all, of the trade (and other non-affiliate) creditors of the Debtors to whom bank lenders made loans received distributions in the *Adelphia* chapter 11 cases sufficient to pay those creditors in full, and that the creditors who were less fortunate in the *Adelphia* chapter 11 cases were creditors of structurally junior debtor entities, such as intermediate holding companies or Adelphia Parent.  But the Court is not in a position to act on a 12(b)(6) motion in connection with its assumptions.  And in particular, the Court is not in a position, especially on a 12(b)(6) motion, to determine how it should factor in interdebtor obligations, which might otherwise have represented claims against operating company Debtors—and that might cause value to flow, upwards or sideways, to other Debtors, with their own creditors.

The *compromise* of the interdebtor obligations adds a further complexity to any analysis, once more making determination on a Rule 12(b)(6) motion inappropriate.  And

---

[193]    264 B.R. at 134.

the extent, if any, to which equitable subordination appropriately should be applied to a

situation where the injured creditors are at different levels in the corporate hierarchy (and

where, arguably, equitable subordination, if it is to be meaningful, must cross Debtor

boundaries) presents a difficult issue that, in this Court's view, can appropriately be

considered only in a factual context.[194]

Thus, subject to limited exceptions as discussed in the following paragraph, the

motions to dismiss Claim 39, to the extent it seeks equitable subordination, are denied.[195]

Once more, however, the Court notes the deficiencies in pleading wrongful

conduct with respect to the FrontierVision and Parnassos facilities.  These were not co-

borrowing facilities, and just as the Court has seen insufficient allegations of wrongdoing

in connection with those facilities with respect to the aiding and abetting claims, it sees

insufficient allegations of inequitable conduct in connection with those facilities to

---

[194]    In *Pepper*, the Supreme Court ruled that "the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate," and that a bankruptcy court's equitable power to subordinate may be "invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." 308 U.S. 295, 305, 308 (1939).  Some might regard distinctions between Debtors as a "technical consideration[]" that should not prevent "substantial justice from being done," and others might regard such distinctions as much more than merely technical.  That kind of determination, in this Court's view, should be made in factual context.

For the same reason, the Court does not now address the Creditors' Committee's contention that section 510(c) of the Code does not mandate that the creditors benefiting from subordination be creditors of the same legal entity as the creditors to be subordinated.  *See* Cred. Comm. Br. 235 n.182.  Whether or not that is true may depend not just on an abstract principle of law, but also on particular circumstances, *e.g.*, the extent to which any inequitable conduct prejudiced particular creditors.

[195]    The Court knowingly declines to dismiss Claim 39 not just as to Bank Agents, but also the members of their syndicates, and, within those syndicates, as to both original members and assignees of claims.  *See In re Enron Corp.*, 2005 WL 3832053, at *14 (Bankr. S.D.N.Y. Nov. 28, 2005) (Gonzalez, J.) ("[T]he priority of a claim resulting from equitable subordination should not be impacted by a transfer.  Once it is established that a claim in the hands of the transferor would be subject to subordination, such claim in the hands of a transferee should fare no differently.  Rather, it should be subordinated to the same extent that such claim would be subject to equitable subordination in the hands of the transferor.).

support equitable subordination.[196]  Claim 39 is dismissed to the extent it is based on

wrongful conduct in connection with the FrontierVision and Parnassos facilities.

    *2.  Equitable Disallowance.*

    In addition to seeking equitable subordination, the Creditors' Committee

complaint also seeks equitable disallowance.  All of the Defendants move to dismiss this

aspect of the Creditors' Committee's claims, for failure to state a claim upon which relief

can be granted.

    While section 510(c) of the Code, discussed above, expressly authorizes equitable

subordination, it does not likewise expressly authorize equitable disallowance.  Thus the

Court must decide whether section 510(c) *forecloses* equitable disallowance—and if

section 510(c) does not, the extent to which equitable disallowance was authorized under

the pre-Code caselaw, and survived after the enactment of the Code.

    With respect to the first issue, the Court starts with textual analysis and then turns

to legislative history because the textual analysis is inconclusive.  As the first step in the

textual analysis, the Court notes that section 510(c) is silent on the matter, and neither

authorizes, nor prohibits, equitable disallowance.  The same is true with respect to section

502 of the Code, which relates to the allowance of claims generally.[197]  Congress

presumably could have authorized equitable disallowance under section 510(c), where it

dealt with equitable subordination (another consequence of inequitable conduct), or under

---

[196]    After factual analysis, it may be the case that like considerations will apply to the Century-TCI facility.  In connection with that facility, however, there are allegations of some (albeit lesser) wrongful conduct.  The Court believes that the decision as to whether the same considerations apply is inappropriate for 12(b)(6) consideration, and would be better made upon a fuller factual record, on summary judgment or thereafter.

[197]    Section 506 of the Code, captioned "Determination of secured status" (whose subsection (b) places limits on the allowance of items of recovery on secured claims that would be recoverable in a non-bankruptcy situation), and which is applicable to the bank lenders' claims here, is likewise silent on the issue.

section 502, where it dealt with circumstances under which otherwise allowable claims

are disallowed.  But it did neither.  And if this Court were writing on a clean slate,

arguments based on the maxim "*expressio unius*" would have some force, especially in

the context of section 502, where other exceptions to allowability were expressly set

forth.

But the Court is not writing on a clean slate, in two important respects.  The first

is the relevant legislative history.  The legislative history accompanying section 510

stated, with respect to what is now section 510(c)[198]:

> This section is intended to codify case law, such as
> *Pepper v. Litton*, 308 U.S. 295 (1939), and *Taylor v.*
> *Standard Gas and Electric Co.*, 306 U.S. 307
> (1938), *and is not intended to limit the court's*
> *power in any way. … Nor does this subsection*
> *preclude a bankruptcy court from completely*
> *disallowing a claim in appropriate*
> *circumstances.*[199]

The second is the caselaw, emerging from courts as high as the United States

Supreme Court, that on matters where the Code is silent, courts continue to look to pre-

Code law.

> The normal rule of statutory construction is that if
> Congress intends for legislation to change the
> interpretation of a judicially created concept, it
> makes that intent specific. …The Court has
> followed this rule with particular care in construing
> the scope of bankruptcy codifications.[200]

---

[198]   At the time, what is now subsection (c) was evidently subsection (b).

[199]   H.R. Rep. No. 595, 95th Congr., 1st Session 359 (1977) (emphasis added) (*reprinted in*
Appendix C to *Collier on Bankruptcy* (15th ed. rev.), App. Pt. 4-1495).

[200]   *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) (citation omitted). *See*
*also Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("this Court has been reluctant to accept
arguments that would interpret the Code, however vague the particular language under
consideration might be, to effect a major change in pre-Code practice that is not the subject of at
least some discussion in the legislative history").

Thus the Court is not in a position to conclude that by expressly addressing equitable *subordination* in section 510(c), Congress intended to foreclose the possibility of invocation of equitable *disallowance*, under *Pepper* and its progeny.

The Court then turns to consider the extent to which *Pepper*, or other applicable common law, supports equitable disallowance, as contrasted to equitable subordination. Having considered this issue for the first time in a situation where it matters,[201] the Court believes that if the Creditors' Committee's allegations were proven, *Pepper* might support equitable disallowance.

While the bankruptcy community has tended to refer to *Pepper* as an equitable subordination case, *Pepper* was an equitable disallowance case as well. The question there before the Supreme Court, as that court described it, was "the power of the bankruptcy court to *disallow*," either as a secured or as a general or unsecured claim, a judgment obtained by the dominant and controlling stockholder of the bankrupt corporation on alleged salary claims,[202] after a judgment by the district court *disallowing* the claim had been reversed by the Fourth Circuit Court of Appeals.[203] The Supreme Court had granted *certiorari* because of an apparent restriction imposed by the Fourth

---

[201]    In previous decisions, *see Lois/USA,* 264 B.R. 69, 132 n.158 (Bankr. S.D.N.Y. 2001) and *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)* 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002) (Gerber, J.) ("*Adler Coleman*"), this Court said, in more general terms than it should have, that the equitable subordination doctrine "is limited to reordering priorities and does not permit disallowance of claims." In each case, the quoted language was not then intended by this Court, as the Creditors' Committee argues here, to simply be a reference to what section 510(c) says. Rather, the quoted language was taken from the cited authority, *80 Nassau Associates,* 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994). But those statements were unnecessary to this Court's ruling in each case, and the extent to which *Pepper* might support equitable disallowance, as contrasted to subordination, was not litigated in those cases. The issue of equitable disallowance was not litigated in *Lois/USA, Mishkin* or *80 Nassau Assocs.*

[202]    308 U.S. at 296 (emphasis added).

[203]    *Id. See also id.* at 301 *("*the question of the *allowance* of the Litton judgment came before the bankruptcy court"); *id.* at 301-02 ("the District Court *disallowed* the Litton claim") (emphasis added in each instance).

69

Circuit's decision "on the power of the bankruptcy court to *disallow or* to subordinate such claims in exercise of its broad equitable powers."[204]  In the course of its decision the *Pepper* court held that:

> Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on *allowance* of their claims in bankruptcy, in the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.[205]

In *Pepper*, an order disallowing—not just subordinating—a claim was affirmed. And as the quoted language from *Pepper* makes clear, subordination and disallowance, which were linked by an "or" no less than five times, were perceived by that court as separate remedies, each of which was available.  That does not mean to this Court that they are equally appropriate alternatives, but it tells this Court that disallowance would be permissible in those extreme instances—perhaps very rare—where it is necessary as a remedy.  Plainly disallowance is more draconian, and would be appropriate in just a few situations.  And a court exercising its equitable powers might well want to consider, even where inequitable conduct has been shown, what would be the most measured means to correct any inequities that have been found.

---

[204]   *Id.* at 296 (emphasis added).  *See also id.* at 302 (*res judicata* did not prevent the district court from examining into the Litton judgment "and *disallowing or* subordinating it as a claim"); *id.* at 303 ("we are of the opinion that the District Court properly *disallowed or* subordinated it"); *id.* at 311 ("the action of the District Court in *disallowing or* subordinating Litton's claim was clearly correct"); *id.* at 305 ("For certainly if, as provided in [Section 57(k) of the former Bankruptcy Act], a claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case', *disallowance or* subordination in light of equitable considerations may originally be made."); *id.* at 312 ("This alone would be a sufficient basis for the exercise by the District Court of its equitable powers in *disallowing* the Litton claim") (emphasis added in each instance).

[205]   *Id.* at 307-308 (emphasis added).

But in this Court's view, equitable disallowance is permissible under *Pepper,* just as equitable subordination is. The issue then devolves into the determination of not whether equitable disallowance is *ever* permissible, but rather whether such a penalty is appropriate under the circumstances of the case. That determination raises factual issues, inappropriate for decision under Rule 12(b)(6).

Thus, at least for the time being, claims for equitable disallowance must now survive, to the same extent claims for equitable subordination survive.

G.    *Recharacterization of Debt as Equity Claims*
      *(Claim 34 (Co-Borrowing Lenders*
      *Claim 35 (Century-TCI Lenders))*

In Claims 34 and 35, the Creditors' Committee seeks to recharacterize debt owed to various Defendants as equity. The targeted Defendants move to dismiss those claims, arguing that the complaint fails to establish claims for recharacterization. The Court agrees.

Recharacterization cases turn on whether a debt actually exists—not on whether the claim should be equitably subordinated[206] or disallowed. The Creditors' Committee's claims rest on the contention that no debt actually exists, or should be deemed to exist, because the Rigases (allegedly with the targeted Defendants' knowledge, approval and assistance) used substantial portions of the loan proceeds to fund purchases of Adelphia equity and to repay margin loans for prior equity purchases—arguing that the fundamental inquiry in a debt recharacterization claim is whether the capital at issue "in economic substance was an equity contribution rather than a true debt obligation."[207]

---

[206]    *See In re SubMicron Sys. Corp.,* 432 F.3d 448, 454 (3d Cir. 2006); *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 748-49 (6th Cir. 2001).

[207]    Cred. Comm. Br. at 240.

71

That is a decent shorthand for capsulizing a materially more extensive inquiry, but without more it fails to address all of the applicable legal principles.

It is true that bankruptcy courts, as an element of their equity powers, have the ability to ensure that "substance will not give way to form," and that "technical considerations will not prevent substantial justice from being done."[208] And plainly the Creditors' Committee is correct, as far as it goes, in proceeding on the assumption that bankruptcy courts have the power to recharacterize ostensible debt as equity,[209] and in arguing that the substance of a transaction can trump its form on a recharacterization determination.[210] But that is not the entirety of the analysis.

Courts have looked to factors (in part based on tax law precedent) to be used in determining whether an investment that purports to be debt should be recharacterized as equity.[211] Factors a court considers in determining whether it should recharacterize a claim include: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending

---

[208]   *Pepper*, 308 U.S. at 304-05.

[209]   The Court rejects the contention (*See* Bank of America Reply Br. 50) that bankruptcy courts lack the authority to recharacterize debt as equity.  *See In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006) ("*Dornier Aviation*") (flatly disagreeing with that exact contention).

[210]   *See In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991) ("The ability to recharacterize a purported loan emanates from the bankruptcy court's power to ignore the form of a transaction and give effect to its substance.").

[211]   *See* Ayer & Bernstein, *Bankruptcy in Practice* 308 (4th ed. 2007).

institutions; (9) the extent to which the advances were subordinated to the claims of

outside creditors; (10) the extent to which the advances were used to acquire capital

assets; and (11) the presence or absence of a sinking fund to provide repayments.[212]

Other cases include other factors, or state the factors somewhat differently, but

they do not differ in material respects.[213]

As the Fourth Circuit noted in *Dornier Aviation*, recharacterization and equitable

subordination analyses differ from each other in that recharacterization analyses focus on

the substance of the *transaction*, whereas equitable subordination analyses focus on the

*creditor's behavior*.[214]  The Creditors' Committee complaint puts forward a damning

portrayal of the bank lenders' *behavior*, but is conspicuously lacking in allegations

addressing the relevant recharacterization factors—particularly allegations suggesting

that the bank lenders advanced their funds without an expectation of getting paid back.

This is not a case like the paradigmatic situation for recharacterization where the same

individuals or entities (or affiliates of such) control both the transferor and the transferee,

and inferences can be drawn that funds were put into an enterprise with little or no

expectation that they would be paid back along with other creditor claims.  Rather, the

Court is here faced with transactions between the Debtors and third-party, independent

lenders, where the contention is that transactions that were plainly documented and

denominated as loans must be characterized as something else.  If that is to be done, the

Complaint must provide a basis for reaching that conclusion.

---

[212]    *Dornier Aviation*, 453 F.3d at 233 (citing *AutoStyle Plastics*) (bankruptcy context); *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749-50 (6th Cir. 2001) (bankruptcy context); *Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 630 (6th Cir. 1986) (tax context).

[213]    *See Dornier Aviation*, 453 F.3d at 234 n.6.

[214]    *Id.* at 232.

If the Court were faced with allegations that addressed some, but less than all, of the relevant recharacterization factors, it might find there to be issues of fact precluding dismissal under Rule 12(b)(6).  But here the Creditors' Committee essentially puts all of its eggs in a single basket, based on its contention that the funds received when the debt was incurred were actually used as an equity contribution, and denominated as such by the Rigases.[215]  But that is in too many respects a play on words—melding an equity contribution by the Rigases and an argued equity contribution by the bank lenders—and fails to address, by either allegations or argument, the showings that need to be made under the caselaw for recharacterizing debt as equity.[216]

Claims 34 and 35 are, accordingly, dismissed.

H.      *Bank Holding Company Act Claims*
        *(Claim 32)*

Claim 32 of the Creditors' Committee complaint charges the Agent Banks and the Investment Banks with violation of the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1972.[217]  As explained in the Creditors' Committee's brief, the essence of the

---

[215]     *See* Cred. Comm. Br. at 241.

[216]     The Court notes that the Creditors' Committee asked for leave to replead in any instances where the Court regarded the Creditors' Committee's allegations to be insufficient.  In the Court's view, in order to state a claim upon which relief could be granted on Claims 34 and 35, any complaint would have to plead facts to trigger the applicability of the *AutoStyle* factors or their equivalent, or a meaningful subset of them.

          The Creditors' Committee's 256-page complaint set forth its claims in excruciating detail, and it is plain that if the Creditors' Committee had facts to support a claim, it knew how to allege them.  The *AutoStyle* factors are so familiar to the bankruptcy community that the Court does not believe that the failure to allege them resulted from error or oversight.  Thus the Court denies leave to replead.  If the Creditors' Committee wishes to assert that the *AutoStyle* factors were not addressed solely by reason of error or oversight, and that it can make the necessary allegations consistent with Rule 11, it can move for authorization to replead as to these claims.

[217]     As relevant here, section 1972 provides:

          (1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement--

74

claims is that the Agent Banks and Investment Banks violated the "anti-tying" provisions

of the BHCA by expressly conditioning the Agent Banks' extensions of credit on

Adelphia's use of the Agent Banks' Investment Bank affiliates in securities offerings.

Claims of this character are conceptually similar to those for "tie-ins" under the antitrust

laws;[218] in each case, an entity allegedly uses its muscle with respect to one product or

service (here, loans) to extract benefits from its delivery of a second product or service

(here, investment banking services).

The BHCA prohibits banking institutions from conditioning the extension of

credit on the purchase by a customer of some other services offered by the bank or one of

its affiliates.  To establish a violation of section 1972, a plaintiff must show that "(1) the

banking practice in question was unusual in the banking industry; (2) an anti-competitive

tying arrangement existed, and (3) the practice benefits the bank."[219]  The BHCA does

not prohibit routine banking measures by a bank to maximize the bank's ability to be

repaid.  The anti-tying provisions were not intended to interfere with or impede

appropriate traditional banking activities through which banks safeguard the value of

their investment.[220]  As the Creditors' Committee concedes, a violation of section 1972 is

---

...

    (B) that the customer shall obtain some additional
    credit, property, or service from a bank holding
    company of such bank, or from any other subsidiary
    of such bank holding company....

[218]   *See, e.g., S&N Equip. Co. v. Casa Grande Cotton Fin. Co.,* 97 F.3d 337, 343 (9th Cir. 1996) (The
Bank Holding Company Act "appl[ies] the general principles of the Sherman Antitrust Act
prohibiting anti-competitive tying arrangements specifically to the field of commercial
banking....")

[219]   *Id.* at 346 (internal quotations omitted).  *See also Cohen v. United Am. Bank of Cent. Florida,* 83
F.3d 1347, 1350 (11th Cir. 1996); *NCNB Texas Nat'l Bank v. Johnson,* 11 F.3d 1260, 1268 (5th
Cir. 1994); *Alpine Elec. Co. v. Union Bank,* 979 F.2d 133, 135 (8th Cir. 1992); *Sanders v. First
Nat'l Bank & Trust Co.,* 936 F.2d 273, 278 (6th Cir. 1991).

[220]   *Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 554 (S.D.N.Y. 1985).

not a defense to the duty to repay a loan.[221]  But other damages proximately caused by the

tie may be recovered.

The Defendants move to dismiss Claim 32 on a number of grounds.  Some assert

that the loans and other products or services that were allegedly tied are not sufficiently

described, and that the Debtors that used such services are not specifically identified.

The Court cannot agree.  The pleading more than sufficiently meets the requirements of

Fed.R.Civ.P. 8(a) requiring a "short and plan statement of the claim showing that the

pleader is entitled to relief."  Although the Court's view of the nature of the BHCA claim

(and the evidence that would be used to support and oppose it) necessarily is shaped in

part by evidence as to this claim that was submitted by both sides on the related

*Housecraft* motion,[222] it is very clear to this Court what this claim is all about.  There will

undoubtedly be issues of fact as to whether the Agent Banks and Investment Banks were

conditioning their delivery of commercial banking services on investment banking

services opportunities, on the one hand, or the Rigases were using the link as an

enticement to the Agent Banks, on the other.  But such issues are, of course,

inappropriate for disposition on a 12(b)(6) motion.

Some Defendants argue that allegations are lacking in the required showing that

the practice be unusual,[223] or argue, as a factual matter, that "one-stop shopping" is "not

uncommon in the banking industry,"[224] or that upholding these claims would be

---

[221]    *See*, *e.g.*, *Exch. Nat'l Bank of Chicago v. Daniels,* 768 F.2d 140, 144 (7th Cir. 1985) (even if tying
pressure is applied in connection with a loan application, "an obligation to pay back a loan
actually made is not an injury"); *Chase Manhattan Bank, N.A. v. Remington Products, Inc.,* 865
F.Supp. 194, 199-200 (S.D.N.Y. 1994) (quoting *Exch. Nat'l Bank*).

[222]    *See* the *Housecraft Decision*, *supra* note 1.

[223]    *See*, *e.g.*, Bank of Montreal Br. at 37, Bank of America Br. at 66.

[224]    *Id.*

inconsistent with the repeal by Congress of the Glass-Steagall Act.[225]    The suggestion

seems to be that if a tying practice prohibited under the plain words of the statute is

common enough, it becomes acceptable.  The Court cannot agree, especially on a motion

under 12(b)(6).  The requirement that the practice be "unusual" in the banking industry

distinguishes prohibited practices from "appropriate traditional banking practices" that

constitute legitimate means of maximizing a lender's chances of getting repaid.[226]  The

key questions are whether the challenged practice requires a service reasonably employed

to assure that the bank will be repaid,[227] or has a purpose different from that—and

whether the customer's use of supplemental services was merely *suggested*, or was

*required* to get the underlying financing.  Thus a bank's requirement that loan collateral

be insured would at least seemingly be entirely lawful; requiring the use of an affiliate's

investment banking services might not be.[228]  Similarly, the Court does not understand

the Creditors' Committee to be arguing that merely *providing* other services (such as

investment banking services), or even pointing out the advantages of affiliates providing

related services, would be unlawful; the violation would result from the *conditioning* of

the receipt of one on the receipt of the other.  Offering "one-stop shopping" as a matter of

convenience might be entirely innocuous, but *requiring* it would be a different matter.  At

least under the facts of this case, telling the difference between permitted requirements

---

[225]    *See* Bank of America Br. at 66-67.

[226]    *See Nordic Bank*, 619 F.Supp. at 556.

[227]    *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1338 (7th Cir. 1989).

[228]    *See Nordic Bank*, 619 F.Supp. at 556-57 ("A bank's attempt to protect its investment by requiring
that a borrower purchase or provide something usually provided in connection with a loan does
not violate the BHCA.  A bank may require a debtor in a precarious financial position to employ a
full-time business advisor designated by the bank, to release financial control to an individual
designated by the lender, or to maintain interest-free deposits with the lender….") (internal
citations omitted).

77

and prohibited ones (or, indeed, determining the extent to which anything was required in the first place) will require factual scrutiny.

Several Defendants also argue that the Creditors' Committee complaint is deficient for failure to plead that the banking practice in question was anti-competitive. Once more the Court disagrees. "[M]erely proving the existence of the condition or requirement is sufficient to state a claim.[229] Unlike the Sherman Act, the BHCA does not require that the plaintiff demonstrate either (1) specific adverse effects on competition; (2) any dominance or control by the defendant over the tying product or service; or (3) any effect on commerce.[230] The BHCA does not require a plaintiff to prove that the arrangement in question had an anticompetitive effect. Instead the BHCA establishes a *per se* rule.[231]

Another argument that is made—by Citibank, in particular—is that there are no specific allegations in the Creditors' Committee complaint linking the acts of that Defendant as *a facility decision maker* with a tie-in to business with that Defendant's affiliated Investment Bank. The premise is correct. The Creditors' Committee complaint does not provide that level of detail. But the relevant conduct is better analyzed with a factual record, given the variety of roles that Defendant Banks played in this case—as administrative agents, as agents with lesser responsibilities, as original syndicate members and lenders, and/or as later acquirors of bank debt. Thus, for example, Citibank may turn out to be right when it asserts that when it acted as administrative agent for the

---

[229]     *Dibidale of Louisiana, Inc. v. Am. Bank & Trust Co.*, 916 F.2d 300, 305 (5th Cir. 1990).

[230]     *See Costner v. Blount Nat'l Bank*, 578 F.2d 1192, 1196 (6th Cir. 1978) (distinguishing the BHCA from the Sherman Act because the BHCA does not require a proof of "any economic power in the market for the tying product").

[231]     *Nordic Bank*, 619 F.Supp. at 556 n.9.

Century-TCI facility, it did not then condition its willingness to serve as such (or to lend money under that facility) on business for its affiliate Salomon Smith Barney. But participation in facilities in which a defendant bank lender acted in different roles (as, for example in connection with the Arahova bridge loan, or the Olympus facility) might have been so conditioned, and determining whether there is liability when defendants were acting in different roles would require scrutiny of the relevant facts.

Chase's point that no valid BHCA claims could be asserted vis-à-vis the FrontierVision facility, as FrontierVision was not owned by Adelphia when that facility was structured, is well taken. As with respect to other claims, discussed above, BHCA claims against Chase must be dismissed insofar as they are based on its acts as agent for the FrontierVision facility. To the extent they are based on other Chase conduct, they are not susceptible to dismissal on a 12(b)(6) motion, and must await development of their particular facts.

I.      *Equitable Estoppel*
        *(Claim 48)*

In claim 48, the Creditors' Committee alleges that the co-borrowing lenders should be equitably estopped from enforcing co-borrowing security interests, and receiving principal and interest payments from the Debtors for funds used by the Rigases. The Creditors' Committee alleges that the Defendants, who were or should have been aware that the Rigases were defrauding the Debtors, knowingly misrepresented and/or concealed material facts about fraud from Adelphia's independent directors, with the intention that the Debtors act upon the lenders' concealment.

79

The Defendants argue that the Creditors' Committee's equitable estoppel claim must fail because Pennsylvania law, under which, they assert, this claim should be evaluated, does not recognize equitable estoppel as a separate cause of action.[232]

The Creditors' Committee does not dispute that it cannot make its equitable estoppel claim under Pennsylvania law. That is the end of the discussion, because Pennsylvania has the most significant contacts and interests with respect to the equitable estoppel claim. Pennsylvania law applies to the equitable estoppel claim here, and requires its dismissal.

J.      *Unjust Enrichment Claims*
        *(Claims 45-47)*

In claims 45-47, the Creditors' Committee charges the bank lenders under the UCA/HHC, CCH and Olympus co-borrowing facilities with unjust enrichment. The Creditors' Committee alleges that the bank lenders knowingly approved and authorized funding under facilities structured to allow the Rigases to use facility proceeds for their own benefit with no benefit to the Debtors, and that the RFE co-borrowers contributed a disproportionately small number of assets for repayment under these facilities. The Creditors' Committee further alleges that the lenders received security interests and principal and interest payments from the Debtors on funds drawn by the Rigases despite the lenders' knowledge of the Rigases' abuse of facilities. As a result, the Creditors' Committee argues, the lenders were unjustly enriched.

The bank lenders argue that the Creditors' Committee may not recover on its unjust enrichment claim because the existence of written credit agreements precludes

---

[232]        *See*, *e.g.*, *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990).

such a quasi-contractual remedy.  The Creditors' Committee offers no legal arguments to counter the bank lenders' assertions.

The Court agrees with the bank lenders contentions in this regard, and must dismiss the unjust enrichment claims.  Under Pennsylvania law, which, once more, the Court believes it should apply, a court may not make a finding of unjust enrichment where a written or express contract between the parties exists.[233]

Here the lenders allegedly were unjustly enriched when they received security interests and repayments from the Debtors, which repayments were made (and funds borrowed) *pursuant to the credit agreements*.  The Creditors' Committee may not seek a quasi-contractual remedy where the bank lenders lent the money and performed on written agreements, the existence of which is undisputed.

K.    *Preference Claims*
      *Claims 43 (Century-TCI)*
      *Claim 44 (Parnassos)*
      *Claim 49 (FrontierVision)*
      *Claim 50 (CCH)*
      *Claim 51 (Olympus)*
      *Claim 52 (UCA/HHC))*

Several of the bank lenders have also been named as defendants in garden variety section 547 preference claims.  If facts turn out to be true as facts outside the complaint now suggest that they might, the preference claims ultimately may not survive.  But for now, 12(b)(6) motions must be denied.

Bank of Nova Scotia, the administrative agent on the Parnassos facility, argues that review of the repayments demonstrates that they were ordinary course payments, which, if established, would constitute an affirmative defense to the claims.  It also

---

[233]    *See Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999).

argues there is no issue about the Parnassos borrowers' insolvency, contending that the Parnassos borrower was a "cash cow."[234]  Citibank, the administrative agent on the Century-TCI facility, makes similar arguments.

These arguments may ultimately turn out to have merit, but they raise factual issues, inappropriate for determination on a motion under Rule 12(b)(6).  The Parnassos and Citibank's motions to dismiss under Rule 12(b)(6) are denied, without prejudice to consideration under Rule 56 or as development of the factual record might otherwise warrant.

The Creditors' Committee also alleges that in the 90 days preceding the Debtors' bankruptcy filings, the lenders in the UCA/HHC and Olympus facilities filed UCC financing statements to perfect their security interests, and that to the extent transfers in connection with those facilities were not fraudulent transfers, they were preferential. Once more, defenses to them—*e.g.*, based on lack of insolvency—are essentially factual. Dismissal under Rule 12(b)(6) on factual contentions is inappropriate.

The Creditors' Committee similarly alleges that in the 90 days preceding the Debtors' bankruptcy filings, the lenders in the FrontierVision facility also filed UCC financing statements to perfect their security interests, and that the perfection of those security interests was a voidable preference.  Their administrative agent, Chase, moves to dismiss those preference claims, making a number of factual arguments, *e.g.*, that that the newly filed security interests related only to "marginal pieces of collateral,"[235] that the bank lenders were secured by liens on hard assets (rather than the stock of particular

---

[234]     Hrg. Tr. Day 2 at 15.

[235]     Hrg. Tr. Day 2 at 39.

Debtors),[236] and that the FrontierVision lenders were oversecured in any event.

Therefore, Chase argues, while uncertain intercompany obligations might have to be

taken into account for the insolvency analysis as to payments to other bank lenders, they

are inapplicable here, and there should be no basis for finding insolvency on the part of

the FrontierVision debtors, or for asserting that the FrontierVision lenders received any

more than they would receive in a liquidation.  Chase also argues, by supplemental

submission, that the recent effectiveness of the reorganization plan for the FrontierVision

debtors, among others, under which unsecured creditors of the Debtors liable under the

FrontierVision facility were paid in full, defeats the allegations of insolvency.

It might well be the case that if Chase's factual assertions turn out to be true, it

will have no preference exposure.  But at this point the Court lacks the factual predicate

to confirm that the perfection of the security interests within the preference period related

only to marginal pieces of collateral, and hence was inconsequential.  And while the

Court's knowledge, with hindsight, of the subsequent confirmation and effectiveness of

the FrontierVision debtors' reorganization plan—under circumstances where unsecured

creditors those debtors did indeed receive payment in full (seemingly inconsistent with

insolvency)—strongly suggests that there would be no viable preference claims here, the

Court's skepticism as to these claims, or even inclination to disbelieve them, is

---

[236]    In argument that may have been addressed to its 12(b)(6) motion or that may have been addressed
only to its *Housecraft* points, Chase has also emphasized that the FrontierVision facility was  put
into place before the co-borrowing facilities, and was not being a co-borrowing facility itself.  (*See*
Hrg. Tr. Day 2 at 33-35.)  But these points, which are relevant to torts such as alleged aiding and
abetting, are not relevant to "no-fault" preference claims.

insufficient to dismiss these claims on a 12(b)(6) motion.[237]  They can be reexamined

with a fuller factual record, under Rule 56 or otherwise.

L.      *Declaratory Judgment Claims*
        *(Claim 41 (CCH Facility)*
        *Claim 42 (Olympus Facility))*

        In Claims 41 and 42, the Creditors' Committee seeks declaratory judgments

limiting the Debtors' duty to repay the debt on the CCH and Olympus facilities,

respectively.  The Creditors' Committee refers to provisions in the loan documents for

each of those facilities providing, in substance, that the repayment obligations under each

such facility would not exceed the amount permitted by fraudulent transfer laws.  So far

as the Court can tell, the affected Defendants did not move to dismiss those claims.  They

will rise or fall with the fraudulent transfer claims themselves.

M.      *Sabres Claims*
        *(Claims 17-24)*

        In Claims 17 through 24, the Creditors' Committee asserts claims against banks

Fleet, Key Bank and HSBC, in connection with loans they made to the Debtors, and

payments they received from the Debtors, in connection with the Buffalo Sabres hockey

team (owned by Niagara Frontier Hockey L.P.), in which the Rigases once had an

interest.  Niagara Frontier filed a chapter 11 case in the Western District of New York,

before Bankruptcy Judge Michael Kaplan, and the Sabres were ultimately sold in a

section 363 sale, to an unrelated third-party purchaser, in the *Niagara Frontier*

bankruptcy case.

---

[237]     *See Bell Atlantic*, 2007 WL 1461066, at *8 ("Rule 12(b)(6) does not countenance ... dismissals
based on a judge's disbelief of a complaint's factual allegations") (quoting *Neitzke v. Williams,*
490 U.S. 319, 327 (1989)).

Upon the agreement of the parties and with the approval of this Court, Judge Kaplan was authorized to, and did, issue rulings in connection with Claims 17 through 24.[238]  Accordingly, this Court does not address those claims.  This Court recognizes that Judge Kaplan, after ruling on the issues he did, returned claims that he found still to be viable to this Court.  To the extent that Judge Kaplan permitted claims to survive, any other defenses to them, or motions with respect to them (*e.g.*, motions to sever, if HSBC or Key so moves), may be considered in later proceedings in this case.

III.

Remaining Contentions

The Court has considered the other contentions made by various of the Defendants—including, among others, claims of failures to make sufficiently particularized allegations against individual Defendants, claims of insufficient detail in pleading and constitutional defenses—and finds them to be without merit.[239]

Conclusion

For the foregoing reasons, the motions are determined in accordance with the table attached.

SO ORDERED.

Dated: New York, New York              *s/Robert E. Gerber*
       June **11** , 2007              United States Bankruptcy Judge

---

[238]   *See Niagara Frontier Hockey, L.P. v. HSBC Bank USA (In re Niagara Frontier Hockey, L.P.)*, Case No. 03-10210; AP No. 03-1292 K (Bankr. W.D.N.Y. Mar 2, 2007) ("*Niagara Frontier Hockey*").

[239]   Likewise, the Court has considered the Creditors' Committee's request to replead in connection with all dismissed claims.  The Court has granted leave to replead to the extent, but only to the extent, to which it regards such as appropriate.

85

**See Attachment for Dispositions as to Particular Claims**